## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REBECCA BROWN and AUGUST
TERRENCE ROLIN, on behalf of
themselves and all others similarly situated,

    *Plaintiffs*,

v.

TRANSPORTATION SECURITY
ADMINISTRATION;

DAVID P. PEKOSKE, Administrator,
Transportation Security Administration,
in his official capacity;

DRUG ENFORCEMENT
ADMINISTRATION;

UTTAM DHILLON, Acting Administrator,
Drug Enforcement Administration, in his
official capacity;

"STEVE" LAST NAME UNKNOWN,
Agent, Drug Enforcement Administration, in
his individual capacity; and

UNITED STATES OF AMERICA,

    *Defendants*.

Civil Action No. _____

**COMPLAINT – CLASS ACTION**

**JURY DEMANDED**

## CLASS COMPLAINT FOR CLASS-WIDE DECLARATORY AND INJUNCTIVE RELIEF AND FOR INDIVIDUAL RELIEF OF RETURN OF PROPERTY AND COMPENSATORY DAMAGES

**Introduction**

1.     This civil rights lawsuit asks whether the government may seize a 79-year-old man's life savings without any indication of criminal activity, pursuant to unlawful and unconstitutional federal agency policies or practices that violate the rights of thousands of air travelers each year.

2.     In addition to seeking the return of their unconstitutionally seized cash and compensatory damages, Named Plaintiffs Rebecca Brown and August Terrence "Terry" Rolin seek declaratory and injunctive relief on behalf of a nationwide class of individuals who have been or will be subjected to unlawful and unconstitutional cash seizure policies or practices at airports across the country.

3.     The Transportation Security Administration ("TSA") and the Drug Enforcement Administration ("DEA") have policies or practices of seizing cash from travelers at airports without reasonable suspicion or probable cause and based solely on the amount of cash. TSA's policy or practice exceeds the agency's statutory authority and violates the Fourth Amendment. DEA's policy or practice violates the Fourth Amendment.

4.     In late August 2019, Terry entrusted his daughter, Rebecca, with $82,373 in cash—his and his parents' life savings—so she could deposit it into a new bank account for him. They planned to use the money for his health care and other needs, including replacing his teeth and fixing his truck.

5.     Rebecca was visiting Pittsburgh for the weekend to see Terry and attend a family celebration. She intended to fly back to her home in Massachusetts with the cash and deposit it into a new joint bank account. She placed the cash in a purse in her carry-on luggage and went to the Pittsburgh airport early in the morning on August 26, 2019. She did not check any luggage.

1

6.     When she went through TSA transportation security screening at the Pittsburgh airport, TSA Screeners pulled aside Rebecca's carry-on luggage solely because they observed via X-Ray that it contained a "large" amount of cash. They did not further inspect her carry-on luggage or the cash to see if it was concealing any dangerous or prohibited items.

7.     After the TSA Screeners completed the security screening of Rebecca's carry-on luggage containing her cash, they told her they were going to hold on to her luggage until law-enforcement officers could arrive.

8.     The TSA Screeners questioned Rebecca about why she had so much cash in her carry-on luggage and asked her to produce her ID and proof of her travel arrangements to and from Pittsburgh. Rebecca provided her ID and boarding passes, which the TSA Screeners took and photocopied.

9.     Rebecca did not feel free to leave and believed she was being held by TSA. Even if the TSA Screeners had told her she was free to leave, she could not realistically have left her carry-on luggage with her father's life savings and her other possessions. She was, in fact, effectively seized along with her luggage.

10.     As determined by TSA's transportation security screening, Rebecca had no items that could threaten transportation security—weapons, explosives, or incendiaries—in her luggage or on her person. She also had no illegal drugs or any other contraband.

11.     There was no indication of suspicious or criminal activity in Rebecca's behavior or the way she was traveling with cash, which was in a purse in her carry-on luggage.

12.     Nevertheless, after TSA seized her and her luggage for approximately 10-20 minutes, Rebecca was questioned by a Pennsylvania state trooper and then by his supervisor about why she was traveling with the cash.

13.     Rebecca was honest and forthcoming with the troopers and explained that she was taking the cash home with her to deposit in a new bank account for her father. After answering their questions, Rebecca was eventually allowed to leave with her carry-on luggage, including the cash.

14.     But after she arrived at her boarding gate, the same trooper and a DEA agent approached her, pulled her aside, and questioned her further about the cash. She truthfully explained to the DEA agent that she was traveling with the cash to deposit it in the bank for her father and why she was doing so.

15.     Despite Rebecca's explanation, and without probable cause, the DEA agent seized Terry's life savings because it was greater than $5,000 and was thus considered a "suspicious" amount under DEA's policy or practice regarding the seizure of cash from travelers at airports.

16.     DEA has continued to hold Terry's life savings since August 26, 2019, and has taken actions to permanently keep the money using civil forfeiture.

17.     Neither Terry nor Rebecca has been arrested for or charged with any crime.

18.     The initial and continued seizure of Terry's life savings since August 26, 2019, has prevented him from replacing his teeth and repairing his truck, among other expenses.

19.     Terry's and Rebecca's story is not unique. What happened to them illustrates the systematic policies or practices of TSA and DEA: seizing cash from air travelers based solely on the presence of what these agencies believe to be "large" or "suspicious" amounts of cash.

20.     These policies or practices of TSA and DEA violate the Fourth Amendment.

21.     TSA's policy or practice also exceeds TSA's statutory authority, which is limited to transportation security and does not extend to investigating potential crimes unrelated to transportation security.

22.     On behalf of themselves and others similarly situated, Terry and Rebecca bring this class-action lawsuit to recover their property and put these systematic unlawful and unconstitutional policies and practices to an end.

### Jurisdiction

23.     This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

24.     Plaintiffs bring their class-wide statutory and Fourth Amendment claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the United States Constitution.

25.     Plaintiffs bring their individual claim for the return of seized property under Federal Rule of Criminal Procedure 41(g) and this Court's general equity jurisdiction under 28 U.S.C. § 1331.

26.     Plaintiffs bring their individual Fourth Amendment claim for compensatory damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

### Venue

27.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(b)(2) and 1391(e)(1)(B) and Federal Rule of Criminal Procedure 41(g) because Defendants' unlawful and unconstitutional conduct occurred, and on information and belief continues to occur, in Pittsburgh, Pennsylvania.

### Parties

#### A.  Named Plaintiff Rebecca Brown

28.     Named Plaintiff Rebecca Brown is an adult citizen of the United States and is a resident of Lowell, Massachusetts.

29.     Rebecca is the daughter of Named Plaintiff August Terrence "Terry" Rolin.

30.     Rebecca has joint ownership with Terry of the $82,373 in U.S. currency that Defendants seized on August 26, 2019. She also had a possessory interest in the cash on the day of the seizure.

31.     Rebecca, with Terry, brings:

    a.  Three class-wide claims for declaratory and injunctive relief on behalf of individuals whose currency, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by Defendants;

    b.  Two individual claims for the return of their seized cash, with interest, and for compensatory damages.

**B.  Named Plaintiff August Terrence Rolin**

32.     Named Plaintiff August Terrence Rolin ("Terry") is an adult citizen of the United States and is a resident of Morgan, Pennsylvania.

33.     Terry is a 79-year-old retiree and is the father of Named Plaintiff Rebecca Brown.

34.     Terry has joint ownership with Rebecca of the $82,373 in U.S. currency that Defendants seized on August 26, 2019.

35.     Terry, with Rebecca, brings:

    a.  Three class-wide claims for declaratory and injunctive relief on behalf of individuals whose currency, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by Defendants;

    b.  Two individual claims for the return of their seized cash, with interest, and for compensatory damages.

### C.  Defendant Transportation Security Administration ("TSA")

36.     TSA is a federal agency charged with protecting the nation's transportation systems, particularly air travel. 49 U.S.C. § 114(d)-(e).

37.     TSA is not a general law-enforcement agency. Most of its employees are not law-enforcement officers and do not have general law-enforcement authority or duties.

38.     Pursuant to its statutory mandate, TSA conducts transportation security screenings of passengers and their luggage at U.S. airports. *See* 49 U.S.C. §§ 114(e), 44901.

39.     TSA must promulgate regulations requiring air carriers to refuse to transport a passenger or their luggage if the passenger "does not consent to a search under section 44901(a) of this title establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance" or if the passenger "does not consent to a search of the property establishing whether the property unlawfully contains a dangerous weapon, explosive, or other destructive substance." 49 U.S.C. § 44902(a)(1)-(2).

40.     TSA conducts the transportation security screenings described in 49 U.S.C. § 44902(a).

41.     Pursuant to its statutory mandates, TSA's authority to conduct transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5.

42.     TSA employees who conduct these transportation security screenings at airports ("TSA Screeners") include Transportation Security Officers and Supervisory Transportation Security Officers.

43.     TSA Screeners are not law-enforcement officers, do not have general law-enforcement authority or duties, and are not permitted to engage in general law-enforcement investigations.

44.     Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law-enforcement purposes.

45.     In contravention of this limited authority and duties, upon information and belief, TSA Screeners follow a TSA policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons *after* TSA Screeners have concluded the transportation security screening and determined that no items that pose a threat to transportation security are present.

46.     Upon information and belief, TSA Screeners base these seizures on whether the traveler appears to be traveling with a "large" amount of currency.

47.     Upon information and belief, what TSA Screeners consider to be a "large" amount of currency may vary, but is usually approximately $10,000 or more, or what appears to TSA Screeners to be approximately $10,000 or more, based on visual inspection or the X-Ray image of carry-on luggage.

48.     Upon information and belief, TSA Screeners make these seizures without regard for whether reasonable suspicion or probable cause exists for the seizures.

49.     Upon information and belief, TSA Screeners make these seizures in order to hold the traveler's currency, carry-on luggage, personal effects, and/or person until law-enforcement officers can arrive and investigate.

50.     Upon information and belief, TSA has been engaging in this policy or practice for the entirety of the period described in Plaintiffs' proposed TSA Class definition.

51.     Upon information and belief, pursuant to this policy or practice, TSA seized Terry's and Rebecca's cash, Rebecca's carry-on luggage and its contents, Rebecca's ID and boarding passes, and Rebecca herself on August 26, 2019.

**D.  Defendant David P. Pekoske**

52.     Defendant Pekoske is the current Administrator of TSA.

53.     As Administrator of TSA, Pekoske is responsible for overseeing the operations of TSA, including the policy or practice at issue here.

54.     Pekoske is sued in his official capacity.

**E.  Defendant Drug Enforcement Administration ("DEA")**

55.     DEA is a federal agency charged with enforcing the controlled substances laws and regulations in the United States. 21 U.S.C. § 878.

56.     A substantial portion of DEA's activities involve the seizure of currency that it believes is connected to controlled substances, including at airports across the country.

57.     Upon information and belief, DEA follows a policy or practice of seizing currency from travelers at U.S. airports without probable cause, based solely on the presence of currency on their person or in their carry-on luggage.

58.     Upon information and belief, DEA follows a policy or practice of seizing currency from travelers at U.S. airports without probable cause, based solely on the presence of $5,000 or more on their person or in their carry-on luggage.

59.     Upon information and belief, after seizing currency from air travelers in this manner, DEA typically attempts to initiate the civil forfeiture of the property under the Civil Asset Forfeiture Reform Act ("CAFRA").

60.     Upon information and belief, DEA has been engaging in this policy or practice of seizing currency from travelers at U.S. airports without probable cause for the entirety of the period described in Plaintiffs' proposed DEA Class definition.

61.     Upon information and belief, pursuant to DEA's policy or practice, one or more DEA agents seized Terry's and Rebecca's cash on August 26, 2019.

**F.  Defendant Uttam Dhillon**

62.     Defendant Dhillon is the current Acting Administrator of DEA.

63.     As Acting Administrator of DEA, Dhillon is responsible for overseeing the operations of DEA, including the policy or practice at issue here.

64.     Dhillon is sued in his official capacity.

**G.  Defendant DEA Agent "Steve," Last Name Unknown**

65.     Upon information and belief, the DEA agent who, pursuant to the DEA policy or practice described above, seized Terry's and Rebecca's cash on August 26, 2019, in violation of their Fourth Amendment rights is named Steve, last name unknown ("Steve").

66.     Upon information and belief, DEA Agent Steve's phone number is 412-475-3678.

67.     Steve's full identity is currently unknown, but Plaintiffs expect that his identity will be uncovered in the course of discovery.

68.     Steve is sued in his individual capacity pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

**H.  Defendant United States of America**

69.     Defendant United States of America is the national federal government established by the United States Constitution. As such, it is subject to limitations imposed by the Constitution—including, as relevant here, the Fourth Amendment.

70.     The constitutional violations at issue here involve the actions of federal agencies and employees and are therefore ultimately chargeable to the federal government itself.

**Factual Allegations**

**A.  Terry and his family stored cash in their family home.**

71.     Terry is 79 years old and lives in Morgan, Pennsylvania.

72.     Terry grew up in a mining community southwest of Pittsburgh, where his parents purchased the family home in South Fayette, Pennsylvania, in the 1920s with money earned from his father's mining wages.

73.     After graduating from college in the 1960s, Terry worked for a railroad company until workplace knee and shoulder injuries forced him to retire in 1994. Since 1994, Terry has been receiving Railroad Retirement benefits.

74.     In 2005, after his wife passed away, Terry moved back into the family home with his mother.

75.     When his mother passed away in 2006, Terry purchased the family home from his other family members and continued living there.

76.     Terry's parents lived through the Great Depression, so instead of keeping most of their money in bank accounts, they had a habit of storing cash in envelopes hidden throughout the family home, particularly in the unfinished basement.

77.      Terry adopted this same habit long ago, and after moving back into the family home, he continued to store cash there.

78.     Each month since his retirement, Terry receives about $2,700 in Railroad Retirement payments deposited into his PNC bank account.

79.     Terry regularly withdrew a portion of his Railroad Retirement payments from the bank and stored the cash in the family home, stuffed into envelopes. Generally, these envelopes of cash were stored in spaces between the walls and rafters in the unfinished basement.

80.     Envelopes of cash hidden by Terry's mother were also still in the family home at the time of her passing.

81.     Over the years, between envelopes of cash stashed away by Terry and his mother, tens of thousands of dollars accumulated within the walls of the family home.

82.     In 2018, Terry and Rebecca decided that with Terry's progressing age and declining health, the family home was too much for him to maintain.

83.     Terry sold the longtime family home in November 2018, and moved into a small apartment located in Morgan, Pennsylvania. He still lives in the apartment.

84.     In the course of Terry's move, the cash stored in the family home was placed into various moving boxes, dispersed somewhat sporadically throughout Terry's belongings as more envelopes of cash turned up in the crevices of the family home.

85.     Because of his health problems, Terry took months to slowly unpack his belongings in his new apartment. While unpacking, he would periodically find the envelopes of cash. He eventually stored all of the cash in one large tupperware container in the apartment.

86.     Terry continues to occasionally store cash in his new apartment.

**B. Terry entrusted the stored cash with his daughter, Rebecca.**

87.     After a substantial amount of cash accumulated in the tupperware container, Terry became concerned about the security of his family's life savings. To better safeguard his family's life savings, Terry asked his family for help.

88.     In August 2019, Terry's daughter, Rebecca, who lives in Massachusetts, flew to Pittsburgh for the weekend for her brother's wedding reception and to visit with Terry.

89.     Rebecca, who works full time, was only in town for the weekend; she arrived on Friday, August 23, 2019, and departed early on the morning of Monday, August 26, 2019.

90.     Terry decided that he should give Rebecca power of attorney so that she could help care for him.

91.     Terry and Rebecca also decided the best course of action would be to deposit the cash into a new joint bank account shared with Rebecca so that she could help him use the money to pay for his much-needed dental care and to fix his truck, among other health care needs and projects.

92.     Terry and Rebecca would have joint ownership of and access to the new bank account, but the primary purpose of the account would be to help with Terry's health care and other expenses.

93.     Terry and Rebecca only finalized their plan for the cash on Saturday after the banks had closed, and Rebecca was not able to take physical possession of the cash until Sunday night.

94.     There was no time for Rebecca to deposit the cash in a bank before her flight left on Monday morning, so she planned to take it with her and deposit it in the new bank account after she arrived back home in Massachusetts.

95.     Rebecca was excited to use the funds to improve her aging and ailing father's quality of life. Some of the money was immediately earmarked for urgent dental care—namely replacing Terry's teeth and caring for his gum disease—and for fixing Terry's old truck, which is his primary mode of transportation and is badly in need of repairs.

96.     With Terry's consent, some of the money was also earmarked to pay off a tax debt Rebecca owes the IRS.

97.     Rebecca and one of her brothers also decided to give their father something his life was lacking: a hobby. They planned to use some of the money to buy Terry an old hobby truck to repair and tinker with.

98.     Rebecca's brother found a 1972 Chevrolet C10 Stepside for sale online that Rebecca was going to look at the following weekend. They were excited to give their father a hobby to keep him engaged and occupied in his later years.

99.     Terry did not know that his children were planning to buy him a hobby truck as a surprise.

### C.  TSA seized Terry's and Rebecca's cash at the transportation security screening checkpoint.

100.    Rebecca had an early flight back to Boston, Massachusetts, departing from Pittsburgh International Airport on the morning of August 26, 2019.

101.    Because she did not have time to deposit the cash before leaving Pittsburgh, Rebecca researched on the Internet whether she could lawfully fly with the cash. She learned that flying domestically with any amount of cash is legal.

102.    She packed Terry's cash inside a purse in her carry-on luggage, which was a beach bag with her belongings. She did not bring any luggage to check.

103.    When she got to the airport, Rebecca was directed to an alternate transportation security screening checkpoint several minutes away from the primary transportation security screening checkpoint.

104.    While she went through the transportation security screening checkpoint, a TSA Screener was alerted to the presence of cash in Rebecca's luggage.

105.    Upon information and belief, a TSA Screener saw the cash in the X-Ray image of Rebecca's carry-on luggage.

106.    Rebecca's carry-on luggage was pulled aside by TSA Screeners, but no TSA Screener ever opened or physically inspected Rebecca's carry-on luggage or the purse inside containing the cash.

107.    Upon information and belief, the TSA Screeners had no safety concerns about Rebecca's carry-on luggage, as evidenced by that fact that no TSA Screener ever physically examined the contents of her carry-on luggage or the purse inside containing the cash.

108.    Upon information and belief, TSA had completed its transportation security screening at this point.

109.    After Rebecca's carry-on luggage was pulled aside, a TSA Screener questioned Rebecca about the cash inside. Rebecca explained why she had the cash—that she was taking it to deposit in a bank account for her father, who had accumulated the cash in savings.

110.    A TSA Screener also asked her for her ID and proof of her travel arrangements to and from Pittsburgh. Rebecca provided her ID and boarding passes, as requested. A TSA Screener took the documents she provided and photocopied them.

111.    Upon information and belief, TSA was pursuing no transportation security objectives when TSA Screeners questioned Rebecca about the cash, demanded her travel documents and ID, and photocopied those documents.

112.    Upon information and belief, TSA was pursuing no transportation security objectives when TSA Screeners seized Rebecca's carry-on luggage and cash and held it until law enforcement arrived.

113.     Rebecca was not permitted to retrieve her carry-on luggage and continue to her gate.

114.     Rebecca did not feel free to leave. She believed that both she and her luggage were being held by TSA. TSA Screeners also had her ID and boarding passes.

115.     Even if TSA had told her she was permitted to leave, it would not have been practical or reasonable for Rebecca to leave the transportation security screening checkpoint without her and her father's cash, her carry-on luggage and its contents, and her ID.

116.     Upon information and belief, the mere presence of the cash in Rebecca's carry-on luggage was the only reason that the TSA Screeners seized Rebecca's carry-on luggage and cash, seized Rebecca herself, questioned her about the cash, and asked for her ID and proof of her travel arrangements to and from Pittsburgh.

117.     Upon information and belief, based solely on the presence of the cash in Rebecca's carry-on luggage, the TSA Screeners called a Pennsylvania state trooper to the scene.

118.     TSA made Rebecca wait approximately 10-20 minutes for the state trooper to arrive while TSA held her and her father's cash, her carry-on luggage and its contents, and her ID and boarding passes.

119.     During this period of time, Rebecca's and her father's cash, Rebecca's carry-on luggage and its contents, and Rebecca's ID and boarding passes were seized by TSA.

120.     During this period of time, Rebecca herself was also seized by TSA.

121.     When the state trooper finally arrived, he again questioned Rebecca. She repeated her explanation of the cash's origin, purpose, and destination.

122.     The state trooper then called his supervisor, a lieutenant, and Rebecca had to wait an additional 10-15 minutes to repeat herself a third time to the lieutenant.

123.    After this third round of questioning, the TSA Screeners permitted Rebecca to retrieve her carry-on luggage, cash, and other possessions, and resume her trip.

124.    By the end of these encounters, TSA had held Rebecca and her possessions for approximately 30 minutes or more.

125.    Rebecca found it extremely embarrassing to be held and questioned for approximately 30 minutes or more in front of other travelers because it appeared she had done something wrong or illegal.

126.    Despite these delays, Rebecca made it to her gate with time to spare and began working on her laptop.

**D. DEA seized Terry's and Rebecca's cash.**

127.    But Rebecca was soon approached at the gate by the same state trooper who questioned her earlier, this time accompanied by another man in a blue polo shirt.

128.    The man in the blue polo said his name was Steve, that he was a DEA agent, and that he had some questions for her.

129.    Rebecca felt like she had no choice but to comply with his demands.

130.    The two men escorted Rebecca to a less crowded part of the gate area to question her.

131.    Rebecca did not feel free to leave. She also needed to remain near the gate in order to board her flight.

132.    Steve asked Rebecca to show him the cash in the purse in her carry-on luggage. Rebecca felt like she had no choice but to comply with his demands and showed him the cash.

133.    Upon information and belief, Steve decided to seize the cash as soon as he saw the amount, pursuant to DEA's policy or practice of seizing currency totaling more than $5,000 when

found in the possession of travelers at airports regardless of whether there is probable cause for the seizure.

134.    Steve then questioned Rebecca about why she was traveling with the cash. For the fourth time, Rebecca explained the origins of the cash and why she was traveling with it.

135.    After hearing Rebecca's explanation, Steve asked to speak with Terry to verify what she had just told him.

136.    Rebecca informed Steve that her father was elderly, would still be asleep at 7:00 a.m., and would likely be confused by the call, but Steve insisted that she call Terry so that Steve could talk to him.

137.    Terry has age-related memory and cognitive issues, and he typically sleeps until late morning or noon. Terry was woken up by the phone call and was groggy, confused, and upset when he answered the phone.

138.    Terry also did not know that his children were planning to buy him a surprise hobby truck, so he could not corroborate those facts.

139.    For these reasons—Terry being awoken several hours early; Terry's cognitive issues; and Terry being unaware of Rebecca's planned surprise—Terry had difficulty answering all of Steve's questions.

140.    After speaking with Terry, Steve told Rebecca that "your answers don't match."

141.    Steve then took the cash and searched the rest of Rebecca's beach bag.

142.    Steve seized all of Terry's and Rebecca's cash, totaling $82,373 in U.S. currency.

143.    Rebecca was not arrested or charged with any crime, and was finally permitted to board her flight to Boston, deeply embarrassed by her fellow passengers and other onlookers

staring at her during this entire encounter because it appeared she had done something wrong or illegal.

144.    Rebecca was the last passenger to board her flight and was not able to call her father before her flight departed. When she landed, she had several missed calls and voicemails from her distraught father, who did not know what was happening to his daughter or where she may have been taken.

145.    Terry and Rebecca have been unable to recover their money for more than four months.

146.    Terry and Rebecca received CAFRA notices for the entire $82,373 dated October 11, 2019, from DEA indicating DEA's intention to permanently keep their cash through civil forfeiture.

147.    Upon information and belief, Terry's and Rebecca's cash was seized and is being forfeited without any articulable reasonable suspicion or probable cause.

148.    Upon information and belief, at the time of the seizure, neither Terry nor Rebecca was under investigation for any criminal activity.

149.    Neither Terry nor Rebecca has been arrested for or charged with any crime related to or arising from any circumstances surrounding the seizure of their cash.

150.    It is not a crime to travel with any amount of currency, and there are no legal requirements to report to the government that one is traveling domestically with any amount of currency.

### Individual Injuries to the Named Plaintiffs

151.    Terry and Rebecca have a joint ownership interest in the $82,373 in cash that Defendants seized and that DEA seeks to forfeit.

152.    Rebecca also has a possessory interest in the seized cash.

153.    TSA's *ultra vires* and unconstitutional seizure of Terry's and Rebecca's cash after the transportation security screening had concluded violated their Fourth Amendment rights to be free from unreasonable seizures.

154.    TSA's *ultra vires* and unconstitutional seizure of Rebecca's carry-on luggage, ID, boarding passes, and other possessions after the transportation security screening had concluded violated her Fourth Amendment right to be free from unreasonable seizures.

155.    TSA's *ultra vires* and unconstitutional seizure of Rebecca's cash, carry-on luggage, ID, boarding passes, and other possessions after the transportation security screening had concluded constituted a seizure of Rebecca herself and violated her Fourth Amendment right to be free from unreasonable seizures.

156.    DEA's unconstitutional seizure of Terry's and Rebecca's cash violated and continues to violate their Fourth Amendment rights to be free from unreasonable seizures.

157.    DEA's continued and ongoing seizure of Terry's and Rebecca's money constitutes an ongoing injury to Terry and Rebecca.

158.    Throughout the time Terry's and Rebecca's cash has been in DEA's possession, Terry and Rebecca have been unable to make use of their money.

159.    Terry's and Rebecca's inability to use the seized money has resulted in ongoing pain and suffering to Terry and Rebecca, including but not limited to Terry's inability to pay to replace his teeth, care for his gums, and fix his truck.

160.    Terry is suffering serious physical pain caused by not being able to replace his teeth. It is painful for him to eat, and he can only eat soft foods that he does not have to chew. But for the seizure of the cash, Terry and Rebecca would have spent some of the money on dental

procedures to replace Terry's teeth and care for his gums so that he could eat normally and without pain.

161. Terry is suffering from the deprivation of the financial resources to repair his truck, which is badly rusted and needs a new body and interior repairs. But for the seizure of the cash, Terry and Rebecca would have spent some of the money to repair Terry's truck, which is his primary mode of transportation.

162. Terry is suffering from the ongoing deprivation of the enjoyment and use of his life savings, materially impacting his quality of life. But for the seizure of the cash, Rebecca would have spent some of the money to buy Terry a hobby truck to tinker with, and they would have spent some of the money on other expenses that would improve Terry's quality of life, such as health care.

163. Rebecca's inability to use the money has deprived her of the planned payment of her tax debt, which is accordingly accruing interest. But for the seizure of the cash, Rebecca would have paid off her tax debt and it would not have continued to accrue interest.

164. Terry suffered emotional distress, pain, and suffering caused by the stress of not knowing what happened to his daughter for several hours on the day of the seizure.

165. Terry continues to suffer emotional distress, pain, and suffering caused by the ongoing deprivation of his and his parents' life savings.

166. Rebecca suffered and continues to suffer emotional distress, pain, and suffering caused by the insult and humiliation of the circumstances and manner of the unlawful seizure of her and her father's cash and life savings.

167. Rebecca suffered and continues to suffer emotional distress, pain, and suffering caused by her father's ongoing physical pain and suffering due to not having the dental and medical

care he needs, and from her concerns about her father's safety while driving his truck, which is badly in need of repairs.

168.    Terry and Rebecca have been deprived of their preferred method of managing and moving Terry's cash once it accumulates again or when Terry finds additional envelopes of cash as he continues unpacking moving boxes. Because Rebecca regularly visits Terry over the weekend, when banks are typically closed, it would be easiest for her to simply take the cash back home with her and deposit it when the bank opens.

169.    But for the seizure of their cash at the Pittsburgh airport on August 26, 2019, Rebecca would continue to fly home to Massachusetts with the cash and deposit it there to ensure that it is deposited in the correct accounts and to avoid the re-accumulation of a large amount of cash in Terry's apartment.

### TSA Class Action Allegations

170.    Congress gave TSA statutory authority to operate under 49 U.S.C. § 114, which makes the agency "responsible for security in all modes of transportation." 49 U.S.C. § 114(d). This includes the authority to conduct air transportation security screening operations. 49 U.S.C. § 114(e). TSA is statutorily charged with developing "policies, strategies, and plans for dealing with threats to transportation security." 49 U.S.C. § 114(f)(3).

171.    TSA's authority over air transportation security is set forth in 49 U.S.C. § 44903.

172.    TSA's authority to screen passengers and property is set forth in 49 U.S.C. § 44901.

173.    TSA's statutory authority is so narrowly limited to these purposes that Congress felt it was necessary to specifically authorize TSA to keep loose change and other money that is incidentally left behind at transportation security screening checkpoints. *See* 49 U.S.C. § 44945.

174. Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law-enforcement purposes.

175. TSA's screening procedures are designed to assess whether air passengers or their luggage are a threat to transportation security by screening for dangerous items.

176. The scope of TSA transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5; *see also* 49 U.S.C. § 44902.

177. Air travelers "may not have a weapon, explosive, or incendiary, on or about the individual's person or accessible property." 49 C.F.R. § 1540.111.

178. A weapon, explosive, or incendiary is specifically defined by TSA in an exhaustive list at 70 Fed. Reg. 9878 (Mar. 1, 2005), *available at* https://www.govinfo.gov/content/pkg/FR-2005-03-01/pdf/05-3977.pdf. TSA's exhaustive list of defined weapons, explosives, or incendiaries does not include "cash," "currency," or "money."

179. Once TSA Screeners have determined that none of the defined prohibited items are present and that the traveler and their carry-on luggage and personal effects do not present a threat to transportation security, the transportation security screening has concluded, and TSA Screeners do not have authority to further detain the traveler, their carry-on luggage, or their personal effects.

180. Currency is not a weapon.

181. Currency is not an explosive.

182. Currency is not an incendiary.

183. Currency is not a threat to transportation security or air travel safety.

184.    Air travelers carrying large amounts of currency do not, on that basis, present any threat to transportation security or air travel safety.

185.    No statute or regulation identifies "cash" or "currency" as a threat to transportation security or air travel safety.

186.    No statute or regulation identifies "cash" or "currency" as a dangerous or prohibited item for air travelers.

187.    TSA provides an online list of items which are, or are not, prohibited. *See* Transportation Security Administration, *What Can I Bring?*, https://www.tsa.gov/travel/security-screening/whatcanibring/all-list (last visited Jan. 10, 2020). There are currently 457 items on the list.

188.    Nowhere on this list of 457 items are "cash," "currency," or "money" mentioned, let alone identified as prohibited items.

189.    TSA Operations Directive 400-54-6 (Oct. 29, 2009) and TSA Management Directive No. 100.4 (Sept. 1, 2009) are agency policies that purport to provide binding guidance to TSA Screeners regarding their statutory and regulatory authority and duties with respect to the detection of currency at transportation security screening checkpoints.

190.    TSA admits that "[t]raveling with large amounts of currency is not illegal," and that the only relevance of currency to transportation security screenings is that "[l]arge amounts of currency ('bulk currency') can . . . conceal a weapon, explosives, or other items that may pose a threat to transportation security." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

191.    Accordingly, "large quantities of currency discovered at the checkpoint, either on a person or in accessible property, may need closer examination to ensure prohibited items are not

secreted and to clear the person or property to enter the sterile area." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

192.    If that additional screening is completed uneventfully and no prohibited items are discovered, the transportation security screening has concluded and the traveler is free to enter the sterile (secured) area of the airport.

193.    TSA also admits that "[s]creening may not be conducted to detect evidence of crimes unrelated to transportation security." TSA Management Directive No. 100.4 (Sept. 1, 2009).

194.    Neither TSA Operations Directive 400-54-6 (Oct. 29, 2009) nor TSA Management Directive No. 100.4 (Sept. 1, 2009) purports to expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds—*i.e.*, administrative screenings limited to threats to transportation security.

195.    Indeed, no TSA directive could expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds.

196.    TSA Screeners have no statutory authority to seize people or property based on the presence of currency.

197.    TSA Screeners also do not have statutory authority to seize other items that do not pose a threat to transportation security, including potential contraband or potential evidence of a crime unrelated to transportation security.

198.    Because of the limits of their statutory authority, if TSA Screeners encounter potential contraband or potential evidence of a crime unrelated to transportation security, they are supposed to notify law-enforcement personnel rather than seize the property or personally investigate.

199.    But in contravention of those statutory and regulatory bounds, upon information and belief, TSA follows a policy or practice of having TSA Screeners seize travelers' currency, carry-on luggage, personal effects, and/or persons *after* TSA has determined that no items that pose a threat to transportation security are present and the transportation security screening has concluded.

200.    Upon information and belief, TSA follows this policy or practice based on the presence of what TSA Screeners consider "large" amounts of currency on travelers or in their carry-on luggage.

201.    But traveling with "large" amounts of currency is not illegal, and an air traveler's mere possession of "large" amounts of currency, by itself, does not give rise to reasonable suspicion of a crime.

202.    Upon information and belief, these TSA seizures of travelers' currency, carry-on luggage, personal effects, and/or persons, while temporary, can sometimes last from several minutes to more than 30 minutes *after* the transportation security screening is complete.

203.    During this time, although TSA Screeners may tell travelers that they are free to leave, as a practical matter, travelers may not leave without their seized currency, carry-on luggage, and/or personal effects.

204.    These temporary TSA seizures of travelers' currency, carry-on luggage, and/or personal effects meaningfully interfere with these travelers' possessory interest in their property. For example, while TSA Screeners seize their currency and/or carry-on luggage, travelers cannot take their currency and/or carry-on luggage with them to their boarding gate, use items in their carry-on luggage, or use the currency to purchase items in the airport.

205.    Travelers typically keep valuable or important personal effects and property in their carry-on luggage that they cannot realistically leave behind, including cell phones, laptop computers and tablets, wallets, credit cards, passports and other identification documents, travel documents, appointment books, medications, essential toiletries, and clothes. This is particularly true while going through TSA transportation security screening, because travelers are typically instructed by TSA to remove everything from their pockets and are typically not permitted to have anything on their person that will cause TSA metal detectors or other screening devices to alert.

206.    Because these TSA seizures are of a traveler's valuable or important possessions, which typically include their currency and their carry-on luggage (including their personal effects stored in their carry-on luggage), the traveler is effectively seized when their property is seized.

207.    TSA's policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded is *ultra vires* because it exceeds TSA's statutory authority to exercise administrative powers related to transportation security and to conduct "day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation," 49 U.S.C. § 114(e)(1), which TSA defines as "the inspection of individuals and property for weapons, explosives, and incendiaries," 49 C.F.R. § 1540.5.

208.    TSA's policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded and without reasonable suspicion or probable cause also violates the Fourth Amendment's prohibition against unreasonable searches and seizures by seizing property and persons beyond the time and scope of the mission for which the agency's initial lawful administrative search was initiated.

209.     To remedy the ongoing statutory and constitutional violations caused by TSA's policy or practice, Plaintiffs seek class-wide declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs seek a declaration that TSA's policy or practice exceeds the agency's statutory and regulatory authority and violates the Fourth Amendment rights of travelers. Plaintiffs accordingly seek an injunction prohibiting TSA from seizing travelers' currency, carry-on luggage, personal effects, and/or persons at transportation security screening checkpoints— based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded.

210.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual challenges to TSA's unlawful and unconstitutional policy or practice will, by their nature, often become moot by the return of property, and in any event the costs associated with bringing individual challenges are often prohibitive of a full and fair process for vindicating individuals' statutory and constitutional rights. A class action will allow for effective, class-wide relief to remedy these ongoing and repeated *ultra vires* actions by TSA that also violate the Fourth Amendment.

211.     Plaintiffs propose the following class definition for the "TSA Class":

"All air travelers who, from January 15, 2014, until the present, either have had or will have their currency, carry-on luggage, personal effects, and/or person seized by TSA Screeners at transportation security screening checkpoints—based on the presence of a 'large' amount of currency on their person or in their carry-on luggage—after the transportation security screening has concluded."

212.     This action meets all the Rule 23(a) prerequisites for maintaining a class action.

213. ***Numerosity under Rule 23(a)(1):*** The putative class is so numerous that joinder of all members is impracticable.

    a. TSA is responsible for the security of nearly 440 airports, and over 25,000 flights per day.

    b. Every day in 2018, TSA screened over two million passengers, with a total of 813.8 million passengers screened over the course of the year.

    c. Every day, TSA screens 5.5 million carry-on items for weapons, explosives, and incendiaries.

    d. In 2018 alone, TSA Screeners detected and seized 4,239 firearms at transportation security screening checkpoints.

    e. In 2015, TSA confiscated more than 22,000 "dangerous items" at transportation security screening checkpoints.

    f. Upon information and belief, air travelers bring what TSA considers to be a "large" amount of currency into the secured area of an airport (which is legal) far more often than they attempt to bring guns or other dangerous items into the secured area of an airport (which is illegal).

    g. Upon information and belief, TSA Screeners are likely to detect when an air traveler brings what TSA considers to be a "large" amount of currency through a transportation security screening checkpoint.

    h. TSA Screeners regularly detect and temporarily seize "large" amounts of currency and/or carry-on luggage containing "large" amounts of currency from travelers at transportation security screening checkpoints in order to

hold it until law enforcement can arrive and investigate the person traveling with the currency.

i.  Upon information and belief, TSA Screeners frequently question air travelers about why they have a "large" amount of currency and temporarily seize the traveler's currency, carry-on luggage, personal effects, and/or their person after the transportation security screening has concluded.

j.  Upon information and belief, many of these seizures are based on TSA Screeners becoming aware that a traveler possesses a "large" amount of currency on their person or in their carry-on luggage during the transportation security screening.

k.  Upon information and belief, many of these seizures were based on travelers' possessing what TSA Screeners estimated to be $10,000 or more.

l.  Upon information and belief, the number of current and future class members is in the thousands.

m.  Upon information and belief, the members of the proposed class are dispersed across the United States, with many living far from the location where TSA seized their currency.

214.   ***Commonality under Rule 23(a)(2)*:** This action presents questions of law and fact common to the putative class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff. Common questions include, but are not limited to:

a.  Does TSA have a policy or practice of having TSA Screeners seize travelers' currency, carry-on luggage, personal effects, and/or persons—based on the

presence of a "large" amount of currency on their person or in their carry-on luggage—after the transportation security screening has concluded?

b. Are TSA Screeners authorized under statute to seize travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of a "large" amount of currency on their person or in their carry-on luggage— after the transportation security screening has concluded?

c. Does an air traveler's possession of a "large" amount of currency, by itself, constitute reasonable suspicion or probable cause?

d. Does TSA's policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of a "large" amount of currency on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause violate the Fourth Amendment?

215. ***Typicality under Rule 23(a)(3):*** The Named Plaintiffs' claims seeking declaratory and injunctive relief from the challenged TSA policy or practice are typical of the claims of the putative class.

a. The Named Plaintiffs' claim regarding TSA's *ultra vires* and unconstitutional policy or practice affects the other members of the class.

b. The Named Plaintiffs seek the same class relief for themselves and all other members of the class:

i. a declaration that TSA Screeners do not have statutory authority to seize travelers' currency, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of currency on

30

their person or in their carry-on luggage—after the transportation security screening has concluded;

ii.    an injunction prohibiting TSA Screeners from seizing travelers' currency, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded;

iii.   a declaration that TSA's policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons (even temporarily—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause violates the Fourth Amendment; and

iv.    an injunction prohibiting TSA from seizing travelers' currency, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

216.    ***Adequacy of Representation under Rule 23(a)(4)***: The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys.

a. The Named Plaintiffs adequately represent the putative class because their interests are aligned with the class's and there are no conflicts of interest between the Named Plaintiffs and members of the putative class.

b. The Named Plaintiffs and the putative class members are ably represented *pro bono* by the Institute for Justice ("the Institute"). The Institute is a nonprofit, public-interest law firm that, since its founding in 1991, has litigated constitutional issues nationwide. The Institute has a particular expertise in litigating to protect property rights, including challenging civil-forfeiture programs on constitutional grounds. In bringing this action, the Institute has done extensive work to identify and investigate Plaintiffs' claims.

217. This action also meets the requirements of, and is brought in accordance with, Federal Rule of Civil Procedure 23(b)(2). TSA has acted, or refused to act, on grounds generally applicable to the class. Final declaratory and injunctive relief is appropriate with respect to all of the members of the class.

218. Finally, this action is a Rule 23(b)(2) action where the putative class is only seeking declaratory and injunctive relief, and thus is not required to satisfy the ascertainability requirement. *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). However, even if the ascertainability requirement applied, the members of the class are ascertainable because TSA records such as Incident Reports—which are prepared whenever law enforcement is notified about a traveler by TSA—should be able to identify travelers affected by the above-referenced TSA policy or practice.

## **DEA Class Action Allegations**

219. Every year, DEA conducts tens of thousands of seizures of currency, including hundreds or even thousands of seizures of currency from travelers at U.S. airports.

220.    From 2009 to 2013, DEA seized over $2 billion in currency.

221.    DEA made more than 80,000 seizures of currency from FY 2007 to FY 2016, which is approximately 80% of all federal seizures of currency by DOJ agencies during that period.

222.    From 2009 to 2013, DEA interdiction Task Force Groups, which operate at airports and other mass transportation facilities, seized $163 million in more than 4,000 individual currency seizures.

223.    DEA has operated an "airport interdiction task force" at one or more U.S. airports since at least 1975.

224.    DEA sometimes refers to its airport interdiction activities as "Operation Jetway." Operation Jetway is also the name of DEA's transportation interdiction training course.

225.    The Operation Jetway airport interdiction program was established in 1993 with DEA as the lead agency, to provide standardized training and to collect and analyze arrest and seizure data from federal, state, and local drug interdiction units working at airports and other mass transportation facilities.

226.    In 2001, DEA collected data on Operation Jetway airport interdiction operations at 77 U.S. airports.

227.    Upon information and belief, DEA now operates an Operation Jetway airport interdiction program at every major commercial airport in the United States.

228.    A 2017 report by the Department of Justice Office of Inspector General ("OIG") reviewed a sample of 100 DEA currency seizures that "appeared to have occurred without a court-issued warrant and without the presence of narcotics" and "found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports . . . ."

Office of Inspector General, *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* at iii (Mar. 2017) ("2017 OIG Report"), https://oig.justice.gov/reports/2017/e1702.pdf.

229.    The 2017 OIG Report found that DEA could verify that "only 29 of the 85 interdiction seizures, had (1) advanced or been related to ongoing investigations, (2) resulted in the initiation of new investigations, (3) led to arrests, or (4) led to prosecutions." 2017 OIG Report at iii.

230.    Of the 85 DEA interdiction seizures reviewed by the OIG at transportation facilities, more than half of those currency seizures—46 of the 85—occurred at airports. *See* 2017 OIG Report at 22.

231.    The 2017 OIG Report found that: "DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on or checked luggage." 2017 OIG Report at 23.

232.    Upon information and belief, DEA agents participating in Operation Jetway airport interdiction operations at U.S. airports follow a DEA policy of seizing any currency found that totals more than $5,000.

233.    Upon information and belief, DEA follows a policy or practice of seizing currency from travelers at U.S. airports based on the presence of a threshold amount of currency that DEA considers "suspicious," regardless of whether there is probable cause.

234.    Upon information and belief, DEA follows a policy or practice of seizing currency from travelers at U.S. airports based solely on whether they have at least $5,000, regardless of whether there is probable cause.

235.     This policy or practice violates the Fourth Amendment's prohibition against unreasonable searches and seizures.

236.     To remedy the ongoing constitutional violations caused by DEA's policy or practice, Plaintiffs seek class-wide declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs seek a declaration that DEA's policy or practice violates the Fourth Amendment. Plaintiffs accordingly seek an injunction prohibiting DEA from seizing luggage or currency at any airport in the United States in the absence of articulable circumstances demonstrating probable cause, which must be more than the mere presence of currency itself.

237.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual challenges to DEA's unconstitutional policy or practice will, by their nature, often become moot by the return of property, and in any event the costs associated with bringing individual challenges are often prohibitive of a full and fair process for vindicating individuals' constitutional rights. A class action will allow for effective, class-wide relief to remedy this ongoing and repeated violation of the Fourth Amendment.

238.     Plaintiffs propose the following class definition for the "DEA Class":

"All air travelers who, from January 15, 2014, until the present, either had or will have their currency seized by DEA at a U.S. airport because they were or are traveling with at least $5,000 in currency, pursuant to DEA's policy or practice of making such seizures regardless of whether there is probable cause for the seizure."

239.     This action meets all the Rule 23(a) prerequisites for maintaining a class action.

240.     ***Numerosity under Rule 23(a)(1):*** The putative class is so numerous that joinder of all members is impracticable.

a. Upon information and belief, DEA regularly seizes currency from travelers at U.S. airports.

b. For example, from 2006-2016, DEA seized more than $200 million in currency from at least 5,200 people at the nation's 15 busiest airports.

c. Upon information and belief, many DEA seizures of currency at airports are based on information from TSA Screeners that the travelers possessed a "large" amount of currency on their person or in their carry-on luggage.

d. Upon information and belief, many of these seizures were based on travelers possessing more than DEA's $5,000 threshold for seizing currency from travelers at airports regardless of whether there was probable cause for the seizure.

e. Upon information and belief, the number of current and future class members is in the thousands.

f. Upon information and belief, the members of the proposed class are dispersed across the United States, with many living far from the location where DEA seized their currency.

241. ***Commonality under Rule 23(a)(2)*:** This action presents questions of law and fact common to the putative class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff. Common questions include, but are not limited to:

a. Does DEA frequently conduct seizures of currency from travelers at airports based on information from TSA Screeners that the travelers possessed a "large" amount of currency on their person or in their carry-on luggage?

b. Does DEA have a policy or practice of seizing currency from travelers at airports because the currency exceeds a particular threshold amount (such as $5,000) that DEA deems "suspicious," regardless of whether there is probable cause for the seizure?

c. Does an air traveler's possession of $5,000 or more in currency, by itself, constitute reasonable suspicion or probable cause?

d. Does DEA's policy or practice violate the Fourth Amendment?

242. ***Typicality under Rule 23(a)(3)***: The Named Plaintiffs' claims seeking declaratory and injunctive relief are typical of the claims of the putative class.

a. The Named Plaintiffs' claim regarding DEA's unconstitutional policy or practice affects the other members of the class.

b. The Named Plaintiffs seek the same class relief for themselves and other members of the class:

i. a declaration that DEA's airport currency seizure policy or practice violates the Fourth Amendment; and

ii. an injunction prohibiting DEA from seizing currency from travelers at airports because it exceeds a particular currency threshold, regardless of whether there is probable cause for the seizure.

243. ***Adequacy of Representation under Rule 23(a)(4)***: The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys.

a. The Named Plaintiffs adequately represent the putative class because their interests are aligned with the class's and there are no conflicts of interest between the Named Plaintiffs and members of the putative class.

b. The Named Plaintiffs and the putative class members are ably represented *pro bono* by the Institute for Justice ("the Institute"). The Institute is a nonprofit, public-interest law firm that, since its founding in 1991, has litigated constitutional issues nationwide. The Institute has a particular expertise in litigating to protect property rights, including challenging civil-forfeiture programs on constitutional grounds. In bringing this action, the Institute has done extensive work to identify and investigate Plaintiffs' claims.

244.   This action also meets the requirements of, and is brought in accordance with, Federal Rule of Civil Procedure 23(b)(2). DEA has acted, or refused to act, on grounds generally applicable to the class. Final declaratory and injunctive relief is appropriate with respect to all of the members of the class.

245.   Finally, this action is a Rule 23(b)(2) action where the putative class is only seeking declaratory and injunctive relief, and thus is not required to satisfy the ascertainability requirement. *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). However, even if the ascertainability requirement applied, the members of the class are ascertainable because DEA maintains records of its currency seizures and forfeitures.

## Class Claims

### Count I
**Class Claim for *Ultra Vires* Agency Action Under 5 U.S.C. §§ 701-706
(Against TSA, TSA Administrator Pekoske in his official capacity,
and the United States of America)**

246.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-245.

247.    Plaintiffs bring this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

248.    Plaintiffs bring this claim on behalf of themselves and the TSA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America.

249.    TSA's statutory authority to conduct screenings of air travelers is limited to conducting administrative searches to ensure transportation security; by law, these transportation security screenings are not for general law-enforcement purposes.

250.    TSA's transportation security screenings may not go beyond their limited purpose of searching for threats to transportation security.

251.    No statute or regulation authorizes TSA Screeners to engage in searches, seizures, or investigations for general law-enforcement purposes.

252.    No statute or regulation authorizes TSA Screeners to seize property that does not threaten transportation security.

253.    No statute or regulation authorizes TSA Screeners to seize potential contraband or potential evidence of a crime unrelated to transportation security.

254.    No statute or regulation authorizes TSA Screeners to seize or question travelers after the transportation security screening has concluded.

255.    No statute or regulation authorizes TSA Screeners to seize or question travelers to investigate potential crimes that do not threaten transportation security.

256.    TSA's challenged policy or practice—having TSA Screeners seize travelers' currency, carry-on luggage, personal effects, and/or their person, based on the presence of currency

on their person or in their carry-on luggage, after the transportation security screening has concluded—exceeds TSA's statutory authority to conduct administrative searches for threats to transportation security.

257. TSA's challenged policy or practice is *ultra vires* because it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

258. TSA's *ultra vires* policy or practice affects every member of the TSA Class—*i.e.*, every instance in which, after concluding the transportation security screening, TSA Screeners seize a traveler's currency, carry-on luggage, personal effects, and/or their person based on the presence of currency on their person or in their carry-on luggage.

259. As a direct and proximate result of TSA's *ultra vires* policy or practice, the Named Plaintiffs and other members of the TSA Class have suffered or will suffer the same injury.

260. Therefore, class-wide declaratory and injunctive relief is necessary to remedy TSA's unlawful policy or practice, which will otherwise continue.

### Count II
**Class Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706
and the Fourth Amendment
(Against TSA, TSA Administrator Pekoske in his official capacity,
and the United States of America)**

261. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-245.

262. Plaintiffs bring this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

263. Plaintiffs bring this claim on behalf of themselves and the TSA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against TSA, TSA

Administrator Pekoske in his official capacity, and the United States of America for violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

264.    Even when the government has lawfully initiated a search or seizure, it may not extend that search or seizure to pursue broader or different investigatory purposes absent reasonable suspicion or probable cause.

265.    TSA airport transportation security screenings are administrative searches that may not be conducted for general law-enforcement purposes; they may not go beyond their limited purpose of searching for threats to transportation security.

266.    Once TSA completes the administrative search of an air traveler and their carry-on luggage and does not detect any threats to transportation security, TSA may not continue to search or seize the air traveler, their carry-on luggage, or their currency without reasonable suspicion or probable cause.

267.    It is legal to travel with any amount of currency, and there are no legal requirements to report to the government that one is traveling domestically with any amount of currency.

268.    An air traveler's possession of any amount of currency, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

269.    After TSA determines, in the scope of a lawful administrative search at a transportation security screening checkpoint, that nothing on a traveler's person or in a traveler's carry-on luggage presents a threat to transportation security, the Fourth Amendment prohibits TSA from (1) extending that administrative search for other purposes or (2) seizing the traveler's currency, carry-on luggage, personal effects, and/or person without reasonable suspicion or probable cause.

270.    Seizing a traveler's currency, carry-on luggage, personal effects, and/or person, even briefly or temporarily, is a meaningful interference with that traveler's possessory interest in their property and freedom of movement.

271.    Even if travelers are told they are free to leave the transportation security screening checkpoint without their carry-on luggage or their currency, they are effectively seized by the interference with their property, particularly if it includes valuable or important property such as currency or other personal effects typically packed in carry-on luggage.

272.    Plaintiffs challenge TSA's policy or practice of seizing travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded, and without reasonable suspicion or probable cause.

273.    TSA's seizure of currency, carry-on luggage, personal effects, and/or persons pursuant to this policy or practice violates the Fourth Amendment, even if the seizure is only temporary.

274.    For example, TSA's temporary seizure of Rebecca's carry-on luggage and personal effects after the transportation security screening concluded violated the Fourth Amendment because it was beyond the scope of TSA's administrative search for threats to transportation security and was not based on reasonable suspicion or probable cause. This seizure was conducted pursuant to TSA's challenged policy or practice.

275.    For example, TSA's temporary seizure of Terry's and Rebecca's cash after the transportation security screening concluded violated the Fourth Amendment because it was beyond the scope of TSA's administrative search for threats to transportation security and was not based

on reasonable suspicion or probable cause. This seizure was conducted pursuant to TSA's challenged policy or practice.

276.    For example, TSA's temporary seizure of Rebecca's person after the transportation security screening concluded violated the Fourth Amendment because it was beyond the scope of TSA's administrative search for threats to transportation security and was not based on reasonable suspicion or probable cause. This seizure was conducted pursuant to TSA's challenged policy or practice.

277.    TSA's unconstitutional policy or practice affects every member of the TSA Class— *i.e.*, every instance in which TSA seizes a traveler's currency, carry-on luggage, personal effects, and/or person—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded, and without reasonable suspicion or probable cause.

278.    As a direct and proximate result of TSA's unconstitutional policy or practice, the Named Plaintiffs and other members of the TSA Class have suffered or will suffer the same injury, including the deprivation of their constitutional rights and the interference with their property rights and freedom of movement.

279.    Therefore, class-wide declaratory and injunctive relief is necessary to remedy TSA's unconstitutional policy or practice, which will otherwise continue.

**<u>Count III</u>**
**Class Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706**
**and the Fourth Amendment**
**(Against DEA, DEA Acting Administrator Dhillon in his official capacity,**
**and the United States of America)**

280.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-245.

281.    Plaintiffs bring this claim against DEA, DEA Acting Administrator Dhillon in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

282.    Plaintiffs bring this claim on behalf of themselves and the DEA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against DEA, DEA Acting Administrator Dhillon in his official capacity, and the United States of America for violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

283.    It is legal to travel with any amount of currency, and there are no legal requirements to report to the government that one is traveling domestically with any amount of currency.

284.    An air traveler's possession of any amount of currency, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

285.    DEA follows a policy or practice of seizing currency from travelers at U.S. airports without probable cause based solely on the presence of the currency itself.

286.    DEA follows a policy or practice of seizing currency from travelers at U.S. airports based on the presence of a threshold amount of currency that DEA considers "suspicious," regardless of whether there is probable cause for the seizure.

287.    DEA follows a policy or practice of seizing currency from travelers at U.S. airports based solely on whether they have at least $5,000 in currency, regardless of whether there is probable cause for the seizure.

288.    DEA's policy or practice violates the Fourth Amendment right to be free from unreasonable searches and seizures.

289.    Pursuant to this unconstitutional policy or practice, DEA seized Terry's and Rebecca's cash without probable cause.

290.     As a direct and proximate result of DEA's policy or practice, the Named Plaintiffs and other members of the DEA Class have suffered or will suffer the same injury, including the deprivation of their constitutional rights and the deprivation and/or loss of their currency.

291.     DEA's unconstitutional policy or practice affects every member of the DEA Class—*i.e.*, every instance in which DEA seizes currency from a traveler at a U.S. airport because they were or are traveling with at least $5,000 in currency, regardless of whether there is probable cause for the seizure.

292.     Therefore, class-wide declaratory and injunctive relief is necessary to remedy DEA's unlawful policy or practice, which will otherwise continue.

### Individual Claims

### Count IV
**Individual Claim Under Federal Rule of Criminal Procedure 41(g)
and 28 U.S.C. § 1331 for Return of Plaintiffs' Property Currently Held
in Violation of the Fourth Amendment
(Against DEA, DEA Acting Administrator Dhillon in his official capacity,
and the United States of America)**

293.     The Named Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-245.

294.     The Named Plaintiffs bring this claim for the return of their seized cash (or an equivalent amount in U.S. currency) against DEA, DEA Acting Administrator Dhillon in his official capacity, and the United States of America under Federal Rule of Criminal Procedure 41(g), this Court's general equity jurisdiction under 28 U.S.C. § 1331, and the Fourth Amendment to the United States Constitution.

295.     Terry and Rebecca are both aggrieved, injured, and harmed by the unlawful and unconstitutional seizure of their property—the seized cash—and by the continued deprivation of that property.

296.    DEA's seizure and continued retention of Terry's and Rebecca's cash violated and continues to violate the Fourth Amendment because the warrantless seizure and retention were and remain without probable cause to believe that Terry or Rebecca engaged in any criminal activity, or that the cash was connected to any criminal activity, and no exception to the warrant requirement applied or applies to the initial seizure or the retention of the seized cash.

297.    Terry and Rebecca are entitled to the immediate return of their cash (or an equivalent amount in U.S. currency) in the amount of $82,373, plus interest.

**Count V**
**Individual *Bivens* Claim for Compensatory Damages**
**Under the Fourth Amendment**
**(Against DEA Agent Steve, Last Name Unknown)**

298.    The Named Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-245.

299.    The Named Plaintiffs bring this claim for compensatory damages against Defendant DEA Agent Steve, last name unknown, in his individual capacity, under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and the Fourth Amendment to the United States Constitution.

300.    DEA Agent Steve's last name and identity are currently unknown to Terry and Rebecca but will be revealed in the course of this litigation.

301.    DEA Agent Steve violated Terry's and Rebecca's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing their cash without a warrant or probable cause.

302.    As a direct and proximate result of DEA Agent Steve's unconstitutional actions, Terry and Rebecca have suffered injuries, as set forth in the preceding paragraphs—particularly

the section entitled "Individual Injuries to the Named Plaintiffs"—and as may further be developed in discovery or at trial.

303. An award of compensatory damages plus interest—in amounts to be determined in discovery or at trial—is necessary to remedy the injuries caused by DEA Agent Steve's violation of Terry's and Rebecca's Fourth Amendment rights.

## Request for Relief

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A. Certify the TSA Class under Federal Rule of Civil Procedure 23(b)(2) consisting of: "All air travelers who, from January 15, 2014, until the present, either have had or will have their currency, carry-on luggage, personal effects, and/or person seized by TSA Screeners at transportation security screening checkpoints—based on the presence of a 'large' amount of currency on their person or in their carry-on luggage—after the transportation security screening has concluded."

B. Certify the DEA Class under Federal Rule of Civil Procedure 23(b)(2) consisting of: "All air travelers who, from January 15, 2014, until the present, either had or will have their currency seized by DEA at a U.S. airport because they were or are traveling with at least $5,000 in currency, pursuant to DEA's policy or practice of making such seizures regardless of whether there is probable cause for the seizure."

C. Issue class-wide declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring *ultra vires* and unlawful TSA's policy or practice of having TSA Screeners seize (even temporarily) air travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of currency

on their person or in their carry-on luggage—after the transportation security screening has concluded.

     D.    Issue class-wide injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA Screeners from seizing (even temporarily) air travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded.

     E.    Issue class-wide declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment TSA's policy or practice of seizing (even temporarily) air travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

     F.    Issue class-wide injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA from seizing (even temporarily) air travelers' currency, carry-on luggage, personal effects, and/or persons—based on the presence of currency on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

     G.    Issue class-wide declaratory relief against Defendants DEA, DEA Acting Administrator Dhillon in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment DEA's policy or practice of seizing air travelers'

currency at U.S. airports because they are traveling with currency in excess of $5,000 (or any other threshold amount of currency), regardless of whether there is probable cause for the seizure.

      H.     Issue class-wide injunctive relief against Defendants DEA, DEA Acting Administrator Dhillon in his official capacity, and the United States of America enjoining DEA from seizing air travelers' currency at U.S. airports because they are traveling with currency in excess of $5,000 (or any other threshold amount of currency), regardless of whether there is probable cause for the seizure.

      I.     Order Defendants DEA, DEA Acting Administrator Dhillon, and the United States of America to immediately return Terry's and Rebecca's cash (or an equivalent amount in U.S. currency) in the amount of $82,373, plus interest.

      J.     Award Terry and Rebecca compensatory damages plus interest—in an amount to be proven in discovery or at trial—against *Bivens* Defendant DEA Agent Steve (last name and identity to be discovered in the course of litigation) for his violations of Terry's and Rebecca's Fourth Amendment rights.

      K.     Enter an award against all Defendants allowing Plaintiffs to recover their attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

      L.     Award any further equitable or legal relief the Court may deem just and proper.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated:  January 15, 2020.            Respectfully submitted,

<u>/s/ Dan Alban</u>
Dan Alban*
VA Bar No. 72688

Jaba Tsitsuashvili*
DC Bar No. 1601246

Richard Hoover*
NY Bar No. 5717269

INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org
rhoover@ij.org

*Attorneys for Plaintiffs*

*Motions for Admission *Pro Hac Vice* to be filed

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on this 15th day of January, 2020, I electronically filed the foregoing CLASS COMPLAINT FOR CLASS-WIDE DECLARATORY AND INJUNCTIVE RELIEF AND FOR INDIVIDUAL RELIEF OF RETURN OF PROPERTY AND COMPENSATORY DAMAGES with the Clerk of Court using the CM/ECF System.

      I further certify that I caused a copy of the foregoing Class Action Complaint to be sent by certified mail to the following address:

Transportation Security Administration
Office of Chief Counsel, TSA-2
601 S. 12th St.
Arlington, VA 20598-6002

Drug Enforcement Administration
Office of Chief Counsel
8701 Morrissette Drive
Springfield, VA 22152

Drug Enforcement Administration
Pittsburgh District Office
1781 McKees Rocks Rd.
McKees Rocks, PA 15136

Attorney General William Barr
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530

Scott W. Brady, U.S. Attorney for the
Western District of Pennsylvania
Civil Process Clerk
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

                      /s/ Dan Alban