**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____

REBECCA BROWN and AUGUST
TERRENCE ROLIN, on behalf of
themselves and all others similarly
situated,

        Plaintiffs,

v.

TRANSPORTATION SECURITY
ADMINISTRATION, et al.,

        Defendants.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 2:20-cv-64-LPL**


**BRIEF IN SUPPORT
OF MOTION TO DISMISS**

**<u>BRIEF IN SUPPORT OF MOTION TO DISMISS
INDIVIDUAL-CAPACITY CLAIM AGAINST "STEVE" LAST NAME UNKNOWN</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................ 1

I.    Factual Background ............................................................................................ 1

  A.  Allegations at the Pittsburgh International Airport. ........................................... 1

  B.  Post-Airport Administrative Process. ............................................................... 3

II.   Asset Forfeiture's Relevant Federal Statutory and Regulatory Framework ....... 4

  A.  Administrative Asset Forfeiture by the DEA. .................................................... 4

  B.  Civil Judicial Forfeiture of Assets Seized by the DEA. ..................................... 5

DISCUSSION .............................................................................................................. 6

I.    Special Factors Preclude the Extension of an Individual-Capacity Bivens Remedy to the Novel Context of Government Forfeiture .................................... 7

  A.  Extending the Bivens Remedy to Any New Context is Strongly Disfavored. ..... 7

  B.  Plaintiffs Cannot Satisfy the Rigorous Inquiry the Supreme Court Requires to Imply an Individual-Capacity Claim for Damages Arising from Law Enforcement's Seizure of Cash at an International Airport. .................................. 8

    1.  Plaintiffs' Proposed Bivens Claim Presents a New Context. ........................... 9

    2.  Multiple Independent Factors Counsel Against Extending a Bivens Remedy to this New Context. ...................................................................................... 9

      a.  Alternative Processes for Redress Preclude a Bivens Remedy. ................ 10

        i.  Congress has Enacted Comprehensive Legislation Governing Forfeiture, Including Specific Judicial and Administrative Mechanisms to Challenge Asset Seizures and Seek Return of Property. ..................................................................................... 10

        ii.  There are Additional Processes to Vindicate the Interest. ..................... 13

      b.  Additional Special Factors Counsel Hesitation in Creating a Bivens Remedy for DEA's Forfeiture-Related Asset Seizures. ............................. 15

        i.  Separation-of-Powers Considerations. ................................................. 15

        ii.  National Security Concerns also Warrant Caution. ............................... 19

        iii.  Challenges to Federal Policy, or the Actions of Federal Agencies, are Inappropriate under Bivens. .............................................................. 20

        iv.  A Bivens Remedy in the Asset-Seizure Context Would Raise Significant Practical Problems. ...................................................................... 21

II.   Qualified Immunity Protects the TFO's Alleged Conduct. ............................... 23

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Federal Cases**

Andrews v. Miner,
    301 F. Supp. 3d 1128 (N.D. Ala. 2017) ................................................................. 15

Ashcroft v. al-Kidd,
    563 U.S. 731 (2011) ......................................................................................... 24

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ...................................................................................... 1, 8

Bivens v. Six Unknown Fed. Narcotics Agents,
    403 U.S. 388 (1971) ........................................................................................... 7

Bryan v. United States,
    913 F.3d 356 (3d Cir. 2019) ............................................................................. 23

Buck v. Hampton Twp. Sch. Dist.,
    452 F.3d 256 (3d Cir. 2006) ............................................................................... 3

Bush v. Lucas,
    462 U.S. 367 (1983) ................................................................................ 10, 15

Camreta v. Greene,
    563 U.S. 692 (2011) ................................................................................ 23, 24

Carlson v. Green,
    446 U.S. 14 (1980) ............................................................................... 7, 15

Carpenter's Produce v. Arnold,
    189 F.3d 686 (8th Cir. 1999) ........................................................................... 14

Chappell v. Wallace,
    462 U.S. 296 (1983) ........................................................................................ 13

United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account
    L7N01967,
    731 F.3d 189 (2d Cir. 2013) .............................................................................. 12

Corr. Servs. Corp. v. Malesko,
    534 U.S. 61 (2001) ............................................................................... 7, 15, 21

Davis v. Passman,
    442 U.S. 228 (1979) ......................................................................................... 8

District of Columbia v. Wesby,
    138 S. Ct. 577 (2018) ...................................................................................... 23

Estate of Roman v. City of Newark,
    914 F.3d 789 (3d Cir.) ....................................................................................... 3

F.D.I.C. v. Meyer,
    510 U.S. 471 (1994) ................................................................................ 21, 22

Farah v. Wekyer,
    926 F.3d 492 (8th Cir. 2019) ............................................................................ 12

Francis v. Miligan,
    530 F. App'x 138 (3d Cir. 2013) ....................................................................... 12

Fowler v. UPMC Shadyside,
   578 F.3d 203 (3d Cir. 2009) ........................................................................... 1

Haig v. Agee,
   453 U.S. 280 (1981) ..................................................................................... 19

Harper v. United States,
   No. 15-cv-4833, 2016 WL 4994996 (E.D.N.Y. Aug. 3, 2016) ......................... 13

Harper v. United States,
   No. 15-cv-4833, 2016 WL 4995077 (E.D.N.Y. Sept. 19, 2016) ...................... 13

Hernández v. Mesa,
   140 S. Ct. 735 (2020) ............................................................................ passim

Jackson v. McNeil,
   No. 19-cv-6245, 2020 WL 2745651 (W.D. Wash. May 27, 2020) .................. 13

Jackson v. Phelps,
   575 F. App'x 79 (3d Cir. 2014) ..................................................................... 24

Libretti v. United States,
   516 U.S. 29 (1995) ......................................................................................... 6

Liff v. Office of Inspector Gen. for U.S. Dep't of Labor,
   881 F.3d 912 (D.C. Cir. 2018) ...................................................................... 13

Malladi Drugs & Pharm., Ltd. v. Tandy,
   552 F.3d 885 (D.C. Cir. 2009) ........................................................................ 4

Mikhaylov v. United States,
   29 F. Supp. 3d 260 (E.D.N.Y. 2014) ............................................................. 13

Miller v. U.S. Dep't of Agr. Farm Servs. Agency,
   143 F.3d 1413 (11th Cir. 1998) ..................................................................... 14

Minneci v. Pollard,
   565 U.S. 118 (2012) ................................................................................ 10, 13

Murphy v. Mifflin Cty. Reg'l Police Dep't,
   548 F. App'x 778 (3d Cir. 2013) ................................................................... 24

Pearson v. Callahan,
   555 U.S. 223 (2009) ..................................................................................... 23

Perkins v. Jordan,
   No. 1:17-cv-03507, 2018 WL 2722875 (S.D. Ind. June 6, 2018) .................... 13

Rankin v. United States,
   556 F. App'x. 305 (5th Cir. 2014) ................................................................. 12

Schrob v. Catterson,
   948 F.2d 1402 (3d Cir. 1991) ......................................................................... 5

Schweiker v. Chilicky,
   487 U.S. 412 (1988) ................................................................... 10, 11, 13, 18

Sherwood v. Mulvihill,
   113 F.3d 396 (3d Cir. 1997) ......................................................................... 24

Shreiber v. Mastrogiovanni,
   214 F.3d 148 (3d Cir. 2000) ............................................................ 10, 13, 17, 18

*United States v. Frost,*
    999 F.2d 737 (3d Cir. 1993) ...................................................................... 23

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ............................................................................... 19

*United States v. Place,*
    462 U.S. 696 (1983) ............................................................................... 21

*United States v. Stanley,*
    483 U.S. 669 (1987) ............................................................................... 15

*Vanderklok v. United States,*
    868 F.3d 189 (3d Cir. 2017) ............................................................... passim

*Vega v. United States,*
    881 F.3d 1146 (9th Cir. 2018) ................................................................. 14

*W. Radio Servs. Co. v. U.S. Forest Serv.,*
    578 F.3d 1116 (9th Cir. 2009) ................................................................. 14

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ................................................................. 8, 10, 15, 22

*Williams v. Fed. Bureau of Investigation,*
    No. 3:19-cv-00418, 2019 WL 5295465 (D. Or. Oct. 18, 2019) ..................... 13

*Wilson v. Layne,*
    526 U.S. 603 (1999) ............................................................................... 24

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ...................................................................... passim

**Federal Statutes**

5 U.S.C. § 7543 ....................................................................................... 18
18 U.S.C. § 242 ....................................................................................... 18
18 U.S.C. § 983 ................................................................................. passim
18 U.S.C. § 981 ......................................................................................... 4
18 U.S.C. § 982 ......................................................................................... 4
19 U.S.C. § 1602 ....................................................................................... 4
19 U.S.C. § 1607 ....................................................................................... 4
19 U.S.C. § 1608 ....................................................................................... 5
19 U.S.C. § 1609 ....................................................................................... 5
19 U.S.C. § 1618 ....................................................................................... 5
21 U.S.C. § 801 ......................................................................................... 4
21 U.S.C. § 853 ..................................................................................... 4, 6
21 U.S.C. § 881 ................................................................................... 4, 21
21 U.S.C. § 960 ....................................................................................... 19
28 U.S.C. § 2465 ................................................................................. 6, 12
28 U.S.C. § 2680 ............................................................................... 14, 17
46 U.S.C. § 70507 ..................................................................................... 4

**Federal Regulations**

5 C.F.R. § 752.403 ....................................................................................................... 18
28 C.F.R. § 8.10 ........................................................................................................... 5
28 C.F.R. § 8.12 ........................................................................................................... 5
28 C.F.R. § 8.9 .......................................................................................................... 4, 5
28 C.F.R. § 8.8 ............................................................................................................. 4
28 C.F.R. § 9.3 ............................................................................................................. 5
28 C.F.R. § 9.5 ............................................................................................................. 5

**Other Authorities**

The Need to Reform Asset Forfeiture Hearing Before the S. Comm. on the Judiciary, 114th
    Cong. (Apr. 15, 2015) ............................................................................................ 17
Due Process Act of 2016, H.R. 5283, 114th Cong. (2016)...................................... 17
Due Process Act of 2016, S. 3045, 114th Cong. (2016) .......................................... 17
Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government
    Forfeiture Authority and Strict Deadlines Imposed On All Parties,
    27 J. Legis. 97 (2001)............................................................................................. 16

# INTRODUCTION

Plaintiffs Rebecca Brown and her father, August Terrence Rolin, seek to hold "Steve,"

Last Name Unknown, a Task Force Officer (TFO) with the U.S. Drug Enforcement

Administration (DEA) personally liable for unspecified money damages, alleging the TFO,

acting "pursuant to [] DEA policy or practice[,]" unlawfully seized $82,373 in cash from Ms.

Brown at the Pittsburgh International Airport.  ECF No. 1 ¶¶ 65-68, 289, 298-303.  This sole

claim against the TFO under the Fourth Amendment (Count V) is subject to dismissal for two

basic reasons.  For one, Plaintiffs lack a cognizable cause of action to begin with, since they

cannot meet the demanding test the Supreme Court requires before a court may imply an

individual-capacity claim for damages under the Fourth Amendment to challenge a forfeiture-

related seizure by the DEA.  Equally problematic, assuming such a novel cause of action were

recognized, qualified immunity would bar it, since the allegations in the complaint do not

suggest the TFO violated Plaintiffs' clearly established Fourth Amendment rights.  Either of

these two reasons, standing alone, compels the same conclusion: dismissal of TFO Steve in his

individual capacity with prejudice under Rule 12(b)(6) is warranted.

## I.    Factual Background[1]

### A.    Allegations at the Pittsburgh International Airport.

On Monday, August 26, 2019, Ms. Brown placed her carry-on bag through an x-ray

machine at the Pittsburgh International Airport.  ECF No. 1 ¶¶ 100, 104.  A TSA screener

noticed what appeared to be a large amount of cash inside Ms. Brown's bag, so the screener

pulled the bag aside, questioned Ms. Brown about the money, and asked for her identification

---

[1] The TFO, as he must, accepts the well-pleaded factual allegations as true for the limited purpose of this motion only.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Conclusory allegations, as with formulaic recitations of legal elements, however, are not entitled to a presumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

and proof of travel arrangements to and from Pittsburgh.  Id. ¶¶ 105-06, 109-110, 116.  Ms.

Brown explained that she was bringing the cash–which she claimed to be Mr. Rolin's savings–

home with her to Massachusetts, to open a bank account for him (though he lives in the

Pittsburgh area).  Id. ¶ 109.  The "TSA Screeners" purportedly "completed the security screening

of Rebecca's carry-on luggage containing her cash," and "told her they were going to hold on to

her luggage until law enforcement officers could arrive." Id. ¶ 7.  A Pennsylvania state trooper

arrived 10-20 minutes later and questioned Ms. Brown about "the cash's origin, purpose, and

destination."  Id. ¶¶ 118, 121.  The trooper, in turn, called his supervising lieutenant, who also

spoke to Ms. Brown and after a "third round of questioning," id. ¶ 123, she proceeded to her

departure gate with the bag and its contents in tow.  Id. ¶¶ 122, 126.

At the gate, the same state trooper, along with TFO Steve, approached Ms. Brown to

discuss the cash.  Id. ¶¶ 127-28.  The TFO "asked" Ms. Brown if she would show him the cash,

and she "compl[ied,]" albeit Plaintiffs now allege, because she felt she had "no choice" but to do

so.  Id. ¶ 132.  Ms. Brown gave an explanation as to why she was flying with over $82,000 cash

in her carry-on bag.  Id. ¶ 134.  TFO Steve then asked Ms. Brown to call her father, Mr. Rolin, so

that the TFO could corroborate that story.  Id. ¶ 135.  Ms. Brown purportedly informed the TFO

"that her father was elderly, would still be asleep at 7:00 a.m., and would likely be confused by

the call," id. ¶ 136, but it is not entirely clear, nor does the complaint suggest, how an officer

might independently substantiate those claims at that time.

As alleged, Mr. Rolin in fact did have "difficulty" answering TFO Steve's questions.  Id.

¶ 139.  Plaintiffs claim Mr. Rolin was "groggy, confused, and upset" on the phone and they

acknowledge he could not corroborate certain aspects of Ms. Brown's story.  Id. ¶¶ 137-39.

Following that call, TFO Steve told Ms. Brown that her and Mr. Rolin's "answers don't match."

Id. ¶ 140.  It was at that point TFO Steve "took the cash and searched the rest of Rebecca's beach

bag," after which Ms. Brown boarded her flight home.  Id. ¶¶ 141-43.  The TFO seized the cash,

according to Plaintiffs, "pursuant to DEA's policy or practice of seizing currency totaling more

than $5,000 found in the possession of travelers at airports regardless of whether there is

probable cause for the seizure." Id. ¶¶ 133, 234, 289.

     **B.**    **Post-Airport Administrative Process.[2]**

    On October 11, 2019, the DEA sent Ms. Brown and Mr. Rolin notices indicating the

DEA's intent to seek forfeiture of the seized cash.  Id. ¶ 146; Ex. A (Civil Asset Forfeiture

Reform Act [CAFRA] Notices). These letters detailed the processes for Plaintiffs to pursue

return of the funds.  See Ex. A (describing procedures for filing petition for remission or

mitigation, and for submitting claim to contest forfeiture in court).  Plaintiffs opted to file claims

to contest the forfeiture in federal court.  See Ex. B (Receipt of Claims).  Ultimately, on February

20, 2020, after this complaint was filed, the DEA remitted the funds to Plaintiffs in full.  See Ex.

C (Return letter).  Plaintiffs, nevertheless, press a civil claim against TFO Steve, seeking to hold

him personally liable in damages for the DEA's seizure and attempted forfeiture of those now-

returned funds.  ECF No. 1 ¶¶ 298-303.

---

[2] In deciding a motion to dismiss, this Court may consider matters incorporated by
reference in the complaint and items subject to judicial notice.  Buck v. Hampton Twp. Sch.
Dist., 452 F.3d 256, 260 (3d Cir. 2006).  The TFO affixes three such exhibits in support of the
instant motion.  See Exs. A-C.  Although not attached to the complaint, these items are
incorporated by reference therein, see, e.g., ECF No. 1 ¶¶ 145-46, and are subject to judicial
notice as redacted copies of "indisputably authentic" DEA documents which add "essential
context" to Plaintiffs' allegations. Estate of Roman v. City of Newark, 914 F.3d 789, 796-97 (3d
Cir.), cert. denied sub nom. Estate of Roman v. City of Newark, New Jersey, 140 S. Ct. 82
(2019), and cert. denied, 140 S. Ct. 97 (2019); see also Institute for Justice, Pittsburgh Airport
Forfeiture, https://ij.org/case/pittsburgh-forfeiture/ (Timeline and Case Documents) (last visited
May 28, 2020) (publishing these redacted documents on the web).

## II.    Asset Forfeiture's Relevant Federal Statutory and Regulatory Framework

Informing this Court's analysis of Plaintiffs' claim against the TFO are the multiple mechanisms Congress has provided to individuals (like Plaintiffs) who have assets seized by the DEA to, among other things, challenge the legality of a seizure and seek return of their property.

### A.    Administrative Asset Forfeiture by the DEA.

CAFRA, codified as amended in part at 18 U.S.C. § 983, works in tandem with the United States customs laws, found at 19 U.S.C. § 1602 et seq., to govern administrative forfeitures by the DEA.  See 21 U.S.C. § 881(d) (incorporating customs laws to apply to DEA administrative forfeitures); see also Malladi Drugs & Pharm., Ltd. v. Tandy, 552 F.3d 885, 887 (D.C. Cir. 2009) ("[C]ustoms laws, as modified by [CAFRA,] govern seizure and forfeiture" by DEA "insofar as they are not inconsistent with other laws applicable to controlled substances"). The DEA has the statutory authority to seek administrative forfeiture for, among other things, seized currency of any value.  19 U.S.C. § 1607(a).[3]  To initiate administrative forfeiture, the DEA must give written notice, within 60 days of a seizure, to any potential claimant with an interest in the seized asset.  18 U.S.C. § 983(a)(1)(A)(i); 28 C.F.R. §§ 8.8, 8.9(b).  The DEA is also required to publish notice of its intent to seek forfeiture in a newspaper of general circulation (for three consecutive weeks) or on a government website (for at least 30 consecutive days).  19 U.S.C. § 1607(a); 28 C.F.R. § 8.9(a).  If the DEA fails to comply, it must return the asset to the party from whom the seizure was made.  18 U.S.C. § 983(a)(1)(F).

---

[3] The overarching authority for the DEA to seize and seek civil forfeiture of various assets (including, but not limited to, cash) comes from the Controlled Substances Act, 21 U.S.C. § 801 et seq.  See id. §§ 881(a)(6), (b).  Congress has authorized the DEA to seek forfeiture of cash in various settings in other statutes as well.  See, e.g., 18 U.S.C. §§ 981, 982; 21 U.S.C. § 853; 46 U.S.C. § 70507.

Upon receiving notice from the DEA, an individual owner (or any other interested party) may (as Plaintiffs did here) submit a claim with the DEA to contest the forfeiture.  Id. § 983(a)(2)(B); 28 C.F.R. § 8.10(a).  If no claim is filed within the prescribed timeframe, the DEA proceeds administratively and issues a declaration of forfeiture against the asset, which "ha[s] the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding[.]"  19 U.S.C. § 1609(b); 28 C.F.R. § 8.12.[4]  "[T]he exclusive remedy for seeking to set aside" such a declaration is a motion under CAFRA's § 983(e).  See 18 U.S.C. § 983(e).

### B.    Civil Judicial Forfeiture of Assets Seized by the DEA.

Under the statutory scheme Congress created, the filing of a timely claim, on the other hand, halts administrative forfeiture proceedings.  19 U.S.C. § 1608; 18 U.S.C. § 983(a)(3)(A); 28 C.F.R. § 8.10(e).  At that point, the DEA must refer the matter to the United States Attorney's Office in the district where the seizure arose, which then has 90 days to either (i) initiate a civil judicial forfeiture action; (ii) obtain an indictment alleging the asset is subject to forfeiture; or (iii) return the seized asset.  18 U.S.C. §§ 983(a)(3)(A), (B); 28 C.F.R. §§ 8.10(e), 8.13.

If the United States Attorney's Office pursues the first of these options, it must file a verified complaint in federal court.  Supp. R. G(2).  A judicial forfeiture action then proceeds against the seized asset in rem, governed by Supplemental Rule G of the Federal Rules of Civil Procedure.  Supp. R. G(1).  Through CAFRA, Congress provided additional safeguards for such

---

[4] Congress considered other aspects of these procedures, too, such as the requirement that individuals have at least 35 days from the date the DEA mails its notice to submit a claim.  18 U.S.C. § 983(a)(2)(B); 28 C.F.R. § 8.9(b).  Beyond that, individuals may request remission or mitigation of any DEA forfeiture. 19 U.S.C. § 1618; 28 C.F.R. §§ 9.3, 9.5.  Such petitions are resolved administratively, and presume the validity of the seizure itself.  See Schrob v. Catterson, 948 F.2d 1402, 1420 (3d Cir. 1991).  The public can access and file petitions for remission or mitigation on the DEA's website.  See United States Dep't of Justice, Asset Forfeiture Program: File A Petition, https://ocp.forfeiture.gov/OnlineClaimsPetitions/petition (last visited May 28, 2020)

judicial proceedings.  One principal reform was adding the requirement that, in any civil

forfeiture action, "the burden of proof [rest] on the Government to establish, by a preponderance

of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).  Congress also

established an "innocent owner defense," allowing full return of assets seized absent any

wrongdoing on the claimant's part.  Id. § 983(d).[5]  Another of CAFRA's key provisions entitles

claimants who substantially prevail in judicial forfeiture proceedings to recover, in some cases,

attorneys' fees and costs, as well as interest.  28 U.S.C. § 2465.[6]  Notably missing from this

scheme, however, is any damages remedy against an individual officer for an alleged wrongful

seizure.

### DISCUSSION

Invoking Bivens, Plaintiffs ask this Court to step in and create by implication what

Congress left out: an individual capacity damages remedy based on a forfeiture-related seizure

by federal law enforcement.  This Court should reject that request out of hand.  For starters,

Plaintiffs' claim, if recognized, would insert a Bivens remedy into a novel context in which

multiple special factors counsel hesitation against doing so.  Separately, even if this Court were

to imply such a remedy (which it should not), the TFO is entitled to qualified immunity on that

claim.  This Court should dismiss Count V against him under Rule 12(b)(6) with prejudice.

---

[5] Claimants may also request immediate release of their property, pending resolution of a forfeiture action, to avoid "substantial hardship," like "preventing the functioning of a business, preventing [the claimant] from working, or leaving [the claimant] homeless[.]" 18 U.S.C. § 983(f)(1).

[6] If the United States Attorney's Office obtains a criminal indictment, forfeiture becomes a sanction imposed as part of a defendant's sentence. Libretti v. United States, 516 U.S. 29, 39 (1995); see also 21 U.S.C. § 853(a) (authorizing criminal forfeiture of assets derived from a felony conviction under 21 U.S.C.).  Rule 32.2 of the Federal Rules of Criminal Procedure outlines specific safeguards for criminal forfeiture proceedings.

I.       **Special Factors Preclude the Extension of an Individual-Capacity <u>Bivens</u> Remedy to the Novel Context of Government Forfeiture**

The availability of Plaintiffs' <u>Bivens</u> remedy is a threshold question of law, the answer to which involves a "rigorous inquiry[.]"  <u>Vanderklok v. United States</u>, 868 F.3d 189, 197, 200 (3d Cir. 2017) (refusing to recognize <u>Bivens</u> remedy for alleged unconstitutional conduct by TSA officer in context of airport security screenings).  Informing this inquiry is the basic principle that "a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress, and no statute expressly creates a <u>Bivens</u> remedy."  <u>Hernández v. Mesa</u>, 140 S. Ct. 735, 742 (2020) (citation omitted).  Rather, the <u>Bivens</u> remedy is a product of judicial implication, born in an <u>ancien regime</u>.  <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1855 (2017) (quotation marks and citation omitted). Those "heady days in which [the Supreme Court] assumed common-law powers to create causes of action," <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 75 (2001) (Scalia, J., concurring), however, have long since passed.  Over the last four decades, "the Supreme Court has plainly counseled against creating new <u>Bivens</u> causes of action." <u>Vanderklok</u>, 868 F.3d at 199.  Plaintiffs' novel constitutional claim here offers no reason to depart from 40 years of Supreme Court precedent.

A.       **Extending the <u>Bivens</u> Remedy to Any New Context is Strongly Disfavored.**

In 1971, when the Supreme Court decided <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, it implied, for the first time, a damages action directly under the Constitution against federal agents in their individual capacities, based on allegations that the agents "manacled" the plaintiff in his home "in front of his wife and children, and threatened to arrest the entire family" before "search[ing] the apartment from stem to stern."  403 U.S. 388, 389 (1971).  Since then, the Court has extended the <u>Bivens</u> remedy only twice.  <u>See</u> <u>Carlson v. Green</u>, 446 U.S. 14 (1980) (deliberate-indifference claim against federal jailers based on fatal failure to treat inmate's

asthma); <u>Davis v. Passman</u>, 442 U.S. 228 (1979) (gender-discrimination claim against Congressman for firing female employee).  So "three cases–<u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u>– represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."  <u>Abbasi</u>, 137 S. Ct. at 1855.

Beyond these cases, though, and "for almost 40 years," the Court has "consistently rebuffed requests to add to the claims allowed under <u>Bivens</u>."  <u>Hernández</u>, 140 S. Ct. at 743 (citations omitted); <u>accord</u> <u>Vanderklok</u>, 868 F.3d at 198 ("[O]ver the course of nearly four decades, the Supreme Court has repeatedly refused to recognize <u>Bivens</u> actions in any new contexts.").  As this history shows, a <u>Bivens</u> remedy is no "automatic entitlement."  <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007).  Just the opposite. "[E]xpanding the <u>Bivens</u> remedy" beyond the specific contexts of <u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u> is now considered "a 'disfavored' judicial activity" that is seldom, if ever, appropriate.  <u>Abbasi</u>, 137 S. Ct. at 1857 (quoting <u>Iqbal</u>, 556 U.S. at 675).

> **B.**     **Plaintiffs Cannot Satisfy the Rigorous Inquiry the Supreme Court Requires to Imply an Individual-Capacity Claim for Damages Arising from Law Enforcement's Seizure of Cash at an International Airport.**

The test for whether to recognize any new <u>Bivens</u> claim is a demanding one, involving two steps.  <u>Hernández</u>, 140 S. Ct. at 743.  At the first step, this Court must determine whether the case "involves a claim that arises in a new context or involves a new category of defendants" than those in <u>Bivens</u>, <u>Davis</u>, or <u>Carlson</u>.  <u>Id.</u> (quotation marks omitted).  At the next step, this Court asks whether any 'special factors' "<u>may</u> provide a reason not to extend <u>Bivens</u>" to the context at issue.  <u>Id.</u> (emphasis added).  At bottom, this inquiry looks to the presence of any "sound reason[] to think Congress <u>might</u> doubt the efficacy or necessity of a damages remedy[.]" <u>Abbasi</u>, 137 S. Ct. at 1858 (emphasis added).  As is the case here, if there is "reason to pause"

before extending <u>Bivens</u> to the context at bar, the Court should "reject the request" to do so. <u>Hernández</u>, 140 S. Ct. at 743.

     **1.**      **Plaintiffs' Proposed <u>Bivens</u> Claim Presents a New Context.**

Plaintiffs' proposed <u>Bivens</u> claim passes the new-context inquiry by a mile, as it "is different in a meaningful way from previous <u>Bivens</u> cases decided by [the Supreme] Court[.]" <u>Abbasi</u>, 137 S. Ct. at 1859.  It is not enough that the Court may previously have recognized a remedy under the same constitutional amendment. <u>See Hernández</u>, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").  And differences need not be significant to render a case a "new context." <u>See Abbasi</u>, 137 S. Ct. at 1864 ("even a modest extension" is enough).  Here, though, the distinctions between Plaintiffs' claim against the TFO and the allegations in <u>Bivens</u>, <u>Davis</u>, or <u>Carlson</u> are obvious.  Unlike any of those decisions, Plaintiffs invoke <u>Bivens</u> to sue a DEA officer for a forfeiture-related cash seizure that occurred at an international airport, allegedly pursuant to DEA policy or practice. <u>See</u> ECF No. 1 ¶¶ 65, 133, 298-303.  These allegations "bear little resemblance to the three <u>Bivens</u> claims the Court has approved in the past[,]" <u>Abbasi</u>, 137 S. Ct. at 1860, so the "new-context inquiry is easily satisfied." <u>Id.</u> at 1865; <u>see</u> <u>Vanderklok</u>, 868 F.3d at 199-200 (airport security setting a new context and TSA screeners a new category of defendants).

     **2.**      **Multiple Independent Factors Counsel Against Extending a <u>Bivens</u> Remedy to this New Context.**

Where, as here, a case presents a new context, "the Constitution's separation of powers requires [courts] to exercise caution" before allowing a <u>Bivens</u> remedy to proceed.  <u>Hernández</u>, 140 S. Ct. at 739.  That caution is embodied in the 'special factors' inquiry, which asks, at base,

"who should decide whether to provide for a damages remedy, Congress or the courts?"  Abbasi, 137 S. Ct. at 1857 (quotation omitted).  Here, as in most cases, the answer is Congress.  Id.

> ### a.      Alternative Processes for Redress Preclude a Bivens Remedy.

As a threshold matter, this Court should consider if "there is any 'alternative, existing process' capable of protecting the constitutional interests at stake."  Vanderklok, 868 F.3d at 200 (quoting Minneci v. Pollard, 565 U.S. 118, 125 (2012)).  The claim against the TFO implicates a purported interest to be free of allegedly unreasonable forfeiture-related asset seizures by the DEA.  But, as discussed below, multiple mechanisms (including ones Congress specifically put in place) give individuals claiming infringement of that interest "some procedure to defend and make good on his [or her] position."  Wilkie, 551 U.S. at 552.  The very presence of these alternatives bars the novel Bivens remedy Plaintiffs seek.  See Abbasi, 137 S. Ct. at 1865 ("[T]he existence of alternative remedies usually precludes a court from authorizing a Bivens action.").

> ### i.      Congress has Enacted Comprehensive Legislation Governing Forfeiture, Including Specific Judicial and Administrative Mechanisms to Challenge Asset Seizures and Seek Return of Property.

It is well settled that "where Congress has provided meaningful remedies [courts] should exercise extreme caution in creating additional relief" by way of a Bivens action.  Shreiber v. Mastrogiovanni, 214 F.3d 148, 153 (3d Cir. 2000).  Likewise, a Bivens remedy is improper if existing legislation "suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur" in a given setting.  Schweiker v. Chilicky, 487 U.S. 412, 423 (1988) (emphasis added); accord Abbasi, 137 S. Ct. at 1858 (Bivens remedy improper if an "alternative remedial structure" or scheme is "present" to address the interest at stake); see also Bush v. Lucas, 462 U.S. 367, 385 (1983) (declining to recognize Bivens remedy given "comprehensive [statutory and regulatory] scheme" in place).

In enacting CAFRA, Congress constructed a framework of explicit rules and procedures governing civil asset forfeiture by Executive Branch agencies like the DEA.  This scheme gives individuals means to challenge the legality of a seizure itself, even, where warranted, in a full-blown civil judicial proceeding in federal court.  See 18 U.S.C. § 983(a)(3) (allowing aggrieved party to file claim to contest forfeiture, which requires seizing agency to initiate judicial proceeding or return property); see also Supp. R. G(8) ("[A] party with standing [may move] to contest the lawfulness of the seizure" in judicial forfeiture proceeding).  Congress, therefore, already provided a process for individuals to contest the precise act–the underlying seizure–that Plaintiffs seek to attack by way of a Bivens claim.  That, in itself, is "a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  Abbasi, 137 S. Ct. at 1858.

Beyond that, CAFRA is comprehensive and abounds with "meaningful safeguards or remedies for the rights of persons situated as" Plaintiffs here.  Schweiker, 487 U.S. at 425-28.  That, too, is a reason this Court should hesitate before authorizing a new Bivens remedy.  Id.  In addition to the mechanism discussed above, CAFRA added several other substantive procedures to govern the relationship between individuals and the seizing agency within the context of civil asset forfeiture.  Among them is the "innocent owner defense," a remedy specifically designed for those who have had assets seized for forfeiture absent any wrongdoing, underscoring that the legislature recognized certain property might be seized from individuals who committed no wrongdoing.  18 U.S.C. § 983(d).  Congress also contemplated that individuals might need to seek immediate release of seized property in cases of substantial hardship, and so included an express provision to that effect.  Id. § 983(f).  Through another key reform, CAFRA enhanced

the government's burden of proof in every civil judicial forfeiture proceeding.  Id. § 983(c).[7]

What is more, Congress even determined that monetary compensation (in the form of attorneys'

fees and costs, plus interest, see 28 U.S.C. § 2465) may, in certain cases, be appropriate for

individuals who have shown their assets were unjustly seized.  See Farah v. Wekyer, 926 F.3d

492, 501-02 (8th Cir. 2019) (availability of attorneys' fees within statutory scheme at issue a

"special factor" demonstrating "what Congress has already done to address [the] injuries of the

sort the plaintiffs have allegedly suffered," even though plaintiffs themselves were ineligible to

recover such fees).  Importantly, though, Congress never provided for additional remedies, like a

damages action against the seizing agent or an award of consequential damages against the

agency itself.  See infra Section I.2.b.i (discussing relevance of such legislative silence to special

factors inquiry).

       In another important feature of CAFRA's comprehensive transformation of civil asset

forfeiture, Congress created an "exclusive remedy" for individuals seeking to set aside a final

declaration of administrative forfeiture.  18 U.S.C. § 983(e)(5).  In Francis v. Miligan, the Third

Circuit relied on that provision to affirm dismissal of a Bivens claim based on the failure to

provide adequate notice of forfeiture in the criminal context, finding that § 983(e), by its plain

terms, was the exclusive remedy for that claim, instructing courts not to "extend Bivens when an

alternative remedy exists."  530 F. App'x 138, 139 (3d Cir. 2013) (per curiam); accord Rankin v.

United States, 556 F. App'x. 305, 311 (5th Cir. 2014) (CAFRA "provides a comprehensive

statutory scheme for challenging a civil forfeiture[,]" sufficient to foreclose a Bivens claim for

_____

       [7] See United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967, 731 F.3d 189, 196 (2d Cir. 2013) (remarking that among CAFRA's "most notable changes was the heightened standard" – preponderance of evidence, not mere probable cause – "by which the government must prove that the property is subject to forfeiture.").

"the purportedly unconstitutional forfeiture of [the plaintiff's] property.").[8]  All of this

underscores that in CAFRA Congress designed an "elaborate remedial scheme" which extends to

forfeiture-related seizures such as the one at issue here, thereby precluding the creation of a new

"cause of action for money damages" through Bivens.  Schweiker, 487 U.S. at 414; see Shreiber,

214 F.3d at 152-53 (refusing to imply Bivens remedy where "Congress chose to provide certain

remedies, and not others, as part of [a] complex statutory scheme").[9]

ii. **There are Additional Processes to Vindicate the Interest.**

Beyond what Congress has explicitly provided for in CAFRA, individuals whose assets

have been seized subject to forfeiture have "available to them other alternative forms of judicial

relief," Abbasi, 137 S. Ct. at 1863 (quotations omitted), "capable of protecting the constitutional

interests at stake." Minneci, 565 U.S. at 125.  These alternatives, which should be considered

"together," not in isolation, Chappell v. Wallace, 462 U.S. 296, 304 (1983), also foreclose the

Bivens remedy Plaintiffs ask this Court to imply.  See Liff v. Office of Inspector Gen. for U.S.

Dep't of Labor, 881 F.3d 912, 919-21 (D.C. Cir. 2018) (rejecting new Bivens remedy based on

the "constellation of statutes and regulations governing" conduct at issue, without "pars[ing] the

---

[8] Several district courts have likewise declined to imply a Bivens remedy when doing so implicates CAFRA's statutory scheme.  See, e.g., Jackson v. McNeil, No. 19-cv-6245, 2020 WL 2745651 (W.D. Wash. May 27, 2020) (screening order); Williams v. Fed. Bureau of Investigation, No. 3:19-cv-00418, 2019 WL 5295465, at *6-8 (D. Or. Oct. 18, 2019); Perkins v. Jordan, No. 1:17-cv-03507, 2018 WL 2722875, at *3-4 (S.D. Ind. June 6, 2018); Harper v. United States, No. 15-cv-4833, 2016 WL 4994996, at *12-13 (E.D.N.Y. Aug. 3, 2016), report and recommendation adopted, No. 15-cv-4833, 2016 WL 4995077 (E.D.N.Y. Sept. 19, 2016); Mikhaylov v. United States, 29 F. Supp. 3d 260, 270-72 (E.D.N.Y. 2014).

[9] Also relevant are "non-judicial alternative, existing process[es]" applicable to DEA forfeitures. Vanderklok, 868 F.3d at 204 (quotation omitted).  As just one example, post-CAFRA regulations establish a process for individuals to file petitions on the DEA's website for full remission or mitigation of assets seized for forfeiture.  See supra n.4; see also Vanderklok, 868 F.3d at 205 (noting TSA's claim-filing website made "it seem[] plain that an alternative administrative process exists for addressing claims such as [the plaintiff]'s.").

specific applicability of this web of [alternative] remedies" but instead acknowledging "the spectrum of remedies they provide.").

Here, such alternatives include claims for equitable relief and even the potential for state-law damages actions against the United States.  See Abbasi, 137 S. Ct. at 1865 (alternative to Bivens can include a "form of equitable relief."); see also Vega v. United States, 881 F.3d 1146, 1154 (9th Cir. 2018) ("'Alternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies.").  Plaintiffs, to wit, already pursue such relief in this case, invoking Rule 41(g) of the Federal Rules of Criminal Procedure to challenge by way of official-capacity claim the same alleged conduct they seek to hold TFO Steve personally liable for under Bivens.  ECF No. 1 ¶¶ 293-97 (Count IV); see Abbasi, 137 S. Ct. at 1862 (availability of equitable relief "of central importance" to "special factors" inquiry).  So too in this lawsuit, Plaintiffs assert three claims under the Administrative Procedure Act, ECF No. 1 ¶¶ 246-92 (Counts I-III), which, as a number of courts of appeals have recognized, is yet another alternative form of judicial review sufficient to preclude a Bivens remedy.  See W. Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1123 (9th Cir. 2009); Carpenter's Produce v. Arnold, 189 F.3d 686, 688 (8th Cir. 1999); Miller v. U.S. Dep't of Agr. Farm Servs. Agency, 143 F.3d 1413, 1416 (11th Cir. 1998).

Still, more alternative causes of action may exist.  For instance, although the availability of damages is by no means required, Congress has taken action to provide a monetary remedy against the United States under the Federal Tort Claims Act (FTCA) in certain analogous circumstances.  See 28 U.S.C. § 2680(c) (permitting claims for loss or detention of property by

law enforcement if, among other things, property seized for forfeiture and never returned).[10]

And, as the Third Circuit recognized in a similar context, another possible alternative is a state-

law damages action against federal officers whose conduct exceeds the scope of employment.

See Vanderklok, 868 F.3d at 204; see also Malesko, 534 U.S. at 72-73 (considering possibility of

state-law negligence action as alternative to Bivens remedy).  These examples, taken together,

indicate there are "alternative, existing process[es] for protecting the interest" at stake, Wilkie,

551 U.S. at 550, and where such "alternative methods of relief are available," much less pursued,

"a Bivens remedy usually is not."  Abbasi, 137 S. Ct. at 1863.[11]

### b. Additional Special Factors Counsel Hesitation in Creating a Bivens Remedy for DEA's Forfeiture-Related Asset Seizures.

Although multiple alternative avenues for redress should foreclose any question on

whether to imply a Bivens cause of action, see Abbasi, 137 S. Ct. at 1858, there are additional

"'sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy'"

in this context.  Hernández, 140 S. Ct. at 743 (quoting Abbasi, 137 S. Ct. at 1858).

### i. Separation-of-Powers Considerations.

Chief among these concerns are separation-of-powers principles, which "are or should be

central" to this Court's analysis.  Abbasi, 137 S. Ct. at 1857.  As the Supreme Court recently

---

[10] Although the FTCA may not, standing alone, be a sufficient alternative process to foreclose a Bivens remedy, see Carlson 446 U.S. at 20-23, its availability, coupled with the many other alternatives described above, can and should be part of the analysis of whether Congress "might doubt" the need to extend Bivens.  Abbasi, 137 S. Ct. at 1861; see Andrews v. Miner, 301 F. Supp. 3d 1128, 1134-35 (N.D. Ala. 2017) (although "not a substitute for a Bivens action," the FTCA was still "effective and available remedy" to be considered with other "special factors").

[11] The "adequacy" of whatever relief these alternatives provide to a particular plaintiff is irrelevant to the analysis.  See, e.g., United States v. Stanley, 483 U.S. 669, 683 (1987); see also Bush, 462 U.S. at 388 (alternatives existed even though they did not provide "complete relief").  What matters, instead, is only that Plaintiffs and any similarly situated have "alternative methods of relief [] available"–not that they prevail.  Abbasi, 137 S. Ct. at 1863.  (Still, here, Plaintiffs did prevail when, after filing claims, their funds were remitted.)

reiterated, "[t]he Constitution grants legislative power to Congress" and that body, not the federal courts, "is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." Hernández, 140 S. Ct. at 741-42 (quoting Abbasi, 137 S. Ct. at 1856). Courts, then, must contemplate "the likely or probable intent of Congress" before stepping in and implying a damages remedy where no statutory cause of action exists. Abbasi, 137 S. Ct. at 1862. This follows as a matter of deference to the Constitution's commitment of the lawmaking power to the legislature. See id. at 1858 (inquiry asks whether "Congress would want the Judiciary to entertain a damages suit in a given case."); cf. Hernández, 140 S. Ct. at 741 ("[W]hen a court recognizes an implied claim for damages on the ground that doing so furthers the 'purpose' of the law, the court risks arrogating legislative power.").

In the asset forfeiture context at issue here, there is plainly "legislative action suggesting that Congress does not want a damages remedy." Abbasi, 137 S. Ct. at 1865. Take, for example, the absence of any such remedy in CAFRA itself. That statute, enacted in 2000, marked the "most comprehensive revision of the civil asset forfeiture laws to be passed by Congress since the first forfeiture statutes were enacted in 1789." Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed On All Parties, 27 J. Legis. 97 (2001). Its legislative history spans more than four years. Id. at 98. And its aims were to "make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures." H.R. Rep. No. 106-192, at 11 (1999). Nevertheless, despite ushering in a series of reforms to further these goals, "at no point did Congress choose to extend to any person the kind of remedies that [Plaintiffs] seek

in this lawsuit." Abbasi, 137 S. Ct. at 1862 (quotation omitted). Such silence, particularly in light of the extensive statutory reforms Congress did enact, "make[s] it less probable that Congress would want the Judiciary to entertain a damages suit" now. Id. at 1858; see also Shreiber, 214 F.3d at 152 (noting "importance of considering Congress's activities in the area in question even if the remedies provided did not afford complete relief.").

A related reason to doubt "Congress would want the Judiciary to interfere" in this context, Abbasi, 137 S. Ct. at 1858, is the "guarded way" Congress has legislated with respect to remedies in a similar setting. See Hernández, 140 S. Ct. at 747 ("Our reluctance to [imply a Bivens remedy] is reinforced by [a] survey of what Congress has done in statutes addressing related matters."). In the FTCA, Congress deliberately chose not to waive sovereign immunity for claims arising out of the detention or loss of property by federal law-enforcement officers (save for certain limited exceptions). See generally 28 U.S.C. § 2680(c). And so monetary remedies in the context of forfeiture-related seizures are expressly "circumscribed as a direct result of Congressional decisions." Vanderklok, 868 F.3d at 208; accord Hernández, 140 S. Ct. at 748 (FTCA's foreign country exception, 28 U.S.C. § 2680(k), was 'special factor' demonstrating Congress's reluctance to authorize a damages award in relevant setting).

This lack of any statutory damages remedy is all the more salient given Congress's attention to issues surrounding asset forfeiture. See Abbasi, 137 S. Ct. at 1862 (Congress's silence is "relevant" and "telling" given "frequent and intense" interest to an issue). Recent years, for example, have seen a Senate hearing and proposed legislation in both houses of Congress on whether to reform civil asset forfeiture procedures. See The Need to Reform Asset Forfeiture Hearing Before the S. Comm. on the Judiciary, 114th Cong. (Apr. 15, 2015); Due Process Act of 2016, H.R. 5283, 114th Cong. (2016); Due Process Act of 2016, S. 3045, 114th

Cong. (2016).  Such attention, as Plaintiffs are aware, ECF No. 1 ¶¶ 229-31, even spurred

Executive Branch oversight by DOJ's Office of Inspector General, which has conducted

investigations into many of the same issues taken up in this lawsuit–another factor counselling

hesitation.  See Abbasi, 137 S. Ct. at 1862 (noting in "special factors" analysis that "at Congress'

behest, the [DOJ IG] compiled a 300-page report documenting" some of the same issues

plaintiffs sought to redress).[12]

Plainly, then, concerns over asset forfeiture and related seizures have not flown under

Congress's radar.  Rather, "it seems clear that Congress had," and continues to have, "specific

occasion to consider the matter of" forfeiture-related asset seizures "and to consider the proper

way to remedy" what if any wrongs may arise in this context.  Abbasi, 137 S. Ct. at 1865.

Notably missing from the "pattern of congressional action" is the remedy Plaintiffs seek.

Hernández, 140 S. Ct. at 749.  This "indicat[es] that congressional inaction has not been

inadvertent[,]" which, in turn, requires "appropriate judicial deference[.]" Schweiker, 487 U.S. at

423.  This, then, is straightforwardly not a case for a court to step in and "create a remedy where

Congress has chosen not to." Shreiber, 214 F.3d at 153.

---

[12] See generally United States Dep't of Justice, Office of the Inspector General, Review of the Department's Oversight of Cash Seizure and Forfeiture Activities (Mar. 2017), https://oig.justice.gov/reports/2017/e1702.pdf (last visited May 28, 2020); United States Dep't of Justice, Office of the Inspector General, Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities (Jan. 2015), https://oig.justice.gov/reports/2015/e153.pdf (last visited May 28, 2020).  Beyond OIG oversight, additional safeguards ensure "that absent a Bivens remedy there will be []sufficient deterren[ts] to prevent officers from violating the Constitution." Abbasi, 137 S. Ct. at 1863.  These include the possibility of criminal prosecution, see 18 U.S.C. § 242, and adverse employment actions, see 5 U.S.C. § 7543; 5 C.F.R. § 752.403.

### ii.      National Security Concerns also Warrant Caution.

Distinct from, but much related to, these separation-of-powers considerations are

concerns over the impact a <u>Bivens</u> remedy could have on national-security matters, which are

"the prerogative of the Congress and President[,]" <u>Abbasi</u>, 137 S. Ct. at 1861, and "rarely proper

subjects for judicial intervention." <u>Haig v. Agee</u>, 453 U.S. 280, 292 (1981).  Indeed, the

Supreme Court has never implied a <u>Bivens</u> remedy in a case implicating national security.

<u>Vanderklok</u>, 868 F.3d at 206.  Yet, here, Plaintiffs ask this Court to do just that, i.e. create a non-

statutory damages remedy against a DEA officer "tasked with assisting in a critical aspect of

national security–securing our nation's airports and air traffic."  <u>Id.</u> at 207; <u>see also</u> <u>United States

v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985) (describing "the veritable national crisis in

law enforcement caused by smuggling of illicit narcotics.").

Whether or not Plaintiffs themselves were involved in drug-trafficking activities is beside

the point.  That Congress and the Executive Branch consider the DEA's drug interdiction efforts

(particularly those at international airports) intertwined with matters of national security is clear.

<u>See</u> 21 U.S.C. § 960a (amending Controlled Substances Act to criminalize drug-trafficking

activities with nexus to terrorism); 151 Cong. Rec. H6293-02 (daily ed. July 21, 2005) (statement

of Rep. Henry Hyde) (such legislation was proposed after Congress had "taken a focused look"

at the "definite link between the illicit narcotics trade and the financing of terrorism.").[13]  And so

--------

[13] <u>See</u> <u>also</u> Drug Enf't Admin., National Drug Threat Assessment 3 (2019)
https://www.dea.gov/sites/default/files/2020-02/DIR-007-
20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf  (last
visited May 29, 2020) (DEA statement recognizing relationship between its mission and
safeguarding national security interests); <u>Counternarcotics Strategy and Policy Training in
Afghanistan: Hearing before the Subcomm. on the Middle East and South Asia of the H. Comm.
on Foreign Affairs</u>, 110th Cong. 5 (2007) (statement of Rep. Mike Pence) ("[T]he war on drugs
is a crucial piece of the war on terror."); <u>DOD Counternarcotics: What is Congress Getting for its
Money?: Hearing before the Subcomm. on Criminal Justice, Drug Policy and Human Resources</u>

long as national security concerns "are in play" (as they most certainly are if courts were to incentivize litigation by recognizing a damages remedy for the class of cases in which DEA officials assigned to international airports engage in forfeiture-related seizures), this Court should hesitate before extending Bivens.  Vanderklok, 868 F.3d at 207; see also Hernández, 140 S. Ct. at 746 (refusing to imply Bivens remedy to govern "conduct of agents positioned at the border" given its "clear and strong connection to national security").

### iii.   Challenges to Federal Policy, or the Actions of Federal Agencies, are Inappropriate under Bivens.

Just as national-security matters raise separation-of-powers issues, so too do challenges to federal policy.  See Abbasi, 137 S. Ct. at 1860 ("[I]t must be noted that a Bivens action is not a proper vehicle for altering an entity's policy.") (quotation omitted).  Yet, in this case, Plaintiffs leave no qualms that they bring this suit to contest alleged "unlawful and unconstitutional" DEA and TSA "policies or practices that violate the rights of thousands of air travelers each year." ECF No. 1 ¶ 1.  As to the Bivens claim, in particular, Plaintiffs sue the TFO for conduct he took "pursuant to" such alleged "policy or practice."  Id. ¶ 65.  More to the point, that same claim is, at bottom, a challenge to the DEA's preliminary decision in this matter to issue CAFRA notices and seek forfeiture of seized money pursuant to express congressional authority.  See Exs. A, C

_____

of the H. Comm. on Government Reform, 108th Cong. 9 (2004) (statement of Rep. Elijah Cummings) ("[T]he United Nations Office on Drugs and Crimes has stressed that the war on terror and the war on drugs are in effect the same war[.]"); Narco-Terrorism: International Drug Trafficking and Terrorism – A Dangerous Mix: Hearing Before the S. Comm. on the Judiciary, 108th Cong. 7 (2003) (statement of Steven Casteel, Assistant Adm'r for Intelligence, DEA) ("Prior to September 11, 2011, the law enforcement community typically addressed drug trafficking and terrorist activities as separate issues.  In the wake of the terrorist attacks in New York City, Washington, DC, and Pennsylvania, these two criminal activities are visibly intertwined.").

(all forfeiture-related correspondence issued on behalf of DEA, not the TFO himself); 21 U.S.C. § 881(a)(b) (DEA's authority to seize items for forfeiture).  Plaintiffs' grievance, then, is not with the actions of some rogue officer.  Cf. F.D.I.C. v. Meyer, 510 U.S. 471, 485 (1994) ("[T]he purpose of Bivens is to deter the officer.").  Instead, they challenge purported policies of the federal government that lead the TSA officers to call local law enforcement, as they did in this case, and in turn, the DEA.[14]  Equitable relief, not Bivens, is the proper means to raise any such challenge to the policies or conduct of federal agencies.  Malesko, 534 U.S. at 74.

### iv.    A Bivens Remedy in the Asset-Seizure Context Would Raise Significant Practical Problems.

Beyond these weighty separation-of-powers concerns, Plaintiffs' proposed Bivens remedy, if allowed, would implicate "a number of economic and governmental concerns." Abbasi, 137 S. Ct. at 1856.  "Th[e]se matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself[.]"  Id. at 1858.  Chief among these burdens are practical ones. Vanderklok, 868 F.3d at 208.

Given "the inherently transient nature of drug courier activity at airports," United States v. Place, 462 U.S. 696, 704 (1983), TFOs responsible for interdiction efforts in our nation's airports must, on a routine basis, make quick, discretionary judgments about whether there is sufficient justification to investigate a traveler or seize contraband for forfeiture or further investigation.  In this context, even just the "threat of damages liability could [] increase the probability that a [DEA] agent would hesitate in making split-second decisions about suspicious passengers." Vanderklok, 868 F.3d at 207; see Abbasi, 137 S. Ct. at 1861.

---

[14] The complaint is replete with references to an alleged TSA and DEA policy or practice Plaintiffs seek to challenge here.  See, e.g., ECF No. 1 ¶¶ 1-3, 15, 19-22, 45, 50-51, 53, 57-58, 60-61, 63, 65, 133, 199-200, 207-10, 218, 232-38, 256-60, 272-79, 285-92.

Aside from the impact of a new <u>Bivens</u> action on officers' daily responsibilities, this Court should also consider the potential economic toll of extending such a remedy to the class of cases involved here.  <u>Abbasi</u>, 137 S. Ct. at 1856.  As Plaintiffs acknowledge, "[e]very year, [the] DEA conducts tens of thousands of seizures of currency, including hundreds or even thousands of seizures of currency from travelers at U.S. airports."  ECF No. 1 ¶ 219.[15]  And while the number of DEA cash-related seizures are (by themselves) significant, Plaintiffs' theory of liability is even more unbounded; a <u>Bivens</u> remedy predicated on an alleged wrongful forfeiture-related seizure by the DEA would necessarily encompass seizures of other property by other agencies as well.  Plaintiffs' attempt to bring this case as a class action, <u>see</u> ECF No. 1 ¶¶ 170-245, just underscores the breadth of the remedy they seek.  Given the frequency with which such asset seizures occur, "a general provision for tortlike liability" whenever federal "employees are unduly zealous in pressing a governmental interest [in] property would invite an onslaught of <u>Bivens</u> actions."  <u>Wilkie</u>, 551 U.S. at 562.[16]  The economic costs, in other words, would be substantial; as would "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process" whenever a public official is sued personally.  <u>Abbasi</u>, 137 S. Ct. at 1856.  This Court should thus refrain from implying a <u>Bivens</u> remedy and, instead, "leave it to Congress to weigh the implications of such a significant" and costly "expansion of Government liability."  <u>Meyer</u>, 510 U.S. at 486.

***

---

[15] From 2007 to 2016, the DEA made over 80,000 seizures of currency.  <u>See</u> <u>supra</u> n.12 (citing 2017 DOJ OIG Report), at 11; <u>see</u> <u>also</u> ECF No. 1 ¶ 221 (referring to this statistic).

[16] The DEA engaged in just under 10,000 asset seizures in 2019 alone.  <u>See</u> Drug Enf't Admin., DEA Asset Forfeiture Statistics (Apr. 1, 2020), https://www.dea.gov/dea-asset-forfeiture (last visited May 26, 2020) (asset forfeiture statistics) (reporting 9,827 such seizures in fiscal year 2019).

**II.      Qualified Immunity Protects the TFO's Alleged Conduct**

Qualified immunity shields public officials from the burdens not only of liability, but of litigation, too, unless their conduct, as alleged, violated a clearly established constitutional right. Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Such immunity, therefore, applies if a plaintiff is unable to allege "a constitutional right was violated or in the alternative, [] that [the] right was clearly established."  Bryan v. United States, 913 F.3d 356, 362 (3d Cir. 2019).  Although courts have discretion as to the order in which to tackle these questions, Pearson, 555 U.S. at 236, the Supreme Court has underscored that its "usual adjudicatory rules" favor resolving claims of qualified immunity at the latter inquiry when, as here, it is plain the alleged right was not "clearly established."  Camreta v. Greene, 563 U.S. 692, 705 (2011).  This approach is particularly appropriate where resolving "the constitutional question is so fact-bound" that any decision would "provide[] little guidance for future cases."  Pearson, 555 U.S. at 237.

In this case, Plaintiffs' failure to allege the violation of any clearly established Fourth Amendment right is dispositive of the proposed Bivens claim against the TFO.  That is, Plaintiffs cannot, as they must, point to controlling precedent where "an officer acting under similar circumstances" as the TFO "was held to have violated the Fourth Amendment."  District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (quotations omitted); see also id. (emphasizing need to define 'clearly-established law' with "specificity" in Fourth Amendment context) (quotations omitted).  Indeed, no Supreme Court or Third Circuit decision has found Fourth Amendment liability on an official for making an investigatory seizure of tens of thousands of dollars of cash at an international airport, and certainly not in circumstances analogous to these, where the officer called the alleged co-owner of the property who was unable to corroborate the traveler's story.  Rather, limited Third Circuit precedent on the investigatory seizure of property in an airport has found such seizure constitutional.  See United States v. Frost, 999 F.2d 737, 740

(3d Cir. 1993) (upholding seizure of traveler's property at Pittsburgh International Airport based on reasonable suspicion); cf. Murphy v. Mifflin Cty. Reg'l Police Dep't, 548 F. App'x 778, 782 (3d Cir. 2013) (seizure of bus passenger's backpack on reasonable suspicion did not violate Fourth Amendment).[17]

So "even assuming–contrafactually–that his alleged [cash seizure] violated the Fourth Amendment" as pleaded, qualified immunity applies because the constitutionality of that conduct was not so "beyond debate" such that "every reasonable official" in the TFO's shoes would have understood what he or she was doing violated the Fourth Amendment. Ashcroft v. al-Kidd, 563 U.S. 731, 741-43 (2011) (emphasis added). More to the point, Plaintiffs affirmatively allege the TFO seized the cash in reliance on some DEA policy or practice, see ECF No. 1 ¶ 65, which only underscores his entitlement to qualified immunity, since there is no way the TFO could "have known for certain that [any such policy or practice] was unlawful[.]" Abbasi, 137 S. Ct. at 1867; see also Wilson v. Layne, 526 U.S. 603, 617 (1999); cf. Hernández, 140 S. Ct. at 744 ("presume[ing] that "policy and training incorporate[s] [] the Executive's understanding of the Fourth Amendment's prohibition of unreasonable seizures"). In sum, given that "prior case law has not clearly settled the right, and so given [the TFO] fair notice of it," this Court should follow the Supreme Court's guidance to "dismiss the claim for money damages" on the basis of qualified immunity. Camreta, 563 U.S. at 705.

---

[17] To be sure, this limited caselaw involves additional facts not affirmatively alleged in the complaint and not in the record at this point (such as a canine alert to the property after the initial seizure). But it remains Plaintiffs' burden to cite the caselaw showing the particular conduct at issue was clearly established to be unconstitutional; it isn't the TFO's duty to prove the reverse. See Jackson v. Phelps, 575 F. App'x 79, 82 (3d Cir. 2014) ("[T]he plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right.") (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)).

**CONCLUSION**

For the foregoing reasons, this Court should dismiss the claim against "Steve" Last Name

Unknown with prejudice.

Dated: May 29, 2020                                    Respectfully submitted,


                                                      JOSEPH H. HUNT
                                                      Assistant Attorney General
                                                      Civil Division

                                                      C. SALVATORE D'ALESSIO, JR.
                                                      Acting Director
                                                      Torts Branch, Civil Division

                                                      MARY HAMPTON MASON
                                                      Senior Trial Counsel, Torts Branch

                                                      /s/ *David Inkeles*
                                                      DAVID W. INKELES
                                                      Trial Attorney (NY Bar No. 5511068)*
                                                      United States Department of Justice
                                                      Torts Branch, Civil Division
                                                      P.O. Box 7146, Ben Franklin Station
                                                      Washington, D.C. 20044-7146
                                                      Tel:    (202) 305-0401
                                                      Fax:    (202) 616-4314
                                                      E-mail: david.w.inkeles@usdoj.gov
                                                      *Attorneys for "Steve" Last Name Unknown*

                                                      *Admitted *Pro Hac Vice*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of May, 2020, a true and correct copy of Defendant "Steve" Last Name Unknown's Brief in Support of his Motion to Dismiss was served upon the attorney of record for each other party by means of the District Clerk's CM/ECF electronic filing system.


/s/ *David Inkeles*
DAVID W. INKELES
Trial Attorney, U.S. Department of Justice