**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

REBECCA BROWN, AUGUST TERRENCE
ROLIN, STACY JONES-NASR, and
MATTHEW BERGER, on behalf of
themselves and all others similarly situated,

     *Plaintiffs*,

v.

TRANSPORTATION SECURITY
ADMINISTRATION;

DAVID P. PEKOSKE, Administrator,
Transportation Security Administration,
in his official capacity;

DRUG ENFORCEMENT
ADMINISTRATION;

TIMOTHY J. SHEA, Acting Administrator,
Drug Enforcement Administration, in his
official capacity;

STEVE DAWKIN, Agent, Drug Enforcement
Administration, in his individual capacity;
and

UNITED STATES OF AMERICA;

     *Defendants*.

Civil Action No. 2:20-cv-00064-LPL

**FIRST AMENDED
COMPLAINT – CLASS ACTION**

**JURY DEMANDED**

**FIRST AMENDED CLASS COMPLAINT FOR CLASS-WIDE DECLARATORY AND
INJUNCTIVE RELIEF AND FOR INDIVIDUAL RELIEF OF RETURN OF PROPERTY
AND COMPENSATORY DAMAGES**

# TABLE OF CONTENTS

Introduction .................................................................................................................. 1

Jurisdiction ................................................................................................................ 11

Venue ........................................................................................................................ 11

Parties ....................................................................................................................... 11

    A.  Named Plaintiff Rebecca Brown ............................................................... 11

    B.  Named Plaintiff August Terrence Rolin ................................................... 12

    C.  Named Plaintiff Stacy Jones-Nasr .......................................................... 13

    D.  Named Plaintiff Matthew Berger .............................................................. 13

    E.  Defendant Transportation Security Administration ............................... 14

    F.  Defendant David P. Pekoske ..................................................................... 16

    G.  Defendant Drug Enforcement Administration ....................................... 17

    H.  Defendant Timothy J. Shea ....................................................................... 18

    I.  Defendant DEA Task Force Officer Steve Dawkin ................................ 18

    J.  Defendant United States of America ........................................................ 18

Factual Allegations .................................................................................................... 19

    A.  Terry and his family stored cash in their family home ......................... 19

    B.  Terry entrusted the stored cash with his daughter, Rebecca ............... 21

    C.  TSA unlawfully seized Rebecca and her carry-on luggage, which contained Terry's and Rebecca's cash, at the transportation security screening checkpoint ........................ 22

    D.  DEA seized Rebecca, her carry-on luggage, her cell phone, and Terry's and Rebecca's cash, and then DEA kept their cash for civil forfeiture .................................. 26

    E.  Aftermath for Terry and Rebecca ........................................................... 29

    F.  Individual injuries to Terry and Rebecca ............................................... 31

    G.  Continuing and ongoing harm to Terry and Rebecca from TSA's and DEA's airport personal seizure and cash seizure policies or practices ......................... 33

H. Stacy and her husband traveled to North Carolina with cash for gambling, and while there also sold a car to a friend for cash ................................................................. 35

I. TSA seized Stacy, her husband, their carry-on luggage, and their cash ........................... 37

J. DEA seized Stacy, her husband, their carry-on luggage, and their cash, and then DEA kept their cash for civil forfeiture ................................................................. 39

K. DEA still has Stacy's cash ................................................................. 41

L. Continuing and ongoing harm to Stacy and her husband from TSA's and DEA's airport personal seizure and cash seizure policies or practices ......................... 42

M. TSA seized Matt, his carry-on luggage, and his cash ....................................... 43

N. Matt and his business are suffering continuing and ongoing harm from TSA's and DEA's airport personal seizure and cash seizure policies or practices ..................... 46

TSA Class Action Allegations ................................................................. 50

A. Nationwide examples of TSA Screeners following the challenged TSA personal seizure and cash seizure policy or practice ................................................ 58

B. Class action requirements ................................................................. 68

DEA Class Action Allegations ................................................................. 74

A. DEA's unconstitutional policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on the knowledge or belief that they are traveling with a "large" amount of cash ...................................... 77

B. DEA's unconstitutional policy or practice of seizing for civil forfeiture "large" amounts of cash from air travelers because DEA deems "large" amounts of cash presumptively subject to seizure ................................................. 81

C. Nationwide examples of DEA agents following the challenged DEA airport personal seizure and cash seizure policies or practices ..................................... 82

D. Class action requirements ................................................................. 92

Class Claims ................................................................. 96

Individual Claims of Named Plaintiffs Rebecca Brown and Terry Rolin ................................................. 103

Request for Relief ................................................................. 105

Jury Demand ................................................................. 108

CERTIFICATE OF SERVICE ................................................................. 109

**Introduction**

1.     This civil rights lawsuit asks whether federal agencies may seize air travelers, their belongings, and/or their cash at U.S. airports without any indication of criminal activity, but simply because they are traveling with a "large" amount of cash. Plaintiffs seek to enjoin these unlawful and unconstitutional policies or practices of the Transportation Security Administration ("TSA") and the Drug Enforcement Administration ("DEA"), which violate the Fourth Amendment rights of thousands of air travelers each year.

2.     Named Plaintiffs Rebecca Brown, August Terrence "Terry" Rolin, Stacy Jones-Nasr, and Matthew Berger seek declaratory and injunctive relief on behalf of a nationwide class of individuals who have been or will be subjected to TSA's and DEA's unlawful and unconstitutional personal seizure and cash seizure policies or practices at airports across the country.

3.     Named Plaintiffs Rebecca and Terry also seek (1) from DEA, the return of interest that accrued on their unconstitutionally seized cash that DEA withheld from them for seven months and (2) from the seizing DEA agent, compensatory damages caused by the unconstitutional cash seizure and the seven months of unconstitutional deprivation of their money.

4.     TSA has a policy or practice of seizing travelers, their property, and/or their cash at airports without reasonable suspicion or probable cause, based solely on the amount of cash they are traveling with or the amount of cash TSA believes they are traveling with. TSA's policy or practice exceeds the agency's statutory authority—which is limited to transportation security and does not extend to investigating potential crimes unrelated to transportation security—and violates the Fourth Amendment.

5.     DEA has policies or practices of (1) seizing travelers, their property, and/or their cash at airports without reasonable suspicion or probable cause, based solely on the presence or amount

1

of cash DEA agents know or believe they are traveling with, and (2) seizing cash from travelers at airports for civil forfeiture without probable cause, based solely on the amount of cash DEA agents know or believe they are traveling with, which DEA deems presumptively subject to seizure at a certain threshold. DEA's policies or practices violate the Fourth Amendment.

6.     In late August 2019, Terry entrusted his daughter, Rebecca, with $82,373 in cash—his and his parents' life savings—so she could deposit it into a new bank account for him. They planned to use the money for his health care and other needs, including replacing his teeth and fixing his truck.

7.     Rebecca was visiting Pittsburgh for the weekend to see Terry and attend a family celebration. She intended to fly back to her home in Massachusetts with the cash and deposit it into a new joint bank account. She placed the cash in a purse in her carry-on luggage and went to the Pittsburgh International Airport (PIT) early in the morning on August 26, 2019. She did not check any luggage.

8.     When she went through TSA transportation security screening at the Pittsburgh airport, TSA Screeners pulled aside Rebecca's carry-on luggage solely because they observed via X-Ray that it contained a "large" amount of cash. They did not further inspect her carry-on luggage or the cash to see if it was concealing any dangerous or prohibited items.

9.     After the TSA Screeners completed the transportation security screening of Rebecca's carry-on luggage containing her cash, they told her they were going to hold on to her carry-on luggage until law enforcement officers could arrive.

10.     After the TSA Screeners completed the transportation security screening of Rebecca's carry-on luggage containing her cash, they questioned Rebecca about why she had so much cash in her carry-on luggage and told her to give them her ID and proof of her travel arrangements to

and from Pittsburgh. Rebecca provided her ID and boarding passes, which the TSA Screeners took and photocopied.

11.    Rebecca did not feel free to leave the transportation security screening area, to decline to answer the TSA Screeners' questions about her cash, or to decline to give the TSA Screeners her ID and travel documents. Rebecca reasonably believed she was being detained by TSA. Even if the TSA Screeners had told her she was free to leave, she could not realistically have left her carry-on luggage with her father's life savings and her other possessions. TSA seized Rebecca along with her carry-on luggage, her cash, and her ID. The TSA Screeners' seizure of Rebecca and her belongings exceeded TSA's statutory authority and was unconstitutional.

12.    As determined by TSA's transportation security screening, Rebecca had no items that could threaten transportation security—weapons, explosives, incendiaries, or other prohibited items—in her carry-on luggage or on her person. She also had no illegal drugs or any other contraband.

13.    But rather than permit Rebecca to continue to her gate, the TSA Screeners unlawfully prolonged Rebecca's detention beyond the administrative search of Rebecca and her carry-on luggage by detaining Rebecca, photocopying her ID and boarding pass, and questioning her about why she was traveling with cash, a topic that was not relevant to any transportation security concerns.

14.    Rebecca was behaving normally, like a typical air traveler. There was no indication of suspicious or criminal activity in Rebecca's behavior or the way she was traveling with cash, which was in a purse in her carry-on luggage. And flying domestically with any amount of cash is entirely lawful.

3

15.    Nevertheless, after TSA seized her and her carry-on luggage for approximately 10-20 minutes, Rebecca was questioned in the transportation security screening area by a Pennsylvania state trooper and then by his supervisor about why she was traveling with the cash. Rebecca did not feel free to walk away from the troopers or to decline to answer their questions.

16.    Rebecca was honest and forthcoming with the troopers and explained that she was taking the cash home with her to deposit in a new bank account for her father. After answering the troopers' questions, Rebecca was eventually allowed to leave with her carry-on luggage, including the cash.

17.    But after she arrived at her boarding gate, the same trooper and a DEA agent again approached Rebecca, and the DEA agent pulled her aside in order to question her about the cash. The DEA agent was Defendant Steve Dawkin. From the start of this encounter, Rebecca did not feel free to walk away from Defendant Dawkin or to decline to answer his questions.

18.    The sole reason Defendant Dawkin initiated this non-consensual seizure was because he knew that Rebecca was traveling with a large amount of cash.

19.    Rebecca truthfully explained to Defendant Dawkin that she was traveling with the cash to deposit it in the bank for her father and why she was doing so.

20.    Despite Rebecca's explanation, and without probable cause, Defendant Dawkin seized Terry's life savings because it was greater than $5,000 and was thus considered a "suspicious" amount presumptively subject to seizure under DEA's policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture.

21.    Rebecca was not arrested or charged with any crime. She was free to leave as soon as (but not before) Defendant Dawkin took her father's life savings.

22.    DEA held Terry's life savings without probable cause for seven months.

23.     Neither Terry nor Rebecca has been arrested for or charged with any crime.

24.     DEA's initial seizure and continued retention of Terry's life savings for seven months prevented him from replacing his teeth, repairing his truck, and paying for other expenses for those seven months.

25.     After these events, as a result of their knowledge of TSA's and DEA's airport personal seizure and cash seizure policies or practices, Rebecca has refrained and will refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash for her to deposit in Terry's bank account.

26.     Named Plaintiff Stacy Jones-Nasr ("Stacy") is an airline employee and avid recreational gambler who frequently travels to casinos to play poker, slot machines, and other games of chance with her husband.

27.     On May 19, 2020, as Stacy and her husband were returning from a trip to North Carolina, TSA Screeners and DEA agents at the Wilmington International Airport (ILM) seized approximately $40,000-45,000 in cash they were traveling with, most of which—approximately $38,000 in cash—was sealed in a clear plastic FoodSaver bag in Stacy's carry-on luggage.

28.     When Stacy and her husband went through TSA transportation security screening at the Wilmington airport, a female TSA Screener pulled aside Stacy's carry-on luggage solely because another TSA Screener observed via X-Ray that it contained a "large" amount of cash. The female TSA Screener opened Stacy's carry-on luggage and found the cash sealed in the clear plastic FoodSaver bag but did not further inspect the cash to see if it was concealing any dangerous or prohibited items.

29.     At this point, TSA had completed the transportation security screening of Stacy's carry-on luggage.  As determined by TSA's transportation security screening, Stacy had no items that

could threaten transportation security—weapons, explosives, incendiaries, or other prohibited items—in her luggage or on her person. She also had no illegal drugs or any other contraband.

30.    But rather than permit Stacy and her husband to continue to their gate, the TSA Screener unlawfully prolonged the detention beyond the administrative search of Stacy and her husband and their carry-on luggage by detaining Stacy and her husband and questioning them about the source of the cash, a topic that was not relevant to any transportation security concerns.

31.    After Stacy and her husband honestly answered several questions about their cash, the TSA Screener told them to wait while she called a sheriff's deputy to the scene.

32.    Stacy and her husband did not feel free to leave the transportation security screening area or to decline to answer the TSA Screener's questions about their cash. They reasonably believed they were being detained by TSA. Even if the TSA Screener had told Stacy she was free to leave, she could not realistically have left her carry-on luggage with their money and her other possessions. Stacy and her husband were seized by TSA along with their carry-on luggage and their cash. The TSA Screener's seizure of Stacy, her husband, and their belongings exceeded TSA's statutory authority and was unconstitutional.

33.    Stacy and her husband were behaving normally, like typical air travelers. There was no indication of suspicious or criminal activity in their behavior or the way they were traveling with cash, which was in the clear plastic FoodSaver bag in Stacy's carry-on luggage as well as in her husband's fanny pack. And flying domestically with any amount of cash is entirely lawful.

34.    Once TSA turned over custody of Stacy, her husband, their carry-on luggage, and their cash to the sheriff's deputy, they were again questioned by the sheriff's deputy about the source and purpose of the cash. Stacy and her husband answered the deputy's questions honestly. After they explained that much of it was from the sale of a car to a friend, the deputy asked for the

friend's phone number, and called him to verify the story. The deputy then told them that their stories did not "add up" and escorted them to his office in the airport. They and their luggage remained under detention during this time.

35.    Two plainclothes DEA officers then came to the deputy's office and interrogated Stacy and her husband about the cash. The officers searched their carry-on luggage and found several thousand dollars in her husband's fanny pack. Along with the $38,000 in Stacy's carry-on luggage, the DEA agents seized all of the cash from the fanny pack, except for $500 that was in a bank envelope with an ATM receipt.

36.    The DEA agents seized for civil forfeiture all of the cash in Stacy's carry-on luggage and all but $500 of the cash in her husband's fanny pack, seizing a total of approximately $40,000-$45,000.

37.    Neither Stacy nor her husband were arrested or charged with any crime. Nor were they accused of any crime. Once the DEA agents seized their cash for civil forfeiture, the DEA agents told Stacy and her husband they were free to leave and catch their flight. They flew back home to Tampa that same day.

38.    Now, two months after the seizure, DEA has not returned any of the approximately $40,000-$45,000 that they seized from Stacy and her husband on May 19, 2020.

39.    DEA has also never provided them with any property receipt for the seized cash, much less a receipt itemizing the exact amount of the seized cash.

40.    Stacy and her husband have also not yet received a notice regarding the DEA's intent to pursue civil forfeiture of their cash under the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983(a)(1)(A).

41.    Two months after the unlawful seizure of their cash, neither Stacy nor her husband has been arrested for or charged with any crime related to or arising from any circumstances surrounding the seizure of their cash on May 19, 2020.

42.    Named Plaintiff Matthew Berger ("Matt") owns a limo and tour bus company in California.

43.    On November 3, 2015, Matt was flying domestically from Las Vegas, Nevada to Newark, New Jersey to inspect and potentially purchase a pre-owned commercial tour bus in New York. He was traveling with $55,000 in hundred-dollar banded bills in a black, bank-issued envelope inside his carry-on luggage. He had paperwork and electronic communications with the seller regarding the potential business purchase.

44.    Matt was traveling on a one-way airline ticket. If the inspections and purchase negotiations were successful, he planned to drive the tour bus cross-country back to California. If they failed, he planned to purchase a return airline ticket to California.

45.    Matt's flights to New Jersey connected through the Charlotte Douglas International Airport (CLT), and he had an overnight layover in Charlotte, North Carolina.

46.    When Matt returned to CLT at approximately 7 a.m. the next morning and went through the TSA transportation security screening checkpoint, TSA Screeners pulled his carry-on luggage aside for additional screening. Matt had no weapons, explosives, incendiaries, or other prohibited items in his carry-on luggage or on his person.

47.    During the additional search, a TSA Screener opened his carry-on luggage, unzipped the bank envelope, and asked Matt how much money was there and what it was for.

48.    At this point, the TSA Screener had completed the transportation security screening of Matt and of his carry-on luggage. The TSA Screener had inspected Matt's carry-on luggage and

found no weapons, explosives, incendiaries, or other prohibited items, and his questions about the amount of, and purpose for, the cash were not relevant to any transportation security concern.

49.    Matt reasonably believed he was being detained by TSA at this point. Even if TSA Screeners had told him he was free to leave, he could not realistically have left his carry-on luggage with his cash and her other possessions. TSA seized Matt along with his carry-on luggage, cash, and ID. The TSA Screeners' seizure of Matt and his belongings exceeded TSA's statutory authority and was unconstitutional.

50.    Matt did not feel free to walk away from the TSA Screener or to decline to answer the TSA Screener's questions about his cash, so Matt explained that the amount of cash was $55,000 and that its purpose was to potentially purchase a tour bus for his business.

51.    Another TSA Screener, assisted by a TSA supervisor, then took and began photographing Matt's cash, his driver's license, and his boarding pass. Matt did not feel free to walk away or to decline to let the TSA Screeners photograph his belongings.

52.    Rather than permit Matt to continue to his gate, the TSA Screeners unlawfully prolonged his detention beyond the administrative search of Matt and his carry-on luggage by detaining Matt, photographing his belongings, and questioning him about why he was traveling with cash, a topic that was not relevant to any transportation security concerns.

53.    Keeping Matt in the transportation security screening area, the TSA Screeners then called over two law enforcement officers, who took Matt's carry-on luggage and cash from the TSA Screeners and escorted him into a small room, where they interrogated him about the cash. Even though Matt showed the officers all the documentation he had with him regarding his business, the potential purchase, and his communications with the seller of the tour bus, they seized Matt's cash for civil forfeiture.

54.    Matt was not arrested or charged with any crime. He was free to leave as soon as (but not before) the officers took his money.

55.    Without the money for the purchase of the tour bus, Matt no longer had any reason to travel to New Jersey and had to purchase a new ticket to return directly from CLT to his home in San Diego, California.

56.    After hiring an attorney to contest the seizure and attempted civil forfeiture of his cash, Matt's money was eventually returned. However, he remains deeply traumatized by these events and by the violations of his rights.

57.    After these events, Matt is now aware of TSA's and DEA's airport personal seizure and cash seizure policies or practices, and as a result he has refrained and will refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash. Matt has significantly changed his business behavior when buying or purchasing pre-owned vehicles; he now refuses to fly commercially with more than $10,000 in cash or to do business in any circumstances that would require someone to fly commercially with more than $10,000 in cash. This puts Matt at a significant disadvantage in the market for pre-owned limos and tour buses, which typically are paid for with cash.

58.    Rebecca's, Stacy's, and Matt's stories are not unique. What happened to them illustrates the systematic nationwide policies or practices of TSA and DEA: seizing air travelers, their luggage, and their cash based solely on the presence or assumed presence of what these agencies deem "large," "excessive,' or "suspicious" amounts of cash. On behalf of themselves and all others similarly situated, Named Plaintiffs Terry, Rebecca, Stacy, and Matt bring this nationwide class-action lawsuit to recover their property and end these unlawful and unconstitutional airport personal seizure and cash seizure policies or practices.

## Jurisdiction

59.    This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

60.    Plaintiffs bring their class-wide statutory and Fourth Amendment claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the United States Constitution.

61.    Named Plaintiffs Rebecca Brown and Terry Rolin bring their individual claim for the return of seized property under Federal Rule of Criminal Procedure 41(g) and this Court's general equity jurisdiction under 28 U.S.C. § 1331.

62.    Named Plaintiffs Rebecca Brown and Terry Rolin bring their individual Fourth Amendment claim for compensatory damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

## Venue

63.    Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(b)(2) and 1391(e)(1)(B) and Federal Rule of Criminal Procedure 41(g) because Defendants' unlawful and unconstitutional conduct occurred, and on information and belief continues to occur, in Pittsburgh, Pennsylvania.

## Parties

**A.  Named Plaintiff Rebecca Brown**

64.    Named Plaintiff Rebecca Brown is an adult citizen of the United States and is a resident of Lowell, Massachusetts.

65.    Rebecca is the daughter of Named Plaintiff August Terrence "Terry" Rolin.

66.    Rebecca has joint ownership with Terry of the $82,373 in cash that Defendants seized on August 26, 2019. She also had a possessory interest in the cash on the day of the seizure. Rebecca

11

also owned the carry-on luggage, the contents of the carry-on luggage, and the other possessions that TSA seized on August 26, 2019.

67. Rebecca brings:

    a. Three class-wide claims for declaratory and injunctive relief on behalf of individuals whose cash, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by TSA and/or DEA;

    b. One individual claim against DEA for the return of interest that accrued on Terry's and Rebecca's seized cash for the seven months that DEA unconstitutionally withheld it from them; and

    c. One individual claim against DEA agent Dawkin for compensatory damages caused by his unconstitutional cash seizure and the seven months of unconstitutional deprivation of Terry's and Rebecca's money.

**B. Named Plaintiff August Terrence Rolin**

68. Named Plaintiff August Terrence Rolin ("Terry") is an adult citizen of the United States and is a resident of Morgan, Pennsylvania.

69. Terry is a 79-year-old retiree and is the father of Named Plaintiff Rebecca Brown.

70. Terry has joint ownership with Rebecca of the $82,373 in cash that Defendants seized on August 26, 2019.

71. Terry brings:

    a. Three class-wide claims for declaratory and injunctive relief on behalf of individuals whose cash, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by TSA and/or DEA;

    b.   One individual claim against DEA for the return of interest that accrued on Terry's and Rebecca's seized cash for the seven months that DEA unconstitutionally withheld it from them; and

    c.   One individual claim against DEA agent Dawkin for compensatory damages caused by his unconstitutional cash seizure and the seven months of unconstitutional deprivation of Terry's and Rebecca's money.

**C.  Named Plaintiff Stacy Jones-Nasr**

72.   Named Plaintiff Stacy Jones-Nasr is an adult citizen of the United States and is a resident of Tampa, Florida.

73.   Stacy works for a commercial airline and flies frequently, in part because she can fly standby for free on her own airline and also receives reduced airfare on other airlines. She and her husband are avid recreational gamblers. She typically plays poker and slot machines.

74.   Stacy and her husband have joint ownership of the approximately $40,000-$45,000 that first TSA and then DEA seized from Stacy and her husband at the Wilmington International Airport (ILM) while they were traveling home to Tampa on May 19, 2020. She also has a possessory interest in the approximately $38,000 that was in her carry-on bag (a portion of the $40,000-$45,000 total).

75.   Stacy brings three class-wide claims for declaratory and injunctive relief on behalf of individuals whose cash, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by TSA and/or DEA.

**D.  Named Plaintiff Matthew Berger**

76.   Named Plaintiff Matthew Berger ("Matt") is an adult citizen of the United States and is a resident of San Diego, California.

77.     Matt owns a limo and tour bus company in California that operates under the name Cali Party Bus. It operates primarily in San Diego and the San Francisco Bay Area.

78.     Matt's business, Cali Party Bus, owned the $55,000 in cash that TSA seized while Matt was traveling with it to potentially purchase a tour bus on November 3, 2015.

79.     Matt had an ownership interest and a possessory interest in the $55,000 in cash that TSA seized on November 3, 2015. Matt also owned the carry-on luggage, the contents of the carry-on luggage, and the other possessions that TSA seized on November 3, 2015.

80.     Matt brings three class-wide claims for declaratory and injunctive relief on behalf of individuals whose cash, carry-on luggage, personal effects, and/or persons have been or will be unlawfully and unconstitutionally seized by TSA and/or DEA.

**E.  Defendant Transportation Security Administration**

81.     TSA is a federal agency charged with protecting the nation's transportation systems, particularly air travel. 49 U.S.C. § 114(d)-(e).

82.     TSA is not a general law enforcement agency. Most of its employees are not law enforcement officers and do not have general law enforcement authority or duties.

83.     Pursuant to its statutory mandate, TSA conducts transportation security screenings of passengers and their luggage at U.S. airports. *See* 49 U.S.C. §§ 114(e), 44901.

84.     TSA must promulgate regulations requiring air carriers to refuse to transport a passenger or their luggage if the passenger "does not consent to a search under section 44901(a) of this title establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance" or if the passenger "does not consent to a search of the property establishing whether the property unlawfully contains a dangerous weapon, explosive, or other destructive substance." 49 U.S.C. § 44902(a)(1)-(2).

14

85.   TSA conducts the transportation security screenings described in 49 U.S.C. § 44902(a).

86.   Pursuant to its statutory mandates, TSA's authority to conduct transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5.

87.   TSA employees who conduct these transportation security screenings at airports ("TSA Screeners") include Transportation Security Officers and Supervisory Transportation Security Officers.

88.   TSA Screeners are not law enforcement officers, do not have general law enforcement authority or duties, and are not permitted to engage in general law enforcement investigations.

89.   Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law enforcement purposes.

90.   In contravention of this limited authority and duties, TSA Screeners follow a TSA policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons *after* TSA Screeners have concluded the transportation security screening and determined that no items that pose a threat to transportation security are present.

91.   TSA Screeners base these seizures on whether the traveler appears to be traveling with a "large" amount of cash.

92.   What TSA Screeners consider to be a "large" amount of cash may vary, but is usually approximately $10,000 or more, or what appears to TSA Screeners to be approximately $10,000 or more, based on visual inspection or the X-Ray image of carry-on luggage.

93.   TSA Screeners make these post-screening seizures without regard for whether reasonable suspicion or probable cause exists for the seizures.

15

94. TSA Screeners make these post-screening seizures to gather information regarding travelers with cash and their cash amounts that TSA Screeners pass on to law enforcement officers, including DEA agents.

95. TSA Screeners also make these post-screening seizures in order to hold the traveler's cash, carry-on luggage, personal effects, and/or person until law enforcement officers, including DEA agents, can arrive at the transportation security screening area and continue to seize and interrogate travelers based solely on the presence or amount of cash that TSA Screeners inform them the person is traveling with.

96. TSA has been engaging in this policy or practice for the entirety of the period described in Plaintiffs' proposed TSA Class definition.

97. Pursuant to this policy or practice, TSA seized Terry's and Rebecca's cash, Rebecca's carry-on luggage and its contents, Rebecca's ID and boarding passes, and Rebecca herself on August 26, 2019.

98. Pursuant to this policy or practice, TSA seized Stacy's and her husband's cash, their carry-on luggage and its contents, and Stacy and her husband themselves on May 19, 2020.

99. Pursuant to this policy or practice, TSA seized Matt's cash, Matt's carry-on luggage and its contents, Matt's ID and boarding pass, and Matt himself on November 3, 2015.

**F. Defendant David P. Pekoske**

100. Defendant Pekoske is the current Administrator of TSA.

101. As Administrator of TSA, Pekoske is responsible for overseeing the operations of TSA, including the policy or practice at issue here.

102. Pekoske is sued in his official capacity.

**G.  Defendant Drug Enforcement Administration**

103.  DEA is a federal agency charged with enforcing the controlled substances laws and regulations in the United States. 21 U.S.C. § 878.

104.  In addition to DEA agents who are exclusively federal employees, DEA includes DEA Task Force Officers, who are state and local law enforcement officers cross-sworn as Title 21 DEA agents.

105.  A substantial portion of DEA's activities involve the seizure of cash that DEA agents, including DEA Task Force Officers, justify by unsubstantiated references to controlled substances, including at airports across the country.

106.  DEA follows a policy or practice of seizing air travelers and their possessions at U.S. airports without reasonable suspicion, based solely on the presence or amount of cash DEA agents know or believe they are traveling with.

107.  DEA follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture, based solely on the presence or amount of cash DEA agents know or believe they are traveling with, which DEA deems presumptively subject to seizure.

108.  DEA follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture, based solely on the fact that DEA agents know or believe they are traveling with $5,000 or more, which DEA deems presumptively subject to seizure.

109.  DEA has been engaging in these policies or practices for the entirety of the period described in Plaintiffs' proposed DEA Class definition.

110.  Defendant Dawkin was operating as a DEA agent on August 26, 2019 when he seized Rebecca and her possessions without reasonable suspicion and then seized Terry's and Rebecca's cash for civil forfeiture without probable cause.

## H. Defendant Timothy J. Shea

111.  Defendant Shea is the current Acting Administrator of DEA.

112.  As Acting Administrator of DEA, Shea is responsible for overseeing the operations of DEA, including the policies or practices at issue here.

113.  Shea is sued in his official capacity.

## I. Defendant DEA Task Force Officer Steve Dawkin

114.  Defendant Steve Dawkin is an Allegheny County Police Officer who is cross-sworn as a DEA Task Force Officer assigned to the Pittsburgh International Airport. He is the DEA agent who seized Rebecca and her possessions without reasonable suspicion and then seized Terry's and Rebecca's cash for civil forfeiture without probable cause on August 26, 2019.

115.  Defendant Dawkin's actions in seizing Rebecca and her property without reasonable suspicion and in seizing Terry's and Rebecca's cash for civil forfeiture without probable cause were in accordance the DEA interdiction policies or practices that Plaintiffs seek to declare unlawful and enjoin in this lawsuit. The constitutional violations at issue are standard DEA practice (as illustrated herein), but upon information and belief, no written DEA policy *required* Defendant Dawkin to commit these constitutional violations.

116.  Defendant Dawkin is sued in his individual capacity pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

## J. Defendant United States of America

117.  Defendant United States of America is the national federal government established by the United States Constitution. As such, it is subject to limitations imposed by the Constitution— including, as relevant here, the Fourth Amendment.

118.  The constitutional violations at issue here involve the actions of federal agencies and employees and are therefore ultimately chargeable to the federal government itself.

**Factual Allegations**

**A.  Terry and his family stored cash in their family home**

119.  Terry is 79 years old and lives in Morgan, Pennsylvania.

120.  Terry grew up in a mining community southwest of Pittsburgh, where his parents purchased the family home in South Fayette, Pennsylvania, in the 1920s with money earned from his father's mining wages.

121.  After graduating from college in the 1960s, Terry worked for a railroad company until workplace knee and shoulder injuries forced him to retire in 1994. Since 1994, Terry has been receiving Railroad Retirement benefits.

122.  In 2005, after his wife passed away, Terry moved back into the family home with his mother.

123.  When his mother passed away in 2006, Terry purchased the family home from his other family members and continued living there.

124.  Terry's parents lived through the Great Depression, so instead of keeping most of their money in bank accounts, they had a habit of storing cash in envelopes hidden throughout the family home, particularly in the unfinished basement.

125.   Terry adopted this same habit long ago, and after moving back into the family home, he continued to store cash there.

126.  Each month since his retirement, Terry receives about $2,700 in Railroad Retirement payments deposited into his PNC bank account.

127.  Terry regularly withdrew a portion of his Railroad Retirement payments from the bank and stored the cash in the family home, stuffed into envelopes. Generally, these envelopes of cash were stored in spaces between the walls and rafters in the unfinished basement.

128.  Envelopes of cash hidden by Terry's mother were also still in the family home at the time of her passing.

129.  Over the years, between envelopes of cash stashed away by Terry and his mother, tens of thousands of dollars accumulated within the walls of the family home.

130.  In 2018, Terry and Rebecca decided that with Terry's progressing age and declining health, the family home was too much for him to maintain.

131.  Terry sold the longtime family home in November 2018, and he moved into a small one-bedroom apartment located in Morgan, Pennsylvania. He still lives in the apartment.

132.  In the course of Terry's move, the cash stored in the family home was placed into various moving boxes, dispersed somewhat sporadically throughout Terry's belongings as more envelopes of cash turned up in the crevices of the family home.

133.  Because of his health problems, Terry has taken months to slowly unpack his belongings in his new apartment. While unpacking, he periodically finds envelopes of cash. He eventually stored all the cash he found through August 2019 in one large tupperware container in his apartment.

134.  Terry continues to store cash in his new apartment as he cashes his retirement checks and occasionally finds more money in his moving boxes.

**B.  Terry entrusted the stored cash with his daughter, Rebecca**

135.  After a substantial amount of cash accumulated in the tupperware container, Terry became concerned about the security of his family's life savings. To better safeguard his family's life savings, Terry asked his family for help.

136.  In August 2019, Terry's daughter, Rebecca, who lives in Massachusetts, flew to Pittsburgh for the weekend for her brother's wedding reception and to visit with Terry.

137.  Rebecca, who works full time, was only in town for the weekend; she arrived on Friday, August 23, 2019, and departed early on the morning of Monday, August 26, 2019.

138.  Terry decided that he should give Rebecca power of attorney so that she could help care for him.

139.  Terry and Rebecca also decided the best course of action would be to deposit the cash into a new joint bank account shared with Rebecca so that she could help him use the money to pay for his much-needed dental care and to fix his truck, among other health care needs and projects.

140.  Terry and Rebecca would have joint ownership of and access to the new bank account, but the primary purpose of the account would be to help with Terry's health care and other expenses.

141.  Terry and Rebecca only finalized their plan for the cash on Saturday after the banks had closed, and Rebecca was not able to take physical possession of the cash until Sunday night.

142.  There was no time for Rebecca to deposit the cash in a bank before her flight left on Monday morning, so she planned to take it with her and deposit it in the new bank account after she arrived back home in Massachusetts.

143.   Rebecca was excited to use the funds to improve her aging and ailing father's quality of life. Some of the money was immediately earmarked for urgent dental care—namely replacing Terry's teeth and caring for his gum disease—and for fixing Terry's old truck, which is his primary mode of transportation and is badly in need of repairs.

144.   With Terry's consent, some of the money was also earmarked to pay off a tax debt Rebecca owes the IRS.

145.   Rebecca and one of her brothers also decided to give their father something his life was lacking: a hobby. They planned to use some of the money to buy Terry an old hobby truck to repair and tinker with.

146.   Rebecca's brother found a 1972 Chevrolet C10 Stepside for sale online that Rebecca was going to look at the following weekend. They were excited to give their father a hobby to keep him engaged and occupied in his later years.

147.   Terry did not know that his children were planning to buy him a hobby truck as a surprise.

**C.  TSA unlawfully seized Rebecca and her carry-on luggage, which contained Terry's and Rebecca's cash, at the transportation security screening checkpoint**

148.   Rebecca had an early flight back to Boston, Massachusetts, departing from Pittsburgh International Airport on the morning of August 26, 2019.

149.   Because she did not have time to deposit the cash before leaving Pittsburgh, Rebecca researched on the internet whether she could lawfully fly with the cash. She learned, accurately, that flying domestically with any amount of cash is legal.

150.   She packed Terry's cash inside a purse in her carry-on luggage, which was a beach bag with her belongings. She did not bring any luggage to check.

22

151. When she got to the airport, Rebecca was directed to an alternate transportation security screening checkpoint several minutes away from the primary transportation security screening checkpoint.

152. At the transportation security screening checkpoint, Rebecca behaved normally, in a similar manner to other air travelers going through the security screening, and did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

153. While she went through the transportation security screening checkpoint, a TSA Screener was alerted to the presence of cash in Rebecca's carry-on luggage.

154. A TSA Screener saw the cash in the X-Ray image of Rebecca's carry-on luggage.

155. Rebecca's carry-on luggage was pulled aside by TSA Screeners, but no TSA Screener ever opened or physically inspected Rebecca's carry-on luggage or the purse inside containing the cash.

156. The TSA Screeners had no safety concerns about Rebecca's carry-on luggage, as evidenced by that fact that no TSA Screener ever physically examined the contents of her carry-on luggage or the purse inside containing the cash.

157. After the TSA Screeners pulled aside Rebecca's carry-on luggage, a TSA Screener questioned Rebecca about the amount and purpose of the cash inside. TSA had already completed the transportation security screening when the TSA Screener began interrogating Rebecca about her cash. The TSA Screener's questions about the amount and purpose of the cash were not relevant to any transportation security concern.

158. But Rebecca did not feel free to walk away from the TSA Screeners or to decline to answer the TSA Screeners' questions about her cash, so Rebecca explained why she had the cash—

that she was taking it to deposit in a bank account for her father, who had accumulated the cash in savings.

159.   A TSA Screener also demanded Rebecca's ID and proof of her travel arrangements to and from Pittsburgh. Rebecca provided her ID and boarding passes. She did not feel free to decline because she reasonably believed that she otherwise would not have been let through the transportation security screening checkpoint. A TSA Screener took the documents she provided and photocopied them.

160.   TSA was pursuing no transportation security objectives when TSA Screeners questioned Rebecca about the cash, demanded her travel documents and ID, and photocopied those documents.

161.   The TSA Screeners were seizing Rebecca, her carry-on luggage, her ID, and her cash without any lawful basis.

162.   TSA was pursuing no transportation security objectives when TSA Screeners seized Rebecca's carry-on luggage and cash and held it until law enforcement arrived.

163.   Rebecca was not permitted to retrieve her carry-on luggage or cash and continue to her gate.

164.   Rebecca did not feel free to leave or to walk away. She believed that both she and her luggage were being detained by TSA. TSA Screeners also had her ID and boarding passes.

165.   Even if TSA had told her she was permitted to leave, it would not have been practical or reasonable for Rebecca to leave the transportation security screening checkpoint without her and her father's cash, her carry-on luggage and its contents, and her ID.

166.   As determined by TSA's transportation security screening, Rebecca had no items that could threaten transportation security—weapons, explosives, incendiaries, or other prohibited

items—in her luggage or on her person. The mere presence of the cash in Rebecca's carry-on luggage was the only reason that the TSA Screeners seized Rebecca's carry-on luggage and cash, seized Rebecca herself, questioned her about the cash, and asked for her ID and proof of her travel arrangements to and from Pittsburgh.

167.  Based solely on the presence of the cash in Rebecca's carry-on luggage, the TSA Screeners called a Pennsylvania state trooper to the scene.

168.  TSA made Rebecca wait approximately 10-20 minutes for the state trooper to arrive while TSA held her and her father's cash, her carry-on luggage and its contents, and her ID and boarding passes.

169.  During this period of time, Rebecca's and her father's cash, Rebecca's carry-on luggage and its contents, and Rebecca's ID and boarding passes were seized by TSA.

170.  During this period of time, Rebecca herself was also seized by TSA.

171.  When the state trooper finally arrived, he again questioned Rebecca about the cash in the transportation security screening area. She again did not feel free to walk away or to decline to answer the trooper's questions about her cash. She repeated her explanation of the cash's origin, purpose, and destination.

172.  The state trooper then called his supervisor, a lieutenant, and Rebecca had to wait an additional 10-15 minutes to repeat herself a third time to the lieutenant.

173.  After this third round of questioning, the TSA Screeners permitted Rebecca to retrieve her carry-on luggage, cash, and other possessions, and resume her trip.

174.  By the end of these encounters, TSA had held Rebecca and her possessions for approximately 30 minutes or more *after* TSA had completed its transportation security screening.

175.  Rebecca found it extremely embarrassing to be held and questioned for approximately 30 minutes or more in front of other travelers because it appeared she had done something wrong or illegal.

176.  Despite these delays, Rebecca made it to the boarding gate for her departing flight with time to spare, sat in a nearby seat, and began working on her laptop and eating breakfast. She continued to behave normally, in a similar manner to other air travelers, and did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

**D. DEA seized Rebecca, her carry-on luggage, her cell phone, and Terry's and Rebecca's cash, and then DEA kept their cash for civil forfeiture**

177.  But Rebecca was soon approached at the gate by the same state trooper who questioned her earlier, this time accompanied by another man in a blue polo shirt.

178.  The man in the blue polo said his name was Steve, that he was a DEA agent, and that he had some questions for her. He was Defendant Steve Dawkin.

179.  The sole reason that Defendant Dawkin approached her and told her he had some questions for her at the airport was because he knew Rebecca was traveling with a "large" amount of cash. That alone is not reasonable suspicion for a seizure. Nor did any combination of information that Defendant Dawkin might have known at the time give rise to reasonable suspicion. Rebecca was behaving normally and was simply working on her laptop and eating breakfast in a seat near her boarding gate, in a similar manner to other air travelers. She did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

180.  Despite the lack of any facts giving rise to reasonable suspicion, Rebecca's encounter with Defendant Dawkin and the state trooper at her gate was not a consensual interview. Defendant Dawkin approached Rebecca in the high security setting of an airport, told her that he was a federal

law enforcement officer, and told her that he wanted to speak with her about the cash in her possession. Rebecca did not feel free to walk away or to decline to answer in the face of these targeted questions by a federal law enforcement officer at the airport, particularly given the similarity of these questions to those asked of her at the transportation security screening checkpoint by TSA Screeners and state troopers.

181.  Continuing the suspicionless non-consensual seizure, Defendant Dawkin and the state trooper who had seized Rebecca at the transportation security screening checkpoint escorted her to a less crowded part of the gate area to question her. Rebecca still felt like she had no choice but to comply with Defendant Dawkin's demands and to answer his questions.

182.  From the start of the encounter, Rebecca did not feel free to walk away from Defendant Dawkin or to decline to answer his questions. She also needed to remain near the gate in order to board her flight.

183.  Defendant Dawkin told Rebecca to show him the cash that he knew she had in the purse in her carry-on luggage. Rebecca felt like she had no choice but to comply with his targeted demands and showed him the cash.

184.  Defendant Dawkin's knowledge that Rebecca was traveling with a "large" amount of cash was the sole basis for Defendant Dawkin's suspicionless non-consensual seizure of Rebecca—including escorting her to a different area, questioning her about the cash, and demanding to see the cash. This was in accordance with DEA's policy or practice of seizing travelers at airports without reasonable suspicion, based solely on the presence or amount of cash DEA agents know or believe they are traveling with.

185.  Upon information and belief, Defendant Dawkin intended to seize Rebecca's cash as soon as he learned of the amount. This was in accordance with DEA's policy or practice of

presumptively seizing cash totaling $5,000 or more from travelers at U.S. airports for civil forfeiture regardless of whether there is probable cause for the seizure.

186.  Defendant Dawkin questioned Rebecca about why she was traveling with the cash. For the fourth time, Rebecca explained the origins of the cash and why she was traveling with it.

187.  After hearing Rebecca's explanation, Defendant Dawkin demanded to speak with Terry to verify what she had just told him.

188.  Rebecca informed Defendant Dawkin that her father was elderly, would still be asleep at 7:00 a.m., and would likely be confused by the call, but Defendant Dawkin insisted that she call Terry so that Defendant Dawkin could talk to him. Defendant Dawkin still had no reasonable suspicion or probable cause for this ongoing seizure of Rebecca and her possessions, including the seizure and use of her cell phone—which Rebecca did not feel free to decline given his targeted questions, the high security setting, and the fact that he escorted her to a different area to speak. Accordingly, while Rebecca did not consent to Defendant Dawkin's use of her cell phone to speak with Terry, she followed his command to call Terry and put him on the phone with Defendant Dawkin.

189.  Terry has age-related memory and cognitive issues, and he typically sleeps until late morning or noon. Terry was woken up by the phone call and was groggy, confused, and upset when he answered the phone.

190.  Terry also did not know that his children were planning to buy him a surprise hobby truck, so he could not corroborate those facts.

191.  For these reasons—Terry being awoken several hours early; Terry's cognitive issues; and Terry being unaware of Rebecca's planned surprise—Terry had difficulty answering all of Defendant Dawkin's questions.

192. After speaking with Terry, Defendant Dawkin told Rebecca: "Your answers don't match."

193. Defendant Dawkin then took the cash and searched the rest of Rebecca's beach bag. He found no contraband or suggestion of criminality.

194. Defendant Dawkin seized all of Terry's and Rebecca's cash, totaling $82,373 in cash.

195. Terry's and Rebecca's cash was seized for civil forfeiture without probable cause.

196. At the time of Rebecca's non-consensual seizures by TSA and by DEA, the non-consensual seizure of her possessions, the non-consensual use of her cell phone by DEA, and the seizure of her cash for civil forfeiture by DEA, neither Terry nor Rebecca was under investigation for any criminal activity. Rebecca was seized by TSA and by DEA based solely on the presence or amount of cash she was known or believed to be traveling with.

**E. Aftermath for Terry and Rebecca**

197. Rebecca was not arrested or charged with any crime. She was free to walk away from Defendant Dawkin as soon as (but not before) he took her father's life savings. She was finally permitted to board her flight to Boston, deeply embarrassed by her fellow passengers and other onlookers staring at her during this entire non-consensual encounter because it appeared she had done something wrong or illegal.

198. Rebecca was the last passenger to board her flight and was not able to call her father before her flight departed. When she landed, she had several missed calls and voicemails from her distraught father, who did not know what was happening to his daughter or where she may have been taken.

199. Neither Terry nor Rebecca has been arrested for or charged with any crime related to or arising from any circumstances surrounding the seizure of their cash.

29

200.  Terry and Rebecca received CAFRA notices from DEA for the seized $82,373 dated October 11, 2019, indicating DEA's intention to permanently keep their cash through civil forfeiture.

201.  Terry and Rebecca timely filed CAFRA claims with the DEA on or about November 12, 2019, demanding that the government initiate judicial forfeiture proceedings in federal court.

202.  After Terry and Rebecca sued TSA and DEA for the return of their property and to enjoin the agencies' unconstitutional policies or practices, the government declined to pursue judicial civil forfeiture of Terry's and Rebecca's money. Because the government did not file a civil forfeiture complaint, there were no CAFRA proceedings related to the seizure of Terry's and Rebecca's cash.

203.  DEA agreed to return all of the seized money but without any interest, after unconstitutionally retaining Terry's and Rebecca's money for seven months.

204.  DEA sent a letter to undersigned counsel dated February 28, 2020, stating: "After further review, a decision has been made to return the property."

205.  Upon information and belief, the government's "further review" confirmed that there was no probable cause to justify the seizure of the cash in the first place, and that lack of probable cause was the basis for the government's decision not to file a judicial civil forfeiture complaint.

206.  Terry and Rebecca received a wire transfer in the amount of $82,373 to their bank account from the government on March 23, 2020.

207.  Terry and Rebecca were unconstitutionally deprived of their $82,373 by DEA for approximately seven months and were thus unable to pay for Terry's much-needed dental work or to repair his truck. All of this happened to Terry and Rebecca even though they were not under investigation for and did not commit any crime. It is not a crime to travel with any amount of cash,

traveling with any amount of cash does not give rise to reasonable suspicion or probable cause, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

## F. Individual injuries to Terry and Rebecca

208.  Terry and Rebecca have a joint ownership interest in the $82,373 in cash that Defendants seized and that DEA sought to forfeit, as well as interest that accrued on that seized cash for the seven months it was retained from DEA and wrongfully withheld from Terry and Rebecca.

209.  Rebecca also has a possessory interest in the seized cash.

210.  TSA's *ultra vires* and unconstitutional seizure of Terry's and Rebecca's cash after the transportation security screening had concluded violated their Fourth Amendment rights to be free from unreasonable seizures.

211.  TSA's *ultra vires* and unconstitutional seizure of Rebecca's carry-on luggage, ID, boarding passes, and other possessions after the transportation security screening had concluded violated her Fourth Amendment right to be free from unreasonable seizures.

212.  TSA's *ultra vires* and unconstitutional seizure of Rebecca's cash, carry-on luggage, ID, boarding passes, and other possessions after the transportation security screening had concluded constituted a seizure of Rebecca herself and violated her Fourth Amendment right to be free from unreasonable seizures.

213.  DEA's unconstitutional seizure of Rebecca and her property based on the fact that she was traveling with a large amount of cash violated and continues to violate her Fourth Amendment right to be free from unreasonable seizures.

214.  DEA's unconstitutional seizure of Terry's and Rebecca's cash violated their Fourth Amendment rights to be free from unreasonable seizures.

215. During the seven months that Terry's and Rebecca's cash was in DEA's possession, Terry and Rebecca were unable to make use of their money.

216. Terry's and Rebecca's inability to use the seized money for seven months resulted in ongoing pain and suffering to Terry and Rebecca, including but not limited to Terry's inability to pay to replace his teeth, care for his gums, and fix his truck.

217. Terry suffered serious physical pain caused by not being able to replace his teeth for seven months. It is painful for him to eat, and he can only eat soft foods that he does not have to chew. But for the seizure of the cash, Terry and Rebecca would have spent some of the money months earlier on dental procedures to replace Terry's teeth and care for his gums so that he could eat normally and without pain. Instead, Terry had to delay his dental care. His dental issues are now more complex and aggravated, including the need for a bone graft.

218. Terry suffered from the seven-month deprivation of the financial resources to repair his truck, which was badly rusted and needed a new body and interior repairs. But for the seizure of the cash, Terry and Rebecca would have spent some of the money months earlier to repair Terry's truck, which is his primary mode of transportation. Because of the seizure and deprivation of their cash, they were not able to repair the truck until May 2020.

219. Terry suffered from the ongoing deprivation of the enjoyment and use of his life savings for seven months, materially impacting his quality of life. But for the seizure of the cash, Rebecca would have spent some of the money to buy Terry a hobby truck to tinker with, and they would have spent some of the money on other expenses that would improve Terry's quality of life, such as health care.

220.  Rebecca's inability to use the money deprived her of the planned payment of her tax debt for seven months, which accordingly accrued interest. But for the seizure of the cash, Rebecca would have paid off her tax debt months earlier and it would not have continued to accrue interest.

221.  Terry suffered emotional distress, pain, and suffering caused by the stress of not knowing what happened to his daughter for several hours on the day of the seizure.

222.  Terry suffered and continues to suffer emotional distress, pain, and suffering caused by the ongoing deprivation of his and his parents' life savings.

223.  Rebecca suffered and continues to suffer emotional distress, pain, and suffering caused by the insult and humiliation of the circumstances and manner of the unlawful seizure of her and her father's cash and life savings.

224.  Rebecca suffered and continues to suffer emotional distress, pain, and suffering caused by her father's ongoing physical pain and suffering due to not having the dental and medical care he needs, and from her concerns about her father's safety while driving his truck, which was badly in need of repairs until it was fixed in May 2020.

## G. Continuing and ongoing harm to Terry and Rebecca from TSA's and DEA's airport personal seizure and cash seizure policies or practices

225.  Terry and Rebecca are suffering the continuing, present adverse effects of TSA's and DEA's *ultra vires* and unconstitutional policies or practices. As a result of Defendants' ongoing policies or practices, Terry and Rebecca have refrained and will refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash.

226.  Thus, as a result of Defendants' ongoing policies or practices, Terry and Rebecca have been deprived of their preferred method of managing and moving Terry's cash from his apartment to their joint bank account once it accumulates again or when Terry finds additional envelopes of cash as he continues unpacking moving boxes.

33

227.  Terry continues to cash his retirement checks as he receives them, and cash that goes unspent continues to accumulate in his apartment.

228.  Because Rebecca regularly visits Terry over the weekend, when banks are typically closed, it would be easiest for her to simply take the accumulated cash back home with her and deposit it in their joint bank account.

229.  Terry has also found additional cash while continuing to unpack his moving boxes; he found over $10,000 on February 4, 2020, after the initial complaint in this lawsuit was filed. Rebecca and Terry would have preferred that she pick up this cash on her next weekend visit, take it back with her on her flight to Boston, and deposit it in their joint bank account when she returned home. But she was unable to do so because of their serious and reasonable concern about being victimized again by Defendants' airport cash seizure policies or practices while she flies from Pittsburgh to Boston.

230.  But for the seizure of Rebecca and the seizure of their cash at the Pittsburgh airport on August 26, 2019, and their subsequent knowledge of Defendants' airport cash seizure policies or practices, Rebecca would continue to fly home to Massachusetts with the cash and deposit it in their joint bank account there to ensure that it is deposited in the correct accounts and to avoid the re-accumulation of a large amount of cash in Terry's apartment.

231.  Being deprived of their preferred method for transferring cash not only inconveniences Terry and Rebecca and increases the chances that accumulated cash will be lost or misplaced; it also puts Terry at risk and costs Rebecca money. When the local news media reported on DEA's return of Terry's and Rebecca's cash, someone tried to break into Terry's apartment. Rebecca spent $200 to install a video camera security system at Terry's apartment to protect Terry's wellbeing and his cash savings.

232.   Until Defendants' airport cash seizure policies or practices are ended, Rebecca and Terry will, quite reasonably, not fly commercially with "large" amounts of cash and will have to use time-consuming, inconvenient, and costly methods to ensure that Terry's cash is deposited in their joint bank account.

## H. Stacy and her husband traveled to North Carolina with cash for gambling, and while there also sold a car to a friend for cash

233.   Stacy and her husband enjoy air travel and are avid recreational gamblers. They regularly travel to gamble at casinos across the country, including in Las Vegas and Atlantic City.

234.   Because Stacy is an airline employee, she receives travel benefits that allow her and her husband to fly standby on her airline for free, and also make her eligible for reduced airfare on other airlines. This allows them to frequently fly to pursue their hobbies, including air travel to casinos for gambling.

235.   Stacy and her husband traveled to North Carolina on vacation in mid-May 2020, with plans to visit friends and then gamble at a recently re-opened casino.

236.   They planned to rent a car and take a road trip up the Atlantic coast through Savannah, Georgia and Wilmington, North Carolina—where they would stop to visit friends—before heading west to the Harrah's Cherokee Casino Resort in Cherokee, NC, which was just reopening after being closed due to the COVID-19 pandemic. They then planned to drive to the Greenville-Spartanburg International Airport (GSP) in South Carolina, drop off the rental car, and fly back home using her airline employee travel benefits.

237.   Ultimately, Stacy did not want to drive in the rainy weather, so she ended up using her employee travel benefits to fly to Wilmington, NC on May 18, 2020, where she met her husband after he drove up the coast in the rental car.

238.   Sadly, when Stacy turned on her phone after the flight landed, she learned that her cousin in Illinois had passed away. She was no longer in the mood for a vacation, so they made plans to cancel the rest of the trip and return home using her employee travel benefits.

239.   In the evening of May 18, 2020, they had a late dinner at their friends' home in Wilmington, NC. Over dinner, one of the friends offered to purchase one of their vehicles, a 2015 Maserati Ghibli. They ultimately agreed on a $28,000 sale price.

240.   The friend excused himself and went to another room. He returned a short time later with $28,000 in cash for the purchase of the car.

241.   Stacy asked for an envelope or bag to put all the cash in. Their friend's wife—who frequently uses a FoodSaver vacuum-sealer to preserve food—suggested putting the money in a clear, plastic FoodSaver bag and then vacuum-sealing it to keep the bills from getting loose. Stacy and her husband agreed.

242.   Since their trip was over and they no longer planned to gamble, Stacy and her husband decided to put much of their gambling bankroll—approximately $10,000 in cash from their recent casino winnings and regular employment income—in the clear plastic FoodSaver bag with the $28,000 from the sale of the car. Ultimately, they placed approximately $38,000 in the clear plastic FoodSaver bag and vacuum-sealed it.

243.   Stacy placed the clear, plastic FoodSaver bag with approximately $38,000 in cash in her carry-on luggage, which she took with her to the airport the next day. Her husband also had several thousand dollars of their cash (that he did not place in the FoodSaver bag), which he wore in a fanny pack to the airport the next day as part of his carry-on luggage.

**I.   TSA seized Stacy, her husband, their carry-on luggage, and their cash**

244.   Pursuant to TSA's airport personal seizure and cash seizure policy or practice, TSA Screeners seized Stacy, her husband, their carry-on luggage, and their approximately $40,000-$45,000 in cash at the Wilmington International Airport (ILM) on May 19, 2020.

245.   When Stacy went through the transportation security screening checkpoint at ILM on May 19, 2020, a TSA Screener was alerted to the presence of cash in Stacy's carry-on luggage.

246.   A TSA Screener saw Stacy's cash in the X-Ray image of Stacy's carry-on luggage.

247.   Based solely on the presence of cash, a TSA Screener pulled aside and searched Stacy's carry-on luggage.

248.   During the search of Stacy's carry-on luggage, the TSA Screener found the clear, plastic FoodSaver bag containing the approximately $38,000 in cash and asked, "Where did this come from?"

249.   Stacy and her husband had no weapons, explosives, incendiaries, or other prohibited items in their carry-on luggage or on their persons. The TSA Screener had completed transportation security screening of Stacy and of her carry-on luggage upon confirming the absence of those items.

250.   But the TSA Screener continued to ask questions about the cash, and Stacy and her husband did not feel free to walk away from the TSA Screener or to decline to answer the TSA Screener's questions. Stacy's husband truthfully answered that it was from the sale of a car. The TSA Screener asked who they had sold the car to, and her husband provided their friend's name.

251.   The TSA Screener had no safety concerns about Stacy's carry-on luggage and found no weapons, explosives, incendiaries, or other prohibited items. This is evidenced by the fact that the TSA Screener stopped searching Stacy's carry-on luggage once she found the clear, plastic FoodSaver bag containing cash.

252. TSA was pursuing no transportation security objectives when the TSA Screener questioned Stacy and her husband about the cash.

253. After a few more questions, the TSA Screener said, "Hang on a minute" and motioned for them to stay.

254. Stacy reasonably believed the TSA Screener was instructing them to not leave the transportation security screening area, and she did not feel free to leave. They both reasonably believed that both they and their luggage were being held by TSA. Stacy did not believe that she would be allowed to simply retrieve her carry-on luggage and continue to her boarding gate.

255. In fact, the TSA Screener had taken Stacy's carry-on luggage and placed it on a table behind the conveyer belt that is used by TSA Screeners to search carry-on luggage. When carry-on luggage is placed on these tables and searched, passengers are not allowed to retrieve or even touch their bags until a TSA screener expressly permits them to do so.

256. Even if TSA had told Stacy she was permitted to leave, it would not have been practical or reasonable for Stacy to leave the transportation security screening checkpoint without her cash, her carry-on luggage, and its contents.

257. The TSA Screener placed a phone call while detaining Stacy and her husband at the transportation security screening area.

258. Approximately 30 seconds to one minute later, a sheriff's deputy took custody of Stacy and her husband from TSA, and the deputy questioned them further.

259. TSA was pursuing no transportation security objectives when TSA Screeners seized Stacy and her husband, their carry-on luggage, and their cash, and continued this seizure at the transportation security screening area until a law enforcement officer arrived to take custody of them and their possessions and continue their detention.

260.  As determined by TSA's transportation security screening, Stacy and her husband had no items that could threaten transportation security—such as weapons, explosives, incendiaries, or other prohibited items—in their luggage or on their persons. The mere presence of the cash in Stacy's carry-on luggage was the only reason that the TSA Screener seized her carry-on luggage and cash, seized Stacy and her husband, questioned them about the cash, and detained them until a law enforcement officer arrived and continued their detention.

**J.   DEA seized Stacy, her husband, their carry-on luggage, and their cash, and then DEA kept their cash for civil forfeiture**

261.  The sheriff's deputy continued to detain Stacy and her husband while he questioned them about the cash in Stacy's carry-on luggage.

262.  Upon learning that much of the cash was from their friend's cash payment for the car, the sheriff's deputy asked for the friend's phone number and called him. Their friend was napping at the time and was woken up by the call; he was half-awake and confused about why a sheriff's deputy was calling him and asking specific questions about his purchase of a car from a friend the night before. Nonetheless, upon information and belief, the friend truthfully answered the deputy's questions, telling the deputy the same information that Stacy and her husband had provided. After the call, the deputy claimed, "your stories aren't adding up," and he took them to his office, which was inside the airport.

263.  The sheriff's deputy continued to detain Stacy and her husband so that DEA could arrive and continue their detention.

264. Two plainclothes officers then arrived at the sheriff's deputy's office, identified themselves as DEA agents, and began interrogating Stacy and her husband about the cash while still in the deputy's office. Stacy and her husband did not feel free to leave and correctly believed they were being detained for questioning.

39

265.  One of the DEA agents identified himself as "Tony" and showed Stacy a contact card identifying himself as DEA Task Force Agent Anthony R. DiGiovanni. The other DEA agent appeared to be Caucasian and had a dark beard.

266.  According to his LinkedIn profile, DEA agent Anthony DiGiovanni is a "National and International Instructor" for "Operation Pipeline/Jetway" and "has been an instructor for the DEA's Operation Pipeline since 2002 and is certified general instructor for the State of NC." These DEA agents' knowledge that Stacy was traveling with a "large" amount of cash in her carry-on luggage was the sole basis for their suspicionless non-consensual seizure of Stacy and her husband—including interrogating them in the sheriff's deputy's office and searching their carry-on luggage. This was in accordance with DEA's policy or practice of seizing travelers at airports without reasonable suspicion, based solely on the presence or amount of cash DEA agents know or believe they are traveling with.

267.  Upon information and belief, these DEA agents intended to seize Stacy's and her husband's cash as soon as they became aware of the amount. This was in accordance with DEA's policy or practice of presumptively seizing cash totaling $5,000 or more from travelers at U.S. airports for civil forfeiture regardless of whether there is probable cause for the seizure.

268.  Upon searching all of their belongings, the DEA agents discovered several thousand dollars in cash that Stacy's husband had in his fanny pack. Along with the $38,000 in Stacy's carry-on luggage, the DEA agents seized all of this cash from the fanny pack, except for $500 that was in a bank envelope with an ATM receipt.

269.  The DEA agents seized for civil forfeiture all of the cash from Stacy's carry-on luggage and all but $500 from her husband's fanny pack, seizing a total of approximately $40,000-$45,000.

270.  The DEA agents did not count the cash at the time of the seizure. They also did not provide Stacy and her husband any sort of property receipt for their tens of thousands of dollars of seized cash. DEA agent DiGiovanni promised to mail the property receipt "in a week or so" after the cash was counted, but that has not happened nearly two months after the seizure.

271.  Neither Stacy nor her husband were arrested or charged with any crime. Nor were they accused of any crime. Once the DEA agents seized Stacy's and her husband's cash for civil forfeiture, the DEA agents told them they were free to leave and catch their flight. They flew back home to Tampa that same day.

272.  At the time of their non-consensual seizures by TSA and by DEA, the non-consensual seizure of their possessions and cash during their interrogations by TSA and by DEA, and the ultimate seizure of their cash for civil forfeiture by DEA, neither Stacy nor her husband was under investigation for any criminal activity. Neither TSA nor DEA had reasonable suspicion to seize Stacy and her husband. Neither Stacy nor her husband consented to the seizure of their persons, carry-on luggage, or cash by TSA or by DEA. And DEA did not have probable cause to seize their cash for civil forfeiture. Instead, Stacy and her husband were seized by TSA and by DEA based solely on the presence or amount of cash that she was known or believed to be traveling with, and their cash was seized for civil forfeiture based solely on its large amount.

**K. DEA still has Stacy's cash**

273.  DEA has not returned any of the approximately $40,000-$45,000 that they seized from Stacy and her husband on May 19, 2020.

274.  Two months after the seizure, Stacy and her husband still have not received a property receipt of any kind, much less a property receipt stating the amount of cash seized by the DEA agents without probable cause.

275. Stacy has called DEA agent DiGiovanni multiple times to request a property receipt or a notice about the seizure, and he simply tells her that it will be mailed to them soon.

276. DEA has also not yet provided Stacy or her husband with a CAFRA Notice as required by federal law to pursue civil forfeiture of their cash under CAFRA. 18 U.S.C. § 983(a)(1)(A).

277. Two months after the unlawful seizure of their cash, neither Stacy nor her husband has been arrested for or charged with any crime related to or arising from any circumstances surrounding the seizure of their cash.

**L.  Continuing and ongoing harm to Stacy and her husband from TSA's and DEA's airport personal seizure and cash seizure policies or practices**

278. Stacy and her husband are suffering the continuing, present adverse effects of TSA's and DEA's *ultra vires* and unconstitutional policies or practices. First, they continue to be deprived of the approximately $40,000-$45,000 that DEA unconstitutionally seized from them pursuant to DEA's airport cash seizure policies or practices. Second, they are no longer able to combine two of their favorite hobbies—air travel and gambling—by traveling commercially with a "large" cash bankroll for gambling, due to their reasonable fear of being detained and having their cash seized again by TSA and/or DEA pursuant to the policies or practices challenged in this lawsuit. Third, Stacy's airline employer has suspended her and may fire her in the coming weeks because DEA continues to unlawfully cast a shadow of suspicion over her by not returning the cash or providing any written notice regarding the unconstitutional seizure of her cash.

279. As a result of the seizure of their cash on May 19, 2020, Stacy and her husband became aware of TSA's and DEA's airport personal seizure and cash seizure polices or practices.

280. Now that Stacy and her husband are aware of TSA's and DEA's airport personal seizure and cash seizure policies or practices, they no longer travel commercially with "large" amounts of

cash because they are reasonably concerned that their cash will be seized again pursuant to those policies or practices.

281.  Possessing a substantial amount of cash for one's bankroll is a necessity for avid gamblers due to the liquidity of cash, its ubiquity at casinos, the desire to avoid paying substantial ATM fees or be hindered by ATM withdrawal limits, and the need to potentially access large amounts of cash quickly to cover large wagers.

282.  Not being able to travel with "large" amounts of cash prevents or substantially hinders Stacy and her husband from pursuing their recreational gambling hobby at casinos across the country.

283.  But for TSA's and DEA's challenged policies or practices, Stacy and her husband would regularly fly commercially with "large" amounts of cash—a completely legal activity—to pursue their hobby of recreational gambling at casinos. Instead, not only are Stacy and her husband deprived of their cash, they are also forced to refrain from completely legal acts.

**M. TSA seized Matt, his carry-on luggage, and his cash**

284.  Pursuant to TSA's airport personal seizure and cash seizure policy or practice, TSA Screeners seized Matt, his carry-on luggage, his ID, and his $55,000 in cash at CLT Airport on November 3, 2015.

285.  When Matt went through the transportation security screening checkpoint at CLT on November 3, 2015, a TSA Screener was alerted to the presence of cash in Matt's carry-on luggage.

286.  A TSA Screener saw Matt's cash in the X-Ray image of Matt's carry-on luggage.

287.  Based solely on the cash, TSA Screeners pulled aside and searched Matt's carry-on luggage.

288.  During the search of his carry-on luggage, a TSA Screener unzipped the bank envelope inside Matt's carry-on luggage and asked him how much money was there and what it was for.

289.  Matt had no weapons, explosives, incendiaries, or other prohibited items in his carry-on luggage or on his person. The TSA Screener had completed the transportation security screening of Matt and of his carry-on luggage upon confirming the absence of those items.

290.  But the TSA Screener continued to ask Matt questions about the cash, and Matt did not feel free to walk away from the TSA Screener or to decline to answer the TSA Screener's questions. Matt answered that it was $55,000 for the potential purchase of a tour bus for his business.

291.  The TSA Screeners had no safety concerns about Matt's carry-on luggage and found no weapons, explosives, incendiaries, or other prohibited items. This is evidenced by the fact that the TSA Screener stopped searching Matt's carry-on luggage once he found the bank envelope with cash.

292.  In the absence of weapons, explosives, or incendiaries, the amount of cash in a traveler's carry-on luggage and the purpose for the cash are not relevant to any transportation security concerns.

293.  Another male TSA Screener also took Matt's ID and boarding pass. That TSA Screener, assisted by a female supervisor TSA Screener, began photographing the documents and the $55,000 in cash. Matt did not feel free to walk away or to decline to let the TSA Screeners photograph his belongings.

294.  TSA was pursuing no transportation security objectives when TSA Screeners questioned Matt about the cash, demanded his ID and boarding pass, and photographed those documents and his cash.

295.  TSA was pursuing no transportation security objectives when TSA Screeners seized Matt, his carry-on luggage, his ID, and his cash and continued his seizure at the transportation security screening area until law enforcement officers arrived.

296.  Matt was not permitted to retrieve his carry-on luggage or cash and continue to his gate.

297.  Matt did not feel free to leave or to walk away. He believed that both he and his luggage were being held by TSA. TSA Screeners also had his ID and boarding pass.

298.  Even if TSA had told Matt he was permitted to leave, it would not have been practical or reasonable for Matt to leave the transportation security screening checkpoint without his business's cash, his carry-on luggage and its contents, and his ID.

299.  As determined by TSA's transportation security screening, Matt had no items that could threaten transportation security—weapons, explosives, incendiaries, or other prohibited items—in his luggage or on his person. The mere presence of the cash in Matt's carry-on luggage was the only reason that the TSA Screeners seized Matt's carry-on luggage and cash, seized Matt himself, questioned him about the cash, and asked for his ID and boarding pass.

300.  Keeping Matt in the transportation security screening area based solely on the presence of the cash in Matt's carry-on luggage, the TSA Screeners called over two law enforcement officers, who took Matt's carry-on luggage and cash from the TSA Screeners and escorted him into a small room, where they interrogated him about the cash. Even though Matt showed the officers all of the documentation regarding his business, the potential purchase, and his communications with the seller of the tour bus, they seized Matt's cash for civil forfeiture.

301.  Matt was not arrested or charged with any crime. He was free to leave as soon as (but not before) the officers took his money.

302.  Without the money for the purchase of the tour bus, Matt no longer had any reason to travel to New Jersey and had to purchase a new ticket to return directly from CLT to his home in San Diego, California.

303.  As soon as the TSA Screeners began questioning Matt about the cash until the law enforcement officers arrived, Matt, his cash, his carry-on luggage and its contents, and his ID and boarding pass were seized by TSA beyond the period of the transportation security screening.

304.  Matt found it extremely embarrassing to be held and questioned in front of other travelers because it appeared he had done something wrong or illegal.

305.  As a direct result of these seizures by TSA, which turned Matt and his belongings over to law enforcement officers, the $55,000 was seized for civil forfeiture without probable cause.

**N.  Matt and his business are suffering continuing and ongoing harm from TSA's and DEA's airport personal seizure and cash seizure policies or practices**

306.  Matt is suffering the continuing, present adverse effects of TSA's and DEA's *ultra vires* and unconstitutional policies or practices. TSA's and DEA's airport cash seizure policies or practices continue to harm Matt and his business, forcing him to substantially change how he does business in order to avoid an unwarranted cash seizure.

307.  Cash is a substantial part of the limo and tour bus business. Not only do customers sometimes pay in cash, but cash is the preferred payment method in the industry for the regular purchase and sale of pre-owned vehicles.

308.  As part of his limo and tour bus business, Matt regularly needs to obtain new vehicles for his fleet and to sell existing vehicles. These are generally large, high-end luxury vehicles that can carry anywhere from a dozen to 45 passengers. The purchase price for these vehicles is typically far more than $10,000 and can exceed $100,000.

309.  As a result of TSA's and CLT airport police's seizure of Matt and of his cash on November 3, 2015, and his subsequent knowledge and understanding of both TSA's and DEA's airport personal seizure and cash seizure policies or practices, Matt has taken reasonable but burdensome precautions to prevent another cash seizure by TSA and/or law enforcement agencies such as DEA, an agency that Matt understands to frequently seize air travelers and their cash.

310.  These precautions include limiting the amount of cash he flies commercially with for business to amounts under $10,000 and declining to do business with anyone who would have to fly commercially with a large amount of cash in order to complete the transaction (such as a buyer of a vehicle Matt is selling) because he does not want those he does business with to be harmed by TSA's and DEA's airport cash seizure policies or practices. This significantly limits the geographic scope of these business dealings.

311.  Because his business operates in both Northern and Southern California, Matt regularly flies commercially between San Diego and the San Francisco Bay Area. To have cash on hand, Matt frequently stores cash in secure facilities in both locations so that it is readily available for business purposes. To most efficiently allocate and store cash, Matt frequently needs to bring cash with him for business purposes when he flies commercially between San Diego and the San Francisco Bay Area. Because of his reasonable concerns about being harmed by TSA's and DEA's airport cash seizure policies or practices, Matt now limits himself to traveling with less than $10,000 in cash on these flights, even when he would prefer to take more cash with him for business purposes. This has prevented him from efficiently managing and storing cash as the demands of his business dictate.

312.  If he needs to travel with more than $10,000 in cash, Matt will sometimes drive instead of fly to avoid being harmed by TSA's and DEA's airport cash seizure policies or practices. He

will also only do business with someone involving a cash transaction of more than $10,000 if they can drive instead of fly because he does not want those he does business with to be harmed by TSA's and DEA's airport cash seizure policies or practices. This is time-consuming and inconvenient, and it significantly limits the geographic scope of his business dealings. He would not do this but for TSA's and DEA's airport cash seizure policies or practices.

313.   Because most vehicles in the limo and tour bus industry are sold pre-owned, it is standard in the industry to travel to inspect the vehicles in person before making an offer and to bring cash to immediately negotiate a specific price and finalize the purchase, so that the vehicle can then immediately be driven back to the purchaser's place of business.

314.   Cash is king for purchasing pre-owned vehicles because it is faster and more flexible than other payment options. Other financial instruments—such as cashier's checks or certified checks—do not allow flexibility in negotiating the purchase price because their total must be determined in advance. Wire transfers or standard checks typically take several days to process and clear, thus requiring the purchaser to either wait for several days before he or she can leave with the vehicle, or to return without the vehicle and either have the vehicle shipped to the purchaser's place of business or make a return trip to retrieve the vehicle once the payment clears. All of these alternatives are more expensive, time-consuming, and inconvenient than paying with cash.

315.   The reasonable but burdensome precautions that Matt takes in response to TSA's and DEA's airport personal seizure and cash seizure policies or practices put him at a significant disadvantage relative to other buyers or sellers of pre-owned limos and tour buses, because the industry standard is to pay with cash due to the speed and convenience of being able to negotiate and finalize a purchase immediately after a vehicle has been inspected.

48

316.  Due to the COVID-19 pandemic, Matt's business, Cali Tour Bus, has had to suspend most of its operations and is attempting to immediately sell its fleet of more than a dozen limos and tour buses in order to remain liquid while business operations are suspended.

317.  Once the COVID-19 pandemic subsides, Cali Tour Bus plans to resume operating and will need to rapidly purchase a new fleet in order to serve customers.

318.  Matt's need to rapidly sell a fleet of limos and tour buses and his anticipated future need to rapidly purchase a fleet of limos and tour buses are made significantly more difficult by the burdensome precautions Matt reasonably takes to avoid being harmed by TSA's and DEA's airport personal seizure and cash seizure policies or practices.

319.  Both over the past few years and in recent weeks, Matt has been told by several prospective purchasers that they are "cash buyer[s]" or simply that they prefer to pay in cash. Prospective purchasers also often inquire about a cash discount. The precautions that Matt now takes to avoid doing business in cash—based on his knowledge of TSA's and DEA's airport cash seizure policies or practices, and his reasonable concern that he will be harmed by them—makes it much more difficult for him to do business with these cash purchasers, many of whom need to travel from out of state to inspect his fleet of vehicles. Addressing these issues and coming up with alternative solutions to these issues has cost him and will continue to cost him substantial time and effort until TSA's and DEA's airport cash seizure policies or practices end.

320.  But for TSA's and DEA's airport cash seizure policies or practices, Matt would be able to resume flying commercially with amounts of cash over $10,000 and engage in business transactions involving cash payments for limos and tour buses.

**TSA Class Action Allegations**

321.  Congress gave TSA statutory authority to operate under 49 U.S.C. § 114, which makes the agency "responsible for security in all modes of transportation." 49 U.S.C. § 114(d). This includes the authority to conduct air transportation security screening operations. 49 U.S.C. § 114(e). TSA is statutorily charged with developing "policies, strategies, and plans for dealing with threats to transportation security." 49 U.S.C. § 114(f)(3).

322.  TSA's authority over air transportation security is set forth in 49 U.S.C. § 44903.

323.  TSA's authority to screen passengers and property is set forth in 49 U.S.C. § 44901.

324.  TSA's statutory authority is so narrowly limited to these purposes that Congress felt it was necessary to specifically authorize TSA to keep loose change and other money that is incidentally left behind at transportation security screening checkpoints. *See* 49 U.S.C. § 44945.

325.  Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law enforcement purposes.

326.  TSA's screening procedures are designed to assess whether air passengers or their luggage are a threat to transportation security by screening for dangerous items.

327.  The scope of TSA transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5; *see also* 49 U.S.C. § 44902.

328.  Air travelers "may not have a weapon, explosive, or incendiary, on or about the individual's person or accessible property." 49 C.F.R. § 1540.111.

329.  A weapon, explosive, or incendiary is specifically defined by TSA in an exhaustive list at 70 Fed. Reg. 9878 (Mar. 1, 2005), https://www.govinfo.gov/content/pkg/FR-2005-03-

01/pdf/05-3977.pdf. TSA's exhaustive list of defined weapons, explosives, or incendiaries does not include "cash," "currency," or "money."

330. Once TSA Screeners have determined that none of the defined prohibited items are present and that the traveler, their carry-on luggage, and their personal effects do not present a threat to transportation security, the transportation security screening has concluded, and TSA Screeners do not have authority to further detain the traveler, their carry-on luggage, or their personal effects.

331. Cash is not a weapon.

332. Cash is not an explosive.

333. Cash is not an incendiary.

334. Cash is not a threat to transportation security or air travel safety.

335. Air travelers with large amounts of cash do not, on that basis, present any threat to transportation security or air travel safety.

336. No statute or regulation identifies "cash" or "currency" as a threat to transportation security or air travel safety.

337. No statute or regulation identifies "cash" or "currency" as a dangerous or prohibited item for air travelers.

338. TSA provides an online list of items which are, or are not, prohibited. *See* Transportation Security Administration, *What Can I Bring?*, https://www.tsa.gov/travel/security-screening/whatcanibring/all-list (last visited July 17, 2020). There are currently 459 items on the list.

339. Nowhere on this list of 459 items are "cash," "currency," or "money" mentioned, let alone identified as prohibited items.

340. TSA Management Directive No. 100.4 (Sept. 1, 2009) and TSA Operations Directive 400-54-6 (Oct. 29, 2009) are agency policies that purport to provide binding guidance to TSA Screeners regarding their statutory and regulatory authority and duties with respect to the detection of cash or currency at transportation security screening checkpoints.

341. TSA admits that "[t]raveling with large amounts of currency is not illegal," and that the only relevance of cash or currency to transportation security screenings is that "[l]arge amounts of currency ('bulk currency') can . . . conceal a weapon, explosives, or other items that may pose a threat to transportation security." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

342. Accordingly, "large quantities of currency discovered at the checkpoint, either on a person or in accessible property, may need closer examination to ensure prohibited items are not secreted and to clear the person or property to enter the sterile area." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

343. If that additional screening is completed uneventfully and no prohibited items are discovered, the transportation security screening has concluded and the traveler is free to enter the sterile (secured) area of the airport.

344. TSA also admits that "[s]creening may not be conducted to detect evidence of crimes unrelated to transportation security." TSA Management Directive No. 100.4 (Sept. 1, 2009).

345. Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds—*i.e.*, administrative screenings limited to threats to transportation security.

346. Indeed, no TSA directive could expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds.

347. TSA Screeners have no statutory authority to seize people or property beyond the duration of the administrative transportation security screening based on the presence of cash.

348. TSA Screeners also do not have statutory authority to seize other items that do not pose a threat to transportation security, including potential contraband or potential evidence of a crime unrelated to transportation security.

349. Because of the limits of their statutory authority, if TSA Screeners encounter potential contraband or potential evidence of a crime unrelated to transportation security, they are supposed to notify law enforcement personnel rather than seize the property or personally investigate.

350. TSA Operations Directive 400-54-2 incorrectly identified "Large amounts of cash ($10,000)" as an example of "contraband" that should be referred to local law enforcement officers.

351. The Operations Directive that replaced it, OD-400-54-6, also identifies non-transportation security related procedures when TSA Screeners encounter a traveler with more than $10,000: "When a TSO performing routine security screening finds currency that appears to be in excess of $10,000, the TSO should notify the STSO." Significant portions of the next two sentences of OD-500-54-6 are redacted in the publicly available version obtained under FOIA, but it appears to direct that, in such circumstances, "the STSO should notify local law enforcement authorities and CBP."

352. Operations Directive 400-54-6 also identifies non-transportation security related procedures when TSA Screeners encounter an air traveler with "a large amount of cash that may be related to criminal activity." Significant portions of this sentence and the next sentence of OD-500-54-6 are redacted in the publicly available version obtained under FOIA, but it appears to direct that, in such circumstances: "the STSO, local law enforcement authorities, and the

[REDACTED] must be notified." The first and primary factor identified by OD-500-54-6 as "indicating that currency may be related to criminal activity" is the "quantity" of currency.

353. Similarly, TSA's Screening Management Standard Operating Procedures specify that supervisor transportation security officers "must" do the following: "Conduct the procedures for checking travel documents and notifying the LEO and the U.S. Customs and Border Protection (CBP), when applicable, when U.S. currency or other monetary instruments appearing to exceed $10,000 is found on an individual or their property during screening."

354. Though not instructed or authorized to do so by these written policies, TSA Screeners frequently detain travelers or their luggage while notifying law enforcement officers about the presence of a "large" amount of cash—typically but not always amounts of $10,000 or more—on a traveler's person or in their luggage and question them while waiting for the law enforcement officers to arrive and take custody of the traveler or their possessions at the transportation security screening area.

355. In addition, TSA's Screening of Passengers by Observation Technique ("SPOT") Referral Report Form instructs TSA Screeners that travelers who have a "Large sum of monies with no apparent reason to possess" should receive an "Automatic LEO Notification," meaning that TSA Screeners should alert law enforcement officers in such situations.

356. Though not instructed or authorized to do so by this written policy, TSA Screeners frequently detain travelers or their luggage while waiting for law enforcement to arrive in these circumstances.

357. As recognized by the DHS Office of Inspector General, "the SPOT program has not defined how [cash- or currency-related] outputs support achieving the SPOT program goals," which are to "identify high-risk individuals who may pose a threat to transportation security." To

this end, cash- or currency-related searches and seizures "do not provide a measure of program effectiveness." DHS Office of Inspector General, *Transportation Security Administration's Screening of Passengers by Observation Techniques* (Redacted) at 6 (May 2013), https://www.oig.dhs.gov/sites/default/files/assets/Mgmt/2013/OIG_13-91_May13.pdf.

358.  In contravention of its statutory and regulatory bounds, TSA Screeners follow a TSA policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons *after* TSA has determined that no items that pose a threat to transportation security are present and the transportation security screening has concluded.

359.  As part of this TSA policy or practice, TSA Screeners regularly prolong or extend the detention of travelers beyond the administrative search of travelers for transportation security screening purposes in order to investigate matters that are unrelated to transportation security, such as to conduct investigations into travelers with "large" amounts of cash.

360.  TSA follows this policy or practice based on the presence of what TSA Screeners consider "large" amounts of cash on travelers or in their carry-on luggage. But traveling with "large" amounts of cash is not illegal, and an air traveler's mere possession of "large" amounts of cash, by itself, does not give rise to reasonable suspicion of a crime, let alone indicate any threat to transportation security.

361.  Upon information and belief, these TSA seizures of travelers' cash, carry-on luggage, personal effects, and/or persons, while temporary, can sometimes last from several minutes to more than 30 minutes *after* the transportation security screening is complete.

362.  During this time, TSA Screeners may tell travelers that they are free to leave, but as a practical matter, travelers may not leave without their seized cash, carry-on luggage, and/or personal effects.

363.  Despite the clear limitations on its statutory authority, as recently as 2009, TSA openly acknowledged that TSA Screeners regularly questioned travelers about why they were traveling with cash and conducted law enforcement investigations, requiring passengers to "account for the money" they traveled with.

364.  On March 29, 2009, traveler Steven Bierfeldt and his possessions were seized by TSA Screeners, and he was detained and questioned by TSA Screeners at the St. Louis Lambert International Airport (STL) because he was traveling with approximately $4,700 in cash. The TSA Screeners took him to a private interrogation room and questioned him for approximately 30 minutes. An audio recording of the encounter revealed the TSA Screeners repeatedly threatening to turn him over to the DEA or FBI or to "take him down to the station" if he did not answer their questions. The money Bierfeldt had with him was entirely lawfully obtained funds belonging to a political organization, the Campaign for Liberty, and TSA Screeners had no basis to suspect otherwise.

365.  In response to news about Bierfeldt's treatment by TSA Screeners at STL, TSA posted the following statement on its official website on April 3, 2009: "Movements of large amounts of cash through the checkpoint may be investigated by law enforcement authorities if criminal activity is suspected. As a general rule, passengers are required to cooperate with the screening process. Cooperation may involve answering questions about their property, including why they are carrying a large sum of cash."

366.  In further response to backlash against the April 3, 2009 post and continued news about Bierfeldt's treatment by TSA Screeners at STL, on April 14, 2009, TSA's Chief Counsel admitted on TSA's official website that it is standard practice for TSA Screeners to "ask a passenger who is carrying a large sum of cash to account for the money." She further stated that the agency viewed

detecting "signs of criminal activity" as one of the principal duties of TSA Screeners along with "reacting to potential security problems." She further admitted that TSA screeners wildly exceed their authority to screen passengers for transportation security: "When presented with a passenger carrying a large sum of money through the screening checkpoint, the TSA officer will frequently engage in dialog with the passenger to determine whether a referral to law enforcement authorities is warranted. The TSA officer may consider all circumstances in making the assessment, including the behavior and credibility of the passenger."

367.  In June 2009, Bierfeldt sued then-Secretary of Homeland Security Janet Napolitano for TSA's violation of his Fourth Amendment rights, pointing out that TSA was also exceeding its statutory authority with policies that directed TSA Screeners to conduct law enforcement investigations rather than limit their searches of travelers and their luggage to transportation security purposes.

368.  In response to Bierfeldt's lawsuit, TSA issued two new directives related to screening operations, TSA Management Directive No. 100.4 (Sept. 1, 2009) and TSA Operations Directive 400-54-6 (Oct. 29, 2009). These directives purport to limit TSA Screeners' behavior to that authorized by statute and permitted by the Fourth Amendment. Bierfeldt dismissed his lawsuit without any judicial determinations regarding any of TSA's policies or practices.

369.  Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to give TSA Screeners the authority to conduct the *ultra vires* and unconstitutional seizures described in this complaint.

370.  Unfortunately, despite the existence of these directives, TSA Screeners continue to conduct the same unlawful and unconstitutional actions that led to the Bierfeldt lawsuit: for no transportation security objectives and based solely on the presence or amount of cash, TSA

continues to seize "large" amounts of cash and continues to question, investigate, and seize travelers with "large" amounts of cash. Upon information and belief, TSA Screeners conduct these *ultra vires* and unconstitutional seizures pursuant to an unwritten policy or practice, or pursuant to some other non-public written policy, as demonstrated by the examples cited herein.

### A. Nationwide examples of TSA Screeners following the challenged TSA personal seizure and cash seizure policy or practice

371.  The experiences of Named Plaintiffs Rebecca, Stacy, and Matt are just three examples of TSA's personal seizure and cash seizure policy or practice. Putative class counsel is aware of the following examples that demonstrate TSA's challenged policy or practice on an ongoing national scale.

372.  On or about February 25, 2020, Kamal Hawkins was traveling from the Raleigh-Durham International Airport (RDU) in North Carolina to his home in Los Angeles, California with approximately $26,000 in cash in his luggage. The cash was his life savings, including money he earned from his production and clothing businesses, as well as financial aid he recently received for college. When Mr. Hawkins went through the transportation security screening checkpoint, a TSA Screener pulled his bag aside and went through it, finding some of the cash in a pants pocket. When Mr. Hawkins explained that more of his money was in the bag, the TSA Screener said, "Hold on right here" and summoned other TSA Screeners to the scene. The TSA Screeners told Mr. Hawkins that they needed to take him to an interrogation room "in the back" to investigate his cash. One TSA Screener told Mr. Hawkins he could walk away, but not with his luggage or his life savings and education funds. He had no choice but to submit to the TSA Screeners' back room interrogation—which was not based on any findings of weapons, explosives, incendiaries, or other prohibited items, but was based solely on presence or amount of cash that Mr. Hawkins was traveling with. The TSA Screeners took Mr. Hawkins to a private interrogation room and began

asking questions about the cash and inspecting the various business and financial documents he provided. They held Mr. Hawkins, his luggage, and his life savings for approximately 10-15 minutes until RDU airport police arrived to continue the law enforcement interrogation.

373.    On September 20, 2019, Boris Nulman was departing from the Tampa International Airport (TPA) in Florida for Cleveland, Ohio with at least $181,500 in cash to purchase one or more pre-owned tractor trailer trucks as a purchasing agent for FGL Transport, Inc., a licensed trucking company. As Mr. Nulman went through the transportation security screening checkpoint with the cash in his carry-on bag, TSA Screeners pulled aside his bag solely because they observed the cash in the X-Ray scan of his bag. The TSA Screeners told Mr. Nulman that they were going to hold on to his cash and carry-on luggage until law enforcement officers arrived. Mr. Nulman reasonably believed he was being detained by the TSA Screeners and did not feel free to leave. Even if he had been told he was free to leave, it would not have been practical or reasonable for him to leave the transportation security screening area without his carry-on luggage or the cash, so he was effectively seized along with his carry-on luggage and the cash. Mr. Nulman had no weapons, explosives, illegal drugs, or other contraband in his luggage or on his person.

374.    On November 13, 2018, at the Eugene Airport (EUG) in Oregon, TSA seized an adult male domestic air traveler and his possessions solely because he was traveling with $100,000 in cash from a business he had just sold. The traveler had the cash in his carry-on backpack. TSA Screeners pulled his backpack aside after they evidently saw the cash during the X-Ray screening. The traveler had no weapons, explosives, incendiaries or other prohibited items. After searching his backpack, TSA Screeners pulled him aside and walked him to a separate interrogation room, where they told him that somebody else had a few questions for him. He did not feel free to leave. He was then questioned by DEA agents, who seized the $100,000 in cash for civil forfeiture. After

the traveler retained an attorney, all his seized money was eventually returned, but he had to pay one third of the recovered money to his attorney as a contingency fee.

375.   On November 9, 2018, at approximately 10:00 a.m. local time, an adult male traveling through Phoenix Sky Harbor International Airport (PHX) in Arizona en route to Detroit, Michigan with more than $10,000 in cash on his person was pulled aside by TSA Screeners at the transportation security screening checkpoint and questioned for approximately 10-15 minutes about why he was traveling with what the TSA Screeners called a "suspicious" amount of cash. He informed the TSA Screeners that he was only traveling domestically, but they continued to question him about the cash, preventing him from proceeding to his gate for several minutes. He did not feel free to leave while this was happening. The traveler had no weapons, explosives, incendiaries, or other prohibited items, and the TSA Screeners did not mention any threats to transportation security—they were only interested in the cash. One of the TSA Screeners who questioned the air traveler was TSA Transportation Security Manager Lori Barr, who gave the air traveler her contact card.

376.   On June 11, 2018, TSA Screeners seized an adult male and his $30,000 in cash while he was traveling back to his home in Sacramento, California from Little Rock, Arkansas. He was returning from a business trip to buy used cars and had brought the cash to make on-the-spot purchases. When he went through transportation security screening at the Clinton National Airport (LIT) in Little Rock, a TSA Screener pulled aside his carry-on bag and searched it after claiming to have seen a "suspicious object" displayed on the X-Ray monitor. There were no weapons, explosives, incendiaries, or other prohibited items in his carry-on bag, but it contained the $30,000 in cash. Upon finding the money, the TSA Screener told the traveler that he would have to call a supervisor. The supervisor TSA Screener arrived and questioned the traveler about why he was

traveling with so much money. The TSA Screeners made no mention of any threats to transportation security. The traveler believed he was not free to leave or walk away and that he had to answer the supervisor TSA Screener's questions. The supervisor TSA Screener detained the traveler and his carry-on bag until a law enforcement officer arrived at the scene and continued the detention based on the presence or amount of cash. The officer ultimately seized the cash for civil forfeiture. After the traveler filed a CAFRA claim demanding that the government pursue civil forfeiture, all of his money was returned approximately five to six months after the seizure.

377. On March 26, 2018, TSA Screeners seized Tom Hill and $62,000 in cash that he was traveling with at John F. Kennedy International Airport (JFK) in New York. Mr. Hill was traveling back to his home in Cedar City, Utah from a business trip to New York City to collect a cash payment from a client of his technology resale business. When Mr. Hill approached the transportation security screening checkpoint at JFK, he asked the TSA Screener for a private screening and said he was traveling with $62,000 in cash. The TSA Screener called a supervisor TSA Screener. That supervisor did a secondary screening of his carry-on luggage, recorded Mr. Hill's information, photocopied his driver's license, took his business card, and asked questions about the cash. Mr. Hill did not feel free to leave while this was happening. The TSA Screeners did not mention any transportation security threats, and Mr. Hill had no weapons, explosives, incendiaries, or other prohibited items on his person or in his carry-on luggage. Mr. Hill was eventually released. At his departure gate, DEA agents approached and interrogated Mr. Hill based on their knowledge that he was traveling with a large amount of cash, and they seized his cash for civil forfeiture. A year later, after spending more than $10,000 in attorney's fees, all but $1,000 of the seized cash was returned. ($1,000 went missing and DEA claimed they had only seized $61,000 from Mr. Hill.)

378.  Tom Hill had another similar experience with TSA Screeners seizing him and his cash at the Philadelphia International Airport (PHL) approximately one year earlier, in 2017, when he was traveling with about $60,000. When Mr. Hill approached the transportation security screening checkpoint at PHL, he notified the TSA Screeners that he had cash and asked to speak to a supervisor. The TSA Screeners directed him to a private room where they checked his bags and briefly detained him while they made a phone call. Mr. Hill did not feel free to leave while this was happening. The TSA Screeners eventually released him to catch his flight.

379.  On or about February 14, 2017, TSA Screeners stopped and detained Charles Homan at the Baltimore/Washington International Airport (BWI) in Maryland after they discovered a "large" amount of cash in his carry-on luggage. The cash was the sole basis for the detention; the TSA Screeners made no mention of any potential transportation security threats.

380.  On or about June 30, 2015, TSA Screeners seized a male air traveler and his $75,000 in cash in a carry-on bag at the transportation security screening checkpoint at the Richmond International Airport (RIC) in Virginia. TSA officers subsequently took a photo of the carry-on bag and the cash, and a TSA employee tweeted the photo from Twitter account @TSAmedia_LisaF with the message: "If you had $75,000, is this how you'd transport it? Just asking! TSA @ #RIC spotted this traveler's preferred method." No mention was made of any transportation security threats. The passenger was permitted to board his flight, but WTVR news reported: "An airport spokesperson said the money was turned over to an unspecified federal agency."

381. On or about July 14, 2014, TSA Screeners at Newark Liberty International Airport (EWR) seized, questioned, and investigated Damon Rasbury at the transportation security screening checkpoint because he "was in possession of a large amount of United States currency

in his carry-on luggage." TSA Screeners questioned Mr. Rasbury about whether there was any contraband in his luggage, searched his bag and found $5,000 in cash, asked him if there was any other cash in the luggage, and continued searching his luggage for more cash, with no evident transportation security purpose for this investigation.

382. In approximately 2013, TSA Screeners questioned software engineer Aaron Nabil-Eastlund about why he was traveling with "so much cash" at the transportation security screening checkpoint at the Portland International Airport (PDX) in Oregon. There was no evident transportation security purpose for the question and he had no weapons, explosives, incendiaries, or other prohibited items on his person or in his carry-on luggage. He was traveling with approximately $5,000-$10,000 in his carry-on bag to play poker recreationally. Mr. Nabil-Eastlund declined to answer and asked if cash was prohibited on the aircraft. He was ultimately permitted to proceed to his gate with his cash. As a result of this experience and his knowledge of TSA's cash seizure policy or practice, Mr. Nabil-Eastlund (who travels regularly with cash as a recreation poker player) takes burdensome precautions, including making a special appointment with his bank to secure fresh bills directly from the Federal Reserve that federal agencies cannot accuse of being illicit or smelling of drugs.

383. On August 11, 2011, TSA Screeners detained Michael Gordon and his possessions at the transportation security screening checkpoint at Logan International Airport (BOS) in Boston after TSA Screeners found $60,000 in his carry-on bag. Mr. Gordon and his possessions were held at the checkpoint for up to 15 minutes until law enforcement officers arrived. No transportation security or other valid reason for the TSA detention was evident; the presence or amount of the cash was the sole basis.

384.  Documents obtained under FOIA related to the Buffalo Niagara International Airport (BUF) in New York indicate that TSA Screeners there regularly exceed their statutory authority by detaining travelers with cash and sometimes questioning them about that cash. For example:

    a.  A BUF Transit Authority Police Department Police Report dated December 17, 2016 states that on that day a traveler was "**stopped by the TSA** at the BNIA checkpoint with a large amount of U.S. currency on his person and carry on backpack held a Jet Blue Airlines ticket for flight# 1001 to JFK (NYC) . . ." (emphasis added).

    b.  The same December 17, 2016 BUF Transit Authority Police Report also explains that the cash was not found while looking for weapons or explosives, but in a search for the cash itself after a TSA Screener operating an X-Ray machine identified it as cash: "TSA Supervisor C. Moore . . . stated that a male attempted to come through lane 4 of the checkpoint with a large sum of US currency. TSA Officer B McMillan was operating the x-ray machine and observed the currency in the subjects backpack. TSA Officer S Greiner searched the subjects bag, locating the currency, who then notified Supervisor Moore."

    c.  Another BUF Transit Authority Police Department Police Report states that on February 27, 2016, a "subject was **stopped by TSA personal** [sic] at the checkpoint with a large sum of US currency. The subject was traveling with four (4) large bundles of US currency, which was located in his shoes in his carry on bag. The bundle appeared to be mostly $20 bills." (emphasis added).

    d.  Another BUF Transit Authority Police Department Police Report states that on November 30, 2016, TSA interviewed a traveler about a "large amount of U.S.

currency he was found to be carrying by the TSA at the BNIA checkpoint." The report states that the traveler "was attempting to return home to NYC when **stopped at the checkpoint with the cash**." (emphasis added).

e. Another BUF Transit Authority Police Department Police Report states that on May 8, 2017, a traveler "was found by TSA to be carrying a large amount of U.S. Currency inside of a large wallet that was inside of her purse. Wallet containing the currency was placed inside of a gray plastic TSA property bin which was **turned over to the Reporting Detective by TSA**." (emphasis added).

f. Another BUF Transit Authority Police Department Police Report states that on March 14, 2019, TSA Screeners encountered two travelers at "lane 4 of the TSA Security Checkpoint at BNIA" and "Suspect 2 **was asked by Reporting Officer if he was also carrying currency** he then replied yes cash **with the assistance of TSA Cheryl Hamm did locate in suspects backpack a plastic bag containing money**." (emphasis added.)

g. Another BUF Transit Authority Police Department Police Report states that on April 18, 2017, "TSA SUPERVISOR CILANO" questioned a passenger about the cash found in his luggage and then escorted the passenger to the reporting police officer: "CILANO ASKED" "IS THIS CASH?" SUB STATED "YES" CILANO STATED "THATS [sic] A LOT OF MONEY" AND THE SUB SAID "ITS [sic] TO BUY AND [sic] ENGAGEMENT RING." CILANO ASKED IS THERE AND [sic] A REASON ITS [sic] PACKAGED LIKE THAT? SUB STATED "THATS HOW I DO IT" AT THIS POINT SUPERVISOR CILANO DID BRING THE SUB BACK TO RO [the reporting officer]."

h. Another BUF Transit Authority Police Department Police Report dated April 1, 2018 documents that TSA Supervisor Cilano told a passenger that the passenger was required to speak with law enforcement about the "Large amount of currency" in her carry-on luggage. The reporting police officer "was alerted by TSA Supervisor Cilano that the above listed subject had a "Large amount of currency" in her carry on bag. **TSA Supervisor Cilano stated that** when **he informed the subject that she would need to speak with an Officer**, she stated to him that the money in her bag was for a down payment on a 2006 Lexus that she was flying to NYC to buy." (emphasis added).

i. Another BUF Transit Authority Police Department Police Report dated March 21, 2019 documents that TSA Supervisor Cilano escorted a passenger with a "large undetermined amount of currency" in his carry-on luggage to the reporting police officer at the police podium: "TSA informed me that they found a large undetermined amount of currency in subject 1's carry on bag. The subject and his 2 bags came thru security lane number 4A and his back pack only was inspected by TSA supervisor Jay Cilano. **Subject with his bags in hand was escorted to police podium** so that R/O could speak with him."

385. Documents obtained under FOIA related to the Buffalo Niagara International Airport (BUF) in New York also indicate that $10,000 continues to be TSA's threshold for seizing cash and alerting law enforcement. For example:

a. A BUF Transit Authority Police Department Police Report states that on November 14, 2018, "PATROL WAS APPROACHED BY TSA AGENT CRAIG BURNS (REPORTING PERSON-1) STATING THEY HAVE A

TRAVELING PASSENGER (SUBJECT -1) **WITH OVER $10,000.00 U.S. CURRENCY IN HIS CARRY ON BAG.** SUBJECT -1 WAS **ATTEMPTING TO CLEAR THE SECURITY CHECKPOINT** AND BOARD JET BLUE FLIGHT #1901." (emphasis added)

b.  Another BUF Transit Authority Police Department Police Report states that on March 16, 2017: "TAPD OFCS..JAWOREK AND LAMONTE RESPONDED TO LANE #4 AT THE BNIA CHECKPOINT. TSA AGENT LEIDENFROST TOLD OFCS.THAT THE SUBJECT HAD A [sic] **APPROX. $11,000 IN US CURRENCY IN HIS POSSESSION.**" The same report also states: "TSA personal [sic] did discover the large sum of currency **after the screening process** on lane 4." (emphasis added).

386.  These temporary TSA seizures of travelers' cash, carry-on luggage, and/or personal effects meaningfully interfere with these travelers' possessory interest in their property. For example, while TSA Screeners seize their cash and/or carry-on luggage, travelers cannot take their cash and/or carry-on luggage with them to their boarding gate, use items in their carry-on luggage, or use the cash to purchase items in the airport.

387.  Travelers typically keep valuable or important personal effects and property in their carry-on luggage that they cannot realistically leave behind, including cell phones, laptop computers and tablets, wallets, credit cards, passports and other identification documents, travel documents, appointment books, medications, essential toiletries, and clothes. This is particularly true while going through TSA transportation security screening, because travelers are typically instructed by TSA to remove everything from their pockets and are typically not permitted to have anything on their person that will cause TSA metal detectors or other screening devices to alert.

388.  Because these TSA seizures are of a traveler's valuable or important possessions, which typically include their cash and their carry-on luggage (including their personal effects stored in their carry-on luggage), the traveler is effectively seized when their property is seized.

389.  TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded is *ultra vires* because it exceeds TSA's statutory authority to exercise administrative powers related to transportation security and to conduct "day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation," 49 U.S.C. § 114(e)(1), which TSA defines as "the inspection of individuals and property for weapons, explosives, and incendiaries," 49 C.F.R. § 1540.5.

390.  TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded and without reasonable suspicion or probable cause also violates the Fourth Amendment's prohibition against unreasonable searches and seizures by seizing property and persons beyond the time and scope of the mission for which the agency's initial lawful administrative search was initiated.

## B.  Class action requirements

391.  To remedy the ongoing statutory and constitutional violations caused by TSA's policy or practice, Plaintiffs seek class-wide declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs seek a declaration that TSA's policy or practice exceeds the agency's statutory and regulatory authority and violates the Fourth Amendment rights of travelers. Plaintiffs accordingly seek an injunction prohibiting TSA from seizing travelers' cash, carry-on luggage, personal effects, and/or persons at transportation security screening checkpoints—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded.

392.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual challenges to TSA's unlawful and unconstitutional policy or practice will, by their nature, often become moot by the return of property, and in any event the costs associated with bringing individual challenges are often prohibitive of a full and fair process for vindicating individuals' statutory and constitutional rights. A class action will allow for effective, class-wide relief to remedy these ongoing and repeated *ultra vires* actions by TSA that also violate the Fourth Amendment.

393.  Plaintiffs propose the following class definition for the "TSA Class":

"All air travelers who, from January 15, 2014, until the present, either have had or will have their cash, carry-on luggage, personal effects, and/or person seized by TSA Screeners at transportation security screening checkpoints—based on the presence of a 'large' amount of cash on their person or in their carry-on luggage—after the transportation security screening has concluded."

394.  This action meets all the Rule 23(a) prerequisites for maintaining a class action.

395.  ***Numerosity under Rule 23(a)(1)*:** The putative class is so numerous that joinder of all members is impracticable.

    a.  TSA is responsible for the security of nearly 440 airports, and over 25,000 flights per day.

    b.  Every day in 2018, TSA screened over two million passengers, with a total of 813.8 million passengers screened over the course of the year.

    c.  Every day, TSA screens 5.5 million carry-on items for weapons, explosives, and incendiaries.

d.  In 2018 alone, TSA Screeners detected and seized 4,239 firearms at transportation security screening checkpoints.

e.  In 2015, TSA confiscated more than 22,000 "dangerous items" at transportation security screening checkpoints.

f.  Upon information and belief, air travelers bring what TSA considers to be a "large" amount of cash into the secured area of an airport (which is legal) far more often than they attempt to bring guns or other dangerous items into the secured area of an airport (which is illegal).

g.  Upon information and belief, TSA Screeners are likely to detect when an air traveler brings what TSA considers to be a "large" amount of cash through a transportation security screening checkpoint.

h.  TSA Screeners regularly detect and temporarily seize "large" amounts of cash and/or carry-on luggage containing "large" amounts of cash from travelers at transportation security screening checkpoints in order to hold it until law enforcement can arrive and investigate the person traveling with the cash.

i.  TSA Screeners frequently question air travelers about why they have a "large" amount of cash and temporarily seize the traveler's cash, carry-on luggage, personal effects, and/or their person after the transportation security screening has concluded.

j.  These seizures are based on TSA Screeners becoming aware that a traveler possesses a "large" amount of cash on their person or in their carry-on luggage during the transportation security screening.

k. Many of these seizures are based on travelers' possessing what TSA Screeners estimate to be $10,000 or more.

l. Upon information and belief, the number of current and future class members is in the thousands.

m. The members of the proposed class are dispersed across the United States, with many living far from the location where TSA seized their cash.

396. ***Commonality under Rule 23(a)(2):*** This action presents questions of law and fact common to the putative class, resolution of which will not require individualized determinations of the circumstances of any particular class member. Common questions include, but are not limited to:

a. Does TSA have a policy or practice of TSA Screeners seizing travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of a "large" amount of cash on their person or in their carry-on luggage—after the transportation security screening has concluded?

b. Does TSA have a policy or practice of TSA Screeners prolonging or extending the detention of air travelers beyond the administrative search of travelers for transportation security screening purposes in order to investigate matters that are unrelated to transportation security, such as to conduct investigations into travelers with "large" amounts of cash?

c. Are TSA Screeners authorized under statute to seize travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of a "large" amount of cash on their person or in their carry-on luggage—after the transportation security screening has concluded? Does an air traveler's possession

of a "large" amount of cash, by itself, constitute reasonable suspicion or probable cause?

d. Does TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of a "large" amount of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause violate the Fourth Amendment?

e. Does TSA's policy or practice of having TSA Screeners prolong or extend the detention of air travelers beyond the administrative search of travelers for transportation security screening purposes in order to investigate matters that are unrelated to transportation security, such as to conduct investigations into travelers with "large" amounts of cash violate the Fourth Amendment?

397. ***Typicality under Rule 23(a)(3)*:** The Named Plaintiffs' claims seeking declaratory and injunctive relief from the challenged TSA policy or practice are typical of the claims of the putative class.

a. The Named Plaintiffs' claim regarding TSA's *ultra vires* and unconstitutional policy or practice affects the other members of the class.

b. The Named Plaintiffs seek the same class relief for themselves and all other members of the class:

i. a declaration that TSA Screeners do not have statutory authority to seize travelers' cash, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of cash on their person or in their

carry-on luggage—after the transportation security screening has concluded;

ii.  an injunction prohibiting TSA Screeners from seizing travelers' cash, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded;

iii.  a declaration that TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause violates the Fourth Amendment; and

iv.  an injunction prohibiting TSA from seizing travelers' cash, carry-on luggage, personal effects, and/or persons (even temporarily)—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

398.  ***Adequacy of Representation under Rule 23(a)(4)***: The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys.

a.  The Named Plaintiffs adequately represent the putative class because their interests are aligned with the class's and there are no conflicts of interest between the Named Plaintiffs and members of the putative class.

73

b. The Named Plaintiffs and the putative class members are ably represented *pro bono* by the Institute for Justice ("the Institute"). The Institute is a nonprofit, public-interest law firm that, since its founding in 1991, has litigated constitutional issues nationwide. The Institute has a particular expertise in litigating to protect property rights, including challenging civil-forfeiture programs on constitutional grounds. In bringing this action, the Institute has done extensive work to identify and investigate Plaintiffs' claims.

399. This action also meets the requirements of, and is brought in accordance with, Rule 23(b)(2). TSA has acted, or refused to act, on grounds generally applicable to the class. Final declaratory and injunctive relief is appropriate with respect to all of the members of the class.

400. Finally, this action is a Rule 23(b)(2) action where the putative class is only seeking declaratory and injunctive relief, and thus is not required to satisfy the ascertainability requirement. *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). However, even if the ascertainability requirement applied, the members of the class are ascertainable because TSA records such as Incident Reports—which are prepared whenever law enforcement is notified about a traveler by TSA—should be able to identify travelers affected by the above-referenced TSA policy or practice.

### DEA Class Action Allegations

401. Every year, DEA conducts tens of thousands of seizures of cash, including hundreds or even thousands of seizures of cash from travelers at U.S. airports.

402. From 2009 to 2013, DEA seized over $2 billion in currency.

403. DEA made more than 80,000 seizures of currency (totaling over $4 billion) from FY 2007 to FY 2016, which is approximately 80% of all federal seizures of cash by DOJ agencies during that period.

404.  From 2009 to 2013, DEA interdiction Task Force Groups, which operate at airports and other mass transportation facilities, seized $163 million in more than 4,000 individual currency seizures.

405.  DEA has operated an "airport interdiction task force" at one or more U.S. airports since at least 1975.

406.  DEA sometimes refers to its airport interdiction activities as "Operation Jetway." Operation Jetway is also the name of DEA's transportation interdiction training course for airports. Operation Jetway is the airport counterpart to DEA's Operation Pipeline, which is DEA's nationwide highway interdiction program that focuses on roadway interdiction of passenger and commercial motor vehicles.

407.  The Operation Jetway airport interdiction program was established in 1993 with DEA as the lead agency, to provide standardized training and to collect and analyze arrest and seizure data from federal, state, and local drug interdiction units working at airports and other mass transportation facilities.

408.  In 2001, DEA collected data on Operation Jetway airport interdiction operations at 77 U.S. airports.

409.  Upon information and belief, DEA now operates an Operation Jetway airport interdiction program at every major commercial airport in the United States.

410.  A 2017 report by the DOJ Office of Inspector General reviewed a sample of 100 DEA currency seizures that "appeared to have occurred without a court-issued warrant and without the presence of narcotics" and "found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports . . . ." Of those 85 seizures, 46 occurred at airports. DOJ Office of Inspector General, *Review of the Department's Oversight of Cash Seizure*

*and Forfeiture Activities* at iii, 22 (Mar. 2017) ("2017 OIG Report"),
https://www.oversight.gov/sites/default/files/oig-reports/e1702.pdf.

411.  DEA's airport interdiction and seizure practices focus on seizing cash, not on stopping crime. The 2017 OIG Report found that DEA could verify that "only 29 of the 85 interdiction seizures, had (1) advanced or been related to ongoing investigations, (2) resulted in the initiation of new investigations, (3) led to arrests, or (4) led to prosecutions." This "risks the reality[] that [DEA] is more interested in seizing and forfeiting cash than advancing an investigation or prosecution." 2017 OIG Report at iii; *id.* at 20 ("many of the DEA's interdiction seizures may not advance or relate to criminal investigations").

412.  Because the vast majority of interdiction encounters and seizures are conducted "absent any preexisting intelligence of a specific drug crime," there are "potential risks to civil liberties associated with [so-called] cold consent encounters that occur during transportation interdiction operations." 2017 OIG Report at iii; *id.* at 21-22 ("interdiction operations at transportation facilities . . . can be particularly susceptible to civil liberties concerns").

413.  DEA Agent Anthony DiGiovanni's status as an instructor for DEA interdiction efforts, including Operation Pipeline and Operation Jetway, demonstrates that DEA's policies or practices described and challenged in this lawsuit are not the acts of rogue or poorly trained DEA interdiction agents, but are the policies or practices actually being taught by DEA interdiction instructors such as Mr. DiGiovanni and implemented by DEA interdiction agents such as Mr. DiGiovanni at U.S. airports.

**A. DEA's unconstitutional policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on the knowledge or belief that they are traveling with a "large" amount of cash**

414.  DEA's airport interdiction and seizure practices are typically not conducted as part of ongoing or known criminal investigations, are not random, and are not based on agents' identification of behaviors that give rise to reasonable suspicion or probable cause.

415.  Instead, DEA interdiction agents have a policy or practice of conducting suspicionless non-consensual seizures of airport travelers based solely on the agents' knowledge or belief that those specific travelers are traveling with a "large" amount of cash. Because that knowledge or belief does not itself give rise to reasonable suspicion, these targeted airport seizures are suspicionless non-consensual seizures that violate the Fourth Amendment.

416.  Especially after the September 11, 2001 terrorist attacks, commercial airports in the United States have become high-security areas manned and patrolled by numerous government agents, including TSA Screeners and law enforcement officers such as DEA and various Department of Homeland Security agencies.

417.  At commercial airports, while the secured area past the transportation security screening checkpoint is particularly high security, the entire airport is a high-security area, including the baggage claim area, ticketing counter, and luggage drop-off areas, which are routinely patrolled and monitored by law enforcement officers and other government or airport personnel.

418.  At commercial airports, air travelers know that they can be prevented from flying, detained, arrested, and face criminal charges and/or civil fines for making careless comments about certain topics related to transportation security, such as any statements—even including obvious jokes—alluding to a traveler possessing weapons or explosives.

419.  Air travelers at transportation security screening checkpoints are legally required to present their identification documents and boarding pass and to truthfully answer questions posed

by TSA Screeners about their identity, travel plans, the purpose of their travel, and the contents of their luggage and other belongings on their person, including whether they have any weapons, explosives, incendiaries or other prohibited items. Airline travelers know that failure to comply with these requirements, questions, and searches is likely to result in being them prevented from flying, detention, criminal charges, and/or civil fines.

420.  Even after passing through transportation security screening checkpoints, air travelers are legally required to comply with the lawful commands of TSA officials and other government personnel. Air travelers know or are likely to reasonably believe that failure to comply with these requirements, questions, and searches is likely to result in them being prevented from flying, detention, arrest, criminal charges, and/or civil fines.

421.  Even when air travelers are not at transportation security screening checkpoints, air travelers may be required to submit to "Administrative Searches" or "Special Needs Searches" of their person and/or luggage by TSA—or by non-TSA personnel, including law enforcement officers, acting at TSA's direction—to ask about and search for weapons, explosives, incendiaries, or other prohibited items. These "Administrative Searches" or "Special Needs Searches" may occur in any area of the airport, such as during Gate Screenings at the boarding gate, Reverse Screenings upon arrival at a flight's destination, or Regulatory Inspections. *See* TSA Management Directive No. 100.4 (Sept. 1, 2009). Air travelers know or are likely to reasonably believe that failure to comply with these requirements, questions, and searches is likely to result in them being prevented from flying, detention, arrest, criminal charges, and/or civil fines.

422.  In these contexts—which can arise in any area of an airport—"[s]creening and searches may be conducted by TSA personnel or at the direction of TSA, and may be initiated by TSA Headquarters or local TSA officials. TSA will consult and coordinate with Federal, state, and local

law enforcement officials, as well as affected transportation entities, as appropriate, when conducting these operations." TSA Management Directive No. 100.4 (Sept. 1, 2009).

423.  Among the personnel that TSA deploys to conduct such "Administrative Searches" or "Special Needs Searches"—which can arise in any area of an airport—are armed Visible Intermodal Prevention and Response ("VIPR") teams designed to "augment the security of any mode of transportation. VIPR teams may comprise any asset of DHS, including[] FAMs [Federal Air Marshals], TSIs [Transportation Security Inspectors], canine detection teams, and detection technology." TSA Management Directive No. 100.4 (Sept. 1, 2009).

424.  Given the high-security environment of an airport and federally mandated compliance with these security procedures—which can arise in any area of an airport and involve multiple different government officials from different agencies—when air travelers are approached by law enforcement officers such as DEA interdiction agents in an airport, most air travelers reasonably believe the encounter is part of their ongoing obligation to comply with federal government questions and searches that are attendant to air travel at commercial airports—especially when the agents ask targeted, individualized, or personalized questions similar to those asked at the transportation security screening checkpoint.

425.  Given the high-security environment of an airport and federally mandated compliance with these security procedures—which can arise in any area of an airport and involve multiple different government officials from different agencies—when air travelers are approached by law enforcement officers such as DEA interdiction agents in an airport, most air travelers reasonably believe they are legally obligated to cooperate with those officers, including truthfully answering the officers' questions and submitting to a search of their person and luggage—or likely risk being prevented from flying, detention, criminal charges, and/or civil fines.

426.  This is particularly true when law enforcement officers begin the encounter by asking questions that seem related to transportation security, such as questions about an air traveler's identity, travel plans, the purpose of their travel, or the contents of their luggage and other belongings. This is also particularly true when law enforcement officers ask targeted questions or make statements demonstrating that they already know specific personal information about the traveler, such as the traveler's name, itinerary, or that the traveler is traveling with cash.

427.  For all of these reasons, and as exemplified by Named Plaintiff Rebecca's suspicionless seizure by Defendant DEA agent Dawkin and by the additional examples herein, when DEA interdiction agents approach and ask targeted questions of specific travelers at airports who the DEA agents know or believe to be traveling with a large amount of cash, these are non-consensual encounters.

428.  As a result, in the federal-government-controlled post-9/11 high-security context of a commercial airport, when a federal law enforcement officer asks an air traveler a question indicating that the federal law enforcement officer knows something about the traveler's circumstances—*e.g.*, the traveler's name, the traveler's itinerary, or that the traveler is traveling with cash—the traveler is not free to walk away or to decline to answer the federal law enforcement officer's questions and is seized by the federal law enforcement officer.

429.  DEA interdiction agents have a policy or practice of conducting these airport seizures of targeted travelers based solely on the DEA agents' knowledge or belief that the targeted travelers are traveling with large amounts of cash. This policy or practice of conducting targeted suspicionless non-consensual seizures in the post-9/11 high-security context of a commercial airport—where no reasonable person would feel free to walk away from or ignore federal law enforcement officers—violates the Fourth Amendment.

430. DEA's policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on DEA interdiction agents' knowledge or belief that those specific travelers are traveling with a "large" amount of cash is related to DEA interdiction agents' policy or practice of seizing for civil forfeiture any cash found that totals more than $5,000—because DEA deems "large" amounts of cash presumptively subject to seizure regardless of whether there is probable cause for the seizure. This second policy (described more fully below) is also exemplified by Defendant Dawkin's seizure of Named Plaintiff Rebecca's cash on August 26, 2019, DEA agent DiGiovanni's seizure of Named Plaintiff Stacy's cash on May 19, 2020, and by the additional examples herein.

**B.   DEA's unconstitutional policy or practice of seizing for civil forfeiture "large" amounts of cash from air travelers because DEA deems "large" amounts of cash presumptively subject to seizure**

431. In addition to their policy or practice of conducting suspicionless non-consensual seizures of air travelers at airports, DEA interdiction agents also follow a related policy or practice of seizing cash without probable cause from travelers at U.S airports for civil forfeiture based on the presence of a "large" amount of cash in the traveler's possession—because DEA deems "large" amounts of cash presumptively subject to seizure, regardless of whether there is probable cause for the seizure.

432. DEA interdiction agents follow a policy or practice of seizing cash from travelers at U.S. airports when the amount of cash meets or exceeds a threshold amount that DEA interdiction agents consider "suspicious" and presumptively subject to seizure and civil forfeiture, regardless of whether there is probable cause for the seizure.

433. $5,000 is the typical threshold amount of cash that DEA interdiction agents deem presumptively subject to seizure for civil forfeiture, regardless of whether there is probable cause

for the seizure. The specific threshold amount deemed presumptively subject to seizure may vary

by DEA interdiction agent and may be as low as $1,000 or as high as $10,000.

434.  Named Plaintiffs Rebecca, Terry, and Stacy were subjected to DEA's policy or practice

of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture when it is

deemed presumptively subject to seizure because it totals $5,000 or more.

435.  Both of the aforementioned DEA airport personal seizure and cash seizure policies or

practices violate the Fourth Amendment's prohibition against unreasonable searches and seizures.

436.  Due to their knowledge of these DEA airport personal seizure and cash seizure policies

or practices, Named Plaintiffs Rebecca, Stacy, and Matt have refrained and will continue to refrain

from the entirely lawful activity of flying commercially with "large" amounts of cash.

## C. Nationwide examples of DEA agents following the challenged DEA airport personal seizure and cash seizure policies or practices

437.  Named Plaintiffs Rebecca's and Stacy's experiences are just two examples of DEA's

airport personal seizure and cash seizure policies or practices. Putative class counsel is aware of

the following examples that demonstrate either or both of DEA's challenged policies or practices

on an ongoing national scale.

438.  In January 2016, two DEA interdiction agents at the Cincinnati/Northern Kentucky

International Airport (CVG) testified that, pursuant to their training, $5,000 carried by any air

traveler was presumptively subject to seizure. One officer testified that pursuant to federal policy,

"my understanding was anything over $5,000 was subject to seizure." Dep. of Christopher Boyd,

No. 2:14-cv-125, Dkt. 76-1 at 34 (Jan. 20, 2016). Another DEA interdiction agent explained that

"DEA passed out a card with the threshold levels on them," explaining that $5,000 was a "federal

threshold." He went on to explain that "98 percent of the time we don't entertain anything less

than the threshold, which would be $5,000." Dep. of William Conrad, No. 2:14-cv-125, Dkt. 76-2 at 28-30 (Jan. 21, 2016).

439.  Upon information and belief, these DEA interdiction agents were likely referencing the DOJ Asset Forfeiture Policy Manual's instruction that to forfeit cash, the "minimum amount must be at least $5,000," which "generally must be met, preferably before property is seized." DOJ Asset Forfeiture Policy Manual (2019) Ch. 1, https://www.justice.gov/criminal-afmls/file/839521/download; *see also* DOJ Asset Forfeiture Policy Manual (2016) Ch. 1 (same); DOJ Asset Forfeiture Policy Manual (2013) Ch. 1 (same).

440. Given these DEA interdiction agents' testimony, it is apparent that at least in some instances, DOJ's minimum forfeiture policy has been taught to or interpreted by DEA interdiction agents as a presumptive policy to seize any amounts of cash totaling $5,000 or more. Indeed, the DOJ Office of Inspector General "highlight[ed] one such seizure . . . that was of particular concern because DEA agents and task force officers seized concealed currency from a piece of checked luggage without attempting to question the owner or otherwise conduct any investigation." 2017 OIG Report at 27.

441. On May 26 2020, DEA agents seized an adult male domestic air traveler at Minneapolis–Saint Paul International Airport (MSP) and his cash. The agents told an airline agent to call the man's name over a speaker; when he heeded this DEA summons, the agents conducted a non-consensual interrogation, search, and seizure. The traveler had no illegal drugs or contraband. The man did not feel free to walk away or to decline to answer the DEA agents' questions after they summoned him in the airport. The DEA agents seized over $10,000 from the man, explaining: "You have to have a legitimate reason to travel with a large amount of

currency"—even though traveling with any amount of cash is entirely lawful, including for no reason at all. The air traveler was not arrested or charged with any crime.

442. On or about March 11, 2019, DEA agents at Chicago's O'Hare International Airport (ORD) approached domestic air traveler Jordan Brooks as he was about to board his departing flight for California and began interrogating him about whether he had cash in his carry-on luggage, presumably because TSA Screeners had notified the DEA agents about the cash. The DEA agents interrogated Mr. Brooks solely on the basis of their knowledge or belief that he was traveling with a large amount of cash. He did not have any illegal drugs, contraband, or prohibited items, and the DEA agents had no reason to think that he did. Nevertheless, Mr. Brooks did not feel free to walk away or to decline to answer the agents' questions at any time. Almost immediately, they asked if he had any cash, and when he said yes, they seized for civil forfeiture his entire $16,000 in lawfully earned savings. The amount of cash was the sole basis for the seizure—which is not a constitutionally valid reason. Mr. Brooks was not arrested or charged with any crime.

443. On November 13, 2018, at the Eugene Airport in Oregon (EUG), DEA agents interrogated an adult male domestic air traveler after the traveler and his possessions were seized by TSA and placed in an interrogation room solely because he was traveling with approximately $100,000 in cash. The DEA agents, like the TSA Screeners, detained and interrogated him in the room based solely on the fact that he was traveling with a large amount of cash. The traveler had no illegal drugs or contraband. At no point did he feel free to walk away or to decline to answer the DEA agents' questions. The DEA agents seized the $100,000 for civil forfeiture without probable cause. The traveler was not arrested or charged with any crime. After the traveler retained

an attorney, all his seized money was eventually returned, but he had to pay one third of the recovered money to his attorney as a contingency fee.

444.   On August 27, 2018, Youngmin Peter Han was traveling from New Jersey to California when TSA Screeners saw him move cash from his jacket to his bag while going through the transportation security screening. When he landed at the Dallas-Fort Worth (DFW) airport for a layover, three or four DEA agents approached him and identified themselves as DEA agents. Mr. Han—who had no contraband or prohibited items—did not feel free to walk away or to decline to answer their questions at any time, including when the DEA agents immediately asked Mr. Han if he had a "large" amount of cash with him. When he said yes, they searched him and seized over $18,000, most of which was the proceeds from the sale of his car. Mr. Han was not arrested or charged with any crime. The money was eventually returned several months later. But as a result of this encounter and his knowledge of DEA's airport personal seizure and cash seizure policies or practices, Mr. Han will not consider flying with a large amount of cash again—even though it is entirely lawful to do so.

445.   On March 26, 2018, DEA agents approached domestic air traveler Tom Hill near his boarding gate at the JFK Airport in New York City, showed their badges, and questioned him about his backpack. He did not feel free to walk away or to decline to answer their targeted questions. The DEA agents interrogated Mr. Hill because they knew he had $62,000 in cash in his backpack—a fact he voluntarily disclosed to TSA when going through the transportation security screening. He had no contraband or prohibited items, and the DEA agents had no reason to think that the did. The DEA agents seized the money for civil forfeiture despite Mr. Hill's detailed explanation of the source and purpose of the cash, which was part of an ongoing business deal.

Mr. Hill was not arrested or charged with any crime. A year later, after Mr. Hill retained counsel, the $61,000 was finally returned to Mr. Hill ($1,000 went unaccounted for by DEA).

446. On March 12, 2018, four plainclothes DEA agents at the Detroit Metropolitan Wayne County Airport (DTW) positioned themselves directly between domestic air traveler Qui Ta and his boarding gate in order to ask him questions about the cash they knew he was traveling with, presumably because they were alerted by TSA Screeners as a result of his transportation security screening. Even though he had no contraband or prohibited items, and the DEA agents had no reason to think he did, the DEA agents blocked his path and interrogated him based solely on their knowledge of the presence and amount of cash in his carry-on luggage. He did not feel free at any point to walk away or to decline to answer their questions, including when—almost immediately upon conducting this non-consensual seizure—the agents asked, "Do you have money with you?" and "How much?" Qui Ta answered truthfully that he was traveling with approximately $34,000 from the sale of his house. Upon seeing the cash, the DEA agents grabbed Qui Ta's backpack and said, "Come with us." They took Qui Ta and his wife to an interrogation room with four or five law enforcement officers present. They searched through all of the couple's luggage and possessions, humiliating them, and seized all of their money. Qui Ta and his wife missed their flight and their vacation was ruined. Neither Qui Ta nor his wife were arrested or charged with any crime. Eventually, Qui Ta accepted a settlement for the return of $29,000 of his unconstitutionally seized $34,000.

447. In February 2018, domestic air traveler Josh Gingerich was seized by DEA interdiction agents at Chicago's O'Hare International Airport (ORD) and taken "down to a dingy basement room" with "no cameras… no nothing" for interrogation about why he was traveling with $29,000 in cash after a TSA agent saw cash in his backpack and tipped off the DEA agents. Mr. Gingerich

had no illegal drugs or contraband and the DEA agents had no reason to think he did. The DEA agents seized the $29,000 from Mr. Gingerich despite his plausible explanation that he had the money to purchase used vehicles on a buying trip for his truck-flipping business in California. Mr. Gingerich was not arrested or charged with any crime.

448.   On or about September 27, 2017, at the San Francisco International Airport (SFO), DEA interdiction agents tapped a male domestic air traveler on the shoulder at baggage claim, asked his name, and identified themselves as DEA agents. He did not feel free to walk away or to decline to answer the DEA agents' questions. The DEA agents immediately forced him to open his checked bag, which contained $87,000 in cash. He had no illegal drugs or contraband and the DEA agents had no reason to think he did. He explained that he worked in event planning and marketing and that the cash was to book a high-profile rap artist. The DEA agents immediately seized the cash for civil forfeiture. When the traveler asked what he did wrong, a DEA officer responded, "Nothing." This air traveler's event-planning business was irreparably damaged by the seizure of all or nearly all of its operating revenue. The air traveler was not arrested or charged with any crime.

449.   On August 29, 2016, Harlan Hunter III and his mother were flying domestically from the Philadelphia International Airport (PHL) to San Francisco. DEA agents seized Mr. Hunter and his mother at their boarding gate and told them that their carry-on luggage must be searched. There was no consent sought or given. The DEA agents told Mr. Hunter to follow them to an interrogation room, where he told them that the approximately $45,000 he and his mother were traveling with was for a semi-trailer truck that his step-father needed for his work. Mr. Hunter and his mother had no illegal drugs or contraband, and the DEA agents had no reason to think they did. Instead, the sole basis for their seizure was the DEA agents' knowledge or belief that they were

traveling with a large amount of cash. Mr. Hunter and his mother did not feel free to walk away when approached by the DEA agents at the boarding gate, to decline the DEA agents' search of their luggage, or to decline to answer the DEA agents' questions about their cash. The only explanation the DEA agents gave when they ultimately seized Mr. Hunter's and his mother's cash for civil forfeiture was that it was suspicious for the cash not to be packed in an envelope. No other reasonable suspicion or probable cause was proffered, and neither Hunter nor his mother were arrested or charged with any crime.

450.  On February 19, 2015, despite finding no illegal drugs, contraband, or prohibited items, DEA agents seized $43,923 from domestic air traveler Vu Do at the JFK Airport in New York. He had had no contraband or prohibited items and the DEA agents had no reason to think he did. The money was lawfully earned from his two nail salon businesses and was intended to assist his brothers in California, who had recently suffered financial losses. Vu Do was not arrested or charged with any crime. In June 2015, Vu Do sued DEA over the unlawful seizure. The complaint states that Vu Do has never been charged, arrested, or convicted for any crime under the Controlled Substances Act. The complaint explains that Vu Do (who was traveling domestically) "did not know that it was a violation of Federal regulations to carry cash in excess of $5,000 at the time of the seizure." *See* Complaint, *Vu Do v. DOJ & DEA*, No. 1:15-cv-3553, Dkt. 1 (June 17, 2015). Because no such violation exists, upon information and belief, when DEA agents seized Vu Do and his cash, they (wrongly) informed him that traveling with $5,000 is unlawful—in accordance with DEA interdiction agents' policy or practice of treating $5,000 or more as presumptively subject to seizure for civil forfeiture.

451. Many of DEA's suspicionless non-consensual airport interrogations, seizures, and searches are the result of TSA "flagging" travelers who are traveling with "large" amounts of cash

and then notifying DEA about the traveler and the cash. Despite DEA's characterization of the ensuing stops—which are based solely on TSA-provided information that a particular traveler is traveling with a large amount of cash—as consensual in its forfeiture complaint allegations, the circumstances and the agency's treatment of "large" amounts of cash as presumptively subject to seizure indicate that these airport encounters are, as a matter of practice, unlawful seizures of airport travelers who cannot walk away or decline to answer questions when federal law enforcement officers ask them targeted and personal questions about their luggage in the high security context of an airport. For example:

    a.   A lawsuit filed in 2008 alleges that TSA Screeners detained two individuals "upon spotting cash" and told them to "wait while TSA contacted someone else." This resulted in a DEA agent arriving to continue the non-consensual seizure and questioning, which were based on the presence of cash. They evidently had no contraband or prohibited items, and the DEA agents had no reason to think they did. After the travelers were allowed to leave with their cash, another DEA agent approached them during their layover for the sole purpose of seizing their cash. *See* First Am. Compl., *Fiore v. Walden*, No. 2:07-cv-1674, Dkt. 11 (July 18, 2008).

    b.   In April 2011, DEA agents at Boston Logan International Airport (BOS) "met [a man] at an airport security checkpoint" and interrogated him based solely on the fact that TSA officials "discovered $29,540" in his possession. *See U.S. v. $29,540 in U.S. Currency*, 2013 WL 783052, at *1 (D. Mass. Feb. 28, 2013). He evidently had no contraband or prohibited items, and the DEA agents had no reason to think he did. He would not have felt free to walk away from these federal

law enforcement officers at an airport security checkpoint, who evidently seized him there based solely on his traveling with cash, which does not provide reasonable suspicion.

c.  In June 2017, "TSA officers alerted the DEA that [a man] was traveling to Phoenix, Arizona with a large sum of currency." Based solely on that information, DEA "approached" the man "in the airside terminal and interviewed" him. *See* Complaint for Forfeiture, No. 2:17-cv-1439, Dkt. 1 (Nov. 3, 2017). He would not have felt free to walk away from these federal law enforcement officers in the high security context of an airport, and they evidently seized him based solely on his traveling with cash, which does not provide reasonable suspicion. He evidently had no contraband or prohibited items, and the DEA agents had no reason to think he did.

452. The 2017 OIG Report corroborates and raises concerns about these coordination practices between DEA and TSA. The Report found: "DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on or checked luggage." The OIG Report noted that when DEA is initiating such cash- or currency-based contacts based on "lucrative relationships" with TSA Screeners and other sources, it raises obvious "implications relating to compliance with the Fourth Amendment's protections against unreasonable searches and seizures." 2017 OIG Report at 23; *see also* DOJ Office of Inspector General, *Investigative Summary of Findings Concerning the DEA's Use of a TSA Airport Security Screener as a Paid Confidential Source* (Jan. 7, 2016), https://www.oversight.gov/sites/default/files/oig-reports/f160107b.pdf (noting Fourth

90

Amendment implications of "asking the TSA Security Screener to notify the DEA of passengers carrying large sums of money in exchange for a reward based on money seized by the DEA").

453. Further demonstrating DEA's practice of conducting suspicionless non-consensual seizures at airports, the DOJ Office of Inspector General "identified practices in which [DEA task force group] members conducting [so-called] cold consent encounters may misrepresent either themselves or the ability of the traveler from whom they seize cash to contest the seizure." The OIG explained: "One such practice that we were told about in one TFG involved approaching a passenger at the gate area (after they passed through [TSA] security) and informing them that the TFG was conducting a 'secondary inspection.' We believe that using such terminology creates a risk that travelers will interpret the statement to mean they are required to consent to the encounter, similar to their obligations at a TSA checkpoint." DOJ Office of Inspector General, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities* at iv (Jan. 2015), https://www.oversight.gov/sites/default/files/oig-reports/e153.pdf; *id.* at 32 ("Some TFG members conduct cold consent encounters and searches in a manner that may be misleading."). Such practices are common and it is common for air travelers to be confused about their obligations—and their rights to not consent to be interviewed or searched—when approached in a similar manner by DEA interdiction officers.

454. In short, the practices described above and the experiences of the Named Plaintiffs demonstrate that DEA employs policies or practices at airports nationwide that consistently violate the Fourth Amendment rights of air travelers. As a result, the agency has "creat[ed] the appearance that they are more interested in seizing and forfeiting cash than advancing [] potential criminal investigation[s]." 2017 OIG Report at 28.

**D.  Class action requirements**

455.  To remedy the ongoing constitutional violations caused by DEA's policies or practices, Plaintiffs seek class-wide declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs seek a declaration that DEA's policies or practices violate the Fourth Amendment. Plaintiffs accordingly seek an injunction prohibiting DEA from (1) seizing air travelers or their property at any U.S. airport without articulable circumstances demonstrating at least reasonable suspicion, which must be more than the mere presence of "large" sums of cash, or (2) seizing for civil forfeiture air travelers' luggage or cash at any U.S. airport without articulable circumstances demonstrating probable cause, which must be more than the mere presence of "large" sums of cash.

456.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual challenges to DEA's unconstitutional policies or practices will, by their nature, often become moot by the return of property, and in any event the costs associated with bringing individual challenges are often prohibitive of a full and fair process for vindicating individuals' constitutional rights. A class action will allow for effective, class-wide relief to remedy these ongoing and repeated violations of the Fourth Amendment.

457.  Plaintiffs propose the following class definition for the "DEA Class":

"All air travelers who, from January 15, 2014, until the present, (1) either have been or will be seized by DEA at a U.S. airport because of DEA agents' knowledge or belief that they are traveling with a large amount of cash, or (2) either had or will have their cash seized for civil forfeiture by DEA at a U.S. airport because they were or are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure."

458.  This action meets all the Rule 23(a) prerequisites for maintaining a class action.

459. **_Numerosity under Rule 23(a)(1)_:** The putative class is so numerous that joinder of all members is impracticable.

    a.  Upon information and belief, DEA regularly seizes cash from travelers at U.S. airports.

    b.  For example, from 2006-2016, DEA seized more than $200 million in currency from at least 5,200 people at the nation's 15 busiest airports.

    c.  DEA interdiction agents nationwide regularly seize airport travelers based solely on the agents' knowledge or belief that those specific travelers are traveling with a "large" amount of cash—which does not itself give rise to reasonable suspicion or probable cause.

    d.  Many DEA seizures of cash at airports are based on information from TSA Screeners that the travelers possessed a "large" amount of cash on their person or in their carry-on luggage.

    e.  Many of these seizures are based on travelers possessing more than DEA's $5,000 threshold for seizing cash from travelers at U.S. airports for civil forfeiture regardless of whether there is probable cause for the seizure.

    f.  Upon information and belief, the number of current and future class members is in the thousands.

    g.  The members of the proposed class are dispersed across the United States, with many living far from the location where DEA seized them or their cash.

460. **_Commonality under Rule 23(a)(2)_:** This action presents questions of law and fact common to the putative class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff. Common questions include, but are not limited to:

a. Does DEA regularly seize travelers, their property, and/or their cash at airports based solely on DEA agents' knowledge or belief that those specific travelers are traveling with a "large" amount of cash?

b. Does DEA regularly seize cash from travelers at U.S. airports for civil forfeiture based on information from TSA Screeners that the travelers possess a "large" amount of cash on their person or in their carry-on luggage?

c. Does DEA have a policy or practice of seizing cash from travelers at airports because the cash exceeds a particular threshold amount (such as $5,000) that DEA deems "suspicious," and therefore presumptively subject to seizure regardless of whether there is probable cause for the seizure?

d. Does an air traveler's possession of $5,000 or more in cash, by itself, constitute reasonable suspicion or probable cause?

e. Do DEA's policies or practices violate the Fourth Amendment?

461. ***Typicality under Rule 23(a)(3)***: The Named Plaintiffs' claims seeking declaratory and injunctive relief are typical of the claims of the putative class.

a. The Named Plaintiffs' claim regarding DEA's unconstitutional policies or practices affect the other members of the class.

b. The Named Plaintiffs seek the same class relief for themselves and other members of the class:

    i. a declaration that DEA's airport personal seizure and cash seizure policies or practices violate the Fourth Amendment;

ii.   an injunction prohibiting DEA from seizing air travelers at airports based solely on a DEA agent's knowledge or belief that a specific traveler is traveling with a "large" amount of cash; and

iii.   an injunction prohibiting DEA from seizing cash from travelers at U.S. airports for civil forfeiture because it exceeds a particular threshold amount deemed presumptively subject to forfeiture regardless of whether there is probable cause for the seizure.

462.   ***Adequacy of Representation under Rule 23(a)(4)*:** The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys.

a.   The Named Plaintiffs adequately represent the putative class because their interests are aligned with the class's and there are no conflicts of interest between the Named Plaintiffs and members of the putative class.

b.   The Named Plaintiffs and the putative class members are ably represented *pro bono* by the Institute for Justice ("the Institute"). The Institute is a nonprofit, public-interest law firm that, since its founding in 1991, has litigated constitutional issues nationwide. The Institute has a particular expertise in litigating to protect property rights, including challenging civil-forfeiture programs on constitutional grounds. In bringing this action, the Institute has done extensive work to identify and investigate Plaintiffs' claims.

463.   This action also meets the requirements of, and is brought in accordance with, Rule 23(b)(2). DEA has acted, or refused to act, on grounds generally applicable to the class. Final declaratory and injunctive relief is appropriate with respect to all of the members of the class.

464. Finally, this action is a Rule 23(b)(2) action where the putative class is only seeking declaratory and injunctive relief, and thus is not required to satisfy the ascertainability requirement. *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). However, even if the ascertainability requirement applied, the members of the class are ascertainable because DEA maintains records of its cash seizures and forfeitures.

## Class Claims

### Count I
### Class Claim for *Ultra Vires* Agency Action Under 5 U.S.C. §§ 701-706
**(Against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America)**

465. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-464.

466. Plaintiffs bring this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

467. Plaintiffs bring this claim on behalf of themselves and the TSA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America.

468. TSA's statutory authority to conduct screenings of air travelers is limited to conducting administrative searches to ensure transportation security; by law, these transportation security screenings are not for general law enforcement purposes.

469. TSA's transportation security screenings may not go beyond their limited purpose of searching for threats to transportation security.

470. No statute or regulation authorizes TSA Screeners to engage in searches, seizures, or investigations for general law enforcement purposes.

471. No statute or regulation authorizes TSA Screeners to seize property that does not threaten transportation security.

472. No statute or regulation authorizes TSA Screeners to seize potential contraband or potential evidence of a crime unrelated to transportation security.

473. No statute or regulation authorizes TSA Screeners to seize or question travelers after the transportation security screening has concluded.

474. No statute or regulation authorizes TSA Screeners to seize or question travelers to investigate potential crimes that do not threaten transportation security.

475. TSA's challenged policy or practice—having TSA Screeners seize travelers' cash, carry-on luggage, personal effects, and/or their person, based on the presence of cash on their person or in their carry-on luggage, after the transportation security screening has concluded—exceeds TSA's statutory authority to conduct administrative searches for threats to transportation security.

476. Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to give TSA Screeners the authority to conduct these *ultra vires* and unconstitutional seizures. TSA Screeners conduct these *ultra vires* and unconstitutional seizures pursuant to an unwritten policy or practice, or pursuant to some other non-public written policy.

477. TSA's challenged policy or practice is *ultra vires* because it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

478. TSA's *ultra vires* policy or practice affects every member of the TSA Class—*i.e.*, every instance in which, after concluding the transportation security screening, TSA Screeners seize a traveler's cash, carry-on luggage, personal effects, and/or their person based on the presence of cash on their person or in their carry-on luggage.

479.  As a direct and proximate result of TSA's *ultra vires* policy or practice, the Named Plaintiffs and other members of the TSA Class have suffered or will suffer the same injury.

480.  Therefore, class-wide declaratory and injunctive relief is necessary to remedy TSA's unlawful policy or practice, which will otherwise continue.

### Count II
**Class Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706
and the Fourth Amendment
(Against TSA, TSA Administrator Pekoske in his official capacity,
and the United States of America)**

481.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-464.

482.  Plaintiffs bring this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

483.  Plaintiffs bring this claim on behalf of themselves and the TSA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America for violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

484.  Even when the government has lawfully initiated a search or seizure, it may not extend or prolong that search or seizure to pursue broader or different investigatory purposes absent reasonable suspicion or probable cause.

485.  TSA airport transportation security screenings are administrative searches that may not be conducted for general law enforcement purposes; they may not go beyond their limited purpose of searching for threats to transportation security.

486. Once TSA completes the administrative search of an air traveler and their carry-on luggage and does not detect any threats to transportation security, TSA may not continue to search or seize the air traveler, their carry-on luggage, or their cash without reasonable suspicion or probable cause.

487. It is legal to travel with any amount of cash, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

488. An air traveler's possession of any amount of cash, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

489. After TSA determines, in the scope of a lawful administrative search at a transportation security screening checkpoint, that nothing on a traveler's person or in a traveler's carry-on luggage presents a threat to transportation security, the Fourth Amendment prohibits TSA from (1) extending or prolonging that administrative search for other purposes or (2) seizing the traveler's cash, carry-on luggage, personal effects, and/or person without reasonable suspicion or probable cause.

490. Seizing a traveler's cash, carry-on luggage, personal effects, and/or person, even briefly or temporarily, is a meaningful interference with that traveler's possessory interest in their property and freedom of movement.

491. Even if travelers are told they are free to leave the transportation security screening checkpoint without their carry-on luggage or their cash, they are effectively seized by the interference with their property, particularly if it includes valuable or important property such as cash or other personal effects typically packed in carry-on luggage.

492. Plaintiffs challenge TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-

on luggage—after the transportation security screening has concluded, and without reasonable suspicion or probable cause.

493.  TSA's seizure of cash, carry-on luggage, personal effects, and/or persons pursuant to this policy or practice violates the Fourth Amendment, even if the seizure is only temporary.

494.  For example, TSA's temporary seizures of Rebecca's, Stacy's, and Matt's carry-on luggage and personal effects after their transportation security screening concluded violated the Fourth Amendment because the seizures were beyond the scope of TSA's administrative search for threats to transportation security and were not based on reasonable suspicion or probable cause. These seizures were conducted pursuant to TSA's challenged policy or practice.

495.  For example, TSA's temporary seizures of Terry's and Rebecca's, Stacy's, and Matt's cash after the transportation security screening concluded violated the Fourth Amendment because they were beyond the scope of TSA's administrative search for threats to transportation security and were not based on reasonable suspicion or probable cause. These seizures were conducted pursuant to TSA's challenged policy or practice.

496.  For example, TSA's temporary seizures of Rebecca's, Stacy's, and Matt's persons after the transportation security screening concluded violated the Fourth Amendment because they were beyond the scope of TSA's administrative search for threats to transportation security and were not based on reasonable suspicion or probable cause. These seizures were conducted pursuant to TSA's challenged policy or practice.

497.  TSA's unconstitutional policy or practice affects every member of the TSA Class—*i.e.*, every instance in which TSA seizes a traveler's cash, carry-on luggage, personal effects, and/or person—based on the presence of cash on their person or in their carry-on luggage—after the

transportation security screening has concluded, and without reasonable suspicion or probable cause.

498.  As a direct and proximate result of TSA's unconstitutional policy or practice, the Named Plaintiffs and other members of the TSA Class have suffered or will suffer the same injury, including the deprivation of their constitutional rights and the interference with their property rights and freedom of movement.

499.  Therefore, class-wide declaratory and injunctive relief is necessary to remedy TSA's unconstitutional policy or practice, which will otherwise continue.

### Count III
### Class Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706 and the Fourth Amendment (Against DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America)

500.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-464.

501.  Plaintiffs bring this claim against DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

502.  Plaintiffs bring this claim on behalf of themselves and the DEA Class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America for violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

503.  It is legal to travel with any amount of cash, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

504. An air traveler's possession of any amount of cash, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

505. DEA follows a policy or practice of conducting suspicionless non-consensual seizures of travelers at U.S. airports based solely on the knowledge or belief that those specific travelers are traveling with a "large" amount of cash.

506. Pursuant to this unconstitutional policy or practice, DEA seized Named Plaintiff Rebecca and her property without reasonable suspicion.

507. Pursuant to this unconstitutional policy or practice, DEA seized Named Plaintiff Stacy and her property without reasonable suspicion.

508. DEA follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture based solely on the presence of a large amount of cash, which DEA deems presumptively subject to seizure.

509. DEA follows a policy or practice of seizing cash from travelers at U.S. airports for civil forfeiture based on the presence of a threshold amount of cash that DEA considers "suspicious" and therefore presumptively subject to seizure regardless of whether there is probable cause for the seizure.

510. DEA interdiction agents follow a policy or practice of seizing cash from travelers at U.S. airports based on whether they have at least $5,000 in cash, regardless of whether there is probable cause for the seizure.

511. Pursuant to this unconstitutional policy or practice, DEA seized Terry's and Rebecca's cash for civil forfeiture without probable cause.

512. Pursuant to this unconstitutional policy or practice, DEA seized Stacy's and her husband's cash for civil forfeiture without probable cause.

513.  The above DEA policies or practices violate the Fourth Amendment right to be free from unreasonable searches and seizures.

514.  As a direct and proximate result of these policies or practices, the Named Plaintiffs and other members of the DEA Class have suffered or will suffer the same injury, including the deprivation of their constitutional rights and the deprivation and/or loss of their cash.

515.  DEA's unconstitutional policies or practices affect every member of the DEA Class—*i.e.*, every instance in which DEA conducts a suspicionless non-consensual seizure of a traveler at a U.S. airport because a DEA agent knows or believes they are traveling with a large amount of cash, and every instance in which DEA seizes cash from a traveler at a U.S. airport because they are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure, regardless of whether there is probable cause for the seizure.

516.  Therefore, class-wide declaratory and injunctive relief is necessary to remedy DEA's unlawful policies or practices, which will otherwise continue.

**<u>Individual Claims of Named Plaintiffs Rebecca Brown and Terry Rolin</u>**

**<u>Count IV</u>**
**Individual Claim Under Federal Rule of Criminal Procedure 41(g)**
**and 28 U.S.C. § 1331 for Return of Interest on Plaintiffs' Property Seized and Held**
**For Seven Months in Violation of the Fourth Amendment**
**(Against DEA, DEA Acting Administrator Shea in his official capacity,**
**and the United States of America)**

517.  Named Plaintiffs Terry Rolin and Rebecca Brown re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-464.

518. Named Plaintiffs Terry Rolin and Rebecca Brown bring this claim for the return of interest on their seized cash against DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America under Federal Rule of Criminal Procedure 41(g), this Court's

general equity jurisdiction under 28 U.S.C. § 1331, and the Fourth Amendment to the United States Constitution.

519. Terry and Rebecca were both aggrieved, injured, and harmed by the unlawful and unconstitutional seizure of their property—the seized cash—and continue to be harmed by the continued deprivation of the interest on their seized cash.

520. DEA's seizure and continued retention of Terry's and Rebecca's cash for seven months violated their Fourth Amendment rights because the warrantless seizure and retention were and remain without probable cause to believe that Terry or Rebecca engaged in any criminal activity, or that the seized cash was connected to any criminal activity, and no exception to the warrant requirement applied or applies to the initial seizure or the retention of the seized cash.

521. For the same reasons, DEA's continued retention of the interest on Terry and Rebecca's seized cash violates their Fourth Amendment rights and deprives them of the interest they would have been entitled to earn on their $82,373, had the cash never been unlawfully and unconstitutionally seized by DEA and wrongfully withheld from them for seven months.

522. Terry and Rebecca are entitled to the immediate return of the interest that accrued on their $82,373 for the seven months they were deprived of their seized cash.

## Count V
### Individual *Bivens* Claim for Compensatory Damages
### Under the Fourth Amendment
### (Against DEA Agent Steve Dawkin)

523. The Named Plaintiffs re-allege and incorporate by reference each and every allegation set forth in preceding paragraphs 1-464.

524. The Named Plaintiffs bring this claim for compensatory damages against Defendant DEA Agent Steve Dawkin, in his individual capacity, under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and the Fourth Amendment to the United States Constitution.

525.  Defendant Dawkin violated Rebecca's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing her and her property without reasonable suspicion or probable cause.

526. Defendant Dawkin violated Terry's and Rebecca's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing their cash for civil forfeiture without a warrant or probable cause.

527.  As a direct and proximate result of Defendant Dawkin's unconstitutional actions, Terry and Rebecca have suffered injuries, as set forth in the preceding paragraphs—particularly the section entitled "Individual Injuries to the Named Plaintiffs"—and as may further be developed in discovery or at trial.

528.  An award of compensatory damages plus interest—in amounts to be determined in discovery or at trial—is necessary to remedy the injuries caused by Defendant Dawkin's violations of Terry's and Rebecca's Fourth Amendment rights.

### **Request for Relief**

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A.     Certify the TSA Class under Federal Rule of Civil Procedure 23(b)(2) consisting of: "All air travelers who, from January 15, 2014, until the present, either have had or will have their cash, carry-on luggage, personal effects, and/or person seized by TSA Screeners at transportation security screening checkpoints—based on the presence of a 'large' amount of cash on their person or in their carry-on luggage—after the transportation security screening has concluded."

B.     Certify the DEA Class under Federal Rule of Civil Procedure 23(b)(2) consisting of: "All air travelers who, from January 15, 2014, until the present, (1) either have been or will be seized by DEA at a U.S. airport because of DEA agents' knowledge or belief that they are traveling with

a large amount of cash, or (2) either had or will have their cash seized for civil forfeiture by DEA at a U.S. airport because they were or are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure."

C.  Issue class-wide declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring *ultra vires* and unlawful TSA's policy or practice of having TSA Screeners seize (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded.

D.  Issue class-wide injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA Screeners from seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded.

E.  Issue class-wide declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment TSA's policy or practice of seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

F.  Issue class-wide injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA from seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the

presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

G.      Issue class-wide declaratory relief against Defendants DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment DEA's policy or practice of seizing air travelers at U.S. airports because of DEA agents' knowledge or belief that they are traveling with a large amount of cash.

H.      Issue class-wide injunctive relief against Defendants DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America enjoining DEA's policy or practice of seizing air travelers at U.S. airports because of DEA agents' knowledge or belief that they are traveling with a large amount of cash.

I.      Issue class-wide declaratory relief against Defendants DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment DEA's policy or practice of seizing cash from air travelers at U.S. airports for civil forfeiture because they are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure.

J.      Issue class-wide injunctive relief against Defendants DEA, DEA Acting Administrator Shea in his official capacity, and the United States of America enjoining DEA's policy or practice of seizing cash from air travelers at U.S. airports for civil forfeiture because they are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure.

K.      Order Defendants DEA, DEA Acting Administrator Shea, and the United States of America to immediately return the interest that accrued on Terry's and Rebecca's $82,373 in

seized cash for the nearly seven months that DEA unlawfully and unconstitutionally retained their seized cash and wrongfully withheld it from them.

L.    Award Terry and Rebecca compensatory damages plus interest—in an amount to be proven in discovery or at trial—against *Bivens* Defendant DEA Agent Steve Dawkin for his violations of Terry's and Rebecca's Fourth Amendment rights.

M.    Enter an award against all Defendants allowing Plaintiffs to recover their attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

N.    Award any further equitable or legal relief the Court may deem just and proper.

## Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated:    July 17, 2020.        Respectfully submitted,

/s/ Dan Alban
Dan Alban*
VA Bar No. 72688

Jaba Tsitsuashvili*
DC Bar No. 1601246

Richard Hoover*
NY Bar No. 5717269

INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org
rhoover@ij.org

*Attorneys for Plaintiffs*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 17th day of July, 2020, I electronically filed the foregoing **FIRST AMENDED CLASS COMPLAINT FOR CLASS-WIDE DECLARATORY AND INJUNCTIVE RELIEF AND FOR INDIVIDUAL RELIEF OF RETURN OF PROPERTY AND COMPENSATORY DAMAGES** with the Clerk of Court using the CM/ECF System, through which all counsel of record will be notified.

/s/ Dan Alban