**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| _____ ) | |
| REBECCA BROWN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Civil Action No. 2:20-cv-64-LPL** |
| v. ) | |
| ) | |
| TRANSPORTATION SECURITY ) | **BRIEF IN SUPPORT** |
| ADMINISTRATION, et al., ) | **OF MOTION TO DISMISS** |
| ) | |
| Defendants. ) | |
| _____) | |

**BRIEF IN SUPPORT OF STEVEN DAWKIN'S MOTION TO DISMISS**
**THE INDIVIDUAL-CAPACITY CLAIM IN THE FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

I.      Allegations in the Amended Complaint ........................................................................2

   A.  Ms. Brown's Encounter at the Pittsburgh International Airport. ..................................2

   B.  Post-Airport Administrative Process............................................................................3

II.     Asset Forfeiture's Relevant Federal Statutory and Regulatory Framework ...................4

   A.  Administrative Asset Forfeiture by the DEA. ..............................................................4

   B.  Civil Judicial Forfeiture of Assets Seized by the DEA. ...............................................5

DISCUSSION ....................................................................................................................6

I.      Special Factors Preclude Plaintiffs' Novel Bivens Claims against TFO Dawkin ..........6

   A.  Bivens Actions are Disfavored.....................................................................................6

   B.  Plaintiffs Cannot Satisfy the Rigorous Inquiry the Supreme Court Requires to Imply a Novel Bivens Remedy in the Context of Forfeiture-Related Seizures at an International Airport..............7

      1.  Plaintiffs' Claims Present a New Bivens Context. .................................................7

      2.  Multiple Special Factors Counsel against Extending Bivens Here. .........................9

         a.  This is Not a Case of "Damages or Nothing." ....................................................9

            i.  CAFRA's Comprehensive Statutory Scheme. ............................................10

            ii.  Other Alternative Processes are Available..................................................12

         b.  Congressional Oversight Has Been "Frequent and Intense," Raising Separation-of-Powers Concerns...............................................................................................13

         c.  Other Special Factors Counselling Hesitation. ...............................................15

            i.  A Bivens Remedy in this Context Risks Interfering with National Security Interests.......16

            ii.  Bivens Cannot be used to Challenge Agency Policy. ..................................17

            iii.  Practical Problems and Other "Forward-Looking" Concerns.......................18

II.     Qualified Immunity Bars the Fourth Amendment Claim against TFO Dawkin ...........20

   A.  Plaintiffs Fail to Allege a Clearly Established Fourth Amendment Violation Based on Any Non-Cash "Seizure."..................................................................................................20

   B.  Plaintiffs Do Not Plead a Clearly Established Fourth Amendment Violation Based on the Cash Seizure Itself..............................................................................................23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

Andrews v. Miner,
  301 F. Supp. 3d 1128 (N.D. Ala. 2017) .................................................................. 13

Ashcroft v. al-Kidd,
  563 U.S. 731 (2011) ............................................................................ 20, 23, 24

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ................................................................................ 2, 3, 21

Baird v. Holton,
  806 F. Supp. 2d 53 (D.D.C. 2011) .......................................................................... 12

Bivens v. Six Unknown Fed. Narcotics Agents,
  403 U.S. 388 (1971) .................................................................................. 6, 8, 9

Bryan v. United States,
  913 F.3d 356 (3d Cir. 2019) ................................................................................ 23

Buck v. Hampton Twp. Sch. Dist.,
  452 F.3d 256 (3d Cir. 2006) ................................................................................. 3

Bush v. Lucas,
  462 U.S. 367 (1983) ........................................................................................ 10

California v. Hodari D.,
  499 U.S. 621 (1991) .................................................................................... 20, 21

Camreta v. Greene,
  563 U.S. 692 (2011) .................................................................................... 23, 25

Cantú v. Moody,
  933 F.3d 414 (5th Cir. 2019) ................................................................................ 7

Carlson v. Green,
  446 U.S. 14 (1980) .................................................................................... 6, 13

Carpenter's Produce v. Arnold,
  189 F.3d 686 (8th Cir. 1999) ............................................................................... 13

Chappell v. Wallace,
  462 U.S. 296 (1983) ........................................................................................ 12

Childress v. Palmer,
  No. 18-cv-514, 2018 WL 4282601 (S.D. Cal. Sept. 7, 2018) ................................................... 12

Corr. Servs. Corp. v. Malesko,
  534 U.S. 61 (2001) ................................................................................. 6, 13, 17

Davis v. Passman,
  442 U.S. 228 (1979) ......................................................................................... 6

District of Columbia v. Wesby,
  138 S. Ct. 577 (2018) ...................................................................................... 23

Estate of Roman v. City of Newark,
  914 F.3d 789 (3d Cir. 2019) ................................................................................. 4

F.D.I.C. v. Meyer,
  510 U.S. 471 (1994) .................................................................................... 17, 18

Farah v. Weyker,
   926 F.3d 492 (8th Cir. 2019) .................................................................. 7, 11
Florida v. Bostick,
   501 U.S. 429 (1991) .................................................................................. 20
Florida v. Rodriguez,
   469 U.S. 1 (1984) ...................................................................................... 22
Fowler v. UPMC Shadyside,
   578 F.3d 203 (3d Cir. 2009) ....................................................................... 2
Francis v. Miligan,
   530 F. App'x 138 (3d Cir. 2013) .............................................................. 11
Haig v. Agee,
   453 U.S. 280 (1981) .................................................................................. 16
Harper v. United States,
   No. 15-cv-4833, 2016 WL 4994996 (E.D.N.Y. Aug. 3, 2016) ................ 11
Illinois v. Wardlow,
   528 U.S. 119 (2000) .................................................................................. 22
Jackson v. McNeil,
   No. 19-cv-6245, 2020 WL 2745651 (W.D. Wash. May 27, 2020) ........... 11
Jackson v. Phelps,
   575 F. App'x 79 (3d Cir. 2014) ................................................................ 24
James v. City of Wilkes-Barre,
   700 F.3d 675 (3d Cir. 2012) ..................................................................... 21
Leyland v. Edwards,
   797 F. Supp. 2d 7 (D.D.C. 2011) ............................................................. 12
Mack v. Yost,
   No. 18-3504, 2020 WL 4459994 (3d Cir. Aug. 4, 2020) .................... passim
Hernández v. Mesa,
   140 S. Ct. 735 (2020) .......................................................................... passim
Mikhaylov v. United States,
   29 F. Supp. 3d 260 (E.D.N.Y. 2014) ....................................................... 11
Miller v. U.S. Dep't of Agr. Farm Servs. Agency,
   143 F.3d 1413 (11th Cir. 1998) ................................................................ 13
Minneci v. Pollard,
   565 U.S. 118 (2012) ............................................................................. 9, 12
Mitchum v. Hurt,
   73 F.3d 30 (3d Cir. 1995) ......................................................................... 17
Murphy v. Mifflin Cty. Reg'l Police Dep't,
   548 F. App'x 778 (3d Cir. 2013) .............................................................. 24
Payton v. New York,
   445 U.S. 573 (1980) .................................................................................... 8
Pearson v. Callahan,
   555 U.S. 223 (2009) .................................................................................. 20

*Perkins v. Jordan,*
　No. 1:17-cv-03507, 2018 WL 2722875 (S.D. Ind. June 6, 2018) ........................................... 11
*Rankin v. United States,*
　556 F. App'x 305 (5th Cir. 2014) ...................................................................................... 11
*Schweiker v. Chilicky,*
　487 U.S. 412 (1988) ........................................................................................... 10, 12, 15
*Shreiber v. Mastrogiovanni,*
　214 F.3d 148 (3d Cir. 2000) ........................................................................................ 10, 14
*United States v. Drayton,*
　536 U.S. 194 (2002) ........................................................................................................ 21
*United States v. Foster,*
　891 F.3d 93 (3d Cir. 2018) ............................................................................................... 23
*United States v. Frost,*
　999 F.2d 737 (3d Cir. 1993) ........................................................................................ 22, 24
*United States v. Hartwell,*
　436 F.3d 174 (3d Cir. 2006) .............................................................................................. 20
*United States v. Jacobsen,*
　466 U.S. 109 (1984) ........................................................................................................ 23
*United States v. Lockett,*
　406 F.3d 207 (3d Cir. 2005) .............................................................................................. 21
*United States v. Mendenhall,*
　446 U.S. 544 (1980) ........................................................................................................ 21
*United States v. Place,*
　462 U.S. 696 (1983) ........................................................................................................ 19
*United States v. Sharpe,*
　470 U.S. 675 (1985) .................................................................................................. 22, 23
*United States v. Stanley,*
　483 U.S. 669 (1987) ........................................................................................................ 10
*Vanderklok v. United States,*
　868 F.3d 189 (3d Cir. 2017) ..................................................................................... passim
*Vargas v. City of Philadelphia,*
　783 F.3d 962 (3d Cir. 2015) .............................................................................................. 22
*W. Radio Servs. Co. v. U.S. Forest Serv.,*
　578 F.3d 1116 (9th Cir. 2009) ........................................................................................... 12
*Walker v. Coffey,*
　905 F.3d 138 (3d Cir. 2018) ........................................................................................ 20, 22
*Wilkie v. Robbins,*
　551 U.S. 537 (2007) ................................................................................................ passim
*Williams v. Fed. Bureau of Investigation,*
　No. 3:19-cv-00418, 2019 WL 5295465 (D. Or. Oct. 18, 2019) ............................................. 11
*Wilson v. Layne,*
　526 U.S. 603 (1999) ........................................................................................................ 24

_Ziglar  v. Abbasi,_
  137 S. Ct. 1843 (2017) ..................................................................................... passim

**Statutes**

5 U.S.C. § 7543 ............................................................................................... 15
18 U.S.C. § 242 ............................................................................................... 15
18 U.S.C. § 981 ................................................................................................. 4
18 U.S.C. § 982 ................................................................................................. 4
18 U.S.C. § 983 .................................................................................. 4, 5, 10, 11
19 U.S.C. § 1602 ............................................................................................... 4
19 U.S.C. § 1607 ............................................................................................... 4
19 U.S.C. § 1608 ............................................................................................... 5
19 U.S.C. § 1609 ............................................................................................... 5
19 U.S.C. § 1618 ............................................................................................... 5
21 U.S.C. § 801 ................................................................................................. 4
21 U.S.C. § 853 ................................................................................................. 4
21 U.S.C. § 881 ................................................................................................. 4
21 U.S.C. § 960a ............................................................................................. 16
28 U.S.C. § 2465 ........................................................................................ 5, 11
28 U.S.C. § 2680 ...................................................................................... 13, 14
46 U.S.C. § 70507 ............................................................................................. 4

**Regulations**

5 C.F.R. § 752.403 .......................................................................................... 15
28 C.F.R. § 8.10 ............................................................................................ 4, 5
28 C.F.R. § 8.12 ............................................................................................... 5
28 C.F.R. § 8.13 ............................................................................................... 5
28 C.F.R. § 8.8 ................................................................................................. 4
28 C.F.R. § 8.9 ................................................................................................. 4
28 C.F.R. § 9.3 ................................................................................................. 5
28 C.F.R. § 9.5 ................................................................................................. 5

**Other Authority**

Fed. R. Civ. P. Supp. R. G. ......................................................................... 5, 10

# INTRODUCTION

This lawsuit seeks to challenge purported policies or practices of the federal government, which, in Plaintiffs' telling, play out thousands of times each year at airports around the country. The nationwide scope of this putative class action notwithstanding, Plaintiffs Rebecca Brown and her father, August Terrence Rolin, pursue a claim for damages from the personal assets of a lone federal employee, U.S. Drug Enforcement Administration (DEA) Task Force Officer (TFO) Steven W. Dawkin. They ask this Court to hold TFO Dawkin individually liable for acting "in accordance [with]" alleged "DEA interdiction polices or practices that Plaintiffs seek to declare unlawful and enjoin in this lawsuit[,]" when he "seized" Ms. Brown and $82,373 of her and Mr. Rolin's jointly-owned cash at the Pittsburgh International Airport. ECF No. 43 ¶ 115.

This Court should dismiss that claim (Count V) with prejudice for two independent reasons. First, the Supreme Court has made plain there is no automatic right to bring a damages action against a federal officer in his or her individual capacity based on an alleged constitutional violation. And because Plaintiffs cannot meet the demanding test required before such a remedy can be implied, they lack a cause of action against TFO Dawkin. But even assuming such a novel cause of action were to be created, qualified immunity would bar it. The well-pleaded allegations in the amended complaint do not suggest TFO Dawkin violated any clearly established constitutional right. In short, either of these two reasons, alone, compels dismissal of TFO Dawkin in his individual capacity under Rule 12(b)(6).

I.      **Allegations in the Amended Complaint[1]**

A.      **Ms. Brown's Encounter at the Pittsburgh International Airport.**

On August 26, 2019, Ms. Brown placed a beach bag through an x-ray machine at the Pittsburgh International Airport.  ECF No. 43 ¶¶ 148, 150, 153.  A TSA screener noticed a large amount of cash within the bag and questioned Ms. Brown about it.  Id. ¶¶ 154-55, 157.  Ms. Brown explained that she was taking the cash, which she claimed to be Mr. Rolin's savings, home to Massachusetts to open a bank account for him (though he lives in the Pittsburgh area). Id. ¶ 158.  She gave her identification and proof of travel arrangements to a TSA screener.  Id. ¶ 159.  Meanwhile, "TSA Screeners" requested the assistance of a state trooper.  Id. ¶ 167-68. When a trooper arrived, Ms. Brown "repeated her explanation of the cash's origin, purpose, and destination[;]" the trooper called his supervising lieutenant.  Id. ¶ 171-73.  The lieutenant spoke with Ms. Brown over the phone and, after a "third round of questioning," she went to her departure gate with the bag and its contents in tow.  Id.

At the gate, Ms. Brown was approached by the same trooper, along with TFO Dawkin, who identified himself as a DEA agent and said that "he had some questions" about the cash. Id. ¶¶ 177-78, 180.  Plaintiffs claim Ms. Brown "did not feel free to walk away or to decline to answer in the face of these targeted questions by a federal law enforcement officer at the airport," id. ¶ 180, but never allege the particular questions asked, what made them "targeted," nor that TFO Dawkin did (or said) anything coercive or confrontational during the encounter.

TFO Dawkin, along with the trooper, "escorted" Ms. Brown to a "less crowded part of

---

[1] TFO Dawkin, as he must, accepts the well-pleaded factual allegations as true for the limited purpose of this motion only.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Conclusory allegations, as with formulaic recitations of legal elements, however, are not entitled to a presumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

the gate area to" continue questioning her. Id. ¶ 181. TFO Dawkin "told" Ms. Brown to show him the cash, and she "compl[ied,]" albeit Plaintiffs now allege because she "felt like she had no choice[.]" Id. ¶ 183. Ms. Brown gave an explanation as to why she was traveling with over $82,000 cash in her bag. Id. ¶ 186. Upon hearing the story, TFO Dawkin sought corroboration from Ms. Brown's father, the co-owner of the cash. Id. ¶ 187. Ms. Brown purportedly told the TFO "that her father was elderly, would still be asleep at 7:00 a.m., and would likely be confused by the call," id. ¶ 188, but it is still unclear (and the amended complaint does not suggest) how an officer might substantiate these claims at that time. In any event, Ms. Brown called her father and placed him on the phone with TFO Dawkin. Id. ¶ 188. Mr. Rolin "had difficulty answering all of [TFO] Dawkin's questions." Id. ¶ 191. Plaintiffs claim Mr. Rolin "was groggy, confused, and upset" on the phone, and acknowledge he was unable to corroborate certain aspects of Ms. Brown's story. Id. ¶¶ 189-90. After the call, TFO Dawkin told Ms. Brown that her and Rolin's "answers don't match." Id. ¶ 192. The TFO then "took the cash and searched the rest of [Ms. Brown]'s beach bag" before she boarded her flight home. Id. ¶¶ 193, 197.

### B.   Post-Airport Administrative Process.

On October 11, 2019, the DEA sent Ms. Brown and Mr. Rolin notices indicating the agency's intent to seek forfeiture of the cash. Id. ¶ 200. The notices detailed the processes to pursue return of the funds, such as by filing a petition for remission or submitting a claim to contest forfeiture in federal court. See Ex. A (Civil Asset Forfeiture Reform Act [CAFRA] Notices).[2] Ms. Brown and Mr. Rolin opted for the latter. ECF No. 43 ¶ 201. And, on March 23, $82,373 was wired directly to their bank account. Id. ¶ 206.

---

[2] This Court may consider matters incorporated by reference and items subject to judicial notice. Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). The CAFRA Notices are incorporated by reference in the amended complaint, ECF No. 43 ¶ 200, and subject

## II.    Asset Forfeiture's Relevant Federal Statutory and Regulatory Framework

Informing this Court's analysis of the claim against TFO Dawkin are the multiple mechanisms Congress provides to individuals (like Plaintiffs) who have assets seized by the DEA to, among other things, challenge the legality of a seizure and seek return of property.

### A.    Administrative Asset Forfeiture by the DEA.

CAFRA, codified as amended in part at 18 U.S.C. § 983, works in tandem with the United States customs laws, found at 19 U.S.C. § 1602 et seq., to govern administrative forfeitures by the DEA.  See 21 U.S.C. § 881(d) (incorporating customs laws to apply to such forfeitures).  The DEA has the statutory authority to seek administrative forfeiture for, among other things, seized currency of any value.  19 U.S.C. § 1607(a).[3]  To initiate forfeiture, the DEA must give written notice, within 60 days of a seizure, to any potential claimant with an interest in the asset.  18 U.S.C. § 983(a)(1)(A)(i); 28 C.F.R. §§ 8.8, 8.9(b).  The DEA must also publish notice of its intent to seek forfeiture in a newspaper of general circulation (for three consecutive weeks) or on a government website (for at least 30 consecutive days).  19 U.S.C. § 1607(a); 28 C.F.R. § 8.9(a).  If the DEA fails to comply, it must return the asset.  18 U.S.C. § 983(a)(1)(F).

Upon receiving notice from the DEA, an individual owner (or any other interested party) may (as Plaintiffs did here) submit a claim with the DEA to contest the forfeiture.  Id. § 983(a)(2)(B); 28 C.F.R. § 8.10(a). If no claim is filed within the prescribed timeframe, the

---

to judicial notice as redacted copies of "indisputably authentic" government records that add "essential context" to Plaintiffs' allegations.  Estate of Roman v. City of Newark, 914 F.3d 789, 796-97 (3d Cir. 2019).

[3] The overarching authority for the DEA to seize and seek forfeiture of various assets (including, but not limited to, cash) comes from the Controlled Substances Act, 21 U.S.C. § 801 et seq.  See id. §§ 881(a)(6), (b).  Congress has authorized the DEA to seek forfeiture of cash in other statutes, too.  See, e.g., 18 U.S.C. §§ 981, 982; 21 U.S.C. § 853; 46 U.S.C. § 70507.

DEA issues a declaration of forfeiture against the asset, which "ha[s] the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding[.]" 19 U.S.C. § 1609(b); 28 C.F.R. § 8.12.[4] "[T]he exclusive remedy for seeking to set aside" such a declaration is a motion under CAFRA's § 983(e). See 18 U.S.C. § 983(e).

## B. Civil Judicial Forfeiture of Assets Seized by the DEA.

Under the statutory scheme Congress created, the filing of a timely claim, on the other hand, halts administrative forfeiture proceedings. 19 U.S.C. § 1608; 18 U.S.C. § 983(a)(3)(A); 28 C.F.R. § 8.10(e). At that point, the DEA must refer the matter to the United States Attorney's Office in the district where the seizure arose, which then has 90 days to either (i) initiate a civil judicial forfeiture action; (ii) obtain an indictment alleging the asset is subject to forfeiture; or (iii) return the seized asset. 18 U.S.C. §§ 983(a)(3)(A), (B); 28 C.F.R. §§ 8.10(e), 8.13. If the United States Attorney's Office pursues the first option, it must file a verified complaint in federal court. Supp. R. G(2). A judicial forfeiture action proceeds against the seized asset, governed by Supplemental Rule G of the Federal Rules of Civil Procedure. Supp. R. G(1). And, under CAFRA, in any such action "the burden of proof [rests] on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). Congress also created an "innocent owner defense," allowing full return of assets seized absent wrongdoing on the claimant's part. Id. § 983(d). Another reform allows claimants who substantially prevail in such proceedings to recover, in some cases, attorneys' fees and costs, plus interest. 28 U.S.C. § 2465.

---

[4] Individuals may also seek remission or mitigation of any forfeiture. 19 U.S.C. § 1618; 28 C.F.R. §§ 9.3, 9.5. The public can access and file petitions for remission or mitigation on a DOJ website. See United States Dep't of Justice, Asset Forfeiture Program: File A Petition, https://ocp.forfeiture.gov/OnlineClaimsPetitions/petition (last visited Aug. 19, 2020)

## DISCUSSION

I.  **Special Factors Preclude Plaintiffs' Novel <u>Bivens</u> Claims against TFO Dawkin**

    A.  **<u>Bivens</u> Actions are Disfavored.**

The <u>Bivens</u> doctrine originated in 1971, during the "heady days in which [the Supreme Court] assumed common-law powers to create causes of action[.]" <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 75 (2001) (Scalia, J., concurring). That year, in <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, the Court confronted allegations that federal agents "manacled" a man inside his home "in front of his wife and children, and threatened to arrest the entire family" before "search[ing] the apartment from stem to stern," all without a warrant. 403 U.S. 388, 389 (1971). After finding "no 'special factors' suggested that the Judiciary should 'hesitate,'" <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1854 (2017) (quoting <u>Bivens</u>, 403 U.S. at 396-97), the Supreme Court "broke new ground" by implying a damages remedy against the agents under the Constitution. <u>Hernández v. Mesa</u>, 140 S. Ct. 735, 741 (2020). The Court extended this implied remedy twice over the next nine years. <u>See Carlson v. Green</u>, 446 U.S. 14 (1980) (deliberate-indifference claim against jailers based on fatal failure to treat inmate's asthma); <u>Davis v. Passman</u>, 442 U.S. 228 (1979) (gender-discrimination claim against Congressman for firing female employee). The Court's expansion efforts then "came to a halt." <u>Mack v. Yost</u>, No. 18-3504, 2020 WL 4459994, at *4 (3d Cir. Aug. 4, 2020). Over the last four decades, the Supreme Court has "consistently rebuffed requests to add to the claims allowed under <u>Bivens</u>." <u>Hernández</u>, 140 S. Ct. at 743. Under the modern approach, a <u>Bivens</u> remedy is no "automatic entitlement." <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007). Instead, extending <u>Bivens</u> claims to any new context is "a disfavored judicial activity" that is seldom, if ever, appropriate. <u>Abbasi</u>, 137 S. Ct. at 1857 (quotation omitted).

6

**B.      Plaintiffs Cannot Satisfy the Rigorous Inquiry the Supreme Court Requires to Imply a Novel _Bivens_ Remedy in the Context of Forfeiture-Related Seizures at an International Airport.**

In line with this reluctance, the Supreme Court has set forth "a restrictive two-step framework for courts to follow when analyzing _Bivens_ claims." _Mack_, 2020 WL 4459994, at *3. The first question asks if the case "involves a claim that arises in a new context or involves a new category of defendants" than those in _Bivens_, _Davis_, or _Carlson_. _Hernández_, 140 S. Ct. at 743. This test is "easily satisfied." _Abbasi_, 137 S. Ct. at 1865. The second inquiry depends on whether any 'special factors' "_may_ provide a reason not to extend _Bivens_" to the context at issue. _Hernández_, 140 S. Ct. at 743 (emphasis added). This asks if there is any "sound reason[] to think Congress _might_ doubt the efficacy or necessity of a damages remedy[.]" _Abbasi_, 137 S. Ct. at 1858 (emphasis added). Where, as here, there is "reason to pause," then the Court should "reject the request" to extend _Bivens_. _Hernández_, 140 S. Ct. at 743.

**1.      Plaintiffs' Claims Present a New _Bivens_ Context.**

The Supreme Court's "understanding of a 'new context' is broad." _Id._ The test is straightforward: "[u]nless the Supreme Court has recognized the context before," it is "'new.'" _Mack_, 2020 WL 4459994, at *5. And since "the Supreme Court has not previously recognized" a _Bivens_ remedy in the airport setting, the inquiry is readily met in this case. _Id_; _See Vanderklok v. United States_, 868 F.3d 189, 199-200 (3d Cir. 2017) (airport security setting "new context.").[5]

---

[5] It is of no moment that Plaintiffs (presumably in an effort to come closer to the facts of _Bivens_) now claim that in addition to the cash, Ms. Brown's person was "seized." ECF No. 43 ¶ 525; _see Hernández_, 140 S. Ct. at 743 (claim presents 'new context' even if alleging violation of "same constitutional provision as a claim in a case in which a damages remedy was previously recognized."); _Cantú v. Moody_, 933 F.3d 414, 422 (5th Cir. 2019) ("Courts do not define a _Bivens_ [claim] at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'"), _cert. denied,_ No. 19-1033, 2020 WL 3146702 (U.S. June 15, 2020); _Farah v. Weyker_, 926 F.3d 492, 499 (8th Cir. 2019) (recognizing that treating all search-and-seizure cases same "would contradict the Supreme Court's direction that a context can be new even if it involves the same constitutional right as an existing case.").

"[D]ue to the Court's expressed caution about extending" Bivens, Mack, 2020 WL 4459994, at *3 (quotation omitted), a "modest extension" or one seemingly "small, at least in practical terms" is sufficient. Abbasi, 137 S. Ct. at 1864-65. Here, the forfeiture-related seizure of $82,373 cash at an airport (and any alleged temporary "seizure" of Ms. Brown in that context) is worlds away from the intrusive in-home search and arrest in Bivens. Cf. Payton v. New York, 445 U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quotation omitted)). Unlike Bivens, there is no allegation Ms. Brown was handcuffed, arrested or charged with a crime; nor is there a claim TFO Dawkin touched (let alone "manacled") her. Bivens, 403 U.S. at 389. Nor did Bivens (or its progeny) grapple with the unique national security concerns that the airport setting implicates. See, e.g., Mack, 2020 WL 4459994, at *7 ("allowing private individuals to bring a damages action against TSA officials could cause officials to hesitate before making [] decisions which directly affect national security." (citing Vanderklok, 868 F.3d at 207)).[6] None of the Supreme Court's three prior decisions involved airports or asset forfeiture, much less a statutory scheme like CAFRA. More still, neither Bivens, Davis, nor Carlson involved challenges to conduct undertaken via purported policy or practice. ECF No. 43 ¶¶ 115, 506, 511; see Abbasi, 137 S. Ct. at 1860 (listing "legal mandate under which the officer was operating" among non-exhaustive characteristics which can render context "new"). Plaintiffs' claims differ in "meaningful way[s]" from the three prior cases, so they present a "new context." Hernández, 140 S. Ct. at 743.

---

[6] Such matters of national security are also constitutionally committed to the political branches, Abbasi, 137 S. Ct. at 1861, so a separate distinction here (also not present in Bivens, Davis, or Carlson) is the risk that a Bivens remedy could invite "disruptive intrusion by the Judiciary into the functioning of other branches[.]" Id. at 1860.

### 2.    Multiple Special Factors Counsel against Extending <u>Bivens</u> Here.

Where, as here, a case presents a new context, "the Constitution's separation of powers requires [courts] to exercise caution" before allowing a <u>Bivens</u> remedy to proceed. <u>Hernández</u>, 140 S. Ct. at 739. That caution is embodied in the 'special factors' inquiry, which asks, at base, "who should decide whether to provide for a damages remedy, Congress or the courts?" <u>Abbasi</u>, 137 S. Ct. at 1857. In this case, as in most, the answer is Congress. <u>Id.</u>

Here, "two special factors" the Third Circuit has already found "particularly weighty" exist: "the availability of an alternative remedial structure and separation-of-powers concerns." <u>Mack</u>, 2020 WL 4459994, at *6. Still, Plaintiffs' claim presents other special factors, such as the risk of intruding on national security; the policy component of Plaintiffs' claims; and additional forward-looking concerns like the practical impact on officers' everyday work and financial costs associated with extending a non-statutory damages remedy to this class of cases. Together, these considerations provide ample "warning flag[s]" or "reason[s] to pause," and counsel against extending a <u>Bivens</u> remedy to this novel setting. <u>Hernández</u>, 140 S. Ct. at 743-44.

### a.    This is Not a Case of "Damages or Nothing."

Classically, for Mr. Bivens "it [was] damages" under the Constitution "or nothing[,]" <u>Id.</u> at 410 (Harlan, J., concurring). There was no "'alternative, existing process' capable of protecting the constitutional interests at stake." <u>Vanderklok</u>, 868 F.3d at 200 (quoting <u>Minneci v. Pollard</u>, 565 U.S. 118, 125 (2012)). Not so for Plaintiffs, whose claims implicate a purported interest to be free of allegedly unreasonable forfeiture-related seizures by the DEA. Multiple mechanisms (including a statutory scheme) give individuals claiming such infringement a "procedure to defend and make good on his [or her] position." <u>Wilkie</u>, 551 U.S. at 552. The very presence of these alternatives bars the novel <u>Bivens</u> remedy Plaintiffs seek. <u>See Abbasi</u>, 137 S. Ct. at 1865.

#### i.      CAFRA's Comprehensive Statutory Scheme.

If "Congress has provided meaningful remedies" through a comprehensive statutory

scheme, courts "should exercise extreme caution" before implying a novel damages action.

Shreiber v. Mastrogiovanni, 214 F.3d 148, 153 (3d Cir. 2000).  A Bivens remedy is also

improper if existing legislation "suggests that Congress has provided what it considers adequate

remedial mechanisms for constitutional violations that may occur" in a given setting.  Schweiker

v. Chilicky, 487 U.S. 412, 423 (1988) (emphasis added).  In enacting CAFRA, Congress

constructed a framework of procedures governing civil asset forfeiture by Executive Branch

agencies like the DEA.  Among its provisions, CAFRA gives individuals a way to challenge the

legality of a seizure itself, where warranted, in a full-blown civil proceeding in federal court.

See 18 U.S.C. § 983(a)(3) (aggrieved party may file claim to contest forfeiture, requiring agency

to initiate proceeding or return property); see also Supp. R. G(8) ("[A] party with standing [may

move] to contest the lawfulness of the seizure" in such proceeding).  Congress, then, already

constructed a mechanism for individuals to contest the precise act Plaintiffs seek to attack by

way of a Bivens claim.  That, alone, is "a convincing reason" for this Court "to refrain from

providing a new and freestanding remedy in damages."  Abbasi, 137 S. Ct. at 1858.[7]

CAFRA's comprehensive scheme includes other "meaningful safeguards or remedies for

the rights of persons situated as" Plaintiffs, too.  Schweiker, 487 U.S. at 425-28.  Among them is

---

[7] As the Third Circuit recently emphasized, it is irrelevant whether a statutory scheme (or
any alternative process) provides a plaintiff "with complete relief in order to foreclose a damages
remedy under Bivens."  Mack, 2020 WL 4459994, at *6 (citing Schweiker, 487 U.S. at 424-25).
The "adequacy" of whatever relief an alternative (scheme or process) provides to a given
plaintiff is irrelevant.  United States v. Stanley, 483 U.S. 669, 683 (1987); see also Bush v.
Lucas, 462 U.S. 367, 388 (1983); Mack, 2020 WL 4459994, at *6 n.8.  What matters, instead, is
that Plaintiffs and others similarly situated have "alternative methods of relief [] available"–not
that those methods provide damages or that they prevail.  Abbasi, 137 S. Ct. at 1863; see also
Bush, 462 U.S. at 385, 388. Here, though, Plaintiffs did prevail when, upon filing CAFRA
claims, they received the funds in full.

the "innocent owner defense," a remedy specifically designed for those who have had assets seized for forfeiture absent any wrongdoing, underscoring that the legislature recognized certain property might be seized from individuals who committed no wrongdoing. 18 U.S.C. § 983(d). Congress also contemplated that individuals might need to seek immediate release of seized property in cases of substantial hardship, so included an express provision to that effect. Id. § 983(f). Through another key reform, CAFRA enhanced the government's burden of proof in every civil forfeiture proceeding. Id. § 983(c). And even monetary compensation (attorneys' fees and costs, plus interest, see 28 U.S.C. § 2465) may, in certain cases, be appropriate for individuals who have shown their assets were unjustly seized. See Farah, 926 F.3d at 501-02 (availability of attorneys' fees a "special factor" although plaintiffs themselves ineligible to recover them). Importantly, though, Congress never provided for a damages action against the seizing agent or an award of consequential damages against the agency itself. See infra I.B.2.b.

CAFRA also created an "exclusive remedy" for setting aside a final declaration of administrative forfeiture. 18 U.S.C. § 983(e)(5). In Francis v. Miligan, the Third Circuit relied on that provision alone to affirm dismissal of a Bivens claim based on the failure to provide adequate notice of forfeiture in the criminal context. 530 F. App'x 138 (3d Cir. 2013) (per curiam). There, the Court found that § 983(e) was the exclusive remedy for the claim, instructing courts not to "extend Bivens when an alternative remedy exists." Id. at 139; accord Rankin v. United States, 556 F. App'x 305, 311 (5th Cir. 2014).[8]

---

[8] Several district courts have declined to imply a Bivens remedy if it would implicate CAFRA. See, e.g., Jackson v. McNeil, No. 19-cv-6245, 2020 WL 2745651 (W.D. Wash. May 27, 2020) (screening order); Williams v. Fed. Bureau of Investigation, No. 3:19-cv-00418, 2019 WL 5295465, at *6-8 (D. Or. Oct. 18, 2019); Perkins v. Jordan, No. 1:17-cv-03507, 2018 WL 2722875, at *3-4 (S.D. Ind. June 6, 2018); Harper v. United States, No. 15-cv-4833, 2016 WL 4994996, at *12-13 (E.D.N.Y. Aug. 3, 2016), R&R adopted, 2016 WL 4995077 (E.D.N.Y. Sept. 19, 2016); Mikhaylov v. United States, 29 F. Supp. 3d 260, 270-72 (E.D.N.Y. 2014).

## ii.    Other Alternative Processes are Available.

The presence of CAFRA's "elaborate remedial scheme" precludes the creation of a new "cause of action for money damages" through <u>Bivens</u>.  <u>Schweiker</u>, 487 U.S. at 414.[9] But even without that scheme, individuals claiming they or their assets were wrongfully seized can pursue "other alternative forms of judicial relief," <u>Abbasi</u>, 137 S. Ct. at 1863, "capable of protecting the constitutional interests at stake." <u>Minneci</u>, 565 U.S. at 125. These alternatives, considered "together," not in isolation, <u>Chappell v. Wallace</u>, 462 U.S. 296, 304 (1983), provide an additional reason this Court should "stay its <u>Bivens</u> hand." <u>Wilkie</u>, 551 U.S. at 554.

For one, the fact Plaintiffs can (and so do) seek equitable remedies is "of central importance" to the "special factors" inquiry. <u>Abbasi</u>, 137 S. Ct. at 1862; <u>accord</u> Mack, 2020 WL 4459994, at *6 (noting possibility of injunctive relief as alternative to <u>Bivens</u>). They invoke Rule 41(g) of the Federal Rules of Criminal Procedure to bring an official-capacity claim seeking return of the interest that accrued on the seized cash over the seven months the funds were held by the DEA. ECF No. 43 ¶¶ 517-22 (Count IV).[10] They also seek injunctive relief under the Administrative Procedure Act, ECF No. 43 ¶¶ 465-516 (Counts I-III), which a number of courts of appeals recognize is yet another alternative that precludes a <u>Bivens</u> remedy. <u>See, e.g.</u>, W.

---

[9] Also relevant are "non-judicial alternative" processes. <u>Vanderklok</u>, 868 F.3d at 204; <u>see</u> <u>Mack</u>, 2020 WL 4459994, at *6 (finding BOP's administrative remedy program alternative foreclosing <u>Bivens</u> claim). Post-CAFRA regulations establish a process for individuals to file petitions on a DOJ website for remission or mitigation of assets seized for forfeiture. <u>See</u> <u>Vanderklok</u>, 868 F.3d at 205 (noting TSA claim-filing website made "it seem[] plain that an alternative administrative process exists for addressing claims such as [the plaintiff]'s.").

[10] Courts have found the possibility of a Rule 41(g) claim an alternative process that bars new <u>Bivens</u> claims. <u>See</u> <u>Baird v. Holton</u>, 806 F. Supp. 2d 53, 58 (D.D.C. 2011); <u>Leyland v.</u> <u>Edwards</u>, 797 F. Supp. 2d 7, 10-11 (D.D.C. 2011); <u>see also</u> <u>Childress v. Palmer</u>, No. 18-cv-514, 2018 WL 4282601, at *3 (S.D. Cal. Sept. 7, 2018) (availability of Rule 41(g) motion, coupled with a "potentially" available FTCA action, barred a <u>Bivens</u> remedy).

Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1123 (9th Cir. 2009); Carpenter's Produce v. Arnold, 189 F.3d 686, 688 (8th Cir. 1999); Miller v. U.S. Dep't of Agr. Farm Servs. Agency, 143 F.3d 1413, 1416 (11th Cir. 1998). And while the availability of damages is by no means required, see Abbasi, 137 S. Ct. at 1865, the Federal Tort Claims Act (FTCA) provides a monetary remedy against the United States under analogous circumstances. See 28 U.S.C. § 2680(c) (permitting claims for loss or detention of property by law enforcement if, among other things, property seized for forfeiture and never returned).[11] Moreover, as the Third Circuit recognized in a similar context, another option is the possibility of a state-law claim against an officer whose conduct exceeds the scope of employment. Vanderklok, 868 F.3d at 204; see also Malesko, 534 U.S. at 72-73 (negligence claim possible alternative to Bivens).

This, then, is "not a case of damages or nothing for" Ms. Brown, Mr. Rolin, or others similarly situated. Mack, 2020 WL 4459994, at *6 (quotation omitted). There are "alternative, existing process[es] for protecting the interest," Wilkie, 551 U.S. at 550, and if alternatives are "available," much less pursued, "a Bivens remedy usually is not." Abbasi, 137 S. Ct. at 1863.

   **b. Congressional Oversight Has Been "Frequent and Intense," Raising Separation-of-Powers Concerns.**

"In addition to the availability of an adequate alternative remedial structure," and the other options noted above, this Court "must also consider whether Bivens expansion would improperly encroach upon other branches of government." Mack, 2020 WL 4459994, at *7. That depends on the "the likely or probable intent of Congress[.]" Abbasi, 137 S. Ct. at 1862.

---

   [11] Although the FTCA may not, alone, be a sufficient alternative to foreclose a Bivens remedy, see Carlson 446 U.S. at 20-23, its availability, coupled with the many other alternatives above, can and should be part of the analysis of whether Congress "might doubt" the need to extend Bivens. Abbasi, 137 S. Ct. at 1861; see Andrews v. Miner, 301 F. Supp. 3d 1128, 1134-35 (N.D. Ala. 2017) (although "not a substitute for a Bivens action," the FTCA was still "effective and available remedy" to be considered with other "special factors").

Here, in the asset forfeiture context, "legislative action suggest[s] that Congress does not want a damages remedy." Id. at 1865. Take, for example, the absence of such a remedy in CAFRA itself. That statute, enacted in 2000, was the "most comprehensive revision of the civil asset forfeiture laws to be passed by Congress since the first forfeiture statutes were enacted in 1789." Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed On All Parties, 27 J. Legis. 97 (2001). Its aims were to "make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures." H.R. Rep. No. 106-192, at 11 (1999). And despite ushering in reforms to further these goals, "at no point did Congress choose to extend to any person the kind of remed[y] that [Plaintiffs] seek" against the TFO. Abbasi, 137 S. Ct. at 1862. Such silence "make[s] it less probable that Congress would want the Judiciary to entertain a damages suit" now. Id. at 1858; accord Shreiber, 214 F.3d at 152.

A related reason to doubt "Congress would want the Judiciary to interfere," Abbasi, 137 S. Ct. at 1858, is the guarded way Congress has legislated with respect to remedies in a similar setting. See Hernández, 140 S. Ct. at 747 ("Our reluctance to [imply a Bivens remedy] is reinforced by [a] survey of what Congress has done in statutes addressing related matters."). In the FTCA, Congress chose not to waive sovereign immunity for claims arising out of the detention or loss of property by federal law-enforcement officers (save for limited exceptions). 28 U.S.C. § 2680(c); see Vanderklok, 868 F.3d at 208 (noting as "special factor" that remedies were "circumscribed as a direct result of Congressional decisions."); cf. Hernández, 140 S. Ct. at 748 (FTCA's foreign country exception was 'special factor' showing Congress's reluctance to authorize damages in relevant setting).

More still, there has also been a Senate hearing and proposed legislation in both houses of Congress on whether to reform civil asset forfeiture, further illustrating legislative attention to the area. See The Need to Reform Asset Forfeiture Hearing Before the S. Comm. on the Judiciary, 114th Cong. (Apr. 15, 2015); Due Process Act of 2016, H.R. 5283, 114th Cong. (2016); Due Process Act of 2016, S. 3045, 114th Cong. (2016). Such attention, as Plaintiffs are aware, ECF No. 43 ¶¶ 410-12, 440, 452-54, spurred oversight by DOJ's Office of Inspector General, which has investigated the same issues taken up in this lawsuit–another factor counselling hesitation. See Abbasi, 137 S. Ct. at 1862 (noting in "special factors" analysis, "at Congress' behest, [DOJ IG] compiled a 300-page report documenting" some of the same issues plaintiffs sought to redress).[12]

Plainly, then, concerns over asset forfeiture and related seizures have not flown under Congress's radar. Rather, "it seems clear that Congress had," and continues to have, "specific occasion to consider the matter of" forfeiture-related seizures "and to consider the proper way to remedy" what if any wrongs may arise in the context. Abbasi, 137 S. Ct. at 1865. Notably missing from this "pattern of congressional action" is the remedy Plaintiffs seek. Hernández, 140 S. Ct. at 749. This "indicat[es] that congressional inaction has not been inadvertent[,]" which, in turn, requires "appropriate judicial deference[.]" Schweiker, 487 U.S. at 423.

### c.      Other Special Factors Counselling Hesitation.

Although these concerns should be dispositive, other "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" exist. Hernández, 140 S. Ct. at 743.

---

[12] Beyond OIG oversight, additional safeguards ensure "that absent a Bivens remedy there will be []sufficient deterren[ts] to prevent officers from violating the Constitution." Abbasi, 137 S. Ct. at 1863. These include criminal prosecution, 18 U.S.C. § 242, and adverse employment actions, 5 U.S.C. § 7543; 5 C.F.R. § 752.403.

i.   A <u>Bivens</u> Remedy in this Context Risks Interfering with
National Security Interests.

Distinct from, but related to, these separation-of-powers considerations is the impact a
<u>Bivens</u> remedy could have on national security issues, which are "rarely proper subjects for
judicial intervention." <u>Haig v. Agee</u>, 453 U.S. 280, 292 (1981). The Supreme Court has never
implied a damages remedy in a case touching upon national security. <u>Vanderklok</u>, 868 F.3d at
206. Here, though, Plaintiffs ask the Court to do just that - extend <u>Bivens</u> to forfeiture-related
seizures at a United States airport - a context implicating "considerations related to public safety
and security." <u>Mack</u>, 2020 WL 4459994, at *7; <u>see</u> <u>Vanderklok</u>, 868 F.3d at 207 (those "tasked
with [] securing our nation's airports and air traffic" assist in "a critical aspect of national
security[.]").[13] And whether or not Plaintiffs themselves were involved in drug-trafficking
activities is beside the point. That Congress and the Executive Branch consider drug interdiction
efforts (particularly those at airports) intertwined with matters of national security is clear. <u>See</u>
21 U.S.C. § 960a (amending Controlled Substances Act to criminalize drug-trafficking activities
with nexus to terrorism); 151 Cong. Rec. H6294 (daily ed. July 21, 2005) (statement of Rep.
Henry Hyde) (such legislation proposed after Congress had "taken a focused look" at "definite
link between the illicit narcotics trade and the financing of terrorism.").[14]   So long as national

---

[13] Plaintiffs readily acknowledge that the airport setting at issue is a "high-security" area.
ECF No. 43 ¶¶ 180, 188, 416-17, 424-25, 428, 429.

[14] <u>See also</u> Drug Enf't Admin., National Drug Threat Assessment 3 (2019)
https://www.dea.gov/sites/default/files/2020-02/DIR-007-
20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf   (last
visited Aug. 19, 2020) (DEA statement recognizing relationship between its mission and
safeguarding national security interests); <u>Counternarcotics Strategy and Policy Training in
Afghanistan: Hearing before the Subcomm. on the Middle East and South Asia of the H. Comm.
on Foreign Affairs</u>, 110th Cong. 5 (2007) (statement of Rep. Mike Pence) ("[T]he war on drugs
is a crucial piece of the war on terror."); <u>Narco-Terrorism: International Drug Trafficking and
Terrorism – A Dangerous Mix: Hearing Before the S. Comm. on the Judiciary</u>, 108th Cong. 7

security concerns "are in play," this Court should hesitate before extending <u>Bivens</u>. <u>Vanderklok</u>, 868 F.3d at 207; <u>cf.</u> <u>Hernández</u>, 140 S. Ct. at 746 (refusing to extend <u>Bivens</u> to govern "conduct of agents positioned at the border" given its "clear and strong connection to national security").

**ii.**      <u>Bivens</u> **Cannot be used to Challenge Agency Policy.**

"[T]he purpose of <u>Bivens</u> is to deter the officer." <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 485 (1994). So a <u>Bivens</u> claim has "never [been] considered a proper vehicle for altering an entity's policy[.]" <u>Malesko</u>, 534 U.S. at 74. Instead, equitable relief is the "means for preventing entities from acting unconstitutionally." <u>Id.</u>; <u>accord</u> <u>Abbasi</u>, 137 S. Ct. at 1860.[15] Yet, here, Plaintiffs challenge actions the TFO apparently took "pursuant to" or in "accordance" with alleged DEA "policies or practices." <u>See, e.g.</u>, ECF No. 54 ¶¶ 115, 184, 427, 429, 430, 431-36. They even claim the TFO's actions were <u>not</u> those "of rogue or poorly trained interdiction agents, but [illustrate the alleged] policies and practices" of the federal government. <u>Id.</u> ¶ 413. In so alleging, they concede just how misplaced, and fundamentally at odds, their proposed claim is with a core justification behind <u>Bivens</u> itself. <u>See</u> <u>Malesko</u>, 534 U.S. at 71 ("<u>Bivens</u> from its inception has been based . . . on the deterrence of individual officers who commit unconstitutional acts."); <u>Hernández</u>, 140 S. Ct. at 756 (describing <u>Bivens</u> as "a remedy trained on deterring rogue officer conduct" (Ginsburg, J., dissenting)).

---

(2003) (statement of Steven Casteel, Assistant Adm'r for Intelligence, DEA) ("Prior to September 11, 2011, the law enforcement community typically addressed drug trafficking and terrorist activities as separate issues. In the wake of the terrorist attacks in New York City, Washington, DC, and Pennsylvania, these two criminal activities are visibly intertwined.").

[15] Equitable remedies (which Plaintiffs pursue) may even "provide[] a faster and more direct route to relief than a suit for money damages." <u>Abbasi</u>, 137 S. Ct. at 1863; <u>cf.</u> <u>Mitchum v. Hurt</u>, 73 F.3d 30, 35 (3d Cir. 1995) (rejecting <u>Bivens</u>, noting "power to impose equitable remedies against agencies is broader than [] power to impose legal remedies against individuals").

And by targeting alleged policies and practices of the DEA, this lawsuit seeks to challenge "more than standard law enforcement operations." Abbasi, 137 S. Ct. at 1861 (quotation omitted). Plaintiffs look to what they claim are "major elements of the Government's" drug-interdiction efforts at airports, and the civil asset forfeiture program at large. Id.[16] So even if "confined to the conduct of a particular Executive Officer in a discrete instance," Plaintiffs' proposed Bivens claim, if recognized, would "call into question the formulation and implementation of [] general policy." Abbasi, 137 S. Ct. at 1860. It would also necessitate "inquiry and discovery into the whole course of the discussions and deliberations that led to the [purported] policies and governmental acts being challenged." Id. Policymakers, in turn, would be hindered "from devoting the time and effort required for the proper discharge of their duties[,]" and discovery might "border upon or directly implicate the discussion and deliberations that led to the formation of the [alleged] policy in question." Id. at 1860-61. Accordingly, a separate special factor counseling hesitation is that the type of policy-driven challenge at issue "would assume dimensions far greater than those present in Bivens itself[.]" Id. at 1861.

### iii.    Practical Problems and Other "Forward-Looking" Concerns.

"For the final special factor," this Court should "consider the burdens and costs associated with establishing whole categories of cases in which federal officers must defend against personal liability claims." Mack, 2020 WL 4459994, at *9 (quotation omitted). The first

---

[16] The claim against TFO Dawkin is also a challenge to the actions (not just alleged policies) of the federal government itself. For example, Plaintiffs seem to ask that the TFO be held personally liable for the seven-month period in which the DEA (not TFO Dawkin) held the cash in escrow, while the DEA and United States Attorney's Office considered whether to initiate a civil forfeiture action. See ECF No. 43 ¶ 3. This is yet another problematic element of the proposed Bivens claim. See Meyer, 510 U.S. 471, 486 (1994) ("An extension of Bivens to agencies of the Federal Government is not supported by the logic of Bivens itself.").

such consideration involves practical concerns. Given "the inherently transient nature of drug courier activity at airports," United States v. Place, 462 U.S. 696, 704 (1983), interdiction agents must, on a routine basis, make quick, discretionary judgments about whether to investigate a traveler or seize contraband for forfeiture or further investigation. In this setting, the "threat of damages liability could [] increase the probability that a [DEA] agent would hesitate in making split-second decisions about suspicious passengers." Vanderklok, 868 F.3d at 207.

More still, "the projected costs and consequences to the Government itself" would appear substantial. Abbasi, 137 S. Ct. at 1858. Plaintiffs' attempt to bring this as a class action (with thousands of members, ECF No. 43 ¶ 459) underscores the breadth of the remedy they seek. Indeed, Plaintiffs allege there are interdiction officers at "every major commercial airport in the United States[,]" id. ¶ 409, and claim, "[e]very year, [the] DEA conducts tens of thousands of seizures of cash, including hundreds or even thousands of seizures of cash from travelers at U.S. airports." Id. ¶ 401.[17] As Plaintiffs also recognize, there are "numerous government agents," from various federal and state entities, stationed at United States airports. Id. ¶ 416. So while the number of alleged cash-related seizures at airports, by itself, appears significant, a Bivens remedy based on the alleged wrongful seizure (of person and property) by the DEA at an airport would encompass allegations of the same against other agencies, too. Another reason to hesitate, then, is the risk that extending Bivens to a class of cases like Plaintiffs' "may well open the floodgates[,]" Mack, 2020 WL 4459994, at *9, to "an onslaught of Bivens actions." Wilkie, 551 U.S. at 562.

***

---

[17] The DEA engaged in just under 10,000 asset seizures in 2019 alone. See Drug Enf't Admin., DEA Asset Forfeiture Statistics (Apr. 1, 2020), https://www.dea.gov/dea-asset-forfeiture (last visited Aug. 19, 2020) (reporting 9,827 such seizures in fiscal year 2019).

II.      **Qualified Immunity Bars the Fourth Amendment Claim against TFO Dawkin**

This Court could separately dismiss the claim against TFO Dawkin because he is entitled to the "strong shield" of qualified immunity, Walker v. Coffey, 905 F.3d 138, 143 (3d Cir. 2018), which insulates public officials from the burdens of litigation (not just liability) unless their conduct, as alleged, violated a clearly established constitutional right. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Plaintiffs can only defeat such immunity if they plead both (1) that TFO Dawkin violated a constitutional right and (2) that the contours of that right were clearly established (that is, "beyond debate") at the time. Ashcroft v. al-Kidd, 563 U.S. 731, 735, 741 (2011). Here, though, the amended complaint lacks any well-pleaded allegations that the TFO violated a clearly established Fourth Amendment right, so he is entitled to qualified immunity.

A.      **Plaintiffs Fail to Allege a Clearly Established Fourth Amendment Violation Based on Any Non-Cash "Seizure."**

With respect to their claim TFO Dawkin unlawfully "seized" Ms. Brown's person, ECF No. 43 ¶ 525, Plaintiffs fail at the "first step in [the] Fourth Amendment analysis[:]" they do not allege that a "seizure has taken place" to begin with. United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006) (Alito, J.). A "seizure" arises if an "officer, by means of physical force or show of authority, [] in some way restrain[s] the liberty of a citizen[.]" Florida v. Bostick, 501 U.S. 429, 434 (1991). Here, Plaintiffs do not allege TFO Dawkin applied physical force to Ms. Brown. He did not arrest, handcuff, or employ any other restraint on her movement. Plaintiffs likewise fail to plausibly allege an unconstitutional "show of authority" seizure, either.

"[T]he test for existence of a 'show of authority' is an objective one[.]" California v. Hodari D., 499 U.S. 621, 628 (1991). It is irrelevant if Ms. Brown may (or may not) personally have "perceived that [she] was being ordered to restrict [her] movement[.]" Id. What matters, instead, is only whether TFO Dawkin's "words and actions," as alleged, "would have conveyed

[] to a reasonable person" that "he [or she] was being ordered to restrict his [or her] movement." Id. Plaintiffs plead no such thing. Stripping away legal conclusions couched as facts, which must be ignored, Iqbal, 556 U.S. at 678-79, the amended complaint alleges only that the TFO (with a trooper) approached Ms. Brown at a public departure gate in the Pittsburgh International Airport, identified himself as law enforcement, and asked about the $82,373 in cash with which she was travelling. Nothing about TFO Dawkin's alleged conduct would have conveyed to a reasonable person that he or she could not have terminated the encounter. See James v. City of Wilkes-Barre, 700 F.3d 675, 682 (3d Cir. 2012) (officers' actions did not cause one "to reasonably believe [] compliance is compelled" given absence of allegations that "officers intimidated [plaintiff] with a threatening presence, engaged in [] physical touching, or displayed a weapon. Nor did [they] order [plaintiff] to the police station for questioning or threaten to arrest her if she refused to [comply]").

At a bare minimum, though, TFO Dawkin's actions, as pleaded, did not constitute a clearly established "seizure" of Ms. Brown's person. That is because "[i]t is well established that no seizure [] occur[s] when an officer approaches an individual in a public place, identifies himself as a law enforcement agent, asks questions, asks to search a person's bags, or explains that he is conducting a narcotics investigation." United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005). So it was certainly not beyond debate that a law enforcement officer such as TFO Dawkin violates, much less triggers, "the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals" at international airports "or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002); accord Lockett, 406 F.3d at 211; see also United States v. Mendenhall, 446 U.S. 544, 555 (1980) (no "seizure" of air traveler when two DEA agents approached, requested

identification and ticket, and "posed to her a few questions."); accord Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984) ("The initial contact between the officers and respondent [at airport], where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest."); United States v. Frost, 999 F.2d 737, 740 (3d Cir. 1993) (no "seizure" when two detectives approached at Pittsburgh airport, stated they were police, and asked, "Is it okay if we talk with you for a few minutes?").

But even if there were a "seizure," Plaintiffs cannot show it was clearly established that such a seizure was unreasonable under the circumstances. Vargas v. City of Philadelphia, 783 F.3d 962, 970 (3d Cir. 2015) (Fourth Amendment "does not protect against all seizures; it only protects against those that are unreasonable."); see also Walker, 905 F.3d at 144 (emphasizing need to "define or identify the right at a particularized level" for purpose of clearly established inquiry). After all, TFO Dawkin could, "consistent with the Fourth Amendment, conduct a brief, investigatory stop" of Ms. Brown upon "reasonable, articulable suspicion that criminal activity [was] afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). And once made aware that she was travelling with over $82,000 in her carry-on bag, and apprised of the explanations she had given to the state trooper (and lieutenant), the TFO had such suspicion; he had "more than an inchoate and unparticularized" basis for stopping Ms. Brown, however briefly, to investigate further. Id. The TFO then "pursued his investigation in a diligent and reasonable manner." United States v. Sharpe, 470 U.S. 675, 687 (1985). Without alleged delay, he asked Ms. Brown about why she was travelling with a large sum of cash (and where it came from), and the TFO attempted to corroborate her story by speaking to Mr. Rolin over the phone. He requested that Ms. Brown show him the cash, and she did. There is no allegation he searched Ms. Brown's person, or prevented her from boarding her flight. So even assuming Plaintiffs sufficiently

alleged a non-consensual encounter, it was no more than a brief investigatory detention, one "'minimally intrusive' and tailored [] to 'diligently pursue[] a means of investigation that was likely to confirm or dispel [the TFO's] suspicions quickly.'" United States v. Foster, 891 F.3d 93, 106 (3d Cir. 2018) (quoting Sharpe, 470 U.S. at 685-86). It was not an unreasonable seizure, much less one "beyond debate." al-Kidd, 563 U.S. at 741.[18]

**B.     Plaintiffs Do Not Plead a Clearly Established Fourth Amendment Violation Based on the Cash Seizure Itself.**

Plaintiffs also challenge the TFO's seizure of the cash itself, but that did not violate any clearly established Fourth Amendment right, either. As noted above, qualified immunity applies if there is an absence of well-pleaded allegations that a "constitutional right was violated or in the alternative, [] that [the] right was clearly established[.]" Bryan v. United States, 913 F.3d 356, 362 (3d Cir. 2019). While courts may tackle these prongs in any order, the Supreme Court's "usual adjudicatory rules" favor resolving claims at the latter inquiry if, as here, it is plain the right was not "clearly established." Camreta v. Greene, 563 U.S. 692, 705-06 (2011).

As to their allegation that TFO Dawkin unlawfully seized the $82,373 cash at the airport, Plaintiffs cannot, as they must, point to controlling precedent where "an officer acting under similar circumstances" as TFO Dawkin "was held to have violated the Fourth Amendment." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (citations omitted). No Supreme

---

[18] Plaintiffs also fail to plausibly allege a "seizure" of Ms. Brown's (non-cash) property. See ECF No. 43 ¶ 188 (claiming the TFO "seized" Ms. Brown's "possessions, including . . . her cell phone[.]"). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Here, though, TFO Dawkin never "meaningful[ly] interfered with" Ms. Brown's "possessory interests in" any item except for the cash. Id. With respect to the phone, it is wholly unclear (and Plaintiffs do not allege) that TFO Dawkin even took possession of it. Instead, the well-pleaded allegations state only that Ms. Brown called her father and "put" him "on the phone" with the TFO. See ECF No. 43 ¶ 188. However that exchange occurred, it was not a seizure in any constitutionally recognized sense and certainly not a clearly established one.

23

Court or Third Circuit decision has found an officer constitutionally liable for seizing tens of thousands of dollars of cash at an international airport, and certainly not in circumstances analogous to these, where the officer called the alleged co-owner of the cash who was unable to corroborate the traveler's story before effecting the seizure. Rather, limited Third Circuit precedent on the seizure of property in an airport (or transportation hub) has found such seizure constitutional. See Frost, 999 F.2d at 740 (upholding seizure of property at Pittsburgh International Airport based on reasonable suspicion); Murphy v. Mifflin Cty. Reg'l Police Dep't, 548 F. App'x 778, 782 (3d Cir. 2013) (seizure of bus passenger's backpack on reasonable suspicion did not violate Fourth Amendment).[19]

So "even assuming–contrafactually–that his alleged [cash seizure] violated the Fourth Amendment" as pleaded, qualified immunity would apply because the constitutionality of that conduct was not "beyond debate" such that "every reasonable official" in the TFO's shoes would have understood what he or she was doing violated the Fourth Amendment. al-Kidd, 563 U.S. at 741-43 (emphasis added). Plaintiffs, moreover, affirmatively (and repeatedly) allege TFO Dawkin seized the cash pursuant to some purported DEA policy or practice, which only underscores his entitlement to qualified immunity, since there is no way the TFO could "have known for certain that [any such policy or practice] was unlawful[.]" Abbasi, 137 S. Ct. at 1867; see also Wilson v. Layne, 526 U.S. 603, 617 (1999); cf. Hernández, 140 S. Ct. at 744 ("presum[ing] that policy and training incorporate[s] [] the Executive's understanding of the Fourth Amendment's prohibition of unreasonable seizures"). And because "prior case law has

---

[19] To be sure, this limited caselaw involves additional facts not affirmatively alleged in the amended complaint and not in the record at this point (such as a canine alert to the property after the initial seizure). But it remains Plaintiffs' burden to cite precedent showing the particular conduct at issue was clearly established to be unconstitutional; it isn't the TFO's duty to prove the reverse. Jackson v. Phelps, 575 F. App'x 79, 82 (3d Cir. 2014).

not clearly settled the right, and so given [the TFO] fair notice of it," this Court should "dismiss the claim for money damages" premised on the seizure of cash. <u>Camreta</u>, 563 U.S. at 705.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Count V with prejudice.

Dated: August 28, 2020                                        Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director
Torts Branch, Civil Division

MARY HAMPTON MASON
Senior Trial Counsel, Torts Branch

/s/ *David Inkeles*
DAVID W. INKELES
Trial Attorney (NY Bar No. 5511068)*
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel:     (202) 305-0401
Fax:     (202) 616-4314
E-mail:  david.w.inkeles@usdoj.gov
*Attorneys for Steven Dawkin*

*Admitted *Pro Hac Vice*

<u>CERTIFICATE  OF SERVICE</u>

I hereby  certify  that on this  28th day of August,  2020, a true and correct copy of Steven

W. Dawkin's  Brief  in Support of his Motion  to Dismiss  was served upon the attorney  of record

for each other party by means  of the District  Clerk's  CM/ECF electronic  filing  system.


<u>/s/ *David Inkeles*   </u>
DAVID  W. INKELES
Trial  Attorney,  U.S. Department  of Justice