**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

REBECCA BROWN, *et al.*,

      *Plaintiffs,*

v.

TRANSPORTATION SECURITY
ADMINISTRATION, *et al.*,

      *Defendants.*

Civil Action No. 2:20-cv-64

**PLAINTIFFS' RESPONSE
IN OPPOSITION TO
MOTION TO DISMISS COUNT V
[ECF Nos. 47–48]**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO STEVEN DAWKIN'S
MOTION TO DISMISS THE INDIVIDUAL-CAPACITY CLAIM
IN THE FIRST AMENDED COMPLAINT**

Dan Alban,* Lead Attorney
VA Bar No. 72688

Jaba Tsitsuashvili*
DC Bar No. 1601246

INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org

Attorneys for Plaintiffs

*Admitted *Pro Hac Vice*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ..........................................................................................................1

BACKGROUND...............................................................................................................4

I.   Terry Rolin and his family stored cash in their family home. .....................................4

II.   Terry entrusted the stored cash with his daughter, Rebecca Brown..........................5

III.   Rebecca flew domestically with the cash—which is completely legal and has
      no reporting requirement—but TSA and Dawkin detained her just
      because she had cash..................................................................................................5

IV.   DEA returned Terry's and Rebecca's cash without initiating any CAFRA proceedings,
      but Terry and Rebecca suffered several material harms due to Dawkin's actions,
      none of which was redressable even if DEA had initiated CAFRA proceedings. .................7

ARGUMENT....................................................................................................................8

I.   Standard of review.......................................................................................................8

II.   Plaintiffs' garden-variety Fourth Amendment claims against a low-level drug-law
      enforcement officer mirror *Bivens* itself. ...................................................................9

III.   No special factors warrant ignoring Dawkin's Fourth Amendment violations.....................13

      A.   Dawkin's reliance on CAFRA as an alternative remedial structure misunderstands
           what this case is about and what CAFRA does and does not do. ........................13

      B.   The "other alternative processes" that Dawkin points to are also irrelevant. ...................16

      C.   Dawkin's remaining special factor arguments—about "congressional oversight,"
           "national security," "agency policy," and "practicality"—also merit little attention. .........18

IV.   Qualified immunity does not shield Dawkin from liability for his clearly established
      Fourth Amendment violations. .................................................................................20

      A.   It was clearly established that Dawkin seized Rebecca when he and another officer
           who had already questioned her re-targeted her and doubled down on conveying
           that she was the subject of a particular law enforcement investigation. .............................20

B.  It was clearly established that flying with a large amount of cash is not reasonable suspicion; Dawkin admits he had no other basis to seize Rebecca. ....................................22

C.  It was clearly established that Dawkin needed probable cause to seize Rebecca's cash for forfeiture; any reasonable officer would know that, and that it was lacking........23

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ...................................................................................................11

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ............................................................................................22, 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .....................................................................................................8

*Big Cats of Serenity Springs, Inc. v. Rhodes,*
    843 F.3d 853 (10th Cir. 2016) ...............................................................................10, 13

*Bivens v. Six Unknown Named Agents,*
    403 U.S. 388 (1971) ..............................................................................................*passim*

*Bueno Diaz v. Mercurio,*
    442 F. Supp. 3d 701 (S.D.N.Y. 2020) ...................................................................10

*Calif. v. Hodari D.,*
    499 U.S. 621 (1991) ...................................................................................................20

*Carpenter's Produce v. Arnold,*
    189 F.3d 686 (8th Cir. 1999) ....................................................................................17

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) .......................................................................................................9

*Florida v. Bostick,*
    501 U.S. 429 (1991) ............................................................................................20, 21

*Francis v. Miligan,*
    530 F. App'x 138 (3d Cir. 2013) ....................................................................2, 13, 16

*G.M. Leasing Corp. v. United States,*
    429 U.S. 338 (1977) ...................................................................................................11

*Gonzalez v. Doe #1,*
    No. 3:18-CV-2254, 2020 WL 1244403 (M.D. Pa. Mar. 16, 2020) ......................13

*Graber v. Dales,*
    No. CV-18-3168, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019)..............9, 10, 18

*Groh v. Ramirez,*
    540 U.S. 551 (2004) ...................................................................................................11

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ........................................................................................................13

*Hicks v. Ferreyra,*
    965 F.3d 302 (4th Cir. 2020) ...............................................................................................9

*Hunter v. Bryant,*
    502 U.S. 224 (1991).............................................................................................................11

*Illinois v. Wardlow,*
    528 U.S. 119 (2000).............................................................................................................22

*INS v. Delgado,*
    466 U.S. 210 (1984)....................................................................................................... 20, 21

*Jacobs v. Alam,*
    915 F.3d 1028 (6th Cir. 2019) ...........................................................................................20

*Kedra v. Schroeter,*
    876 F.3d 424 (3d Cir. 2017)...........................................................................................8, 25

*Lanuza v. Love,*
    899 F.3d 1019 (9th Cir. 2018) ...........................................................................................19

*Linlor v. Polson,*
    263 F. Supp. 3d 613 (E.D. Va. 2017)............................................................................ 17, 18

*Mack v. Yost,*
    968 F.3d 311 (3d Cir. 2020)........................................................................................12, 18, 19

*Miller v. U.S. Dept. of Agric. Farm Servs. Agency,*
    143 F.3d 1413 (11th Cir. 1998) .........................................................................................17

*Murphy v. Mifflin Cty. Reg'l Police Dept.,*
    548 F. App'x 778 (3d Cir. 2013) ........................................................................................24

*Rankin v. United States,*
    556 F. App'x 305 (5th Cir. 2014).............................................................................2, 13, 16

*Reichle v. Howards,*
    566 U.S. 658 (2012).............................................................................................................11

*Rueda Vidal v. DHS,*
    No. CV-189276-DMG-PLAX, 2019 WL 7899948 (C.D. Cal. Aug. 28, 2019)................................14

*Saucier v. Katz,*
    533 U.S. 194 (2001).............................................................................................................11

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) .................................................................................................14

*Terry v. Ohio,*
    392 U.S. 1 (1968) .....................................................................................................23

*Tun-Cos v. Perrotte,*
    922 F.3d 514 (4th Cir. 2019) ..................................................................................13

*United States v. Brown,*
    448 F.3d 239 (3d Cir. 2006) ..............................................................................21, 22

*United States v. Crandell,*
    668 F. Supp. 2d 635 (D.N.J. 2009) .........................................................................21

*United States v. Drayton,*
    536 U.S. 194 (2002) .................................................................................................21

*United States v. Frost,*
    999 F.2d 737 (3d Cir. 1993) ....................................................................................24

*United States v. Jones,*
    678 F.3d 293 (4th Cir. 2012) ..................................................................................21

*United States v. Law,*
    384 F. App'x 121 (3d Cir. 2010) ..........................................................................4, 23

*United States v. Mathurin,*
    561 F.3d 170 (3d Cir. 2009) ............................................................................4, 22, 23

*United States v. Mosley,*
    454 F.3d 249 (3d Cir. 2006) ....................................................................................24

*United States v. One "Piper" Aztec "F" De Luxe Model 250 PA 23 Aircraft,*
    321 F.3d 355 (3d Cir. 2003) ....................................................................................14

*United States v. Place,*
    462 U.S. 696 (1983) .................................................................................................24

*United States v. Pollard,*
    326 F.3d 397 (3d Cir. 2003) ....................................................................................22

*United States v. Puga,*
    No. 5:19-CR-1346-1, 2019 WL 7170623 (S.D. Tex. Dec. 24, 2019) .......................21

*United States v. Sokolow,*
    490 U.S. 1 (1989) ...........................................................................................3, 4, 22, 23

*United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency,*
258 F.3d 215 (3d Cir. 2001) ....................................................................................4, 24, 25

*United States v. Thame,*
846 F.2d 200 (3d Cir. 1988) ....................................................................................3, 21, 22

*United States v. Wilson,*
No. 14-CR-209-1, 2016 WL 11642732 (E.D. Pa. Oct. 27, 2016) .......................................4

*United States v. Wilson,*
960 F.3d 136 (3d Cir. 2020) .............................................................................................4

*Vanderklok v. United States,*
868 F.3d 189 (3d Cir. 2017) ....................................................................................*passim*

*W. Radio Servs. Co. v. U.S. Forest Serv.,*
578 F.3d 1116 (9th Cir. 2009) .........................................................................................17

*Wilkie v. Robbins,*
551 U.S. 537 (2007) ...................................................................................................16, 17

*Williams v. FBI,*
No. 3:19-CV-00418-BR, 2019 WL 5295465 (D. Or. Oct. 18, 2019) ...............................16

*Wilson v. Layne,*
526 U.S. 603 (1999) .........................................................................................................11

*Ziglar v. Abbasi,*
137 S. Ct. 1843 (2017) .............................................................................................*passim*

## STATUTES

18 U.S.C. § 981(b)(2) ...............................................................................................4, 14, 24

18 U.S.C. § 983(a) ...........................................................................................................14

18 U.S.C. § 983(c) ...........................................................................................................14

18 U.S.C. § 983(d) ...........................................................................................................14

18 U.S.C. § 983(f) ...........................................................................................................14

28 U.S.C. § 2465 .......................................................................................................14, 15

28 U.S.C. § 2679(b)(1) ....................................................................................................17

28 U.S.C. § 2680(c) .........................................................................................................17

**RULES**

Fed. R. Civ. P. Supp. R. G(8)..........................................................................................................14

**OTHER AUTHORITIES**

*Black's Law Dictionary* (11th ed. 2019)............................................................................................15

DEA,
    *DEA History, The Early Years,* https://www.dea.gov/history..............................................................9

## INTRODUCTION

Plaintiffs Terry Rolin and Rebecca Brown oppose Defendant Steven Dawkin's motion to dismiss (ECF Nos. 47–48) their Fourth Amendment *Bivens* claims (Count V of the First Amended Complaint, ECF No. 43).[1] Dawkin argues that Plaintiffs cannot bring a *Bivens* action because their claims arise in a new context warranting judicial hesitation, Dawkin Mem., ECF No. 48 at 7–8, 9–19, and that qualified immunity insulates him from judicial review, *id.* at 20–25. But this is not a new context, there is no reason for the Court to not hear Plaintiffs' garden-variety seizure claims, and qualified immunity cannot shield Dawkin from suit for his established Fourth Amendment violations.

Terry is an elderly retiree who kept his life savings in cash. Rebecca is his daughter. After a weekend visit, Rebecca was flying from Terry's home in Pittsburgh back to her home in Boston to deposit his life savings in a joint bank account. Dawkin (a DEA drug taskforce officer) (1) seized Rebecca at her boarding gate—after TSA had cleared her of any security concerns—based solely on the fact that she was traveling with a large amount of cash and (2) seized Terry's and Rebecca's cash for civil forfeiture without any basis to believe it was connected with any crime. To evade accountability for these Fourth Amendment violations, Dawkin argues that (1) Plaintiffs' claims are meaningfully different from recognized *Bivens* contexts, (2) special factors counsel hesitation in hearing these claims, and (3) he is entitled to qualified immunity. His contentions are meritless.

Plaintiffs' *Bivens* claims do not present a new context. They do not arise in the transportation security setting, because TSA had already cleared and released Rebecca when Dawkin seized her. And they do not arise in the forfeiture setting, because Dawkin's conduct preceded any forfeiture proceedings (which the government never initiated). Instead, these claims arise in the commonplace context of a (suspicionless) seizure by a low-level drug-law enforcement officer. This is the recurrent sphere of Fourth Amendment claims that *Bivens* itself addressed. The mere fact that Dawkin

---

[1] The other named plaintiffs in this case have not brought *Bivens* claims.

committed his constitutional violations at an airline boarding gate does not change that. He is not a TSA Screener tasked with conducting administrative searches to secure airplanes for national security purposes. Rather, the claims here are for suspicionless seizures *after* that security screening by TSA had already ended (with no indication of any security threat), and *before* any civil forfeiture proceedings were ever initiated. Therefore, this case raises no meaningful differences from *Bivens* itself, and it is nothing like *Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017) (which addressed First Amendment retaliation by TSA Screeners, not unconstitutional seizures by a criminal law enforcement officer), or like *Francis v. Miligan*, 530 F. App'x 138 (3d Cir. 2013) (per curiam) (which addressed constitutional infirmities with civil forfeiture proceedings themselves).

However, even if the Court holds that the mere location of this case makes it a new *Bivens* context, no special factors warrant ignoring Dawkin's routine Fourth Amendment violations. Dawkin's arguments to the contrary, *see* Dawkin Mem. at 9–19, are unpersuasive. They are all addressed to circumstances that are irrelevant to the actual circumstances of this case.

First, no alternative remedies are available to deter individual law enforcement officers from conducting suspicionless seizures of people and their property *before* the government initiates civil forfeiture proceedings against them under the Civil Asset Forfeiture Reform Act ("CAFRA"). CAFRA has no bearing on constitutional violations that *precede* any actions the government or individuals can take as part of the forfeiture process. Stated differently, the CAFRA provisions that Dawkin points to as alternative remedial mechanisms can only avoid an erroneous *forfeiture*; they cannot deter or redress an unconstitutional *seizure*. That is particularly true of the seizure of a person, which is obviously distinct from the seizure of property—the latter of which is all that CAFRA addresses. And because Plaintiffs' claims do not challenge any constitutional infirmities that Dawkin or DEA could visit on them *within* the CAFRA process, his reliance on *Francis*, 530 F. App'x 138 and *Rankin v. United States*, 556 F. App'x 305 (5th Cir. 2014) (per curiam) is misplaced.

There are also no separation of powers or national security concerns here. Plaintiffs' *Bivens* claims do not arise in the airport administrative search context—which is where Congress tasks TSA with national transportation security. If, as Dawkin suggests, the enforcement of drug laws categorically involves national security, then *Bivens* itself would be off the judicial table. The Court should reject Dawkin's overreading of these factors and heed the Supreme Court's warning: criminal law enforcement officers cannot use the words "national security" as a "talisman … to cover a multitude of sins." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (quotation marks and citation omitted).

Nor can Plaintiffs' claims against Dawkin change agency policies. They are for his own constitutional violations, which is precisely what *Bivens* claims deter. Unlike the mid- to high-level national security officials with "supervisory duties" sued in *Ziglar*, 137 S. Ct. at 1864, Dawkin is a low-level drug-law enforcement officer conducting actual searches and seizures. And there are no practical difficulties for this Court in adjudicating whether Dawkin violated the Fourth Amendment in this commonplace law enforcement role. Indeed, federal courts do that every day.

Finally, qualified immunity does not shield Dawkin.

First, in arguing that the complaint does not allege a seizure of Rebecca, Dawkin's reliance on cases where officers approached individuals in the transportation setting as part of general sweeps or random searches is misplaced. As the Third Circuit explained in distinguishing those cases, "*the important factor*" in determining whether a person is seized is whether the officers indicate that they approached her in order to specifically target her based on some particular conduct—as Dawkin and his companion officer (who had already interrogated Rebecca) did to Rebecca. *United States v. Thame*, 846 F.2d 200, 203 (3d Cir. 1988) (emphasis added).

Second, the Supreme Court and the Third Circuit have clearly established that traveling domestically with any amount of cash is not reasonable suspicion to justify a seizure. *United States v.*

*Sokolow*, 490 U.S. 1, 8–9 (1989); *United States v. Law*, 384 F. App'x 121, 122–23 (3d Cir. 2010). This is not even a "close call." *United States v. Mathurin*, 561 F.3d 170, 179 (3d Cir. 2009).

And third, Dawkin admits that he seized Plaintiffs' cash under the obviously wrong statutory and constitutional standard (reasonable suspicion as opposed to probable cause). *Compare* Dawkin Mem. at 24, *with* 18 U.S.C. § 981(b)(2)(B). Thus, he is not entitled to qualified immunity on Plaintiffs' cash seizure claim. Moreover, the Third Circuit had already held that "the possession of a large sum of currency [is] not enough to establish probable cause." *United States v. Wilson*, 2016 WL 11642732, at *7 (E.D. Pa. Oct. 27, 2016), *aff'd*, 960 F.3d 136 (3d Cir. 2020) (citing *United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d 215, 233 (3d Cir. 2001)). That was true even if Dawkin felt some inchoate hunch after talking to Terry on the phone—because under established caselaw, that conversation obviously did not establish probable cause that Plaintiffs had committed, were committing, or were about to commit a drug crime (or any crime).

The Court should reject Dawkin's efforts to evade judicial review of his unconstitutional acts.

## BACKGROUND

### I.   Terry Rolin and his family stored cash in their family home.

Terry is a retiree living in Morgan, Pennsylvania. From the 1960s to 1994, he worked for a railroad company. Since then, he has received monthly Railroad Retirement payments. He grew up with parents who survived the Great Depression and distrusted banks. So they stored their cash savings (from his father's mining wages) in envelopes throughout the family home, particularly the unfinished basement. First Am. Compl. ("FAC"), ECF No. 43, ¶¶ 119–121, 124, 126.

Terry adopted the same habit long ago. And in 2005, he moved into the family home, bringing cash and the habit with him. Over the next thirteen years, the combination of cash stored in the house by his parents and by Terry himself—including portions of his $2,700 monthly retirement payments—

accumulated to tens of thousands of dollars. In November 2018, Terry moved to a small apartment. In the course of the move, he uncovered all that hidden cash in the house. FAC ¶¶ 122–134.

## II.     Terry entrusted the stored cash with his daughter, Rebecca Brown.

Rebecca Brown is Terry's daughter. She lives in Massachusetts. In August 2019, she flew to Pittsburgh for her brother's wedding reception and to visit with Terry. Because Rebecca works full time, she was only in town for the weekend. She arrived on Friday, August 23, and departed early in the morning of Monday, August 26. FAC ¶¶ 135–137.

Terry—in deteriorating health—decided to give Rebecca power of attorney to help care for him. To safeguard his family's life savings, they decided to deposit the tens of thousands of dollars into a new joint bank account. Its primary uses would be Terry's health care and dental care (including replacing his teeth and caring for his gum disease), fixing his truck (his primary mode of transportation), and other expenses. With Terry's consent, some of the cash was also earmarked to pay off a tax debt that Rebecca owed the IRS. FAC ¶¶ 138–140, 143–144.

Unbeknownst to Terry, Rebecca and her brother also decided to surprise their father with a gift by using some of the money to buy Terry an old hobby truck to repair and tinker with. They had already found one online. FAC ¶¶ 145–147.

## III.    Rebecca flew domestically with the cash—which is completely legal and has no reporting requirement—but TSA and Dawkin detained her just because she had cash.

That Saturday night, Terry and Rebecca finalized their plans to deposit the cash in a joint bank account. This was after the banks had closed and would not reopen until Monday. Because Rebecca had an early morning flight on Monday, she would have to fly home with the cash and deposit it in Massachusetts. FAC ¶¶ 140–142, 148.

On the internet, Rebecca learned, accurately, that flying domestically with any amount of cash is legal and has no reporting requirements. So she packed the cash inside a purse in her carry-on luggage (a beach bag with her belongings). FAC ¶¶ 149–150.

But at the TSA transportation security checkpoint, TSA Screeners pulled aside all of Rebecca's luggage because they saw the cash. They questioned her about it, and she truthfully recounted the events described above. Nevertheless, they demanded her ID and boarding passes, which they photocopied. Rebecca did not feel free to decline these demands. FAC ¶¶ 152–159.

Based solely on the presence of the cash, TSA held Rebecca, her luggage, her ID, and her boarding passes for 10–20 minutes while waiting for a state trooper to arrive. FAC ¶¶ 160–168.

The state trooper questioned her about the cash, still in the transportation security screening area. And she repeated her explanation of the cash's origin, purpose, and destination. The trooper called a supervisor, who arrived another 10–15 minutes later and made Rebecca repeat herself a third time about the cash. After this third round of questioning, TSA and the troopers let her proceed from the security screening area to her flight with all her belongings—including the cash. FAC ¶¶ 171–173.

Rebecca's understanding of these encounters was that she was being accused of doing something wrong or illegal, but that ultimately her questioners did not detect any security threats (because they let her proceed to her boarding gate). Despite being detained for over 30 minutes, she made it to her gate with time to spare. She began working on her laptop and eating breakfast. There was nothing strange or suspicious about her behavior. FAC ¶¶ 174–176.

But soon, two law enforcement officers approached Rebecca directly and began asking her targeted questions. One was the state trooper who had *already* questioned her and made her feel like she was being accused of doing something wrong or illegal. The other was Defendant Dawkin. Approaching her directly, Dawkin identified himself as a DEA agent and told Rebecca he had questions for her about the cash he knew was in her possession (even though it was not openly displayed). Rebecca did not feel free to walk away or to decline to answer his questions in the face of this targeted approach by a federal law enforcement officer at the airport, particularly given the

similarity of his questions to those already asked of her by state troopers—one of whom was again surrounding her. FAC ¶¶ 177–180.

Dawkin and the trooper escorted Rebecca to a less crowded area. Their approach and Dawkin's knowledge of her made her feel like she had no choice but to follow Dawkin and answer his questions. Dawkin told Rebecca to show him the cash—again making clear that he knew who she was and what she was traveling with, and that he had sought her out on that basis. He made her re-tell the origins of the cash for a fourth time. Then he demanded to speak with Terry to verify Rebecca's explanation (which was consistent with the first three times she gave it). FAC ¶¶ 181–183, 186–187.

Rebecca explained that her elderly father would be asleep at that 7:00 a.m. hour and would be confused by the call. Dawkin insisted, so Rebecca followed his command, and he took her phone to speak with Terry. As Rebecca told Dawkin to expect, Terry was woken by Dawkin's call and was confused. So he had some difficulty answering all of Dawkin's questions—particularly about the hobby truck, which was a surprise gift for him. On that sole basis, Dawkin told Rebecca, "Your answers don't match." Dawkin then searched her bag—finding no contraband or suggestion of criminality—and kept Terry's and Rebecca's cash, totaling $82,373 in life savings. FAC ¶¶ 188–194.

## IV.   DEA returned Terry's and Rebecca's cash without initiating any CAFRA proceedings, but Terry and Rebecca suffered several material harms due to Dawkin's actions, none of which was redressable even if DEA had initiated CAFRA proceedings.

Rebecca was then permitted to board her flight, and neither she nor Terry was ever arrested or charged with a crime. In October 2019 (months after Dawkin's seizure), Terry and Rebecca received CAFRA notices from DEA, indicating DEA's intention to permanently keep their cash through civil forfeiture. They filed timely claims, demanding judicial forfeiture proceedings. FAC ¶¶ 197–201.

The government ultimately declined to initiate forfeiture proceedings, and DEA finally returned their money after holding it without probable cause for seven months. Because the government did not file a civil forfeiture complaint, there were no CAFRA proceedings related to

Dawkin's suspicionless seizure of Terry's and Rebecca's cash—and certainly none related to Dawkin's suspicionless seizure of Rebecca herself at the boarding gate. FAC ¶¶ 202–204.

In addition to the emotional distress, pain, and suffering that Terry and Rebecca endured as a direct result of Dawkin's seizure of Rebecca at the boarding gate (including several hours during which Terry had no idea what was happening to his daughter), Terry and Rebecca also suffered the following tangible, material injuries as a result of Dawkin's Fourth Amendment violations: for seven months, Terry could not replace his teeth or care for his dental problems, which aggravated his pain and suffering, including an inability to chew, and caused him to need a bone graft; Terry suffered other material impacts on his quality of life, most notably the inability to fix his truck and the deprivation of the hobby truck that Rebecca intended to buy him; and Rebecca could not pay off her tax debt, which accordingly accrued additional interest. FAC ¶¶ 207–224.

Even if DEA had initiated CAFRA proceedings against Terry's and Rebecca's cash, none of these injuries caused directly by Dawkin's unconstitutional conduct could be raised—let alone redressed—in the CAFRA proceeding. *See infra*, section III.A.

## ARGUMENT

**I.      Standard of review.**

In evaluating Dawkin's motion to dismiss under Rule 12(b)(6), the Court "must accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [Terry and Rebecca]." *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quotation marks and citation omitted). Dawkin's motion must be denied if the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

## II.   Plaintiffs' garden-variety Fourth Amendment claims against a low-level drug-law enforcement officer mirror *Bivens* itself.

Contrary to Dawkin's arguments, *see* Dawkin Mem. at 7–8, Plaintiffs' claims do not arise in a new *Bivens* context. Plaintiffs seek damages because Dawkin (1) seized Rebecca without reasonable suspicion (after TSA cleared her in the transportation security screening) and (2) kept Terry's and Rebecca's cash without probable cause. These claims for unconstitutional seizures in hopes of ferreting out a drug crime are not "fundamentally different" from the Fourth Amendment seizure claims in *Bivens* itself. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001). In *Bivens*, like here, drug-law enforcement officers violated the Fourth Amendment, hoping to find "alleged narcotics violations." 403 U.S. 388, 389 (1971). "Just as in *Bivens*, [Plaintiffs] seek[] to hold accountable [a] line-level agent[] of a federal criminal law enforcement agency, for violations of the Fourth Amendment, committed in the course of a routine law-enforcement action." *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020).[2]

This case does not differ in a "meaningful way" from that established *Bivens* context, because none of the "new context" factors identified by the Supreme Court in *Ziglar* is present. *See* 137 S. Ct. at 1859–60 (identifying factors that might contribute to a meaningful difference). Specifically:

1. *The "rank of the officers" is the same as in Bivens.* Like the officers in *Bivens*, Dawkin is a low-level drug-law enforcement officer who personally conducts seizures. It is "settled" that *Bivens* claims in this "common and recurrent sphere of law enforcement" are not a new context. *Ziglar*, 137 S. Ct. at 1857; *see also Graber v. Dales*, 2019 WL 4805241, at *5 (E.D. Pa. Sept. 30, 2019) ("individual, low-level misconduct … is far likelier to escape congressional notice").

2. *The "constitutional right at issue" is the same.* Like in *Bivens*, Dawkin violated Plaintiffs' right to be free from unconstitutional seizures of person and property. Therefore, this Court should reject

---

[2] The Federal Bureau of Narcotics—whose officers' actions were challenged in *Bivens*—was a precursor agency of DEA. DEA, *DEA History, The Early Years*, https://www.dea.gov/history.

Dawkin's effort "to cast doubt on the continued force, [and] even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Ziglar*, 137 S. Ct. at 1856.

3. *The "official action" at issue is "specific[]," not "general[]."* Plaintiffs' claims "concern[] the same type of federal officers [as *Bivens*]: narcotics officers," and "the officers in both cases carried out the same category of 'official action': [a seizure] of someone [ostensibly] suspected of a narcotics offense." *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 708 (S.D.N.Y. 2020).

4. *There is plenty of "judicial guidance" regarding what does and does not constitute reasonable suspicion and probable cause to seize a person and their cash.* Indeed, Plaintiffs' claims are "a run-of-the-mill challenge to a standard law enforcement operation." *Id. See infra*, sections III.C (addressing Dawkin's "practicality" arguments), IV (addressing Dawkin's "clearly established" Fourth Amendment law arguments).

5. *There is no "risk of disruptive intrusion by the Judiciary into the functioning of other branches."* These are "garden-variety" Fourth Amendment claims. *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 864 (10th Cir. 2016). *See infra*, section III.C (addressing Dawkin's separation of powers and national security arguments).

6. *The "statutory or other legal mandate under which [Dawkin] was operating" is no different than the criminal drug laws the officers were enforcing in Bivens.* It does not matter that Dawkin wore a badge given to him by DEA rather than by the Federal Bureau of Narcotics; his job was to enforce drug laws, just like those officers in *Bivens*. *Graber*, 2019 WL 4805241, at *4 ("a different agency name on the back of an officer's windbreaker, standing alone, seems insufficient to constitute a new context").

To avoid these obvious conclusions, Dawkin conjures up two purported dissimilarities from *Bivens*: "None of the Supreme Court's three prior decisions involved [1] airports or [2] asset forfeiture, much less a statutory scheme like CAFRA." Dawkin Mem. at 8. The Third Circuit's analysis in *Vanderklok*—and accurate descriptions of the circumstances and legal backdrops of this case—demonstrate why Dawkin's purported distinctions are illusory.

In *Vanderklok*, the plaintiff brought a "First Amendment claim against a TSA employee for retaliatory prosecution … *in the context of airport security screenings*." 868 F.3d at 194 (emphasis added).[3] The Third Circuit did not hold that this was a new context just because it arose inside an airport, as Dawkin suggests. The relevant consideration was the *particular area* of the airport, and *the TSA Screener's role there*: Unlike Dawkin and other DEA officers, TSA Screeners "typically are not law enforcement officers and do not act as such. … Instead, they … carry out *administrative searches* … associated with *aircraft security*"—of every flyer, at designated screening checkpoints. *Id.* at 208–09 (emphases added).[4]

Dawkin, on the other hand, is a roving DEA drug-law enforcement officer engaged in general criminal law enforcement. *See* FAC ¶¶ 103–104 (describing DEA criminal law enforcement functions). That brings him within the "common and recurrent sphere of law enforcement," *Ziglar*, 137 S. Ct. at 1857—and outside of TSA's specialized administrative sphere of aircraft security. *See* FAC ¶¶ 81–89 (explaining that TSA Screeners do not enforce criminal laws, but only look for threats to transportation security in the form of weapons, explosives, and incendiaries). And the Supreme Court has repeatedly permitted Fourth Amendment *Bivens* claims against federal officers acting like front-line police in a variety of circumstances.[5]

---

[3] Of note, the district court rejected the TSA defendant's motion for summary judgment on the plaintiff's *Fourth Amendment* claim, which was not at issue on appeal. *Vanderklok*, 868 F.3d at 194. Of course, Plaintiffs' claims here are under the Fourth Amendment.

[4] The fact that the Supreme Court has never recognized a First Amendment *Bivens* claim also cannot be discounted as an animating part of the holding in *Vanderklok*. *See id.* at 199–200.

[5] *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603 (1999) (permitting *Bivens* claim against U.S. Marshalls who let local media accompany them into a home during the execution of an arrest warrant); *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) (suggesting *Bivens* remedy exists against a Secret Service officer making an arrest in a public place while providing security for the vice president); *Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (permitting *Bivens* claim against an ATF agent who conducted a search based on a facially invalid warrant); *Saucier v. Katz*, 533 U.S. 194, 198–99 (2001) (permitting *Bivens* claim against a military police officer for excessive force in a public arrest at an army base); *Hunter v. Bryant*, 502 U.S. 224, 226 (1991) (permitting *Bivens* claim against Secret Service agents who made a warrantless arrest in a home); *Anderson v. Creighton*, 483 U.S. 635, 637 (1987) (permitting *Bivens* claim against FBI agents who conducted a warrantless search of a home); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 360–61 (1977) (permitting *Bivens* claim against IRS agents who seized property from a business).

Simply put, this case is not like *Vanderklok*, where the fact "that the TSA was specifically created in response to the September 11, 2001 terrorist attacks to secure airports" was central to the Third Circuit's analysis. *Mack v. Yost*, 968 F.3d 311, 322 (3d Cir. 2020). Needless to say, that is not true of the DEA, and *Vanderklok*'s transportation security rationale does not apply to line-level DEA drug-law enforcement officers like Dawkin.

Tellingly, Dawkin does not (and cannot) argue that this case arises in the context of an ongoing search for threats to aircraft or transportation security. Indeed, that inquiry was resolved and determined that Rebecca posed no such threat; TSA had permitted her to proceed beyond the security screening area to her boarding gate. *See* FAC ¶¶ 157 ("TSA had already completed the transportation security screening when the TSA Screener began interrogating Rebecca about her cash. The TSA Screener's questions about the amount and purpose of the cash were not relevant to any transportation security concern."), 173 ("TSA Screeners permitted Rebecca to retrieve her carry-on luggage, cash, and other possessions, and resume her trip."), 179 ("The sole reason that … Dawkin approached her … at the airport was because he knew Rebecca was traveling with a 'large' amount of cash."). The fact that Dawkin happened to be at an airport when he violated Rebecca's Fourth Amendment rights against suspicionless seizures does not make this case a new *Bivens* context.

For similar reasons, Dawkin's assertion that this case presents a new context because it "involve[s] a statutory scheme like CAFRA," Dawkin Mem. at 8, is mistaken and misleading. He apparently seeks to analogize this case to *Vanderklok* (which arose under the TSA administrative scheme) by framing Plaintiffs' *Bivens* claims as arising under the CAFRA administrative scheme—rather than the general criminal law enforcement context in which Plaintiffs' claims actually arise. Dawkin's job as a DEA officer is not to administer CAFRA. It is to look for criminal acts. Whatever *remedy* CAFRA may provide for Dawkin's constitutional violations (which happens to be none, *see infra*, section III.A) is immaterial to the *legal mandate under which he operates*—which is general criminal law

enforcement, not any specialized administrative scheme. *See Vanderklok*, 868 F.3d at 208–09; *Francis*, 530 F. App'x 138 (recognizing the difference between *Bivens* claims in the search and seizure context *leading up to* a CAFRA proceeding and *Bivens* claims implicating the CAFRA *proceeding itself*); *Rankin*, 556 F. App'x 305 (same); *see also Tun-Cos v. Perrotte*, 922 F.3d 514, 524 (4th Cir. 2019) (recognizing the difference between those who "enforc[e] the criminal law" and those who "enforce[] the immigration law" for *Bivens* purposes, because non-criminal statutory schemes "implicate[] broad policy concerns distinct from the enforcement of criminal law").

In short, "to apply *Bivens* to the Fourth Amendment claims here is not an expansion at all." *Gonzalez v. Doe #1*, 2020 WL 1244403, at *7 (M.D. Pa. Mar. 16, 2020).

## III.   No special factors warrant ignoring Dawkin's Fourth Amendment violations.

Because Plaintiffs' Fourth Amendment claims do not arise in a new context, the Court need not conduct a "special factors" inquiry and should continue directly to assessing the (non)viability of Dawkin's qualified immunity arguments. *See Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020); *Big Cats*, 843 F.3d at 864. But even if the Court accepts Dawkin's argument that this case presents a new *Bivens* context just because it happened to arise at an airline boarding gate, no "special factors" exist to warrant ignoring Dawkin's unconstitutional acts. Dawkin's reliance on CAFRA as an alternative remedial scheme is severely misplaced. No other alternative remedial processes are at play in circumstances like Plaintiffs'. And Dawkin's "congressional oversight," "national security," "agency policy," and "practicality" arguments are meritless smokescreens.

### A.   Dawkin's reliance on CAFRA as an alternative remedial structure misunderstands what this case is about and what CAFRA does and does not do.

Dawkin devotes much of his "special factors" argument to the notion that CAFRA obviates the need for a damages remedy in circumstances like Terry's and Rebecca's. Dawkin Mem. at 9–11. But even if DOJ had initiated CAFRA proceedings against Plaintiffs' cash, that process would have

nothing to say about Dawkin's unconstitutional seizure of Rebecca or about compensating Terry for the bone graft he needed as a result of Dawkin's unconstitutional cash seizure.

Dawkin's argument that "this is not a case of 'damages or nothing'" relies on provisions of CAFRA that he contends create "'adequate remedial mechanisms for constitutional violations that *may* occur' in a given setting." Dawkin Mem. at 9–10 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)) (emphasis added by Dawkin). Dawkin emphasizes the Supreme Court's use of the word "may"; but the crucial phrase is his own: *in a given setting.*

Dawkin misleadingly frames the "setting" of Plaintiffs' Fourth Amendment claims against him as arising within the CAFRA process itself. That is inaccurate. The CAFRA process has no bearing on constitutional violations that *precede* any actions the government or individuals can take as part of the CAFRA process. *See United States v. One "Piper" Aztec "F" De Luxe Model 250 PA 23 Aircraft*, 321 F.3d 355, 359 (3d Cir. 2003) ("The plain language is clear: the commencement of a forfeiture proceeding can mean only the point when the government first files a complaint for forfeiture in rem under 18 U.S.C. § 981(b)(2)."); *cf. Rueda Vidal v. DHS*, 2019 WL 7899948, at *8 (C.D. Cal. Aug. 28, 2019) (recognizing the jurisdictional relevance of Fourth Amendment violations occurring before— as opposed to as a part of—an administrative process).

Stated differently, the CAFRA provisions that Dawkin points to can be used to *contest or avoid* an erroneous *forfeiture*, but they cannot *deter or redress* an unconstitutional *seizure*. That is especially true when, as here, no CAFRA forfeiture proceeding is even initiated. The CAFRA provisions that Dawkin relies on say nothing to the contrary. *See* 18 U.S.C. § 983(a)(3) (process to avoid erroneous forfeiture); Fed. R. Civ. P. Supp. R. G(8) (same); 18 U.S.C. § 983(d) (same); 18 U.S.C. § 983(f) (process to release property *during pendency of forfeiture proceeding*); 18 U.S.C. § 983(c) (burden of proof *within CAFRA process* to avoid erroneous *forfeiture*). And Dawkin's description of 28 U.S.C. § 2465 as providing "monetary compensation," Dawkin Mem. at 11, is puzzling, because the statute does not provide for monetary

damages; it simply gives a person who prevails in a civil forfeiture proceeding the opportunity to seek attorney fees, costs, and interest. *Cf.* Black's Law Dictionary (defining "compensation" as "[p]ayment of damages … by a person who has caused injury to another" to "make[] the injured person whole").

In short, these provisions have nothing to do with deterring or remedying unconstitutional seizures, even if they can play some role in ultimately avoiding unlawful forfeitures. Therefore, they cannot achieve the "purpose of *Bivens*," which "is to deter the officer" who violates the Fourth Amendment. *Ziglar*, 137 S. Ct. at 1860 (emphasis omitted; citation omitted).

But even if these provisions could provide a measure of mitigation for the harms caused by an unconstitutional *property seizure*—by, for example, permitting the repayment of attorney fees, costs, and interest to a successful forfeiture litigant under 28 U.S.C. § 2465—two undeniable facts remain:

First, such mitigation of harms is not available to a person (like Plaintiffs here) if the government never initiates forfeiture proceedings against their seized property. This means that people whose property was seized *in the most unfounded of circumstances* (where DOJ declines to even pursue the forfeiture) can achieve zero measure of mitigation. That makes acknowledging the *Bivens* damages remedy crucial in precisely these circumstances.

Second, any mitigating effects CAFRA may have on the harms caused by an unconstitutional *property* seizure have absolutely no bearing—under any circumstances—on the unconstitutional seizure of a *person*, which (1) is obviously distinct from the seizure of property (the latter of which is all that CAFRA addresses) and (2) need not even be accompanied by a seizure of property.

Therefore, Dawkin's arguments have no bearing on the claim that "Dawkin violated Rebecca's … Fourth Amendment right to be free from unreasonable searches and seizures by seizing *her* … without reasonable suspicion or probable cause." FAC ¶ 525 (emphasis added). That is so even if the Court holds that his arguments carry some weight regarding Plaintiffs' claim that "Dawkin violated Terry's and Rebecca's … Fourth Amendment right to be free from unreasonable searches and seizures

15

by seizing *their cash* for civil forfeiture without a warrant or probable cause." FAC ¶ 526 (emphasis added). *Cf. Williams v. FBI*, 2019 WL 5295465, at *8 (D. Or. Oct. 18, 2019) (dismissing *Bivens* claims "seek[ing] to litigate the seizure and forfeiture of [the plaintiff's] assets" but not *Bivens* claims "seek[ing] to litigate whether the agents' seizure of his person … violated his Fourth … Amendment rights").

For all of these reasons—i.e., because Plaintiffs' claims challenge unconstitutional conduct preceding any CAFRA process without challenging any constitutional infirmities that arise or can be redressed *within* the CAFRA process—Dawkin's reliance on *Francis*, 530 F. App'x 138 (3d Cir. 2013) and *Rankin*, 556 F. App'x 305 (5th Cir. 2014) is misplaced. Those cases recognized the distinction between a Fourth Amendment *Bivens* challenge to the seizure of property (which is not accounted for in the CAFRA process and is the claim that Plaintiffs have brought) versus a Fifth Amendment *Bivens* challenge for relief from an unconstitutionally administered forfeiture (which could be raised through CAFRA's own mechanisms, unlike Plaintiffs' pre-CAFRA Fourth Amendment seizure claims). *Francis*, 530 F. App'x at 138–39; *Rankin*, 556 F. App'x at 310–11. Plaintiffs challenge the unlawful *seizure* of their property and of Rebecca's person, *not* an unlawfully administered CAFRA forfeiture proceeding. CAFRA is irrelevant.

**B. The "other alternative processes" that Dawkin points to are also irrelevant.**

The remaining patchwork of random alternative "remedies" that Dawkin points to all miss the point—individually and collectively. *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007) (the existence of "a patchwork … assemblage of state and federal, administrative and judicial benches applying regulations, statutes, and common law rules" is alone insufficient to preclude a *Bivens* remedy).

1. Just like the CAFRA provisions already discussed, a Rule 41(g) motion for the return of property, *see* Dawkin Mem. at 12, simply seeks to avoid an erroneous forfeiture. It has nothing to say about an unconstitutional seizure of the person, *see* FAC ¶ 525, and it can do nothing to remedy the material damages—including serious physical injuries, *see* FAC ¶¶ 207–224—caused by Dawkin's

unconstitutional seizure of Terry's and Rebecca's cash. The "meager opportunity" to simply maintain the pre-constitutional-violation status quo by getting a return of property "is not the sort of alternative process that provides a 'convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Linlor v. Polson*, 263 F. Supp. 3d 613, 621–22 (E.D. Va. 2017) (quoting *Wilkie*, 551 U.S. at 550).

2. If the opportunity to sue a federal agency for injunctive relief under the APA could sink a *Bivens* claim, *see* Dawkin Mem. at 12–13, there would be no more *Bivens* claims, because the APA applies to all federal agencies. The cases Dawkin relies on do not say otherwise. They arose in the context of challenges to statutorily governed agency processes that could be compelled or set aside *under the statute's own terms*, thus obviating the need for a damages remedy. *See W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) (APA provided adequate process for challenging "agency action or inaction"—not challenging any individual officer's unconstitutional conduct outside of the agency decision-making process); *Carpenter's Produce v. Arnold*, 189 F.3d 686, 688 (8th Cir. 1999) (process to seek federal disaster relief money was statutorily prescribed and already supplemented by judicial review of constitutional violations); *Miller v. U.S. Dept. of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998) (guaranteed judicial review of employment termination claim was sufficient). Here, the injunctive relief that Plaintiffs separately seek cannot make them whole.

3. Dawkin's reliance on 28 U.S.C. § 2680(c), *see* Dawkin Mem. at 13, is misplaced because that statute has nothing to do with the lawfulness of a seizure (of person or property) or of a forfeiture. It addresses only "injury or loss of … property" itself while that property is in government custody.

4. Even if state-law claims were available against Dawkin, *see* Dawkin Mem. at 13, (which is dubious, *see* 28 U.S.C. § 2679(b)(1)), the Supreme Court made clear in *Bivens* itself that the ability or inability to vindicate Fourth Amendment harms "is not tied to the niceties of local … laws"; rather, it is "an independent limitation upon the exercise of federal power." 403 U.S. at 393–94.

17

**C. Dawkin's remaining special factor arguments—about "congressional oversight," "national security," "agency policy," and "practicality"—also merit little attention.**

Dawkin's remaining "special factor" arguments are easily disposed of.

1. Dawkin's "congressional oversight" argument, *see* Dawkin Mem. at 13–15, is entirely misplaced. It again rests on his misleading framing that Plaintiffs' claims arise under CAFRA proceedings. As already discussed, they do not. They arise in the general criminal law investigation context, where CAFRA's provisions are not in play. Even if one believes there is some tangential relationship between Plaintiffs' Fourth Amendment seizure claims and the CAFRA process, "given that [Plaintiffs'] claim is so close to the core of *Bivens* itself, it is particularly unlikely that Congress meant to preclude a damages remedy by its silence," so a *Bivens* remedy remains viable and necessary. *Graber*, 2019 WL 4805241, at *5; *see also Mack*, 968 F.3d at 324 (congressional silence is of no import in a statutory context similar to that in which a *Bivens* remedy has already been recognized).

2. Dawkin's "national security" argument, *see* Dawkin Mem. at 16–17, is a smokescreen. He argues that drug-law enforcement, particularly at airports, always implicates national security concerns. But his "vague generalizations about the importance of national security are [not] sufficient to defeat *Bivens* liability." *Linlor*, 263 F. Supp. 3d at 625. The question is whether security concerns at airports "have any particular bearing on the context at issue in this case." *Id.* at 623. It is not enough to say that DEA officers are "an integral part of the United States' 'national security apparatus.' Many—perhaps most—federal law enforcement bodies have some claim to that status. The [FBI], for example, is no less a vital part of the 'national security apparatus' … [b]ut that does not insulate FBI agents from valid *Bivens* claims generally." *Id.* at 623 n.2 (citations omitted). To do so "would eviscerate the *Bivens* remedy" in the Fourth Amendment context—where it "remains unquestioned." *Id.*

In short, this factor carries no weight in "domestic cases" like this one—where it is particularly prone to "abuse," *Ziglar*, 137 S. Ct. at 1861–62—because routine line-level drug-law enforcement is quite unlike TSA screening, which was "specifically created in response to the September 11, 2001

terrorist attacks to secure airports throughout the nation from future attacks," *Mack*, 968 F.3d at 322

(citing *Vanderklok*, 868 F.3d at 206). The Court should not countenance Dawkin's effort to use

"national security" as a "talisman … to cover [his] multitude of sins" after he seized Rebecca and her

cash for no reason. *Ziglar*, 137 S. Ct. at 1862 (quotation marks and citation omitted). Deterring law

enforcement officers from sniffing for cash will not weaken national security; it could strengthen it.

3. Dawkin's "agency policy" argument, *see* Dawkin Mem. at 17–18, carries no weight here.

Unlike the mid- to high-level national security officials sued in *Ziglar*, Dawkin has no "supervisory

duties" or any role in shaping DEA policy. 137 S. Ct. at 1864. Contrary to Dawkin's suggestion, the

mere fact that other DEA officers are committing the same Fourth Amendment violations—

prompting Plaintiffs to sue the agency for injunctive relief—does nothing to change his low-level role

and his responsibility for his own unconstitutional acts. That other officers are doing the same thing

does not save him. In fact, "if this problem is indeed widespread, it demonstrates a dire need for

deterrence, validating *Bivens*'s purpose," and thus cuts *in favor* of judicial relief in individual cases, not

against it. *Lanuza v. Love*, 899 F.3d 1019, 1033 (9th Cir. 2018).

4. For similar reasons, the Court should reject Dawkin's "practicality" arguments, *see* Dawkin

Mem. at 18–19. First, Dawkin's effort to portray this routine Fourth Amendment case as an impossible

task for the judiciary ignores the fact that federal judges decide these questions in criminal and civil

cases every day. Second, his "floodgates" argument again suggests that if line-level drug-law

enforcement officers are routinely violating peoples' Fourth Amendment rights, deterrence is crucial.

*Ziglar*, 137 S. Ct. at 1863 ("There is a persisting concern, of course, that absent a *Bivens* remedy there

will be insufficient deterrence to prevent officers from violating the Constitution.").

Finally, there are no administrability or fairness concerns here. In *Vanderklok*, the Third Circuit

was concerned with TSA Screeners' lack of training regarding probable cause and other law

enforcement requirements. 868 F.3d at 208–09. DEA law-enforcement officers like Dawkin, by

contrast, are (or should be) well-versed in those constitutional obligations. *Id.*; *see also  Jacobs v. Alam*, 915 F.3d 1028, 1035–39 (6th Cir. 2019) (courts have "readily provided guidance to individual line officers for how to comply with the Fourth Amendment while carrying out their police duties").

In short, Plaintiffs' Fourth Amendment claims arising from Dawkin's "standard law enforcement operation" should go forward. *Id.* at 1038 (quotation marks and citation omitted).

## IV.   Qualified immunity does not shield Dawkin from liability for his clearly established Fourth Amendment violations.

Dawkin further argues that qualified immunity insulates him from any judicial review of his Fourth Amendment violations. *See* Dawkin Mem. at 20–25. But he is not entitled to qualified immunity for either (1) his seizure of Rebecca or (2) his seizure of Terry's and Rebecca's cash. At the time, it was clearly established that (1) Dawkin's conduct in targeting Rebecca for questioning constituted a seizure, (2) traveling with cash did not constitute reasonable suspicion to justify that seizure, and (3) Dawkin's seizure of the cash required probable cause—which Dawkin obviously did not have.

### A.  It was clearly established that Dawkin seized Rebecca when he and another officer who had already questioned her re-targeted her and doubled down on conveying that she was the subject of a particular law enforcement investigation.

Dawkin is not entitled to qualified immunity on the question of whether he seized Rebecca at her boarding gate. A seizure may occur merely by a show of authority that "convey[s] the message" that the person is "not free to disregard the police and go about [her] business." *Calif. v. Hodari D.*, 499 U.S. 621, 628 (1991). This depends on the "totality of the circumstances." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). A seizure is unlikely to occur where officers convey "no basis for suspecting a *particular individual.*" *Id.* at 435 (emphasis added) (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984)). But officers' show of authority is a seizure if they "convey a message that compliance with their requests is required" by the person targeted, and she submits to that show of authority. *Id.*

The Third Circuit, district courts within it, and courts around the country have recognized and applied that obvious distinction in assessing the relevance of the cases that Dawkin relies on (where

officers conducted general interdiction sweeps or otherwise did not indicate to an individual person that she was being singled out and targeted based on some particular conduct of hers, *see* Dawkin Mem. at 21–22) and cases like Rebecca's (where officers "effectively told [the person] that [she] was a suspect in a crime"). *United States v. Crandell*, 668 F. Supp. 2d 635 647–48 (D.N.J. 2009) (distinguishing *Bostick* and *United States v. Drayton*, 536 U.S. 194 (2002) on these bases; relying on *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006)); *id.* ("There is a notable difference between an encounter where a defendant is among a group of people to whom the police are addressing questions, in furtherance of a random drug interdiction effort; and here, where Crandell was sought out by name by a group of officers … ."); *United States v. Puga*, 2019 WL 7170623, at *4 n.9 (S.D. Tex. Dec. 24, 2019) ("The Government's reliance on [*Bostick* and *Delgado*]—which held that random drug and immigration sweeps do not implicate the Fourth Amendment—is misplaced. As the Fourth Circuit has explained in rejecting a similar argument, those cases did not involve 'particularized suspicion of wrongdoing among any of the [individuals] questioned[.]'" (quoting *United States v. Jones*, 678 F.3d 293, 304 (4th Cir. 2012))); *cf. Drayton*, 536 U.S. at 203 ("The officers gave the passengers no reason to believe that *they* were required to answer the officers' questions." (emphasis added)).

Most directly, the Third Circuit explained that "*the* important factor" in determining whether a person is seized is whether she "knew that the agents had positively identified *[her]* as a suspect," because "[s]tatements which intimate that an investigation *has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would only lead to formal detention*." *Thame*, 846 F.2d 200, 203 (3d Cir. 1988) (emphases added) (quotation marks and citations omitted).

Under this clearly established law, Dawkin knew or should have known that he was conveying to Rebecca that she was not free to leave when Dawkin: (1) approached her directly with targeted questions specific to her, (2) indicated that he knew who she was, (3) told her he had questions about the cash he knew was in her possession (which she was not openly displaying), (4) escorted her to a

different area, (5) told her to show him the cash, (6) demanded to speak with her father, and (7) did all this with another law enforcement officer who had already questioned her and conveyed to her that she was being accused of doing something wrong or illegal—an impression that Dawkin doubled down on and greatly intensified. FAC ¶¶ 171–188; *see Brown*, 448 F.3d at 245; *Thame*, 846 F.2d at 203.

Dawkin's fallback argument—that his seizure of Rebecca was not "unreasonable under the circumstances," Dawkin Mem. at 22—is meritless. He admits that it could be reasonable only if based on "reasonable, articulable suspicion that criminal activity [was] afoot." *Id.* (alteration in original) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). For the reasons explained below, it was clearly established that no such articulable suspicion existed. Therefore, unless some established Fourth Amendment exception applied (which Dawkin rightly does not argue), his "seizures undertaken without a warrant and probable cause or reasonable suspicion are unreasonable and violative of the Fourth Amendment." *United States v. Pollard*, 326 F.3d 397, 410–11 (3d Cir. 2003).

### B. It was clearly established that flying with a large amount of cash is not reasonable suspicion; Dawkin admits he had no other basis to seize Rebecca.

To justify his seizure of Rebecca as described above, Dawkin needed—based on information he knew at the time—"some minimal level of objective justification" rising to reasonable suspicion. *Sokolow*, 490 U.S. at 7, 10 (citation omitted). He could only seize her based on a "particularized and objective basis for suspecting *[her]* of criminal activity." *Mathurin*, 561 F.3d at 179 (emphasis added).

Dawkin admits that he relied solely on two pieces of information to make that seizure: (1) "that she was traveling with over $82,000 in her carry-on bag" and (2) the "explanations she had given to the state trooper[s]" (i.e., that she was helping her elderly father manage his life savings). Dawkin Mem. at 22. Supreme Court and Third Circuit caselaw put it "beyond debate" that this was not reasonable suspicion. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

It has long been established that traveling domestically with a "large amount of cash, in and of itself, is not per se incriminating," because it is "not by itself proof of any illegal conduct and is

quite consistent with innocent travel." *Law*, 384 F. App'x at 122–23 (quoting *Sokolow*, 490 U.S. at 9; collecting cases affirming this proposition—including with respect to cash in the tens of thousands of dollars and even exceeding $100,000).

Because Dawkin admits that he did not take into account any other potentially suspicious behavior by Rebecca (because there was none), the only question that remains is whether he had some "particularized and objective basis [1] for suspecting [her] of criminal activity" just because she was traveling with cash and [2] for thinking that her explanation of the cash's source was a lie, based on something he knew about Rebecca. *Mathurin*, 561 F.3d at 179. Nothing in the record—including Dawkin's own motion—indicates that he had any reason to think Rebecca was involved in criminal activity *or* that she was lying. He knew nothing to justify either of these "inchoate … 'hunch[es].'" *Sokolow*, 490 U.S. at 7 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

Therefore, he seized Rebecca solely because she was traveling with a "large" sum of cash. It is beyond debate that that violates the Fourth Amendment. *Sokolow*, 490 U.S. at 8–9; *Law*, 384 F. App'x at 122–23 (collecting cases). By way of a counterexample that put Dawkin on notice of what constitutional policing looks like, in *Mathurin*, the Third Circuit described as a "close call," for purposes of reasonable suspicion, circumstances that involved not only a large sum of cash, but also actual "evidence [of potential criminality] the agents collected throughout the day." 561 F.3d at 178. In contrast, Dawkin collected nothing and investigated nothing before demanding that Rebecca follow him and that she give him her cell phone to wake up her elderly father.

### C.  It was clearly established that Dawkin needed probable cause to seize Rebecca's cash for forfeiture; any reasonable officer would know that, and that it was lacking.

Dawkin had no reason to think Rebecca was involved in criminal activity or that she was lying about the origin or purpose of her cash. So he had no basis to seize Rebecca and take her cell phone to wake up her elderly father. Accordingly, any information he learned from that call was

unconstitutionally obtained "fruit of the poisonous tree"; it could not form the basis for probable

cause to seize the cash for forfeiture. *See United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006).

But even if that link could somehow be severed, Dawkin is not entitled to qualified immunity

for a simple reason: He *admits* that he seized Plaintiffs' cash for forfeiture pursuant to an *obviously wrong*

*statutory and constitutional standard.* He argues that all he needed to seize the cash for forfeiture was

reasonable suspicion (as opposed to probable cause). *See* Dawkin Mem. at 24. But 18 U.S.C. §

981(b)(2)(B) is clear that the standard for an officer to seize property for forfeiture is probable cause.

The constitutional caselaw (in addition to the statute) reaffirms that seizure for forfeiture requires

probable cause. *United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d

215, 221, 225–26 (3d Cir. 2001). And neither of the cases Dawkin relies on created confusion on this

front: They both involved *temporary* seizures of *luggage* upon reasonable suspicion. They had nothing

to do with the seizure of cash for forfeiture. And as demonstrated by the seven-month deprivation of

Plaintiffs' cash, such seizure is not the short, temporary deprivation envisioned by *United States v. Frost*,

999 F.2d 737, 740 (3d Cir. 1993) (temporary seizure upon reasonable suspicion is acceptable only if

the property is not detained for a "long period of time") or by *Murphy v. Mifflin Cty. Reg'l Police Dept.*,

548 F. App'x 778, 782 (3d Cir. 2013) (same). *Cf. United States v. Place*, 462 U.S. 696, 709–10 (1983)

(detention of property for 90 minutes upon reasonable suspicion violated the Fourth Amendment).

Given the lack of ambiguity in Section 981(b)(2)(B) or in the caselaw on the constitutionality

of such seizures, Dawkin's acts do not warrant qualified immunity. They are the acts of an officer who

is "plainly incompetent or … who knowingly violate[s] the law." *al-Kidd*, 563 U.S. at 743. For the same

reason, his plea that he was just following DEA practices, *see* Dawkin Mem. at 24, does not save him.

Even though Dawkin admits that he was acting pursuant to an obviously wrong standard, he

might now argue (post-hoc) that all should be forgiven because he had probable cause for the cash

seizure. But that is clearly wrong. Any reasonable officer would know that Dawkin's conversation with

Terry did not elevate the situation from one without even reasonable suspicion when he made the call to one with probable cause to keep Terry's and Rebecca's cash for forfeiture. Nothing Dawkin learned by seizing Rebecca and her cell phone and talking to Terry provided a reason to think that any category of crime was afoot. Therefore, he lacked probable cause. *Ten Thousand Seven Hundred Dollars*, 258 F.3d at 225 ("the quality of the circumstantial evidence that the government does proffer to establish probable cause to institute forfeiture proceedings must be strong enough to support reasonable grounds for belief that an actual, rather than purely theoretical, connection exists between the currency in claimants' possession and the drug trade"); *id.* at 232–33 (collecting cases illustrating this principle in the forfeiture context, none of which upheld a probable cause determination where the government had no objective basis to establish a connection between the cash and a particular category of crime).

The only possible inconsistency between Rebecca's explanation and Terry's explanation that might reasonably be inferred from the record is that Terry did not know Rebecca intended to buy him a hobby truck. Of course, that was because the hobby truck was a surprise. Other than that easily explained asymmetry of knowledge, there was no inconsistency. Thus, Dawkin remained without a shred of basis to think that Rebecca and Terry were involved in the drug trade or that Rebecca's explanations were lies. As the Third Circuit explained in *Ten Thousand Seven Hundred Dollars*, "somewhat inconsistent answers" are not "a strong indication of a narcotics nexus" sufficient for probable cause. *Id.* at 227. Indeed, in that case, the inconsistent answers were insufficient *even in combination with a host of other factors, not a single one of which was present when Dawkin seized Terry's and Rebecca's cash*: nervous behavior, potentially suspicious packaging and transportation of the large amount of cash, and knowledge of the travelers' prior drug convictions. *Id.* at 232–33. Dawkin had far more than "fair warning" that his cash seizure violated the Fourth Amendment. *Kedra*, 876 F.3d at 450.

## CONCLUSION

The Court should deny Dawkin's motion to dismiss in its entirety.

Dated:  September 18, 2020                    Respectfully submitted,

                                             /s/ Dan Alban
                                             Dan Alban*
                                             VA Bar No. 72688

                                             Jaba Tsitsuashvili*
                                             DC Bar No. 1601246

                                             INSTITUTE FOR JUSTICE
                                             901 North Glebe Rd., Suite 900
                                             Arlington, VA 22203
                                             (703) 682-9320
                                             (703) 682-9321 (fax)
                                             dalban@ij.org
                                             jtsitsuashvili@ij.org

                                             *Attorneys for Plaintiffs*

                                             *Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2020, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Dan Alban</u>