# TABLIN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REBECCA BROWN, AUGUST TERRENCE ROLIN, STACY JONES-NASR, and MATTHEW BERGER on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| TRANSPORTATION SECURITY ADMINISTRATION; DAVID P. PEKOSKE, Administrator, Transportation Security Administration, in his official capacity; DRUG ENFORCEMENT ADMINISTRATION; TIMOTHY J. SHEA, Acting Administrator, Drug Enforcement Administration, in his official Capacity; "STEVE" LAST NAME UNKNOWN, Agent, Drug Enforcement Administration, in his individual capacity; and UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

CASE NO. 2:20-cv-00064-MJH-LPL

## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION…………………………………………….………………… 1

BACKGROUND…………......……………………………………………..…..… 2

    I.    Factual Background....………………………………........................... 2

        A.    Plaintiffs' Experiences...………………………………..………..... 3

            1.   Plaintiffs Brown and Rolin………….…................................ 3

            2.   Plaintiff Stacy Jones-Nasr………………………………… 5

            3.   Plaintiff Matthew Berger………………………....………........6

        B.    DEA Currency Seizures ..……………………………………… 7

    II.    PROCEDURAL HISTORY……………………………………………8

        ARGUMENT…………..…………………………………………… 9

        I.    The Court Should Dismiss Counts I-III for Lack of Subject Matter Jurisdiction and Failure To State a Claim on Which Relief May Be Granted……………….…………………….………………..…9

        A.    Plaintiffs Lack Standing To Raise the Claims in Counts I-III……….9

        B.    The Court Lacks Jurisdiction To Review Claims Challenging TSA Policies and Procedures……………………………………..……. 15

        C.    Counts I-III Fail to State A Claim on Which Relief May Be Granted……………….…………………………..……...…...16

            1.   Plantiffs Have Not Plausibly Alleged an APA Claim for *Ultra Vires* or Unconstitutional Action by TSA…...……………….…18

              a. Plaintiffs Have Not Plausibly Alleged *Ultra Vires* Action by TSA……………….…………………………..……...…19

              b. Plantiffs Have Not Plausibly Alleged a Fourth Amendment Violation by TSA………………………………………...22

2. Plaintiffs Have Not Plausibly Alleged a Fourth Amendment
Violation by DEA……………………………………………….23

II. The Court Should Dismiss Count IV for Lack of Subject Matter
Jurisdiction…………………………………………………....…28

CONCLUSION……………………………………………………….………… 29

## TABLE AUTHORITIES

**Cases**

*Adamski v. McHugh,*
    304 F. Supp. 3d 227 (D.D.C. 2015) ................................................................. 19, 20

*Afifi v. Lynch,*
    101 F. Supp. 3d 90 (D.D.C. 2015) .................................................................... 13

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013) ............................................................................................ 10

*Argueta v. U.S. Immigration & Customs Enf't,*
    643 F.3d 60 (3d Cir. 2011) ............................................................................... 28

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................... 2, 11, 17, 28

*Bark v. U.S. Forest Serv.,*
    37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................... 18, 21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................................... 17

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................................... 18

*Brown v. Fauver,*
    819 F.2d 395 (3d Cir. 1987) ............................................................................. 10

*Buck v. Hampton Twp. Sch. Dist.,*
    452 F.3d 256 (3d Cir. 2006) ............................................................................... 3

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983) ............................................................................ 10, 13, 15

*Clapper v. Amnesy Int'l,*
    568 U.S. 398 (2013) .......................................................... 10, 13, 14, 15

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) ......................................................................... 18

*Competitive Enter. Inst. v. EPA,*
    67 F. Supp. 3d 23 (D.D.C. 2014) ..................................................................... 21

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..................................................................................... 9, 10

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005) ............................................................................. 10

*Florida v. Bostick,*
    501 U.S. 429 (1991) ......................................................................................... 24

*Florida v. Rodriguez,*
    469 U.S. 1 (1984) ............................................................................................. 25

*Florida v. Royer,*
    460 U.S. 491 (1983) ......................................................................................... 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ......................................................................................... 10

*Gould Elecs., Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000) ............................................................................. 11

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir.1987) ........................................................................... 13

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
  846 F.3d 625 (3d Cir. 2017).............................................................................. 11

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012)................................................................................ 9

*Kerchner v. Obama*,
  612 F.3d 204 (3d Cir. 2010).............................................................................. 10

*Library of Congress v. Shaw*,
  478 U.S. 310 (1986).......................................................................................... 28

*Lillemoe v. U.S. Dep't of Agric.*,
  No. 15-cv-2047, 2020 WL 1984256 n.4 (D.D.C. Apr. 27, 2020)...................... 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).......................................................................................... 10

*McNair v. Synapse Grp. Inc.*,
  672 F.3d 213 (3d Cir. 2012)........................................................................ 11, 15

*McTernan v. City of York*,
  564 F.3d 636 (3d Cir. 2009)........................................................................ 21, 22

*Merritt v. Shuttle, Inc.*,
  187 F.3d 263 (2d Cir. 1999).............................................................................. 16

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978).......................................................................................... 22

*Norton v. S. Utah Wilderness*,
  *All.*, 542 U.S. 55 (2004) .............................................................................. 18, 21

*Raines v. Byrd*,
  521 U.S. 811 (1997).......................................................................................... 10

*Ruskai v. Pistole*,
  775 F.3d 61 (1st Cir. 2014)............................................................................... 15

*Terry v. Ohio*,
  392 U.S. 1 (1968).............................................................................................. 25

*Timoney v. Loughery*,
  670 F. App'x 47 (3d Cir. 2016) ......................................................................... 21

*United States v. Aukai*,
  497 F.3d 955 (9th Cir. 2007) ............................................................................ 19

*United States v. Bein*,
  214 F.3d 408 (3d Cir. 2000)............................................................................... 28

*United States v. Craig*,
  694 F.3d 509 (3d Cir. 2012)........................................................................ 28, 29

*United States v. Hartwell*,
  436 F.3d 174 (3d Cir. 2006)............................................................................... 19

*United States v. Place*,
  462 U.S. 696 (1983).......................................................................................... 25

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & States, Inc.*,
  454 U.S. 464 (1982)............................................................................................ 9

*Warth v. Seldin*,
  422 U.S. 490 (1975).......................................................................................... 10

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990)...................................................................................... 13

**Statutes**

5 U.S.C. § 551(12) ......................................................................................... 18
5 U.S.C. § 704 ......................................................................................... 18, 21
5 U.S.C. § 706(2)(C) ...................................................................................... 19
18 U.S.C. § 983 .............................................................................................. 12
19 U.S.C. §1602 ............................................................................................. 12
28 U.S.C. § 1331 ....................................................................................... 28, 29
49 U.S.C. § 114(d) ......................................................................................... 20
49 U.S.C. § 46110 ..................................................................................... 15, 16
49 U.S.C. § 46110(a) ...................................................................................... 15
Pub. L. No. 102–166 ...................................................................................... 28

**Rules**

Fed. R. Crim. P. 41(g)..................................................................................... 29

**Regulations**

28 C.F.R. § 9.3 ............................................................................................... 12
49 C.F.R. § 1540.5 ......................................................................................... 20

Defendants Transportation Security Administration ("TSA"); David P. Pekoske, TSA Administrator, in his official capacity; Drug Enforcement Administration ("DEA"); Timothy J. Shea, DEA Acting Administrator, in his official capacity; and the United States of America (collectively, "the Government Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the first amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Procedure.

## INTRODUCTION

The four plaintiffs in this case are individuals whose cash was allegedly seized by DEA agents or other unidentified law enforcement personnel after the cash was detected by TSA screeners during routine airport security screenings when three of the plaintiffs were traveling through U.S. airports. Based on their handful of encounters with individual TSA screeners and DEA agents, Plaintiffs attempt to contrive claims that TSA and DEA have adopted agencywide "policies or practices" that are unconstitutional or beyond the agency's statutory authority. However, Plaintiffs' vague allegations of unlawful agency action rest on speculation and conjecture, and none of their claims for relief are viable. As set forth below, the Court should dismiss Counts I, II, and III of the first amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. The Court should dismiss Count IV for lack of subject matter jurisdiction.

Counts I and II allege that TSA has a "policy or practice" of "having TSA Screeners seize travelers' cash, carry-on luggage, personal effects, and/or their person, based on the presence of cash on their person or in their carry-on luggage, after the transportation security screening has concluded." First Amended Complaint, ECF No. 43 ("Compl.") (July 17, 2020) ¶ 475; *see also id.* ¶ 492. Plaintiffs assert that this purported "policy or practice" is "ultra vires" and violates the

Fourth Amendment. Count III, similarly, alleges that the DEA has "a policy or practice of conducting suspicionless non-consensual seizures of travelers at U.S. airports" and "a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture based solely on the presence of a large amount of cash." *Id.* ¶¶ 505, 508. All three counts seek declaratory and injunctive relief. However, Plaintiffs lack standing to raise these claims because, even if they had plausibly alleged that any such policy or practice exists, no Plaintiff has plausibly alleged that he or she is currently being injured or is likely to be injured in the future by that purported policy or practice. In addition, the Court lacks jurisdiction over Counts I and II because the courts of appeals have exclusive jurisdiction over challenges to TSA policies and procedures. Moreover, Plaintiffs have not plausibly alleged the existence of the purported unlawful policies or practices, let alone plausibly alleged any unlawful final agency action by TSA or DEA, and therefore have not stated a claim upon which relief may be granted.

Count IV, which seeks interest on the seized funds that were ultimately returned to Plaintiffs Brown and Rolin, should be dismissed for lack of subject matter jurisdiction because the United States has not waived its sovereign immunity with respect to such claims for interest.

Accordingly, the Court should dismiss the claims against the Government Defendants pursuant to Rules 12(b)(1) and 12(b)(6).

## BACKGROUND

### I.    Factual Background

For the purposes of this motion to dismiss only, the Court may assume the veracity of the well-pleaded factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Except where otherwise indicated, the following facts are derived from the allegations in the

complaint, documents incorporated by reference in the complaint, and items of which judicial notice may be taken. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

### A. Plaintiffs' Experiences

#### 1. Plaintiffs Brown and Rolin

Plaintiff Rebecca Brown ("Brown") is the daughter of Plaintiff August Terrance Rolin ("Rolin"). Compl. ¶¶ 64-65. On August 26, 2019, Brown was traveling back to her home in Massachusetts after visiting her father in Pittsburgh, Pennsylvania. *Id.* ¶¶ 136-137, 148. At the Pittsburgh International Airport, she did not check any luggage. *Id.* ¶ 150. Her carry-on luggage, a beach bag, contained a purse in which Brown had packed $82,373. *Id.* ¶¶ 6-7, 150.

Plaintiffs allege that when Brown went through the TSA checkpoint, a TSA screener was alerted to the presence of the cash in Brown's luggage. *Id.* ¶ 153. Brown's carry-on luggage was pulled aside by TSA screeners, but no TSA screener ever opened or physically inspected Brown's carry-on luggage. *Id.* ¶ 155. After Brown's carry-on luggage was pulled aside, TSA screeners questioned Brown about the cash inside. *Id.* ¶¶ 10, 157. Brown stated that she was taking the cash to deposit in a bank account for her father, who had accumulated the cash in savings. *Id.* ¶¶ 16, 158. A TSA screener asked Brown for her ID and proof of her travel arrangements to and from Pittsburgh, and Brown provided her ID and boarding passes. *Id.* ¶ 159. A TSA screener took the documents Brown provided and photocopied them. *Id.* Brown asserts that she did not feel free to leave the security screening checkpoint; she believed that both she and her luggage were being detained by TSA, and TSA screeners also had her ID and boarding passes. *Id.* ¶ 164.

TSA screeners called a Pennsylvania state trooper to the scene, and Brown waited approximately 10-20 minutes for the state trooper to arrive. *Id.* ¶¶ 167-168. When the state trooper arrived, he questioned Brown, and she repeated her explanation of the origin, purpose, and

destination of the cash in her luggage. *Id.* ¶ 171. The state trooper then called his supervisor, a lieutenant, and Brown waited an additional 10-15 minutes after which she repeated her explanation to the lieutenant. *Id.* ¶ 172. After this questioning, TSA screeners permitted Brown to retrieve her carry-on luggage, cash, and other possessions, and resume her trip. *Id.* ¶ 173.

Despite her delay at the screening checkpoint, Plaintiffs allege that Brown made it to her gate with time to spare and began working on her laptop. *Id.* ¶ 176. Soon after she reached the gate, Brown was approached by the state trooper who had questioned her earlier, accompanied by another man in a blue polo shirt, who was Defendant Steve Dawkin, a DEA Task Force Officer ("TFO"). *Id.* ¶¶ 177-178.[1] TFO Dawkin said that his name was Steve, that he was a DEA agent, and that he had some questions for her. *Id.* ¶ 178. Plaintiffs allege that Brown felt like she had no choice but to comply. *Id.* ¶ 181. The trooper and TFO Dawkin escorted Brown to a less crowded part of the gate area to question her. *Id.* ¶ 181. Brown did not feel free to walk away, and she needed to remain near the gate to board her flight. *Id.* ¶ 182. TFO Dawkin asked Brown to show him the cash in her purse in her carry-on luggage, and Plaintiffs allege that Brown felt like she had to comply and showed TFO Dawkin the cash. *Id.* ¶ 183. TFO Dawkin questioned Brown about why she was traveling with the cash, and Brown again explained the origins of the cash and why she was traveling with it. *Id.* ¶ 186. After hearing Brown's explanation, TFO Dawkin asked to speak with Brown's father, Rolin, to verify what Brown had told him. *Id.* ¶ 187. Brown informed TFO Dawkin that her father was elderly, would still be asleep at 7:00 a.m., and would likely be confused by the call, but TFO Dawkin insisted that Brown call Rolin so that he could verify

---

[1] TFO Dawkin, whom Plaintiffs sue in his individual capacity, is separately represented, and he has already moved to dismiss the sole claim asserted against him, Count V. *See* ECF No. 48.

Brown's explanation of the cash's purported origin and use. *Id.* ¶ 188. Rolin had difficulty answering all of Steve's questions. *Id.* ¶ 191.

After speaking with Rolin, TFO Dawkin told Brown that "your answers don't match." *Id.* ¶ 192. TFO Dawkin then took the cash and searched the rest of Brown's bag. *Id.* ¶ 193. TFO Dawkin seized the $82,373 cash. *Id.* ¶ 194. Brown was not arrested or charged with a crime, and was permitted to board her flight to Boston. *Id.* ¶ 197.

Rolin and Brown subsequently received Civil Asset Forfeiture Reform Act ("CAFRA") notices for the $82,373 dated October 11, 2019, from the DEA. *Id.* ¶ 200. Brown and Rolin filed CAFRA claims on or about November 12, 2019. *Id.* ¶ 201. By letter dated February 28, 2020, the DEA notified the counsel for Brown and Rolin that a decision had been made to return their property. *Id.* ¶ 204. Rolin and Brown received a wire transfer in the amount of $82,373 to their bank account from the government on March 23, 2020. *Id.* ¶ 206.

### 2. Plaintiff Stacy Jones-Nasr

On May 19, 2020, Plaintiff Stacy Jones-Nasr went through the transportation security screening checkpoint at Wilmington International Airport ("ILM"). Compl. ¶ 245. A TSA screener pulled aside and searched Jones-Nasr's carry-on luggage. *Id.* ¶ 247. During the search of Jones-Nasr's carry-on luggage, the TSA screener found a clear, plastic FoodSaver bag containing approximately $38,000 in cash and asked Jones-Nasr where the cash came from. *Id.* ¶ 248. Jones-Nasr's husband, who was traveling with her, answered that the cash came from the sale of a car. *Id.* ¶ 250. The TSA screener asked to whom they had sold the car, and Jones-Nasr's husband provided that person's name. *Id.* The TSA screener asked a few more questions, and then said "Hang on a minute" and motioned for Jones-Nasr and her husband to stay. *Id.* ¶ 253. Jones-Nasr's carry-on luggage was on a table behind the conveyer belt that is used by TSA screeners to search

carry-on luggage. *Id.* ¶ 255. While Jones-Nasr and her husband stayed in the transportation screening area, the TSA screener placed a phone call. *Id.* ¶¶ 254, 257. Approximately 30 seconds to 1 minute later, a sheriff's deputy arrived and questioned Jones-Nasr and her husband further about the cash in Jones-Nasr's luggage. *Id.* ¶¶ 258, 261. Upon learning that much of the cash was from the couple's friend's cash payment for a car, the sheriff's deputy asked for the friend's phone number and called him. *Id.* ¶ 262. After his call with the couple's friend, the sheriff's deputy said "your stories aren't adding up" and took Jones-Nasr and her husband to the deputy's office inside the airport. *Id.* ¶ 262.

Two plainclothes officers arrived at the deputy's office and identified themselves as DEA agents. *Id.* ¶ 264. The DEA agents questioned Jones-Nasr and her husband about the cash. *Id.* Upon searching all of the couple's belongings, the DEA agents discovered several thousand dollars in cash that Jones-Nasr's husband had in his fanny pack. *Id.* ¶ 268. The DEA seized for civil forfeiture the $38,000 in Jones-Nasr's carry-on luggage and all the cash from the fanny pack except for $500 that was in a bank envelope with an ATM receipt, a total of approximately $40,000-$45,000. *Id.* ¶¶ 268-269. After the DEA agents seized the cash, they told Jones-Nasr and her husband that they were free to leave and catch their flight. *Id.* ¶ 271. Neither Jones-Nasr nor her husband was arrested or charged with any crime. *Id.*

### 3.  Plaintiff Matthew Berger

On November 3, 2015, Plaintiff Matthew Berger went through the transportation security screening checkpoint at Charlotte International Airport ("CLT"), *id.* ¶ 284, and TSA screeners pulled aside and searched his carry-on luggage, *id.* ¶¶ 287-288. During the search of Berger's carry-on luggage, a TSA screener unzipped a bank envelope inside the luggage and asked Berger how much money there was and what it was for. *Id.* ¶ 288. Berger answered that it was $55,000

for the potential purchase of a tour bus for his business. *Id.* ¶ 290. TSA screeners took Berger's ID and boarding pass and photographed those documents and the $55,000 in cash. *Id.* ¶ 293. The TSA screeners called over two law enforcement officers, who took Berger's carry-on luggage and cash from the TSA screeners and escorted Berger to a small room, where they questioned him about the cash. *Id.* ¶ 299. Berger showed the officers documentation regarding his business, the potential purchase, and his communications with the seller of the tour bus, but the officers seized Berger's cash. *Id.* ¶ 300. Berger was not arrested or charged with any crime. *Id.* ¶ 301. Because he no longer had the cash for purchase of the tour bus, Berger purchased a new ticket to return directly from CLT to his home in San Diego, California. *Id.* ¶ 302.

## B.  DEA Currency Seizures

Each year, DEA conducts tens of thousands of seizures of cash, including at least hundreds of seizures of cash from travelers at U.S. airports. Compl. ¶ 401. DEA has operated an "airport interdiction task force" at one or more U.S. airports since at least 1975. *Id.* ¶ 405. DEA sometimes refers to its airport interdiction activities as "Operation Jetway." *Id.* ¶ 406. Operation Jetway is also the name of DEA's transportation interdiction training course for airports. *Id.* The Operation Jetway interdiction program was established in 1993 with DEA as the lead agency, to provide standardized training and to collect and analyze arrest and seizure data from federal, state, and local drug interdiction units working at airports and other mass transportation facilities. *Id.* ¶ 407. A 2017 report by the DOJ Office of Inspector General ("OIG") reviewed a sample of 100 DEA currency seizures that "appeared to have occurred without a court-issued warrant and without the presence of narcotics" and "found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports." U.S. Dept. of Justice, Office of the Inspector General, *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities*

at iii (Mar. 2017) ("2017 OIG Report"), https://oig.justice.gov/reports/2017/e1702.pdf (last visited Sept. 16, 2020) (cited in Compl. ¶ 410). Of the 85 DEA interdiction seizures reviewed by the OIG at transportation facilities, 46 occurred at airports. 2017 OIG Report at 22. The OIG Report found that "DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on or checked luggage." *Id.* at 23.

## II.     Procedural History

On January 15, 2020, Plaintiffs Brown and Rolin filed the original complaint in this case, naming as Defendants TSA, the TSA Administrator in his official capacity, DEA, the Acting DEA Administrator in his official capacity, the United States, and a DEA agent named "Steve" (Last Name Unknown) in his individual capacity. ECF No. 1.

The First Amended Complaint, which is brought by Rolin, Brown, and new plaintiffs Stacy Jones-Nasr and Matthew Berger, seeks certification of a nationwide class under Rule 23(b)(2), and brings three claims seeking declaratory and injunctive relief on behalf of the putative class. First, Plaintiffs assert a putative Administrative Procedure Act ("APA") claim alleging that TSA took action outside the scope of its statutory authority by adopting a "policy or practice" of "having TSA Screeners seize travelers' cash, carry-on luggage, personal effects, and/or their person, based on the presence of cash on their person or in their carry-on luggage, after the transportation security screening has concluded." Compl. ¶ 475. Second, Plaintiffs bring a claim under the APA and the U.S. Constitution's Fourth Amendment alleging that TSA has a "policy or practice of  seizing travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded, and without reasonable suspicion or probable cause." *Id.* ¶ 492. Third, Plaintiffs bring

a claim under the APA and the Fourth Amendment, alleging that the DEA (1) "follows a policy or practice of conducting suspicionless non-consensual seizures of travelers at U.S. airports based solely on the knowledge or belief that those specific travelers are traveling with a 'large' amount of cash," *id.* ¶ 505, and (2) "follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture based solely on the presence of a large amount of cash," *id.* ¶ 508.

Plaintiffs Brown and Rolin bring an individual claim against the United States, the DEA, and Acting DEA Administrator in his official capacity seeking interest on the $82,373 that was returned to them by the DEA. *Id.* ¶¶ 517-522.

## ARGUMENT

I.     **The Court Should Dismiss Counts I-III for Lack of Subject Matter Jurisdiction and Failure To State a Claim on Which Relief May Be Granted.**

### A.  Plaintiffs Lack Standing To Raise the Claims in Counts I-III.

Plaintiffs lack standing for their claims for declaratory and injunctive relief based on alleged unlawful TSA and DEA "policies" or "practices" because they have not alleged any injury that is fairly traceable to TSA or DEA actions and that is likely to be redressed by the prospective relief they seek. Indeed, even if Plaintiffs had plausibly alleged that such policies or practices exist, and that they were harmed by these purported policies or practices in the past, they have not plausibly alleged that they will again be harmed by such policies or practices in the future.

"[T]he 'judicial power' of the United States" is limited by Article III of the Constitution "to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & States, Inc.*, 454 U.S. 464, 471 (1982); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012). A plaintiff's standing to sue "is an essential and

unchanging part of the case-or-controversy requirement," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), without which the court lacks jurisdiction to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010). The Supreme Court "ha[s] always insisted on strict compliance with this jurisdictional standing requirement." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

To establish Article III standing, a plaintiff must seek relief for an injury that is (1) "concrete, particularized, and actual or imminent"—i.e. an "injury in fact"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesy Int'l*, 568 U.S. 398, 409 (2013) (citation omitted). The alleged injury must be "distinct and palpable," not "abstract or conjectural or hypothetical." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005). Speculative claims of injury will not support Article III standing. *Clapper*, 568 U.S. at 409. As the "party invoking federal jurisdiction," a plaintiff "bears the burden of establishing these elements" of standing. *Defs. of Wildlife*, 504 U.S. at 561.

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp.*, 547 U.S. at 352 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "In order to obtain standing for prospective relief, the plaintiff must 'establish a real and immediate threat that he would again be [the victim of the allegedly unconstitutional practice].'" *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983)). Accordingly, a plaintiff is not entitled to declaratory or injunctive relief merely on the basis that he or she was injured by past unlawful conduct. *See, e.g.*, *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 98 (2013) ("[W]e have never held that a plaintiff has standing to pursue declaratory relief merely on the basis of being 'once bitten.' Quite the opposite." (citing *Lyons*, 461 U.S. at 109)); *Lyons*, 461 U.S. at 105-07 (holding that plaintiff

alleging that he had been injured by illegal police conduct had no standing to seek declaratory or injunctive relief because he had not made a sufficient showing that he was likely to be wronged again in a similar way). This standard is not relaxed in a putative class action. *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) ("In the class action context, [the Article III standing] requirement must be satisfied by at least one named plaintiff.").

"A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a facial challenge to standing, the court "appl[ies] the same standard as on review of a motion to dismiss under Rule 12(b)(6)." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017). Accordingly, the court accepts the well-pleaded factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Id.* "Nevertheless, '[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Plaintiffs fail to establish standing for prospective declaratory and injunctive relief. Plaintiffs' claims against TSA, for example, are based on their allegation that TSA has a policy or practice of "seizing travelers' cash, carry-on luggage, personal effects, and/or persons *after* TSA has determined that no items that pose a threat to transportation security are present and the transportation security screening has concluded." Compl. ¶ 358. The complaint offers allegations regarding encounters between three of the named plaintiffs and TSA screeners, alleges that the TSA screeners' actions constituted seizures, and alleges that the plaintiffs were embarrassed or inconvenienced by the encounters. *See id.* ¶¶ 175, 215-224, 278, 302, 304. However, Plaintiffs identify no future plans—let alone concrete, imminent plans—to travel by air carrying large

amounts of cash, much less plausibly allege that they or their property will be subject to unlawful seizures by TSA screeners in the course of such travel.

Similarly, with respect to DEA, Brown, Rolin, and Jones-Nasr allege that they suffered various harms as a result of the DEA's seizures of their cash, which they allege were pursuant to an unidentified "policy or practice." *See id.* ¶¶ 215-224, 278. In addition, Jones-Nasr alleges that the DEA has not yet returned the cash it seized from her. *See id.* ¶ 278.[2] However, none plausibly alleges that he or she has imminent future plans to transport a "large" amount of cash via a U.S. airport, let alone that the DEA will unlawfully seize such cash. Plaintiff Berger, in turn, does not even plausibly allege that he or his cash was seized by DEA following his alleged encounter at the Charlotte airport. *See id.* ¶¶ 300-305 (alleging that TSA screeners called over "two law enforcement officers" but not identifying either law enforcement officer as being with the DEA).

Instead, Plaintiffs attempt to manufacture standing by alleging that they are being harmed by their own choices to refrain from traveling with "large" amounts of cash, and state in a conclusory manner that these choices are a "result of" TSA and DEA "policies or practices" that they fail to specifically identify. *See id.* ¶¶ 225-232 (alleging that Rolin and Brown are refraining from "flying commercially with 'large' amounts of cash" and not using their "preferred method for transferring cash"); *id.* ¶¶ 278-283 (alleging that Jones-Nasr "no longer travel[s] commercially with 'large' amounts of cash"); *id.* ¶¶ 309-315 (alleging that Berger now "limit[s] the amount of cash he flies commercially with" and "declin[es] to do business" with individuals who would "have to fly commercially with a large amount of cash" because "he does not want [them] to be

---

[2] CAFRA and its implementing regulations set forth specific procedures for individuals to seek return of funds seized for forfeiture, *see, e.g.*, 19 U.S.C. §1602 *et seq.*; 18 U.S.C. § 983; 28 C.F.R. § 9.3, which Rolin and Brown successfully utilized, *see* Compl. ¶ 206.

harmed" by TSA's and DEA's purported "policies or practices"). These allegations are insufficient for Article III standing.

First, Plaintiffs cannot rely on a risk of future enforcement of the purported agency "policies" or "practices" to establish standing. This is because, to establish standing for injunctive relief, a plaintiff must show more than a "possible future injury"; she must show harm that is "certainly impending." *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Neither conjectural future injuries nor alleged fear of such injuries is sufficient. *See Clapper*, 568 U.S. at 409; *Lyons*, 461 U.S. at 107, n.8. Relevant here, "when a plaintiff seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy or practice of a government agency, the plaintiff must demonstrate that [she] is 'realistically threatened by a repetition of [her] experience.'" *Afifi v. Lynch*, 101 F. Supp. 3d 90, 108–09 (D.D.C. 2015) (quoting *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir.1987) (quoting *Lyons*, 461 U.S. at 109)). Not only have the Plaintiffs in this case failed to allege that they have imminent future plans to travel through U.S. airports with "large" amounts of cash, or that TSA or DEA personnel would subject them or their property to an unlawful search or seizure, they also have identified no *agency* policy or practice that would dictate such action. Rather, Plaintiffs allege a handful of incidents involving individual TSA screeners and DEA agents, and speculate that those incidents reflected a vaguely imagined agency "policy or practice." *See infra* Part C (refuting "policy or practice" allegations for purposes of Rule 12(b)(6)).

Second, Plaintiffs cannot manufacture standing by choosing to refrain from particular conduct or make additional expenditures based on speculation that that they or their property might be unlawfully searched or seized in the future—let alone based on speculation that someone else's property might be unlawfully searched or seized in the future. *See, e.g., Clapper*, 568 U.S. at 402

("respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"). Plaintiffs identify no law, regulation, or official agency policy that directs that TSA or DEA to search or seize air travelers or their property based solely on possession of a threshold amount of cash. *See id.* ¶¶ 321-357, 401-436.[3]

Further, Plaintiffs' allegations that they engaged in certain behaviors because they became "aware" of purported TSA and DEA "policies or practices," *see, e.g.*, *id.* ¶¶ 57, 279, suggests only that Plaintiffs' choices have been informed by their speculation about the existence of such "policies or practices." *Cf. Clapper*, 568 U.S. at 411 (holding that respondents lacked standing to challenge purported government surveillance practices where respondents "respondents ha[d] no actual knowledge of the Government's § 1881a targeting practices" and instead merely "speculate[d] and [made] assumptions" about whether their communications would be acquired under that authority). Indeed, though Plaintiffs allege that the purported DEA and TSA "policies or practices" have been in effect from January 15, 2014, to the present, *id.* ¶¶ 96, 109, 393, 457, they also allege that Jones-Nasr "regularly travel[s] to gamble at casinos across the country," *id.* ¶ 233; *see also id.* ¶ 26. Jones-Nasr does not allege that the purported TSA and DEA policies or practices deterred her from traveling with "large" amounts of money or otherwise "hinder[ed] [her] and her husband from pursuing their recreational gambling hobby" prior to May 2020. *See id.* ¶¶ 280-283. Similarly, Berger does not allege that the alleged policies and practices that have purportedly been in effect since January 2014 affected the way he conducted his business at any point before November 3, 2015, *id.* ¶¶ 306-320, instead attributing his current business practices

---

[3] Notably, Plaintiffs' allegations do not even support an inference that, in their individual cases, their property was seized based solely on Plaintiffs' possession of some "threshold amount of cash." *See, e.g.*, Compl. ¶ 192 (officer stating that "your answers don't match"), ¶ 262 (sheriff stating that explanations did not "add up").

to unspecified "knowledge" and "understanding" he gained after the alleged November 3, 2015, incident, *id.* ¶ 309. In sum, Plaintiffs' choices to refrain from or engage in certain conduct, and whatever purported harms they might suffer as a result of those choices, are not fairly traceable to any alleged action by TSA or DEA. *Cf. Clapper*, 568 U.S. at 416 (explaining that a plaintiff cannot establish Article III standing "simply by making an expenditure based on a nonparanoid fear").

Because Plaintiffs have not plausibly alleged that they are "'likely to suffer future injury' from the [Government Defendants'] conduct," and have not alleged any past injuries that would be redressed by the prospective relief they seek, they lack standing to raise their claims in Counts I-III of the Complaint. *McNair*, 672 F.3d at 223 (quoting *Lyons*, 461 U.S. at 105). Accordingly, the Court should dismiss Counts I, II, and III under Rule 12(b)(1).

### B. The Court Lacks Jurisdiction To Review Claims Challenging TSA Policies and Procedures.

To the extent Plaintiffs challenge purported TSA airport security policies or procedures, Counts I and II also must be dismissed for lack of subject matter jurisdiction because jurisdiction over such claims lies exclusively in the Court of Appeals. With certain exceptions not applicable here, under 49 U.S.C. § 46110, a person "disclosing a substantial interest" in a covered order issued by TSA "may apply for review of the order by filing a petition for review" in an appropriate court of appeals, 49 U.S.C. § 46110(a), and that court has exclusive jurisdiction with respect to such review, *id.* § 46110(c).

TSA's security protocols for airport security checkpoints constitute an order under 49 U.S.C. § 46110. *See, e.g., Ruskai v. Pistole*, 775 F.3d 61, 65 (1st Cir. 2014) (agreeing with the parties that "TSA's security protocol[s]" for airport security screening constitute a final order under 49 U.S.C. § 46110). Moreover, the court of appeals has exclusive jurisdiction not only over a claim in which an individual directly challenges an order pursuant to 49 U.S.C. § 46110, but also

over claims that are not framed as attacks on an order but the review of which is "inescapably intertwined" with such an order. *See, e.g.*, *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 270-71 (2d Cir. 1999) (citation and quotation marks omitted) (holding that § 46110 deprived the district court of jurisdiction over *Bivens* claim because the claim was an improper collateral attack on an order falling within the scope of § 46110).

Here, to the extent Plaintiffs challenge an existing TSA policy or procedure regarding airport security, this court lacks jurisdiction over their claims against TSA because any such policy or procedure would constitute an order falling within the scope of 49 U.S.C. § 46110. Further, to the extent Plaintiffs are alleging that TSA follows some unwritten "policy or practice" in conjunction with its airport security protocols, their claim is still subject to the jurisdictional limitation in § 46110 because any such policy or practice would be "inescapably intertwined" with the policies and procedures for airport security screening adopted by the Administrator of TSA. *Merritt*, 187 F.3d at 270-71. Plaintiffs cannot evade the application of § 46110 simply by conjuring unwritten policies or practices that are untethered from TSA's promulgated policies related to airport security protocols.

Accordingly, the Court should dismiss Counts I and II for lack of subject matter jurisdiction.

### C.  Counts I-III Fail To State A Claim on Which Relief May Be Granted.

In the event the Court finds it has jurisdiction over Counts I-III, it should dismiss the claims under Rule 12(b)(6) because Plaintiffs do not challenge any final agency action by TSA or DEA. Nor have Plaintiffs plausibly alleged that either TSA or DEA has taken action that violates the Fourth Amendment, or that TSA has acted in excess of its statutory authority. Plaintiffs therefore have not stated a claim upon which relief may be granted.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It thus must allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678-79. In reviewing a Rule 12(b)(6) motion, the court accepts as true all well-pleaded factual allegations in the complaint, but disregards legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678. As the Supreme Court explained in *Ashcroft v. Iqbal*, while "[t]he plausibility standard is not akin to a 'probability requirement,'" a plaintiff does not survive a Rule 12(b)(6) motion by pleading facts that are "merely consistent" with a defendant's liability. *Id.* Rather, the factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When a plaintiff's claims are based on a contention that the government has adopted a certain policy, a "bare assertion[ ]" that the government has adopted the policy is not enough to satisfy *Iqbal*'s "facial plausibility" standard. *Id.* at 681. Rather, the plaintiff must allege specific facts that demonstrate the adoption of such a policy, as illustrated in *Iqbal* itself. In *Iqbal*, the plaintiffs alleged, among other things, that the defendants had a policy of subjecting detainees to harsh conditions based on race, religion, and national origin. *Id.* at 666. The Supreme Court held that this assertion should be set aside because the plaintiffs did not allege specific facts that would "nudg[e]" the plaintiffs' claim of a discriminatory policy "across the line from conceivable to plausible." *Id.* at 682–83.

Further, Plaintiffs bring Counts I-III under the APA. APA review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. To bring a claim under the APA, the claimant must challenge a

"circumscribed [and] discrete" federal "agency action." *Norton v. S. Utah Wilderness All.*, 542

U.S. 55, 62 (2004); *see also* 5 U.S.C. § 551(12); *id.* § 701(b)(2); *id.* § 702. Review under the APA

is limited to "final" agency actions. 5 U.S.C. § 704. To be "final," an agency action must (1) "mark

the 'consummation' of the agency's decisionmaking process," and (2) "be one by which 'rights or

obligations have been determined,' or from which 'legal consequences will flow,'" *Bennett v.*

*Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). Thus, "generalized complaints about

agency behavior" are not reviewable under the APA. *Cobell v. Kempthorne*, 455 F.3d 301, 307

(D.C. Cir. 2006); *see, e.g.*, *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014)

(rejecting challenge to purported Forest Service "policies" where claim rested on an "amorphous

description of the Forest Service's practices").

### 1. Plaintiffs Have Not Plausibly Alleged an APA Claim for *Ultra Vires* or Unconstitutional Action by TSA.

Neither Count I nor Count II states a plausible claim against TSA.

As an initial matter, Plaintiffs' allegations regarding TSA policies concerning notification

of law enforcement personnel, Compl. ¶¶ 349-357, are immaterial.[4] Plaintiffs notably do *not* claim

that it is unconstitutional or in excess of TSA's statutory authority for TSA screeners to contact

appropriate state or federal law enforcement personnel if the TSA screeners identify items

indicative of criminal activity beyond objects and materials that pose a threat to airport security.

---

[4] In addition, the Office of Inspector General ("OIG") report cited by Plaintiffs in support of their allegations regarding TSA law enforcement notification policies, Compl. ¶ 357, was issued in 2013 and addressed activities that pre-date the relevant time-period for Plaintiffs' claims. Further, contrary to Plaintiffs' characterization, the quoted language from the report does not comment on "cash- or currency-related searches and seizures." *Id.* Rather, it elaborates on an observation that "TSA had not developed performance measures for the SPOT [Screening of Passengers by Observation Techniques] program" begun in 2007. DHS Office of Inspector General, Transportation Security Administration's Screening of Passengers by Observation Techniques (Redacted) at 6 (May 2013), https://www.oig.dhs.gov/sites/default/files/assets/Mgmt/2013/OIG_13-91_May13.pdf (last visited Sept. 18, 2020).

Nor would Plaintiffs have any legal basis to raise such a claim. Indeed, courts have repeatedly rejected such claims in ruling on suppression motions by criminal defendants. *See, e.g.*, *United States v. Hartwell*, 436 F.3d 174, 181 n.13 (3d Cir. 2006) (affirming denial of motion to suppress drugs located during search at airport security checkpoint); *United States v. Aukai*, 497 F.3d 955, 959-61 (9th Cir. 2007) (en banc) (affirming denial of motion to suppress drugs located after law enforcement officer was summoned by a TSA screener).

Rather, Plaintiffs claim that TSA is violating the Fourth Amendment and acting in excess of its statutory authority by following a "policy or practice" of *seizing* travelers' luggage, personal effects, or persons after the airport security screening has concluded, based solely on a traveler's possession of a large amount of cash or currency. *See* Compl. ¶¶ 256-257, 272. As set forth below, Plaintiffs have not plausibly alleged any such policy or practice.

### a. Plaintiffs Have Not Plausibly Alleged *Ultra Vires* Action by TSA.

With respect to Count I, Plaintiffs have failed to state a claim upon which relief may be granted because Plaintiffs have not plausibly alleged that TSA has taken any final agency action that is in excess of its statutory authority.

Under 5 U.S.C. § 706(2)(C), a court may "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority or limitations, or short of statutory right." When plaintiffs bring claims under this provision of the APA, "courts sometimes characterize these statutorily-based assertions as 'ultra vires' claims." *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (citing cases).[5]

---

[5] As explained in *Adamski*, this kind of statutory claim, brought here under APA § 706(2)(C), is distinct from a judicially created, non-statutory *ultra vires* claim. 304 F. Supp. 3d at 236.

Pursuant to its statutory authority, TSA is "responsible for security in all modes of transportation," 49 U.S.C. § 114(d), including the authority to conduct air transportation security screening operations, *id.* § 114(e). TSA also is charged with developing "policies, strategies, and plans for dealing with threats to transportation security." *Id.* § 114(f)(3). "Screening" in the context of TSA's statutory authority with respect to air cargo on passenger aircraft "means a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security." *Id.* § 44901(g)(4). The scope of TSA transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5.

Plaintiffs claim that TSA has acted in excess of its statutory authority because it has a "policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or their person after the transportation screening has concluded." Compl. ¶ 475. In other words, Plaintiffs allege that TSA has acted in excess of its statutory authority by having a policy or practice of conducting screenings that do not address "threats to transportation security." *Id.* This allegation, however, is merely a conclusion—effectively, a recitation of the elements of Plaintiffs' claim. Plaintiffs have not pointed to any policy or directive that exceeds TSA's statutory authority. Indeed, the only purported TSA policies that Plaintiffs do identify—a TSA Operations Directive and a TSA Management Directive—are entirely consistent with that authority. *See* Compl. ¶¶ 340-345; TSA Operations Directive 400-54-6 (Oct. 9, 2009); TSA Management Directive No. 100.4 (Sept. 1, 2009). As Plaintiffs acknowledge, "[n]either TSA Operations Directive 400-54-6 . . . nor TSA Management Directive No. 100.4 . . . purports to expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds—i.e., administrative screenings limited to threats to transportation security." Compl. ¶ 345. Moreover, although Plaintiffs allege in a conclusory

manner that "TSA Screeners frequently detain travelers or their luggage while waiting for law enforcement to arrive," they acknowledge that TSA screeners are "not instructed or authorized" to engage in such conduct under TSA's "written policy." Compl. ¶ 356.

Plaintiffs offer, at best, an "amorphous description" of the practices of agency personnel, *Bark*, 37 F. Supp. 3d at 50–51, rather than plausibly alleging any final, discrete action by the agency itself, as required for a cause of action under the APA. *See* 5 U.S.C. § 704; *Norton*, 542 U.S. at 62. Thus, the allegations regarding Plaintiffs' individual experiences do not suffice to state an "ultra vires" claim under the APA, even if those allegations could be deemed to plausibly allege that TSA screeners exceeded the scope of their transportation screening authority in particular instances. Nor do the allegations regarding other travelers' experiences, *see* Compl. ¶¶ 371-385, which merely describe purported actions by individual TSA screeners in particular cases, suffice to allege that the agency itself has adopted some "policy or practice." *See, e.g.*, *Lillemoe v. U.S. Dep't of Agric.*, No. 15-cv-2047, 2020 WL 1984256, at *7 n.4 (D.D.C. Apr. 27, 2020) (rejecting plaintiffs' attempt to challenge a "*de facto* policy" of discrimination under the APA in the absence of "written rules, orders or even guidance documents" supporting the existence of such a policy); *Competitive Enter. Inst. v. EPA*, 67 F. Supp. 3d 23, 32 (D.D.C. 2014) (dismissing claim that EPA was violating the Federal Records Act ("FRA") by failing to preserve text messages based on a "concealed" record-keeping policy that conflicted with the EPA's FRA-compliant written policy).

Accordingly, Plaintiffs have not plausibly alleged that TSA has adopted any policy or practice that exceeds its statutory authority. *See, e.g.*, *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) ("To satisfy the pleading standard, McTernan must identify a custom or policy, and specify what exactly that custom or policy was."); *Timoney v. Loughery*, 670 F. App'x 47, 49 (3d Cir. 2016) (unpublished) (allegation that "Defendants had a policy to enforce unlawful evictions

without notice under color of State law" was merely a recitation of the elements of a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and thus insufficient to survive a motion to dismiss). Because Plaintiffs have not plausibly alleged that TSA has taken any *ultra vires* agency action, they have not stated a claim upon which relief may be granted in Count I.

### b. Plaintiffs Have Not Plausibly Alleged a Fourth Amendment Violation by TSA.

Plaintiffs likewise have failed to plausibly allege a Fourth Amendment violation by TSA. The Fourth Amendment assures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV, cl. 1. In support of their Fourth Amendment claim, Plaintiffs rely on the same conclusory allegation that forms the basis for their *ultra vires* claim—that TSA has a "policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons based on the presence of cash on their person or in their carry-on luggage after the transportation screening has concluded," appending the additional conclusion "without reasonable suspicion or probable cause." Compl. ¶ 492. This allegation, again, is no more than a recitation of the elements of Plaintiffs' cause of action. Further, the only purported TSA policies actually identified in the Complaint, *see id.* ¶¶ 330-345, in no way conflict with the Fourth Amendment's prohibition on unreasonable searches and seizures. As with their putative *ultra vires* claim, Plaintiffs fail to allege any specific, unlawful agency action by TSA. *See supra* Part C.1.a. Accordingly, Plaintiffs have failed to state a Fourth Amendment claim as to TSA. *See, e.g.*, *McTernan*, 564 F.3d at 658 (holding that an allegation that plaintiff's rights "were violated 'due to the City's policy of ignoring First Amendment rights" was not sufficient to allege a constitutional violation).

**2.   Plaintiffs Have Not Plausibly Alleged a Fourth Amendment Violation by DEA.**

Like Plaintiffs' claims against TSA, Plaintiffs' putative Fourth Amendment claim for declaratory and injunctive relief against DEA relies on conclusory allegations that the agency is pursuing an unconstitutional "policy or practice," and thus fails to state a claim upon which relief may be granted.

As an initial matter, Plaintiffs do not plausibly allege that DEA has violated the Fourth Amendment by following a "policy or practice" of "conducting suspicionless non-consensual seizures of air travelers based solely on DEA interdiction agents' knowledge or belief that those specific travelers are traveling with a 'large' amount of cash." Compl. ¶ 430. In this regard, Plaintiffs' claim rests on Plaintiffs' characterizations of a handful of individual travelers' encounters with DEA agents. *See id.* ¶¶ 441-451. Even if Plaintiffs had plausibly alleged that some individuals were unlawfully seized by DEA agents,[6] the complaint includes no allegations that would support a reasonable inference that DEA has adopted a policy directing or authorizing DEA agents to detain airport travelers based solely on their traveling with "large" amounts of cash.

To the extent Plaintiffs contend that DEA agents seize travelers at a U.S. airport merely by approaching the traveler and asking questions, Plaintiffs' contention is without legal basis. This contention appears to rest on Plaintiffs' theory that the "high-security environment of an airport" transforms any approach or questioning by a law enforcement officer into a seizure. Compl. ¶¶ 424, 425; *see generally id.* ¶¶ 416-428. However, the Supreme Court has clearly held that a law enforcement officer's mere initiation of contact with a person does not implicate the Fourth

_____

[6] The bases for Plaintiffs' allegations regarding the experiences of other travelers are often not clear. For example, some of the new paragraphs in the amended complaint merely incorporate allegations included in complaints filed by plaintiffs in other cases. *See, e.g.*, Compl. ¶¶ 450-451. For the reasons explained above, these allegations in any case do not support a reasonable inference that that the DEA itself has adopted a "policy or practice" that violates the Fourth Amendment.

Amendment's prohibition on unreasonable searches and seizures. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (noting that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, . . . ask to examine the individual's identification, . . . and request consent to search his or her luggage, . . . as long as the police do not convey a message that compliance with their requests is required" (internal citations omitted)); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (explaining that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"). These holdings carve out no exception for airports.

Nor do the DOJ OIG reports cited by Plaintiffs confer plausibility on their allegation that DEA has a "policy or practice" of having DEA agents seize travelers at U.S. airports based solely on their possession of a threshold amount of cash or currency. *See* Compl. ¶¶ 452-453. The 2015 OIG report cited by Plaintiffs, which addressed "Cold Consent Encounters at Mass Transportation Facilities," did not find that any DEA policy or other agency action violated the Fourth Amendment's prohibition on unreasonable seizures. *See generally* DOJ Office of Inspector General, Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities (Jan. 2015), https://www.oversight.gov/sites/default/files/oig-reports/e153.pdf (last visited Sept. 16, 2020). Rather, in the passages quoted by Plaintiffs, the OIG found merely that members of individual DEA Task Force Groups ("TFGs") engaged with airport travelers during cold consent encounters in ways that could be misleading. *Id.* at iv, 32. The cited portion of the 2017 OIG Report, in turn, alludes to an audit of DEA's Confidential Source Program, which included individuals "who work for airlines, airports, or bus or rail companies" and "airport

security screeners." 2017 OIG Report at 23. The language quoted by Plaintiffs merely notes the audit's findings that "some of these confidential sources are engaged in long-term and lucrative relationships with the DEA" and that "this could have implications relating to compliance with the Fourth Amendment's protections against unreasonable searches and seizures." *Id.* Neither of the cited reports found or suggested that DEA has a policy or practice of having DEA agents seize airport travelers based solely on their possession of a threshold amount of cash or currency.

Further, to the extent Plaintiffs contend that the Fourth Amendment prohibits DEA agents from temporarily detaining airport travelers or their property without probable cause, *see* Compl. ¶¶ 508-512, their contention is also without legal basis. As Plaintiffs elsewhere appear to acknowledge, *see, e.g.*, *id.* ¶¶ 504-507, some Fourth Amendment seizures "may nonetheless be justified even though there is no showing of 'probable cause' if 'there is articulable suspicion that a person has committed or is about to commit a crime.'" *Florida v. Rodriguez*, 469 U.S. 1, 5 (1984) (citations omitted).  For example, "a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968)." *Rodriguez*, 469 U.S. at 5. The Supreme Court has extended this reasoning to temporary detentions of personal effects in the possession of airport travelers as well, allowing a brief detention of luggage based on reasonable suspicion, pending further investigation establishing probable cause. *See United States v. Place*, 462 U.S. 696, 706 (1983).

Plaintiffs likewise fail to plausibly allege that DEA has violated the Fourth Amendment through a "policy or practice" of seizing cash for forfeiture.  Plaintiffs' well-pleaded allegations regarding a purported DEA policy regarding seizure of cash from travelers at U.S. airports amount to the following: DEA conducts hundreds or thousands of seizures of cash from travelers at U.S.

airports each year, Compl. ¶ 401, and DEA operates an airport interdiction program at many U.S. airports, *id.* ¶¶ 405-409.

In support of this claim, Plaintiffs also incorporate by reference the 2017 OIG Report noted above, which reviewed 100 DEA currency seizures that "appeared to have occurred without a court-issued warrant and without the presence of narcotics." 2017 OIG Report at iii. That report found, *inter alia*, that 85 of these 100 seizures occurred at transportation facilities, and that DEA could verify that "only 29 of the 85 interdiction seizures had (1) advanced or been related to ongoing investigations, (2) resulted in the initiation of new investigations, (3) led to arrests, or (4) led to prosecutions." *Id.* Plaintiffs also note the report's findings that of the 85 seizures that occurred at transportation facilities, 46 occurred at airports. Compl. ¶ 411 (quoting 2017 OIG Report at 22). The report noted that the reviewed sample "showed that DEA agents and task force officers reported establishing reasonable suspicion to initiate questioning of an individual suspected of illegal cash couriering based on factors consistent with those described in the DEA's Interdiction Manual," including, but not limited to, "traveling to or from a known source city for drug trafficking, purchasing a ticket within 24 hours of travel, purchasing a ticket for a long flight with an immediate return, purchasing a one-way ticket, and traveling without checked luggage." 2017 OIG Report at 22-23.

The OIG's "evaluation of seizure narratives and . . . discussions with DEA agents and task force officers indicate[d] that they often learn about a traveler's ticket purchase method and travel itinerary from confidential sources who work for airlines, airports, or bus or rail companies." *Id.* at 23. As Plaintiffs note, Compl. ¶ 452, the OIG Report states that "DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on

26

or checked baggage." 2017 OIG Report at 23. However, these observations merely describe aspects of some encounters leading to DEA currency seizures; they do not indicate the existence of some DEA currency seizure policy, let alone that DEA has adopted a policy of seizing cash from airport travelers if a "threshold amount of cash" is present. Compl. ¶ 432. Nor does the report conclude that the DEA has adopted any policy or practice that violates the Fourth Amendment. To the contrary, the OIG simply concluded that Department of Justice managers failed to use aggregate data to determine whether seizures benefit criminal investigations or the extent to which seizures may pose potential risks to civil liberties. 2017 OIG Report at ii, 38.

While Plaintiffs allege that, in January 2016, two DEA agents at a particular airport testified that their understanding was that $5,000 was a threshold amount subject to seizure, Compl. ¶ 438, Plaintiffs acknowledge that the policy the agents appeared to be referring to merely instructed that, for forfeiture of cash, generally, "the 'minimum amount must be at least $5,000.'" *Id.* ¶ 439 (quoting DOJ Asset Forfeiture Policy Manual (2019) Ch. 1, § D.1, https://www.justice.gov/criminal-afmls/file/839521/download). In other words, the policy at issue simply provided guidance regarding a threshold amount below which seizure of cash for forfeiture would *not* be appropriate, absent a compelling law enforcement interest.

Plaintiffs identify no agency action or decision authorizing or directing DEA agents to seize cash from travelers at U.S. airports based on a "threshold amount of cash" and "regardless of whether there is probable cause." Compl. ¶ 509. Indeed, Plaintiffs do not even identify the "threshold amount of cash" that DEA has purportedly set as the trigger for airport seizures— underlining Plaintiffs' inability to plausibly allege the existence of any such agency "policy or practice." *See, e.g.*, *id.* ¶ 433 (alleging that $5,000 is a "typical" amount, but also that "the specific threshold amount deemed presumptively subject to seizure may vary by DEA interdiction agent

and may be as low as $1,000 or as high as $10,000"). Instead, as in their claims against TSA, Plaintiffs attempt to conjure an agency policy from the alleged experiences of a handful of individual travelers. *See id.* ¶¶ 437-451.

Accordingly, Plaintiffs have failed to state a Fourth Amendment claim against the DEA. *See, e.g.*, *Iqbal*, 556 U.S. at 682-83 (holding that bare assertions that government officials had "adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin" were insufficient to state a claim); *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 72-73 (3d Cir. 2011) (explaining that, under *Iqbal*, "a complaint pleading facts that are merely consistent with liability is insufficient").

## II.     The Court Should Dismiss Count IV for Lack of Subject Matter Jurisdiction.

The Court lacks subject matter jurisdiction over Rolin's and Brown's fourth claim, which seeks interest on $82,373 that the DEA returned to Rolin and Brown, Compl. ¶¶ 517-522, because Congress has not waived the government's sovereign immunity with respect to such a claim.

"[F]ederal courts do not have jurisdiction over suits against the United States unless Congress, via a statute, expressly and unequivocally waives the United States' immunity to suit." *United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000). "Furthermore, the Supreme Court's 'no-interest rule' dictates that, '[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.'" *United States v. Craig*, 694 F.3d 509, 512 (3d Cir. 2012), *as modified* (Oct. 5, 2012) (quoting *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986), *superseded on other grounds by* Civil Rights Act of 1991, Pub. L. No. 102–166, § 114, 105 Stat. 1079).

Plaintiffs bring their claim for interest under Rule 41(g) of the Federal Rules of Criminal Procedure and 28 U.S.C. § 1331. However, in neither of these provisions has Congress consented

to the award of interest sought. *See* Fed. R. Crim. P. 41(g) (providing that a person "aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return" in the district where the property was seized); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *Craig*, 694 F.3d at 512 (holding that Rule 41(g) does not waive the federal government's sovereign immunity with respect to a claim for interest on seized funds).

Accordingly, Count IV should be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the claims against the Government Defendants pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: September 18, 2020                Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

SCOTT W. BRADY
United States Attorney

BRIGHAM J. BOWEN
Assistant Director

/s/ Elizabeth Tulis
ELIZABETH TULIS
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-9237
Fax: (202) 616-8470
E-mail: elizabeth.tulis@usdoj.gov

*Attorneys for the Government Defendants*