IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| REBECCA BROWN and AUGUST TERRENCE ROLIN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TRANSPORTATION SECURITY ADMINISTRATION, et al., <br><br> Defendants. | Civil Action No. 2:20-cv-64-MJH-LPL <br><br> **STEVEN W. DAWKIN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS** |

**STEVEN W. DAWKIN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS**

Plaintiffs' opposition to Task Force Officer (TFO) Steven W. Dawkin's Motion to Dismiss, at core, rests on the proposition that an international airport is a setting identical to one's home living room. It is not. Nor is it credible to claim (as Plaintiffs suggest) that this litigation is divorced from either civil asset forfeiture or the alleged nationwide policies or practices they contend TFO Dawkin acted under, and which they ask this Court to enjoin. To stretch to reach these notions – all of which are straightforwardly inaccurate – Plaintiffs ignore, if not re-write, their own pleadings. They also rely on inapt caselaw. And they disregard the body of settled precedent from the Supreme Court and Third Circuit, demonstrating that multiple "special factors" counsel against extending a <u>Bivens</u> remedy to the new context at bar and, in any event, TFO Dawkin is entitled to qualified immunity. Plaintiffs offer no argument of substance to change that. For these reasons, and those discussed in the opening brief, this Court should dismiss Count V of the Amended Complaint with prejudice.

1

**DISCUSSION**

**I. Plaintiffs Ask This Court to Extend <u>Bivens</u> to a New Context Where Special Factors Counsel Hesitation.**
  **A. Plaintiffs' Putative <u>Bivens</u> Claim Arises in a New Context.**

Plaintiffs seek to avoid the basic conclusion that their purported claims against TFO Dawkin present a new <u>Bivens</u> context, ECF No. 48, Motion to Dismiss ("MTD"), at 8-9, by attempting to frame their claims as "commonplace," or "garden-variety," and thus no different from <u>Bivens</u> itself. ECF No. 53, Plaintiffs' Opposition ("Opp."), at 1, 9-13. That position is untenable, both as a matter of precedent and common sense.

Beginning with the former, Plaintiffs' argument "rests on a basic misunderstanding of what" the Supreme Court's "cases mean by a new context." <u>Hernández v. Mesa</u>, 140 S. Ct. 735, 743 (2020). The relevant test is "easily satisfied," and a case presents a "new context" with just a "modest extension" or even "small" differences from <u>Bivens</u> (or <u>Davis</u> and <u>Carlson</u>). <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1864-65 (2017). So it is not enough to say, as Plaintiffs try, that this case is no different from <u>Bivens</u> because they both allege "(suspicionless) seizure[s] by a low-level drug-law enforcement officer." Opp. at 1. Neither the Supreme Court nor the Third Circuit frames the inquiry at such a high level of generality. <u>See</u> MTD at 7-8.[1] In fact, the Supreme Court rejected that approach. <u>See, e.g.</u>, <u>id.</u> n.5 (citing <u>Hernández</u>, 140 S. Ct. at 743 (case can present "new context" even if alleging Fourth Amendment violation by line-level agent)).[2]

---

[1] Plaintiffs rely on dictum from <u>Abbasi</u>, in which the Court noted (after finding the case presented a new context) its decision was "not intended to cast doubt on the continued force … of <u>Bivens</u> in the search-and-seizure context in which it arose," 137 S. Ct. at 1856 (cited in Opp. at 10). But Plaintiffs omit the Court's statement which followed, that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in" <u>Bivens</u> itself "might have been different" if the case "were decided today." <u>Id.</u>

[2] The Supreme Court has never (contrary to Plaintiffs' suggestion, <u>see</u> Opp. at 11) held that any and all search-seizure allegations against line-level officers are actionable under <u>Bivens</u>,

Plaintiffs' superficial comparison also omits important, albeit obvious, differences between their allegations and those in Bivens. The latter case involved a warrantless arrest and excessive force inside the plaintiff's home.[3] One's home, however, holds a special place in the constitutional hierarchy that itself distinguishes context. See MTD at 8 (citing Payton v. New York, 445 U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quotation omitted)); see also Kentucky v. King, 563 U.S. 452, 474 (2011) ("In no quarter does the Fourth Amendment apply with greater force than in our homes, our most private space which, for centuries, has been regarded as entitled to special protection." (Ginsburg, J., dissenting) (internal quotations and citations omitted)).

In stark contrast, Plaintiffs seek to hold TFO Dawkin liable for seizing $82,373 cash, which the DEA subsequently pursued civil forfeiture of, and a related alleged "seizure" of Ms. Brown's person at an international airport. Unlike Bivens, there are no allegations of excessive force, handcuffing, or an actual arrest. (Not to mention one's home and the public departure gate of an international airport are appreciably different settings.)[4] Nor was there a post-deprivation process in place (like the Civil Asset Forfeiture Reform Act ("CAFRA")) for Webster Bivens to rely on, as Plaintiffs did here. See ECF No. 43, First Amended Complaint ("FAC"), at ¶¶ 200-206. Such distinctions plainly satisfy the "modest" bar required. Abbasi, 137 S. Ct. at 1864.

---

no matter the context. And the pre-Abbasi cases Plaintiffs cite for that proposition, id. at 11 n.5, did not engage in any new context or special factors analysis.

[3] Perhaps to avoid the additional distinction that this case involves a cash seizure, Plaintiffs mistakenly characterize Bivens as a case about "seizures of person and property," Opp. at 9, when, in fact, there were no allegations of any property seizures whatsoever in that case.

[4] The special solicitude for the home, noted above, cannot reasonably be analogized to the airport setting at bar, where "reasonable privacy expectations are of significantly lesser magnitude[.]" Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (quotation omitted).

**B. Multiple Special Factors Counsel Hesitation in this New Context.**
    **1. Alternative Processes (Including Those Supplied by Congress) Are Available.**

    **a.** Wisely, Plaintiffs do not dispute that CAFRA is a comprehensive statutory scheme. Nor do (or can) they dispute that "the availability of an alternative remedial structure may, on its own, prevent courts from expanding Bivens." Mack v. Yost, 968 F.3d 311, 320 (3d Cir. 2020); see also MTD at 10. Instead, Plaintiffs argue CAFRA "has no bearing" on their claims because, the argument goes, the comprehensive statute says nothing of alleged "constitutional violations that precede any actions the government or individuals can take as part of the forfeiture process." Opp. at 2; 13-15. This argument misses the point on many levels.

    For one, the distinction Plaintiffs attempt to draw between "seizures" of person and property, on the one hand, and the "forfeiture process," on the other, is without a difference. Every civil forfeiture proceeding is preceded, in one way or another, by an officer's seizure of the subject property. And where (as here) property is in the immediate possession of an alleged owner, a forfeiture proceeding is not just preceded by an asset seizure, but by an encounter subject to an allegation of unlawful seizure of the person, too. Plaintiffs would have the Court ignore these obvious connections.

    Plaintiffs would also seem to ask the Court to disregard their own pleadings. There, Plaintiffs allege (1) Ms. Brown and Mr. Rolin "received CAFRA notices from DEA for the seized $82,373[,]" FAC at ¶ 200; (2) they "timely filed CAFRA claims with the DEA" upon receipt of the notices, id. at ¶ 201; and (3) as a result of filing those claims, the DEA returned the cash, id. at ¶ 206. Plaintiffs cannot now change these allegations, just as they cannot seriously dispute the processes to which they availed themselves were specifically provided for by Congress through CAFRA. See, e.g., MTD at 10 (citing 18 U.S.C. § 983(a)(3)).

Still, Plaintiffs seek to divorce their putative claims from CAFRA by arguing the statute does not provide redress for constitutional violations per se. Opp. at 14. That, however, is not and has never been the standard for whether a statutory scheme is sufficiently comprehensive to preclude a Bivens remedy. Schweiker v. Chilicky, 487 U.S. 412, 427-28 (1988); see also id. at 425 (noting the complete "absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages."). At bottom, Ms. Brown and Mr. Rolin may well be dissatisfied with the adequacy of the remedy they received under CAFRA. That, though, is irrelevant to this Court's inquiry, too. See MTD at 10 n.7 (collecting cases from Supreme Court and Third Circuit holding an alternative process need not leave a plaintiff with compensatory damages or any remedy whatsoever).

What does matter is that, through CAFRA, Congress designed a range of options for individuals, like Plaintiffs and others similarly situated, claiming they or their assets were wrongfully seized preceding forfeiture to seek redress. See MTD at 14 (CAFRA aimed to give asset owners "innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures." (quoting H.R. Rep. No. 106-192, at 11 (1999)). The absence of a specific damages remedy against an individual officer for alleged unlawful seizures pre-forfeiture is (according to a wealth of Supreme Court authority) not a reason for this Court to create one. To the contrary, it is a reason to defer to Congress. See Schweiker, 487 U.S. at 424-25 (deferring to Congress when, in elaborate scheme, it "ha[d] not failed to provide meaningful safeguards or remedies" notwithstanding absence of individual damages claim); accord Shreiber v. Mastrogiovanni, 214 F.3d 148, 153 (3d Cir. 2000). CAFRA, in sum, supplies a sound reason to conclude Congress "might" hesitate before providing a non-statutory remedy against the seizing officer. Abbasi, 137 S. Ct. at 1858.

**b.** Plaintiffs also dismiss the "other alternative forms of judicial relief," id. at 1863, available to them, MTD at 12-13, suggesting that such remedies are "random" or "irrelevant." Opp. at 16-17. On its face, that is a tenuous position to take considering Plaintiffs continue to pursue at least two such alternative forms of relief (a Rule 41(g) claim and three claims under the APA) in this very case. See MTD at 12 (citing FAC at ¶¶ 465-522).

As to Rule 41(g), in particular, Plaintiffs say the remedy is inapposite because it "simply seeks to avoid an erroneous forfeiture." Opp. at 16. Yet the text of that Rule says nothing of "forfeiture." It does, however, allow a person "aggrieved by an unlawful search and seizure of property" to move for the property to be returned. Fed. R. Crim. P. 41(g); cf. Serrano v. Customs & Border Patrol, No. 18-50977, 2020 WL 5539130, at *7 (5th Cir. Sept. 16, 2020) (recognizing in context of due process challenge that Rule 41(g) provides "avenue to challenge [a property] seizure before a neutral decision maker and is an action frequently taken to force the government agency to act expeditiously." (internal quotation and citation omitted)). So while Rule 41(g) does not directly address the alleged "seizure" of Ms. Brown's person (which, as discussed below, is meritless) it certainly applies to the overarching context here, including any incidental restriction on Ms. Brown's person. And Plaintiffs offer no reason whatsoever to reject its viability as an alternative to their proposed Bivens claim as to the alleged seizure of cash.

Plaintiffs also leave much to be desired in attempting to distinguish the holdings from the three courts of appeal that have found availability of review under the APA enough to foreclose a putative Bivens claim. See MTD at 12-13 (cataloging decisions from the Ninth, Eighth, and Eleventh Circuits). Plaintiffs, to be sure, do argue that the possibility for injunctive relief under the APA "cannot make them whole." Opp. at 17. Yet "wholeness" has never been the measure by which courts evaluate alternative processes. See, e.g., Mack, 968 F.3d at 320 ("The Supreme

Court has emphasized that the alternative remedy need not provide an individual with <u>complete</u> relief in order to foreclose a damages remedy under <u>Bivens</u>." (citing <u>Schweiker</u>, 487 U.S. at 424-25)). What is more, the possibility of equitable relief is an alternative process "of central importance" to the special factors inquiry. <u>Abbasi</u>, 137 S. Ct. at 1862. Plaintiffs do not even attempt to reconcile this precedent. Much the same is true for their response to the other alternatives through the FTCA and state law, which likewise does not attempt to grapple with applicable precedent. <u>Compare</u> MTD at 13, <u>with</u> Opp. at 17.

### 2. Plaintiffs' Proposed <u>Bivens</u> Claim, If Recognized, Would Encroach Upon The Coordinate Branches of Government, Raising Separation-of-Powers Concerns.

Plaintiffs also duck any substantive rebuttal to the host of separation-of-powers concerns their putative <u>Bivens</u> claims implicate, <u>see</u> MTD at 13-15 (discussing congressional activity in the field); 16-17 (addressing national security interests in play), no matter that the Supreme Court deems such considerations "central to the [special-factors] analysis." <u>Abbasi</u>, 137 S. Ct. at 1857. Regarding Congress' activity in the area of civil asset forfeiture and related remedies (through CAFRA and the FTCA), MTD at 13-15, Plaintiffs resort once again to the erroneous premise that their claims do not "arise under CAFRA proceedings," Opp. at 18 (whatever that may mean).[5] Repeating a bad argument, however, does not make it so.

Plaintiffs' attempt to dismiss the national security interests in play in the context of drug interdiction efforts at international airports (as expressed by members of both Congress and the Executive Branch), MTD at 16-17, as a "smokescreen," Opp. at 18, is similarly unavailing.

---

[5] The term "CAFRA proceeding" appears nowhere in the text of the statute or any regulation. Maybe Plaintiffs mean "forfeiture proceeding," which is what the government initiated against the cash when it sent Ms. Brown and Mr. Rolin notices pursuant to CAFRA. <u>See</u> MTD at 4 (administrative forfeiture process begins when agency sends notice, citing 18 U.S.C. § 983(a)(1)(A)(i); 28 C.F.R. §§ 8.8, 8.9(b)); <u>see also</u> FAC ¶ 200. In any event, whatever label Plaintiffs choose to ascribe, CAFRA is squarely implicated in this litigation.

Indeed, one need not look any further than Plaintiffs' pleadings to refute the argument, as they themselves allege the context in which the encounter between Ms. Brown and TFO Dawkin arose is a "high-security setting." See FAC at ¶ 180 (TFO "Dawkin approached Rebecca [Brown] in the high-security setting of an airport"); accord id.. at ¶¶ 416-17, 424-25, 428-29. The body of Supreme Court and Third Circuit precedent addressing how and why matters of national security (including airports) constitute a special factor counseling hesitation, see MTD at 13-17, remains good law to which Plaintiffs, in the end, offer no meaningful counter.

### 3. Other Special Factors Counsel Hesitation.

Plaintiffs also fail to rebut the additional special factors, like the policy-driven nature of this lawsuit and forward-looking concerns regarding costs attendant to individual officers and the government, that counsel against extending Bivens. Compare MTD at 17-19, with Opp. at 19-20. As to the policy-focused nature of this litigation, Plaintiffs' own pleadings make plain that they are suing TFO Dawkin for acting "in accordance [with]" alleged DEA policies or practices "that Plaintiffs seek to declare unlawful and enjoin in this lawsuit." FAC at ¶ 115; see also id. at ¶¶ 115, 184, 413, 427, 429, 430, 431-36 (alleging TFO Dawkin was not a "rogue or poorly trained" officer but acted in accordance with purported policy or practice). Nothing Plaintiffs argue in a brief can alter that. Cf. Tun-Cos v. Perrotte, 922 F.3d 514, 527-28 (4th Cir. 2019) (citing United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984) (a party "cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories")). And the Supreme Court has been clear: Bivens is the wrong tool to remedy alleged policy-based conduct, see MTD at 17-18 and cases cited therein, regardless of whether the defendant is claimed to have been the purported architect

of the policy or, as pleaded here, is "a particular Executive Officer [acting] in a discrete instance." Id. at 18 (quoting Abbasi, 137 S. Ct. at 1860)).

Lastly, as to the practical concerns TFO Dawkin identified, MTD at 18-19, Plaintiffs miscast those as problems of workability, Opp. at 19, something TFO Dawkin never argued. The real issue, to which Plaintiffs offer no meaningful response, is that expanding Bivens to the class of cases like those here (or allowing for alleged seizures of this nature to be remedied through judicially implied damages actions against individual officers) could, as explained, threaten substantial "projected costs and consequences" to the government itself and individual officers. See MTD at 19 (quoting Abbasi, 137 S. Ct. at 1858).

## II. Plaintiffs Cannot Overcome TFO Dawkin's Entitlement to Qualified Immunity.
### A. The Claim that TFO Dawkin "Seized" Ms. Brown's Person is Meritless.

TFO Dawkin did not "seize" Ms. Brown when he approached her at the Pittsburgh International Airport with another officer, identified himself as law enforcement, escorted her to a less crowded part of the public gate, and asked her about the cash. See MTD at 20-22 and cases cited therein. And Plaintiffs offer no basis to distinguish these allegations from settled precedent in the Third Circuit and the "Supreme Court [that] has repeatedly rejected the notion that a seizure occurs when an officer approaches a citizen to ask questions or make requests." James v. City of Wilkes-Barre, 700 F.3d 675, 681 (3d Cir. 2012) (collecting cases). Instead, they haphazardly misread a few scant cases.

One such example is Plaintiffs' reference to United States v. Thame, 846 F.2d 200 (3d Cir. 1988). Opp. at 3, 21, 22. As Plaintiffs would have it, in Thame, "the Third Circuit explained that 'the most important factor' in determining whether a person is seized is whether she 'knew that the agents had positively identified her as a suspect[,]'" Id. at 21 (quoting Thame,

846 F.2d at 203, but omitting internal quotations and citations) (Plaintiffs' emphasis)).[6] Yet the Third Circuit said no such thing. The passage Plaintiffs quote from actually comes from the Third Circuit's summary of the rationale of a <u>different</u> court – the Seventh Circuit – in a <u>separate</u> decision – <u>United States v. Borys</u>, 766 F.2d 304, 311 (7th Cir. 1985). The Third Circuit never adopted any rule from the Seventh Circuit's <u>Borys</u> decision as its own, let alone clarified what constitutes "<u>the</u> most important factor" in determining whether a show of authority seizure arises, as Plaintiffs suggest.[7] The other Third Circuit case Plaintiffs cite to, <u>United States v. Brown</u>, 448 F.3d 239 (3d Cir. 2006), is likewise inapposite to the allegations at bar.[8]

Plaintiffs also mischaracterize the cases TFO Dawkin relies on, dismissing them without analysis as inapplicable because (according to Plaintiffs) they dealt with "general interdiction sweeps or otherwise did not" involve facts where an officer "indicate[s] to an individual person that she was being singled out and targeted based on some particular conduct." Opp. at 21. None of this is accurate. The decisions TFO Dawkin cited with respect to "show of authority" seizures

---

[6] Never mind that the relevant inquiry for a "show of authority" seizure is an objective one, <u>see</u> MTD at 20 (citing <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)), with no regard to whatever a suspect (or officer) subjectively "knew" or thought at the time.

[7] Tellingly, Plaintiffs omit any mention of the facts in <u>Thame</u>, wherein officers (like TFO Dawkin here) approached a suspect in the lobby of a train station, asked for his ticket and identification, but "did not restrain him, block his path, or otherwise control his movement by retaining his papers." 846 F.2d at 203. Likewise unmentioned, though significant, is the Third Circuit's holding: that such conduct did not amount to any seizure of the suspect's person. <u>Id.</u>

[8] In <u>Brown</u>, the Third Circuit found an officer had engaged in a "clear show of authority" seizure when he "told" two suspects "that a robbery victim was being brought over to identify them as possible suspects and, if they were not identified, they would be free to go–necessarily implying that they were not free to leave" at the moment. 448 F.3d at 245. More still, the officer "demanded" the suspects submit to a pat-down search. <u>Id.</u> These words and actions, the Third Circuit found, would objectively convey to a reasonable person that he or she was being ordered to restrict his or her movement. <u>Id.</u> No comparable allegations exist here.

10

did not depend on an officer "singling out" or "targeting" a suspect based on "particular conduct," as Plaintiffs suggest; nor did they involve "general interdiction sweeps," either.[9] Such manufactured distinctions distract from the straightforward conclusion that Plaintiffs do not, and cannot, evade. That is, they have not set forth well-pleaded allegations that give rise to a "show of authority" seizure of Ms. Brown under any Supreme Court and Third Circuit precedent, and certainly not a clearly established one. See MTD at 20-22 and cases cited therein.

**B. In Any Event, TFO Dawkin Had Reasonable Suspicion to Conduct a Terry Stop.**

Plaintiffs are also mistaken to claim TFO Dawkin "seized" Ms. Brown "solely" because he knew she was travelling with a large amount of cash. Opp. at 22-23. For one, they cannot plausibly claim to divine TFO Dawkin's subjective basis for approaching Ms. Brown, nor is that even relevant. See, e.g., United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006) ("emphasiz[ing] that the 'reasonable suspicion' analysis is objective").

In any event, as is evident from the pleadings, TFO Dawkin relied on more than just the presence of cash before he spoke to Ms. Brown. As Plaintiffs' own allegations indicate, not only was he aware of the substantial amount of money she was transporting through the airport, but of the various forms of explanation for why she had over $82,000 with her, which were provided to

---

[9] In James v. City of Wilkes-Barre, 700 F.3d 675 (3d Cir. 2012), for example, officers were responding to a 911 call at the home, not conducting a sweep of any kind. Id. at 678. And in United States v. Mendenhall, 446 U.S. 544 (1980), two DEA agents had been watching a particular traveler from the moment she disembarked a plane, before approaching her in a public concourse, identifying themselves as federal agents, and asking for her identification and ticket. Id. at 547-48. Likewise, in United States v. Lockett, 406 F.3d 207 (3d Cir. 2005), officers were eying a suspect for 15 minutes at an Amtrak station before approaching him, showing their badges, and asking if he would answer their questions. Id. at 209. One of the officers even told the suspect they "were looking for contraband including narcotics, large sums of money, guns, and other weapons." Id. In none of these apposite cases did a court find a "show of authority" seizure. See James, 700 F.3d at 682; Mendenhall, 446 U.S. at 555; Lockett, 406 F.3d at 211. Plaintiffs do not so much as mention this caselaw.

other law enforcement officers and TSA screeners, too. See FAC ¶¶ 158, 171-73. These suspicions continued to develop with the phone call to Ms. Brown's father – something Plaintiffs would rather forget. Surely, based on this information, as alleged, TFO Dawkin had "more than an inchoate and unparticularized" basis for his encounter with Ms. Brown, however brief, to investigate further. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Plaintiffs offer no clearly established precedent holding otherwise.

Their citations to United States v. Law, 384 F. App'x 121 (3d Cir. 2010), see Opp. at 4, 23, are very much misplaced. Although, in that case, the Third Circuit recognized a "wad" of cash is not, by itself, incriminating, the court found in that unpublished decision that a large amount of cash may well give rise to probable cause (never mind reasonable suspicion, the relevant standard here) "where the totality of the circumstances provides some indication that the cash is contraband." Law, 384 F. App'x at 123.[10] That statement is wholly consistent with United States v. Sokolow, 490 U.S. 1 (1989), which Plaintiffs also misleadingly cite. There, the Supreme Court – upon observing that "few vacationers carry with them thousands of dollars in $20 bills" – noted that the presence of a large amount of cash was (and actually can be) a factor of "probative significance" in the reasonable suspicion analysis. Id. at 9.

---

[10] It is also worth bearing in mind that, in Law, the Third Circuit considered the probative value of the presence of cash (alone) in the context of a plain-view seizure, which requires, among other things, that the "incriminating character" of an item be "immediately apparent," a showing akin to "probable cause to believe that an object is contraband." 384 F. App'x at 122 (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). That standard is obviously much higher than what is required to make a Terry stop. See Wardlow, 528 U.S. at 123. But, even as to the relevant standard (reasonable suspicion), the Third Circuit actually found "the circumstances here may well have given rise to a reasonable suspicion that criminal activity was afoot" in that case. Law, 384 F. App'x at 123 (emphasis added).

Plaintiffs, in short, are "mistaken in light of [these] precedents" to consider the presence of "money in isolation, rather than as a factor in the totality of the circumstances[.]" Maryland v. Pringle, 540 U.S. 366, 372 n.2 (2003). TFO Dawkin never made that mistake. As Plaintiffs allege, he continued to investigate and attempted unsuccessfully to confirm Ms. Brown's story. This Court, therefore, should dismiss any claim that he unlawfully seized Ms. Brown at the airport, as Plaintiffs' have not pleaded a violation of any clearly established constitutional right.

### C. The Cash Seizure Did Not Amount to a Clearly Established Fourth Amendment Violation.

Plaintiffs' argument regarding TFO Dawkin's entitlement to qualified immunity for the cash seizure itself relies on pure subterfuge. They cite to 18 U.S.C. § 981(b)(2)(B), and assert that statute establishes "the standard for an officer to seize property for forfeiture" as "probable cause." Opp. at 24.[11] But no statute sets the standard governing the constitutionality of a seizure of property by law enforcement; the Fourth Amendment does that. And, consistent with the Fourth Amendment, TFO Dawkin could seize the cash pending further investigation based on reasonable suspicion, not probable cause. See MTD at 19 (citing United States v. Place, 462 U.S. 696, 704 (1983)).[12]

---

[11] That provision reads, in full, that: "Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if there is probable cause to believe that the property is subject to forfeiture and the seizure is made pursuant to a lawful arrest or search; or another exception to the Fourth Amendment warrant requirement would apply[.]" 18 U.S.C. § 981(b)(2)(B).

[12] That suspicion ripened after TFO Dawkin called Mr. Rolin, who could not corroborate Ms. Brown's story. Plaintiffs' post-hoc rationale as to what Ms. Brown claims she intended to do with the funds or why her and Mr. Rolin's explanations 'didn't match,' FAC at ¶ 192, are immaterial to the qualified immunity analysis, which is an objective one viewed from the perspective of a reasonable officer on the scene. See, e.g., Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011) (reminding that the Fourth Amendment "regulates conduct rather than thoughts").

Plaintiffs' repeated claim that TFO Dawkin seized the cash "for forfeiture," Opp. at 24-25, is another red herring. For one, the validity of a seizure is evaluated "at the moment" it transpires. Terry v. Ohio, 392 U.S. 1, 21-22 (1968). That the DEA (not TFO Dawkin) decided to seek forfeiture of the cash weeks after the seizure (and following any investigation into Ms. Brown, Mr. Rolin, and their explanations) has no bearing on this inquiry, except to support the objective reasonableness of the TFO's judgment at the time of his initial acts. Even still, TFO Dawkin is and only can be sued for his own actions (seizing the cash), not those of the federal government (in seeking forfeiture). See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).[13]

In the end, Plaintiffs have no response to the point that they do not allege a "clearly established" Fourth Amendment violation based on the seizure of the cash. See MTD at 24-25. To do that, they must identify controlling precedent where "an officer acting under similar circumstances" as the TFO "was held to have violated the Fourth Amendment. District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018); see also Serrano, 2020 WL 5539130, at *11 (finding CBP officers and paralegal entitled to qualified immunity on Fourth Amendment claim related to seizure of truck at U.S.-Mexico border). Plaintiffs fail in this regard. See MTD at 24-25.[14] Accordingly, TFO Dawkin is entitled to dismissal of Count V, with prejudice, on the basis of qualified immunity.

---

[13] For these reasons, Plaintiffs' suggestion that TFO Dawkin should be held personally liable for the "seven-month deprivation" of their cash (during which time, the money was held in escrow by the government, not TFO Dawkin), Opp. at 24, is specious.

[14] Plaintiffs do not identify a single apposite case: where an officer was found constitutionally liable for seizing tens of thousands of dollars cash at an international airport in circumstances analogous to these, where the officer called the alleged co-owner of the cash, who could not corroborate the traveler's story, before effecting the seizure. Instead, they rely on inapt cases from in rem forfeiture proceedings, Opp. at 24-25, which, as noted above, say nothing of the standard for seizure of property pending further investigation (reasonable suspicion), but address a different legal question entirely (probable cause to forfeit property).

## **CONCLUSION**

For all the foregoing reasons, and those articulated in TFO Dawkin's opening brief, the Court should grant TFO Dawkin dismissal under Rule 12(b)(6) with prejudice.

Dated: October 2, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director
Torts Branch, Civil Division

MARY HAMPTON MASON
Senior Trial Counsel, Torts Branch

/s/ *David Inkeles*
DAVID W. INKELES
Trial Attorney (NY Bar No. 5511068)*
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel:   (202) 305-0401
Fax:   (202) 616-4314
E-mail:  david.w.inkeles@usdoj.gov
*Counsel for Steven Dawkin*

*Admitted *Pro Hac Vice*