**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

REBECCA BROWN, *et al.*,

     *Plaintiffs,*

v.

TRANSPORTATION SECURITY
ADMINISTRATION, *et al.*,

     *Defendants.*

Civil Action No. 2:20-cv-64

**PLAINTIFFS' RESPONSE
IN OPPOSITION TO
MOTION TO DISMISS COUNTS I-IV
[ECF Nos. 56–57]**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS**

Dan Alban,* Lead Attorney
VA Bar No. 72688

Jaba Tsitsuashvili*
DC Bar No. 1601246

INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org

Attorneys for Plaintiffs

*Admitted *Pro Hac Vice*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ............................................................................................................................... 7

I.   Named Plaintiffs Have Standing to Bring Their Class Claims, and This Court Has Jurisdiction
     to Grant Relief on Those Claims .......................................................................................... 7

     A.   Named Plaintiffs Have Standing to Bring Their Class Claims ...................................... 7

          1.   Named Plaintiffs have standing to seek prospective relief when they
               plausibly allege a "substantial risk" of harm and reasonably incur costs
               to avoid that harm ............................................................................................... 7

          2.   Named Plaintiffs have plausibly alleged injuries resulting from TSA's and
               DEA's airport seizure policies and practices and have adequately identified
               those challenged policies and practices. ............................................................ 11

          3.   Named Plaintiffs have plausibly alleged that they are suffering ongoing harm
               as a result of the TSA and DEA policies and practices that they challenge. .......... 12

               a.   Named Plaintiffs continue to suffer ongoing injuries in order to avoid
                    the substantial risk of flying with cash while the challenged policies and
                    practices remain in place. ........................................................................ 12

               b.   Named Plaintiffs' past injuries indicate that their likelihood of future
                    injury is high if they engage in the same legal activity targeted by the
                    challenged policies and practices. ............................................................ 13

               c.   Named Plaintiffs do not have to expose themselves to unreasonable
                    risks to have standing to seek prospective relief from the challenged
                    policies and practices ............................................................................... 15

     B.   This Court Has Subject Matter Jurisdiction to Review Challenges to
          Unconstitutional and *Ultra Vires* TSA Policies and Practices .................................... 16

          1.   The "exclusive" jurisdiction of § 46110 does not apply to broad constitutional
               challenges or other claims that do not seek review of specific
               administrative orders ......................................................................................... 16

          2.   The two cases cited by the government do not support its argument. ................... 17

3.  No administrative record or order exists to be reviewed under § 46110, and the limited relief available under § 46110 cannot provide an adequate remedy here.................................................................................................18

C.  Counts I–III State Valid Claims................................................................................19

1.  Plaintiffs have stated valid *ultra vires* and Fourth Amendment claims against TSA.........................................................................................19

a.  TSA rightly does not argue that Plaintiffs' factual allegations regarding TSA agents' conduct fail to show statutory and constitutional violations. ...............................................................19

b.  The APA provides redress against TSA for its adoption of an unlawful and unconstitutional de facto policy of treating "large" amounts of cash alone as evidence of criminality and detaining travelers and their property on that basis.....................................................................20

2.  Plaintiffs have stated valid Fourth Amendment claims against DEA........................24

a.  The APA provides redress against DEA for its unconstitutional de facto policies of seizing travelers merely for having "large" amounts of cash and of treating travelers' "large" amounts of cash as presumptively subject to seizure for civil forfeiture. ...........................................24

b.  DEA's personal seizure and cash seizure policies clearly violate the Fourth Amendment, and the experiences of Named Plaintiffs and others are illustrative of how those policies operate at airports across the country. ...............................................................................26

II.  Count IV Is Properly Pleaded, and Plaintiffs Preserve It for Appeal. ................................30

CONCLUSION ..................................................................................................................30

## TABLE OF AUTHORITIES

CASES                                                                                          Page(s)

*Abbott Lab. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................................10, 15

*Afifi v. Lynch,*
    101 F. Supp. 3d 90 (D.D.C. 2015) ..................................................................................8

*Amadei v. Nielsen,*
    348 F. Supp. 3d 145 (E.D.N.Y. 2018) ..........................................................................22

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) .......................................................................................................15

*Beins v. United States,*
    695 F.2d 591 (D.C. Cir. 1982) ..................................................................................17, 18

*Blitz v. Napolitano,*
    700 F.3d 733 (4th Cir. 2012) .........................................................................................18

*Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin,*
    972 F.3d 83 (D.C. Cir. 2020) ........................................................................................21

*Brown v. Fauver,*
    819 F.2d 395 (3d Cir. 1987) ..........................................................................................13

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .............................................................................................7, 13, 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .....................................................................................................8, 9

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ...................................................................................................23

*Doe v. Bolton,*
    410 U.S. 179 (1973) .......................................................................................................15

*Florida v. Bostick,*
    501 U.S. 429 (1991) .......................................................................................................27

*Florida v. Royer,*
    460 U.S. 491 (1983) .......................................................................................................27

*Floyd v. City of New York,*
    283 F.R.D. 153 (S.D.N.Y. 2012)..................................................................13, 14, 28

*Foster v. Skinner,*
    70 F.3d 1084 (9th Cir. 1995).........................................................................16

*Free Speech Coal., Inc. v. Att'y Gen.,*
    825 F.3d 149 (3d Cir. 2016).......................................................................10, 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000).................................................................................8, 9, 12

*George v. Rehiel,*
    738 F.3d 562 (3d Cir. 2013)...........................................................................3, 19

*Gilmore v. Gonzales,*
    435 F.3d 1125 (9th Cir. 2006)........................................................................18

*Grand Canyon Trust v. Pub. Serv. Co. of N.M.,*
    283 F. Supp. 2d 124 (D.N.M. 2003)..............................................................22

*Haase v. Sessions,*
    835 F.2d 902 (D.C. Cir. 1987).........................................................................8

*LaDuke v. Nelson,*
    762 F.2d 1318, 1326 (9th Cir. 1985)..............................................................13

*M.B. v. Quarantillo,*
    301 F.3d 109 (3d Cir. 2002)...........................................................................22

*Mace v. Skinner,*
    34 F.3d 854 (9th Cir. 1994)......................................................................17, 18

*McNair v. Synapse Grp. Inc.,*
    672 F.3d 213 (3d Cir. 2012)..............................................................................7

*McNary v. Haitian Refugee Ctr., Inc.,*
    498 U.S. 479 (1991).........................................................................................17

*Meese v. Keene,*
    481 U.S. 465 (1987)...........................................................................................9

*Merritt v. Shuttle, Inc.,*
    187 F.3d 263 (2d Cir. 1999).............................................................................17

*Merritt v. Shuttle, Inc.,*
    245 F.3d 182 (2d Cir. 2001).......................................................................16, 18

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011)......................................................................................22

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)....................................................................................8, 9, 12

*N.H. Right to Life Pol. Action Comm. v. Gardner*,
    99 F.3d 8 (1st Cir. 1996)..........................................................................................15

*Nicacio v. INS*,
    797 F.2d 700 (9th Cir. 1985)...................................................................................13

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).................................................................................................13

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993)...................................................................................................17

*Rodriguez v. United States*,
    575 U.S. 348 (2015).................................................................................................20

*Ruskai v. Pistole*,
    775 F.3d 61 (1st Cir. 2014)......................................................................................17

*State v. $12,986 in American Currency*,
    49CIV20-1996 (S.D. 2d Jud. Cir. July 13, 2020) ...................................................21

*Steffel v. Thompson*,
    415 U.S. 452 (1974).................................................................................................15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)...................................................................................................8

*United States v. Aukai*,
    497 F.3d 955 (9th Cir. 2007)...................................................................................20

*United States v. Craig*,
    694 F.3d 509 (3d Cir. 2012)....................................................................................30

*United States v. Fofana*,
    620 F. Supp. 2d 857 (S.D. Ohio 2009)...................................................................20

*United States v. Frost*,
    999 F.2d 737 (3d Cir. 1993)....................................................................................29

*United States v. Law*,
    384 F. App'x 121 (3d Cir. 2010)........................................................................20, 28

*United States v. McCarty*,
   648 F.3d 820 (9th Cir. 2011) ..................................................................................20

*United States v. Place*,
   462 U.S. 696 (1983) ..............................................................................................29

*United States v. Sokolow*,
   490 U.S. 1 (1989) .............................................................................................20, 28

*United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*,
   258 F.3d 215 (3d Cir. 2001) ................................................................................29

*Velesaca v. Decker*,
   458 F. Supp. 3d 224 (S.D.N.Y. 2020) ................................................................22

*Venetian Casino Resort, LLC v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) .........................................................21, 22, 23, 24, 26

*Washington v. DHS*,
   2020 WL 1819837 (W.D. Wash. Apr. 10, 2020) ............................................23, 25

## STATUTES AND REGULATIONS

21 U.S.C. § 878 ........................................................................................................3

49 U.S.C. § 114(d)–(e) ............................................................................................3

49 U.S.C. § 44901 ...................................................................................................3

49 U.S.C. § 46110 .......................................................................................16, 17, 18

49 U.S.C. §§ 46101–46111 ...................................................................................16

49 C.F.R. § 1540.5 .............................................................................................3, 19

## OTHER AUTHORITIES

DOJ OIG,
   *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* (Mar. 2017) .........................25

# INTRODUCTION

This is a national class action lawsuit challenging ongoing civil rights abuses by the Transportation Security Administration (TSA) and Drug Enforcement Administration (DEA), which have policies and practices of seizing air travelers and their cash without probable cause or reasonable suspicion. Instead, these seizures are based on the unconstitutional presumption that the agencies may seize travelers and their cash if they possess what TSA and DEA consider a "large" amount of cash (typically $5,000–10,000). As a result, hundreds or thousands of innocent travelers are seized by TSA and DEA agents each year at airports across the country simply because they are legally traveling with a "large" amount of cash. First, TSA identifies travelers with "large" amounts of cash during the transportation security screening process using X-rays, luggage inspections, body scans, and pat downs. After the transportation security screening ends, TSA continues to detain the traveler and their luggage to investigate the cash and to contact law enforcement, typically DEA. Then, DEA seizes the traveler, interrogates them about the cash, and ultimately seizes their cash for civil forfeiture, a byzantine process that typically takes many months or even years to resolve—all while the traveler is deprived of their much-needed cash—and frequently results in the permanent loss of property without any criminal charges, much less a conviction. The Complaint identifies dozens of instances of this conduct by both agencies and identifies agency documents, admissions by DEA agents, airport police reports, and OIG reports illustrating these policies and practices.

Named Plaintiffs Rebecca Brown, Terry Rolin, Stacy Jones-Nasr, and Matt Berger seek declaratory and injunctive relief on behalf of a nationwide class of individuals who have been or will be subjected to TSA's and DEA's unlawful and unconstitutional personal seizure and cash seizure policies and practices at airports across the country. Rebecca, Terry, and Matt had their persons and their cash seized by TSA at airports under TSA's policy and practice of detaining travelers beyond the transportation security screening merely for traveling with a "large" amount of cash. Rebecca and Stacy were also seized by DEA at airports merely for traveling with "large" amounts of cash, and DEA seized their cash for civil forfeiture, pursuant to DEA's personal seizure and cash seizure policies and practices. All of the Named Plaintiffs have had to meaningfully change their air travel and money-

handling practices at substantial inconvenience and cost to avoid being further victimized by TSA's and DEA's airport seizure policies and practices.

The Named Plaintiffs bring three class claims challenging these policies and practices. First, they challenge TSA's policy and practice as *ultra vires* because TSA Screeners do not have statutory authority to conduct general criminal investigations and may not detain travelers or their possessions after the transportation security screening has determined that they pose no threat to air travel. Second, they challenge TSA's policy and practice as unconstitutional because it violates the Fourth Amendment to detain travelers or their possessions without reasonable suspicion or probable cause, and merely possessing a "large" amount of cash is insufficient. Third, they bring a Fourth Amendment challenge to DEA's policies and practices of (1) seizing travelers, their property, and/or their cash at airports without reasonable suspicion, based solely on the presence or amount of cash DEA agents know or believe they are traveling with, and (2) seizing cash from travelers at airports for civil forfeiture without probable cause, based solely on the amount of cash DEA agents know or believe they are traveling with, which DEA deems presumptively subject to seizure in "large" amounts. In addition, Named Plaintiffs Terry and Rebecca bring an individual claim against DEA for the return of interest on their seized property.[1]

TSA and DEA have moved to dismiss (ECF Nos. 56–57, "MtD") Claims I–IV of Plaintiffs' First Amended Complaint (ECF No. 43, "FAC"). They incorrectly argue that Plaintiffs (1) lack standing to bring their class claims, (2) may not bring their claims against TSA in this Court, (3) have failed to state a claim on Claims I–III, and (4) may not seek return of interest on their seized cash.

## BACKGROUND

### I. TSA's policy and practice of exceeding its statutory authority and violating the Fourth Amendment by seizing air travelers solely because they have "large" amounts of cash

TSA is a federal agency tasked with protecting against threats to transportation security. It is not a general law enforcement agency, and the authority of TSA Screeners to detain air travelers and their

---

[1] Named Plaintiffs Terry and Rebecca also have an individual *Bivens* claim against the DEA agent, addressed in separate briefing on the *Bivens* Defendant's motion to dismiss. ECF No. 53.

property is limited to administrative searches conducted for the limited purpose of ensuring air travel safety. 49 U.S.C. §§ 114(d)–(e), 44901; *see George v. Rehiel*, 738 F.3d 562, 577–79 (3d Cir. 2013) (detention or search by TSA beyond its administrative scope requires at least reasonable suspicion of a particular crime). Pursuant to its limited statutory authority, TSA Screeners are tasked only with "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5.

But TSA regularly exceeds these clear bounds of its authority, as detailed in the FAC. In short, even after the transportation security screening reveals no threat to air travel, TSA Screeners routinely continue to detain domestic travelers and question them if the administrative search reveals a "large" amount of cash. That both exceeds TSA's statutory authority and violates the Fourth Amendment because traveling domestically with any amount of cash is lawful (without any reporting requirements), and it does not give rise to reasonable suspicion to justify even temporary detention once the transportation security screening has revealed no threats to air travel safety.

In 2009, TSA was sued for this very practice. *See* FAC ¶¶ 364–369. It then promulgated two policies that purport to make clear to TSA Screeners that "[s]creening may not be conducted to detect evidence of crimes unrelated to transportation security," and that "[t]raveling with large amounts of currency is not illegal," so the only relevance of traveling with cash is to the extent it may physically "conceal a weapon, explosives, or other items that may pose a threat to transportation security." *See* FAC ¶¶ 340–345. Unfortunately, despite what these policies say on paper, the agency has adopted a policy of treating "large" amounts of cash as suspicious and detaining travelers and their property on that sole basis, even after the transportation security screening reveals no threats to air travel. Those practices (as illustrated below) have effectively reverted TSA's policy to its pre-2009 status—again putting the agency outside of its statutory and constitutional bounds.

## II. DEA's policies and practices of violating the Fourth Amendment by seizing air travelers and by seizing their cash for civil forfeiture because they possess "large" amounts of cash

DEA is a federal law enforcement agency tasked with enforcing federal drug laws. 21 U.S.C. § 878. A substantial portion of DEA's activities involves the seizure of cash that DEA agents justify by unsubstantiated references to controlled substances, including at airports across the country. These

cash seizures are conducted under the auspices of Operation Jetway, a national standardized training program for DEA agents roving United States airports in search of cash—resulting in the seizure and forfeiture of tens or hundreds of millions of dollars from air travelers every year. *See* FAC ¶¶ 401–409.

The DOJ Office of Inspector General ("OIG") has illustrated several concerning aspects of DEA's policies in this context, in multiple reports in recent years. *See* FAC ¶¶ 410–412, 440, 452–453 (citing reports). Those findings, coupled with the practices detailed in the FAC regarding the Named Plaintiffs and fourteen other individuals across the country, demonstrate that DEA has adopted two unconstitutional policies: first, the agency seizes air travelers at TSA Screening checkpoints and other high-security airport locations without reasonable suspicion, based solely on agents' knowledge or belief that travelers have a "large" amount of cash on hand (referred to by Plaintiffs as DEA's "personal seizure policy"); and second, the agency treats "large" amounts of cash as presumptively subject to seizure for civil forfeiture at airports, regardless of whether probable cause exists (referred to by Plaintiffs as DEA's "cash seizure policy"). DEA's personal seizure policy and its cash seizure policy each violate the Fourth Amendment's prohibition on unreasonable seizures.

### III. Named Plaintiffs' and others' experiences of being seized by TSA and DEA solely for traveling with a "large" amount of cash

#### a. Named Plaintiffs Rebecca Brown and Terry Rolin

In August 2019, Rebecca was flying home from Pittsburgh to Boston after a weekend with family. During the visit, her father, Terry, who is in deteriorating health, entrusted her with his life savings— over $82,000 in cash accumulated over decades by Terry and his parents. With the cash, Rebecca would help Terry obtain much-needed dental care and fix his truck. FAC ¶¶ 119–140.

But at the Pittsburgh airport, Rebecca was subjected to seizure and interrogation by TSA solely because she was traveling with a "large" amount of cash. After confirming that Rebecca and her luggage posed no threat to transportation security, TSA Screeners continued to detain and question her about the cash for about 30 minutes, despite no hint of any threat to air safety. FAC ¶¶ 148–175.

Later, at the airline gate, DEA agent Steve Dawkin approached her, identified himself as an officer, and requested that she answer questions about the "large" amount of cash he indicated he knew she

was traveling with. Accompanying Dawkin was a second officer, who had already detained and interrogated her at the TSA checkpoint. Rebecca did not feel free to decline Dawkin's requests to answer his targeted questions in this high-security setting—in which she was surrounded by two officers asking about cash she was already made to believe was suspicious. FAC ¶¶ 177–186.

With no basis to suspect Rebecca of a crime, Dawkin demanded to speak with Terry on Rebecca's cell phone. Rebecca explained that Terry would be groggy and confused from a 7 a.m. wakeup call, but Dawkin insisted on taking Rebecca's phone. After speaking to a confused Terry, Dawkin said, without any explanation, "Your answers don't match." He seized her cash for civil forfeiture. The seizure was not temporary: Rebecca boarded her flight, not knowing if or when she would ever see her father's life savings again. Seven months later, after this lawsuit was filed, DEA returned the money without explanation. FAC ¶¶ 187–206.

In addition to the injuries to Terry's health caused by Dawkin's seizure of his cash, Terry and Rebecca are currently being injured by TSA's and DEA's seizure policies. To avoid being victimized again by these policies, they reasonably refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash. Because Terry continues to store cash, this deprives Terry and Rebecca of their preferred method of managing and moving Terry's savings. But for TSA's and DEA's policies, Terry and Rebecca would engage in this entirely lawful conduct. FAC ¶¶ 208–232.

**b. Named Plaintiff Stacy Jones-Nasr**

Stacy and her husband are recreational gamblers. In May 2020, they traveled from their home in Florida to North Carolina for the soft reopening (after COVID-19 restrictions) of Harrah's Cherokee Casino Resort. They brought over $10,000 in cash for gambling. While visiting friends in Wilmington, North Carolina en route to the casino, they acquired more cash when their friend offered to purchase their 2015 Maserati Ghibli and paid $28,000 in cash. But they canceled their casino plans after learning that Stacy's cousin had passed away. They flew home the next day. FAC ¶¶ 233–243.

At the Wilmington airport, TSA detained and interrogated Stacy and her husband after completing the transportation security screening, based solely on the fact that they were traveling with a "large" amount of cash. Stacy did not feel free to end the encounter—particularly because TSA had their cash,

and especially once a TSA Screener said, "Hang on a minute" and motioned for them to stay. DEA ultimately took over the detention and interrogation—in a sheriff's deputy's office. DEA agent Anthony R. DiGiovanni seized over $40,000 from Stacy and her husband for civil forfeiture. He accused them of no crime. Over five months later, DEA still has Stacy's money, FAC ¶¶ 244–277, and the deadline for the agency to file a forfeiture complaint has passed without one.

Stacy is suffering the continuing, present adverse effects of TSA's and DEA's airport seizure policies. She no longer travels with "large" amounts of cash to gamble, even though possessing a substantial amount of cash is a necessity for avid gamblers to avoid ATM fees and withdrawal limits. But for TSA's and DEA's seizure policies, she would continue traveling with cash. FAC ¶¶ 278–283.

### c.  Named Plaintiff Matthew (Matt) Berger

Matt runs a limo and tour bus business. He regularly buys and sells limos and tour buses in cash. In November 2015, he was flying with $55,000 in cash for a potential tour bus purchase. TSA Screeners detained and interrogated Matt based solely on that "large" amount of cash—after completing the agency's administrative search for threats to transportation security and finding none. TSA kept Matt detained while law enforcement officers arrived, and those officers ultimately seized Matt's cash for civil forfeiture—killing his business deal. FAC ¶¶ 284–305.

Matt and his business are suffering the continuing, present adverse effects of TSA's and DEA's personal seizure and cash seizure policies. Based on his experience with and knowledge of these policies, Matt no longer travels with "large" amounts of cash, and he advises potential business partners to avoid doing so too. This puts Matt at a considerable disadvantage in a business that prioritizes cash buyers. But for TSA's and DEA's policies, Matt would continue traveling with "large" amounts of cash, and his business would not be disadvantaged. FAC ¶¶ 306–320.

### d.  Other air travelers

The FAC identifies dozens of other air travelers who have been subjected to TSA's and DEA's policies of seizing air travelers without reasonable suspicion and seizing their cash for civil forfeiture without probable cause, based solely on their traveling with "large" amounts of cash. *See* FAC ¶¶ 371–390 (TSA examples); 437–454 (DEA examples).

## ARGUMENT

### I. Named Plaintiffs Have Standing to Bring Their Class Claims, and This Court Has Jurisdiction to Grant Relief on Those Claims.

#### A.   Named Plaintiffs Have Standing to Bring Their Class Claims.

The government argues that Named Plaintiffs do not have standing to bring their class claims, asserting that Plaintiffs "have not alleged any injury that is fairly traceable to TSA or DEA actions and that is likely to be redressed by the prospective relief they seek." MtD 9. The government further claims that Plaintiffs do not have standing to seek prospective relief simply because they were "once bitten" by having their cash seized by TSA and/or DEA while traveling. MtD 10. But these arguments are unavailing in light of the legal standard for standing to seek prospective equitable relief and the plausible allegations of past and current, ongoing injuries in the FAC.

First, the government selectively and incompletely describes the legal standard for prospective standing based on threats of future harm, failing to acknowledge a major, current line of Supreme Court cases holding that standing exists when there is "substantial risk" that future harm will occur and Plaintiffs incur reasonable costs to avoid that future harm. Second, Named Plaintiffs were obviously injured by the seizures of their cash and have plausibly alleged these seizures were based on the TSA and DEA airport seizure policies and practices they are challenging. Third, Named Plaintiffs do not base their standing for prospective relief on past injuries, but on **current injuries they endure** due to the agency policies and practices they challenge. Named Plaintiffs have taken reasonable and necessary precautions—changing their travel and financial habits in ways that are costly, time consuming, and inconvenient—to avoid the substantial risk of imminent harm from traveling with a large amount of cash while TSA's and DEA's airport seizure policies and practices are in effect.

#### 1.   Named Plaintiffs have standing to seek prospective relief when they plausibly allege a "substantial risk" of harm and reasonably incur costs to avoid that harm.

The parties agree that "[w]hen . . . prospective relief is sought, the plaintiff must show that he is 'likely to suffer future injury'" from the defendant's conduct." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (emphasis added) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)); MtD 15. The injury-in-fact requirement exists "to filter out those with merely generalized grievances"

and is "very generous to claimants, demanding only that the claimant allege some specific, identifiable trifle of injury. It is not Mount Everest." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (cleaned up). Pointing to *Afifi v. Lynch*, the government correctly notes that "when a plaintiff seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy and practice of a government agency, the plaintiff must demonstrate that [she] is 'realistically threatened by a repetition of [her] experience.'" 101 F. Supp. 3d 90, 108–09 (D.D.C. 2015). As *Afifi* explained, "[t]o plead a 'threat of repetition, a plaintiff must . . . [allege she] is 'likely to be subjected to the policy again.' This threat must be 'real and immediate,' or, alternatively, 'realistic[]' in nature." *Id.* at 109. (cleaned up) (quoting *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987)).

However, the government's brief selectively focuses on one path to demonstrating likelihood of future injury, insisting that any threat of future harm must be "certainly impending." MtD 13. But the Supreme Court has noted that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' **or there is a 'substantial risk' that the harm will occur.**" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis added) (quotations omitted); s*ee also, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–55 (2010) (holding that a "reasonable probability" of cross contamination of alfalfa crops by the genetically engineered Roundup Ready gene—even if it never actually occurs—creates a "substantial risk" of injuries that "are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis").

The Court acknowledged this second path in *Clapper*, the case the government relies on most: "Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, **we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm**." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (emphasis added). Indeed, in *Monsanto*, the Court found alfalfa farmers had standing to sue over injuries they suffered from the costs of additional measures they took to reduce the risk of genetic contamination of their crops by the Roundup Ready gene, even if that contamination never occurred. 561 U.S. at 154–55; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181–84 (2000)

(finding standing where plaintiffs had "reasonable concerns" about various negative effects of pollutant discharges into a nearby river and averred, conditionally, they would use the river for recreational purposes **but for** those discharges); *Meese v. Keene*, 481 U.S. 465, 475 (1987) (holding that "the need to take . . . affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury").

Ignoring this line of cases, the government attempts to set a higher bar for Plaintiffs by selectively quoting *Clapper* to suggest that anything but "certainly impending" injury is insufficiently "speculative" or "hypothetical" (even though those very injuries have already happened to the Named Plaintiffs). *See, e.g.*, MtD 13–15. But this superficial analysis ignores critical differences between the facts of this case and *Clapper*. Most notably, in *Clapper*, none of the named plaintiffs who were challenging a surveillance program could demonstrate that they had ever been surveilled or were even likely to be surveilled under the challenged program. 561 U.S. at 411. In addition, the Court described the plaintiffs' standing theory as relying on "a highly attenuated chain of possibilities" dependent on the specific outcome of five "highly speculative" events—including a specific decision by the FISA Court. *Id.* at 410. This "[did] not satisfy the requirement that threatened injury must be certainly impending." *Id.* In contrast, Named Plaintiffs here have already been harmed by the challenged government policies and practices, and are highly likely to be harmed again if they merely engage in the same (entirely legal) behavior: domestic air travel with a "large" amount of cash in their possession.

The government further cites *Clapper* to claim that any efforts Named Plaintiffs make to avoid the substantial risks of flying with cash while TSA's and DEA's airport seizure policies are in effect is somehow an attempt to "manufacture standing" and argues that any current, ongoing harm to Named Plaintiffs is self-inflicted because they are "choosing" to refrain from flying with cash or to make additional expenditures based only on "speculation" about "hypothetical future harm." MtD 13–15. This is inconsistent with the Supreme Court's holding in *Monsanto* and *Laidlaw*—summarized in *Clapper*—that costs reasonably incurred to reduce or mitigate a "substantial risk" of actual harm are sufficient for standing. And it ignores that *Clapper* rejected standing because the named plaintiffs could not show they had ever been, or were imminently likely to be, targeted by the surveillance program they challenged, and thus found that costs they incurred to reduce the general risks of electronic

surveillance were insufficient to challenge a specific surveillance program that might never affect them. Here, the Named Plaintiffs were previously harmed by the challenged policies and practices, are at substantial risk of repeated harm if they again fly with "large" amounts of cash due to those policies and practices, and have reasonably incurred costs and inconvenience solely to avoid *that* risk.

Moreover, as the Third Circuit has found in an analogous situation, plaintiffs have standing to bring Fourth Amendment claims when they are "suffering real costs as a condition of compliance with a [government action] that they urge is unconstitutional." *Free Speech Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 166 (3d Cir. 2016); *see also Abbott Lab. v. Gardner*, 387 U.S. 136, 153 (1967) ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the . . . Declaratory Judgment Act must be permitted[]"). As the Third Circuit explained in *Free Speech Coalition*: "Sufficient injury exists to confer standing where 'the regulation is directed at [Plaintiffs] in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the . . . rule they are quite clearly exposed to the imposition of strong sanctions . . . .'" 825 F.3d at 166. Named Plaintiffs here find themselves in a similar dilemma: the TSA and DEA policies they challenge are directed at air travelers with "large" amount of cash; avoiding harm from these policies requires Named Plaintiffs to make significant changes to their travel and financial practices; and if they travel with "large" amounts of cash—a completely legal activity—they are quite clearly exposed to the imposition of strong sanctions, namely the seizure of themselves and their property, including the long-term seizure of a significant amount of their cash for civil forfeiture. Thus, the harm that Named Plaintiffs are suffering to avoid being victimized (again) by the challenged policies is sufficient for standing to seek equitable relief.

Although Plaintiffs have standing under either the "certainly impending" or "substantial risk" standard, they are only required to show that if they failed to take the costly and burdensome measures they have taken to avoid the "substantial risk" of harm from traveling with cash while the challenged airport seizure policies are in effect, they would be "likely to suffer future injury."

**2. Named Plaintiffs have plausibly alleged injuries resulting from TSA's and DEA's airport seizure policies and practices and have adequately identified those challenged policies and practices.**

The government claims that Plaintiffs "have not alleged any injury that is fairly traceable to TSA or DEA actions and that is likely to be redressed by the prospective relief they seek." MtD 9. But Named Plaintiffs have plausibly alleged that they were and continue to be injured, FAC ¶¶ 208–232 (past and ongoing injuries to Terry and Rebecca), ¶¶ 273–283 (past and ongoing injuries to Stacy), ¶¶ 302–320 (past and ongoing injuries to Matt), and that those injuries result from TSA's and/or DEA's ongoing personal seizure and cash seizure policies and practices. FAC ¶¶ 427, 430, 434, 479, 494–496, 498 (injuries resulting from TSA policy and practice); ¶¶ 506–507, 511–512, 514 (injuries resulting from DEA policies and practices). Plaintiffs have also presented dozens of plausible allegations of injuries to other members of the class. FAC ¶¶ 371–385 (injuries to class members caused by TSA); FAC ¶¶ 437–454 (injuries to class members caused by DEA).

The government also wrongly suggests that Plaintiffs have failed to adequately identify the challenged policies and practices, claiming Plaintiffs' injuries resulted from an "unidentified" policy and practice and that Plaintiffs "identify no law, regulation, or official agency policy" that has caused these harms. MtD 12, 14. But Plaintiffs have specifically identified and described in as much detail as possible the agencies' cash seizure policies and practices they challenge. FAC ¶¶ 4, 90–96, 354, 356, 358–362, 370, 395–396, 475, 492 (TSA policy and practice); ¶¶ 5, 106–109, 414–434, 459–460, 505, 508–510 (DEA policies and practices). As explained more fully below in Part I.B, Plaintiffs have plausibly alleged the existence of these seizure policies by not only telling their three separate stories, but also by pointing to agency materials and trainings and providing dozens of examples of similar seizures at airports across the country that follow the very same pattern, plausibly demonstrating that these are not aberrations but part of systematic policies and practices. FAC ¶¶ 371–385 (examples of TSA cash seizure policy); FAC ¶¶ 437–454 (examples of DEA cash seizure policy).

**3. Named Plaintiffs have plausibly alleged that they are suffering ongoing harm as a result of the TSA and DEA policies and practices that they challenge.**

The government next claims that the Named Plaintiffs fail to establish standing for prospective relief because they "identify no future plans—let alone concrete, imminent plans—to travel by air carrying large amounts of cash, much less plausibly allege that they or their property will be subject to unlawful seizures . . . ." MtD 11–12. This, the government claims, indicates that Plaintiffs have not plausibly alleged that they are "'likely to suffer future injury' from the [Government Defendants'] conduct," and thus cannot be redressed by any prospective relief. MtD 15. As discussed below, the government (a) mischaracterizes Plaintiffs' allegations, which do not merely allege imminent injury, but **actual injury** based on reasonable but costly precautions they take to avoid imminent injury from traveling by air with "large" amounts of cash, (b) fails to recognize that the past injuries have bearing on the likelihood of future harm, particularly given the alleged policies and practices, and (c) wrongly suggests that Named Plaintiffs must continue to subject themselves to abuse by TSA and DEA in order to maintain standing for forward-looking relief.

> a. Named Plaintiffs continue to suffer ongoing injuries in order to avoid the substantial risk of flying with cash while the challenged policies and practices remain in place.

First, as Named Plaintiffs repeatedly allege, but for TSA's and DEA's challenged policies and practices, they would continue flying with "large" amounts of cash for personal or business reasons. FAC ¶¶ 230, 283, 312, 320. Such conditional statements are sufficient to establish standing. *See Laidlaw*, 528 U.S. 184 (accepting for standing purposes plaintiffs' conditional statements that they would use a nearby river but for pollutant discharges by the defendant). Named Plaintiffs are reasonably foregoing traveling with their money in their preferred manner in order to avoid the imminent injury from traveling with "large" amounts of cash while TSA's and DEA's personal seizure and cash seizure policies and practices remain in effect. As a result, Named Plaintiffs have plausibly alleged that they are currently suffering ongoing injuries because of the challenged TSA and DEA policies and practices. *See id.*; *Monsanto*, 561 U.S. at 154. Namely, each has made expensive, inconvenient, and burdensome changes to how they travel, move their money, or do business: Rebecca would fly with her father's cash, but does not; Stacy would travel with cash for gambling, but does not; Matt would travel with

cash to buy vehicles for his business, but does not. FAC ¶¶ 225–232, 278–283, 306–320. These are **actual injuries that Named Plaintiffs are currently suffering** from taking reasonable but costly precautions to avoid imminent injury from the challenged policies and practices.

> b. Named Plaintiffs' past injuries indicate that their likelihood of future injury is high if they engage in the same legal activity targeted by the challenged policies and practices.

The likelihood of future injury is high where, as here, Plaintiffs plausibly allege that their past injuries (and those of many others documented in the FAC) are not merely coincidental examples of bad behavior but are instead part of an ongoing institutional pattern, policy, and practice of conduct that targets completely legal behavior. While it is true that past injury is insufficient, by itself, to establish standing for prospective relief, past injuries are certainly relevant to determining whether future harm is likely or imminent. As the Supreme Court has noted: "Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). And when past wrongs are part of an ongoing pattern, policy, and practice of behavior that is triggered by completely legal conduct—such as traveling by air with a "large" amount of cash—a plaintiff can more easily establish that there is a "real and immediate threat that he would again be [the victim of the allegedly unconstitutional practice]." *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987) (quoting *Lyons*, 461 U.S. at 105). For example, the Ninth Circuit found class standing to raise Fourth Amendment claims where an agency's "systematic pattern" targeted class members "based on the completely innocent behavior of residing in migrant farm housing." *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985), *amended by* 796 F.2d 309 (9th Cir. 1986) (evidence presented at trial of agency policy and practice led to district court's "finding of likely recurrence"); *see also Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir. 1985) (finding standing where "government's conduct was both recurrent and in violation of the plaintiffs' constitutional rights"). Similarly, in *Floyd v. City of New York*, the court found that named plaintiffs had standing to challenge NYPD's stop-and-frisk policy on Fourth Amendment grounds based on a recurring pattern of NYPD conduct in neighborhoods where they lived, which targeted them for engaging in completely lawful behavior, as well as evidence presented demonstrating the "frequency of alleged injuries" to class members. 283 F.R.D. 153, 170

(S.D.N.Y. 2012). In *Floyd*, as here, a named plaintiff's "risk of future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law." *Id.*

Indeed, even in *Lyons*, the Supreme Court acknowledged that Adolph Lyons would have had standing to bring claims for prospective relief over LAPD chokehold practices if he alleged that: (1) "the City ordered or authorized police officers to" apply chokeholds to "any citizen with whom they happen to have an encounter" and (2) "he would have another encounter with the police." 461 U.S. at 105–06. While Mr. Lyons was unable to substantiate his allegations after discovery revealed the City had a different policy than he alleged, *see id.* at 110, Plaintiffs here have plausibly made the equivalent allegations: (1) that TSA and DEA have policies and practices that order or authorize TSA Screeners and DEA agents, respectively, to seize any air traveler and their property based solely on the presence of a "large" amount of cash and to seize the cash if it merely exceeds a certain threshold, and (2) that if Named Plaintiffs travel by air with a "large" amount of cash, they will have another encounter with TSA Screeners at the transportation security screening checkpoint (where X-rays and other inspections would reveal the presence of the cash) and DEA agents acting under their respective policies. The government cites to footnote 8 of *Lyons* to suggest that Plaintiffs' "alleged fear" of injuries is insufficient to attain standing. MtD 13. But Plaintiffs nowhere rely on their subjective fear, but rather their reasonable concerns that they will again be targeted for engaging in precisely the same conduct for which they were previously targeted under TSA's and DEA's airport seizure policies. Indeed, in light of Plaintiffs' allegations, including the experiences of not just the Named Plaintiffs but also the other examples of airport seizures under the challenged airport seizure policies, footnote 8 actually supports Plaintiffs: "The reasonableness of [a plaintiff's] fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8. Because the reality of the threat of repeated injury remains high so long as the challenged policies remain in place, *Lyons* dictates that Named Plaintiffs have standing to seek relief from those policies.

      c.  Named Plaintiffs do not have to expose themselves to unreasonable risks to have standing to seek prospective relief from the challenged policies and practices.

Contrary to the government's outrageous suggestion that Named Plaintiffs must have concrete, imminent plans to travel again with large amounts of cash while the TSA and DEA airport seizure policies remain in effect, Plaintiffs certainly do not have to subject themselves to additional predations by TSA and DEA under the challenged airport seizure policies and practices in order to establish standing. It is well established that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). It is perfectly reasonable for plaintiffs to exercise caution and not expose themselves to the substantial risk of enforcement of a challenged policy, particularly when they face serious penalties for doing so. *Free Speech Coal.*, 825 F.3d at 166; *Abbott Lab.*, 387 U.S. at 153 (1967); *see also N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("[A] credible threat of present or future prosecution itself works an injury that is sufficient to confer standing . . . .").

And, while Named Plaintiffs do not necessarily face criminal prosecution for traveling with "large" amounts of cash—because it is a completely legal and legitimate activity—they do face quasi-criminal sanctions, including the seizure of their person and their valuables by law enforcement, as well as the seizure of a substantial amount of their money for civil forfeiture, depriving them of it for many months and perhaps permanently. Thus, in much the same way that "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), it should not be necessary for a plaintiff to subject herself and her valuable personal property to unlawful seizure in order to challenge unconstitutional government agency policies and practices. *See Babbit*, 442 U.S. at 298 ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).

**B.    This Court Has Subject Matter Jurisdiction to Review Challenges to Unconstitutional and *Ultra Vires* TSA Policies and Practices.**

The government argues that this Court lacks subject matter jurisdiction over Plaintiffs' claims challenging TSA's unconstitutional and *ultra vires* polices and practices, asserting that a challenge to TSA's "final orders" lies exclusively with the Court of Appeals under 49 U.S.C. § 46110. The government argues that the challenged policies and practices are either a "final order" or are "inescapably intertwined" with a final order, and thus are subject to § 46110. MtD 15–16.

This is an absurd attempt to evade judicial review by invoking a statute clearly designed to provide appellate review of final orders issued after administrative agency adjudicative proceedings (as described in Title 49, Chapter 461, "Investigations and Proceedings"). To Plaintiffs' knowledge, no "proceeding" was ever held, no "parties" were ever provided notice, no finding of facts were ever entered, nor was any "final order" ever issued. Section 46110 is simply inapplicable to these circumstances, where Named Plaintiffs and hundreds or thousands of putative class members are seeking relief in federal court from widespread unlawful and unconstitutional agency action under the APA. Nothing suggests that Congress intended § 46110 to preclude normal litigation of broad constitutional challenges like this case, and several circuits have rejected TSA's argument. Instead, § 46110 is limited to providing judicial review of administrative orders issued by TSA, FAA, or DOT after adjudicative proceedings that involve a complaint, notice and an opportunity for a hearing, parties to the proceeding, findings of fact, an administrative record, a service requirement on parties, and even procedures for joinder and intervention. *See* 49 U.S.C. §§ 46101–46111.

**1.    The "exclusive" jurisdiction of § 46110 does not apply to broad constitutional challenges or other claims that do not seek review of specific administrative orders.**

Several circuit courts have squarely rejected the arguments advanced by the government that the supposed "exclusive" jurisdiction of § 46110 applies beyond the scope of reviewing administrative orders. *See, e.g., Merritt v. Shuttle, Inc.*, 245 F.3d 182, 191 (2d Cir. 2001) (Sotomayor, J.) (§ 46110 does not preclude district court review of FTCA claim by pilot, who could not have brought such a claim in administrative hearings, which do not address issues of negligence); *Foster v. Skinner*, 70 F.3d 1084, 1088 (9th Cir. 1995) ("[A] district court has subject matter jurisdiction over broad constitutional

challenges to FAA practices because the Federal Aviation Act, 49 U.S.C.A. §§ 40101–49105 (1995), provides no remedy for such claims."); *Mace v. Skinner*, 34 F.3d 854, 859 (9th Cir. 1994) (district court is not precluded from hearing "a broad challenge to the allegedly unconstitutional actions of FAA, NTSB, and DOT" by § 46110); *Beins v. United States*, 695 F.2d 591, 598 & n. 11 (D.C. Cir. 1982) (precursor to § 46110 did not preclude district court's jurisdiction over pilot's FTCA claim because review of FAA orders is "distinct conceptually from a finding of negligence").

The Supreme Court also rejected the same underlying logic when it was advanced by INS in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). In *McNary*, the Court held that district court review of "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications" was not precluded by a statutory provision providing for exclusive review of administrative orders. *Id.* at 492; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (same).

### 2.   The two cases cited by the government do not support its argument.

Neither case cited by the government supports the notion that § 46110 precludes this Court's jurisdiction. First, it cites *Ruskai v. Pistole*, 775 F.3d 61, 65 (1st Cir. 2014) to argue that "TSA's security protocols for airport security checkpoints constitute an order under 49 U.S.C. § 46110." MtD 15. But *Ruskai* is inapposite because it involved review of a specific TSA administrative order for a particular proceeding. Ruskai requested a disability accommodation from TSA and received a denial letter, 775 F.3d at 65, which was the "final order" that constituted the basis of her petition for review. *See id.* (discussing whether she timely filed her petition within 60 days after the letter order issued). Here, there was no such administrative adjudication; thus, no "order" has issued for purposes of § 46110.

Similarly, *Merritt v. Shuttle, Inc.* simply stands for the proposition that plaintiffs cannot bring a district court case to collaterally attack the procedures already used to issue a specific TSA order, because such challenges are exclusively reviewable under § 46110. 187 F.3d 263, 270 (2d Cir. 1999). As *Merritt* explains, a plaintiff may not sue in district court over "the procedures and reasons behind the agency action that aggrieved him" because that "would raise issues that were 'inescapably intertwined' with a review of the procedures and merits surrounding the FAA's order." *Id.* But again,

there was no prior proceeding here for Plaintiffs to challenge, so they cannot possibly be collaterally attacking how a non-existent proceeding was conducted. Indeed, in *Merritt II*, the Second Circuit determined that § 46110 did not preclude the district court from deciding Merritt's separate FTCA claim because he could not have brought it in the administrative proceeding. 245 F.3d 182, 191.

### 3. No administrative record or order exists to be reviewed under § 46110, and the limited relief available under § 46110 cannot provide an adequate remedy here.

The absence of any order or administrative record for the court of appeals to review here demonstrates the folly of bringing this case as a "petition for review" under § 46110. Unlike here, review under § 46110 requires an administrative record and a specific, dated "final order" that is subject to judicial review within 60 days of publication. *Blitz v. Napolitano*, 700 F.3d 733, 739 (4th Cir. 2012) ("final order" for purposes of § 46110 must be "capable of review on the basis of an administrative record"); *see also Gilmore v. Gonzales*, 435 F.3d 1125, 1133 (9th Cir. 2006) ("The existence of a reviewable administrative record is the determinative element in defining an [agency] decision as an 'order' for purposes of Section 46110.") (internal quotations omitted). Plaintiffs are unaware of any administrative record regarding the policies and practices challenged in this case, and the government has identified none. There is also no dated "final order" capable of review under § 46110. As Plaintiffs have alleged, TSA revised its directives for screening operations in 2009 in response to a lawsuit very similar to this one. FAC ¶¶ 363–368. Crucially, the process that led to the promulgation of those directives is not what Plaintiffs challenge, thus making § 46110 irrelevant and ending the inquiry.

The limited relief available under § 46110 further demonstrates why it does not preclude district courts from retaining jurisdiction of broad constitutional challenge like Plaintiffs'. A court of appeals may only "affirm, amend, modify, or set aside any part of the order . . . ." 49 U.S.C. § 46110(c). And the relief available under § 46110 is far too limited to provide an adequate remedy in broad constitutional challenge to abuses unrelated to any adjudicative "order." A court of appeals sitting under § 46110 has no authority to issue equitable relief, which Plaintiffs seek in this case, or award monetary damages. *See Mace*, 34 F.3d at 858; *Beins*, 695 F.2d at 599. It would be futile for Plaintiffs to file a petition for review under § 46110, because § 46110 has nothing to do with Plaintiffs' claims.

C.    **Counts I–III State Valid Claims.**

The government incorrectly argues that plaintiffs fail to state valid claims in Counts I–III of the FAC. Plaintiffs have brought valid *ultra vires* and Fourth Amendment claims against TSA and valid Fourth Amendment claims against DEA over the agencies' respective airport seizure policies.

1.    **Plaintiffs have stated valid *ultra vires* and Fourth Amendment claims against TSA.**

a.    TSA rightly does not argue that Plaintiffs' factual allegations regarding TSA agents' conduct fail to show statutory and constitutional violations.

Tellingly, TSA does not contest the fact that it exceeded its statutory authority and violated the Fourth Amendment with respect to the Named Plaintiffs and every other individual identified at ¶¶ 371–385 of the FAC—all of whom, as detailed, had their persons and/or their property seized by TSA merely for traveling with a "large" amount of cash. Nor does TSA suggest that there is any reason to believe these violations are not ongoing. TSA argues only that redress against the agency is unavailable because there is no "final agency action" at issue here—an argument that amounts to nothing but a legally erroneous assertion that the agency is immune from judicial review as long as it does not write down its unconstitutional policy in explicit terms.

*First*, TSA agrees with Plaintiffs that "[t]he scope of TSA transportation security screenings is limited to 'the inspection of individuals and property for weapons, explosives, and incendiaries.'" MtD 20 (quoting 49 C.F.R. § 1540.5). And, as TSA does not contest, it exceeded this limited scope of authority with respect to the Named Plaintiffs and every other traveler identified, *see* FAC ¶¶ 371–385, by engaging in unfounded criminal investigations unmoored from TSA's administrative search for weapons, explosives, or incendiaries—but instead based on the mere existence of a "large" amount of cash. TSA's conduct in these instances is *ultra vires* because it is in excess of its statutory authority.

*Second*, the law is clear that although TSA's administrative searches for weapons, explosives, and incendiaries do not require individualized suspicion, TSA's detentions and searches of travelers and their property must be confined to that purpose; any further detention or search must be based on at least reasonable suspicion of particularized criminal conduct—which traveling with a "large" amount of cash does not provide. *George v. Rehiel*, 738 F.3d 562, 577–79 (3d Cir. 2013) (detention or search

beyond administrative scope requires at least reasonable suspicion); *United States v. McCarty*, 648 F.3d 820, 836–37 (9th Cir. 2011) (same); *United States v. Aukai*, 497 F.3d 955, 962 (9th Cir. 2007) (same); *United States v. Fofana*, 620 F. Supp. 2d 857, 866 (S.D. Ohio 2009) (same); *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (detention of a person exceeding its original "mission" requires at least reasonable suspicion); *United States v. Law*, 384 F. App'x 121, 122 (3d Cir. 2010) (traveling with cash is not reasonable suspicion); *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (same).

In light of these conclusions, TSA is left to argue that in the absence of a written regulation or written policy explicitly commanding its agents to commit these statutory and constitutional violations, Plaintiffs cannot state either an *ultra vires* claim or a Fourth Amendment claim against the agency itself. TSA's argument evinces an utter disregard for the agency's legal and constitutional obligations. It also misunderstands APA case law, which makes clear that the pragmatic "final agency action" standard is met as long as an agency's written materials or its practices show that it has adopted, authorized, or ratified the unlawful policy at issue. As explained in the next section, Plaintiffs' well-pleaded factual allegations meet this standard, and the Court should deny TSA's motion to dismiss Counts I and II.

      b.   The APA provides redress against TSA for its adoption of an unlawful and unconstitutional de facto policy of treating "large" amounts of cash alone as evidence of criminality and detaining travelers and their property on that basis.

The Court should reject TSA's meritless effort to evade accountability for its agents' consistent, pervasive, and undefended unlawful and unconstitutional practices by arguing that there is no "final agency action" at issue here. MtD 18–22 Under blackletter federal administrative law, TSA's several written materials suggesting to its agents that seizures of travelers with "large" amounts of cash are expected and its consistent practices to that effect are sufficient to demonstrate the agency's adoption of a de facto policy of treating "large" amounts of cash as evidence of criminality and detaining travelers and their property on that basis—in violation of the agency's statutory authority and of the Fourth Amendment. *See* FAC Counts I, II.

Plaintiffs' detailed allegations demonstrate that for years and across the country, TSA's practice has been and continues to be seizing travelers, their cash, and their property beyond the scope of the

agency's administrative search authorization, based on nothing except those individuals' traveling with a "large" amount of cash—without regard to the agency's statutorily limited authority to search only for threats to transportation security and without regard to the Fourth Amendment's requirement of reasonable suspicion (which is not met by traveling with any amount of cash).

This practice is pervasive and ongoing. *See* FAC ¶¶ 152–174 (TSA's 2019 detention of Rebecca and her property in Pittsburgh, PA); ¶¶ 244–260 (TSA's 2020 detention of Stacy and her property in Wilmington, NC); ¶¶ 284–300 (TSA's 2015 detention of Matt and his property in Charlotte, NC); ¶¶ 371–385 (examples of TSA's ongoing conduct from 2011 to 2020 at airports across the country, including as detailed in police reports); *see also* Complaint, *State v. $12,986 in American Currency*, 49CIV20-1996 (S.D. 2d Jud. Cir. July 13, 2020) (state prosecutor stating that "[TSA] agents detained [a traveler] because of a large sum of currency in his carry-on luggage").

Yet, TSA argues that it cannot be held liable for its ongoing policy and practice of committing these statutory and Fourth Amendment violations because Plaintiffs have not been able to point to a written document (such as a training manual) *commanding* these violations. But that is not the law, and this Court should reject TSA's transparent attempt to dodge accountability with its "no final agency action" argument. Despite what TSA's written policy (which it enacted only after being sued for the very conduct at issue here, *see* FAC ¶¶ 364–370) says, the most plausible inference at this stage of the case is that TSA has a de facto policy of treating "large" amounts of cash (typically what a TSA agent thinks is $10,000 or more) as suspicious—and therefore the sole basis to detain travelers and their property beyond the scope of the agency's administrative search for weapons, explosives, and incendiaries. Pursuant to this de facto policy, Named Plaintiffs and the many travelers identified in paragraphs 371–385 of the FAC had their rights violated by TSA's detention practices.

As numerous courts around the country have held in evaluating APA challenges to federal agency practices, "[a]gency action generally need not be committed to writing to be final and judicially reviewable." *Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin*, 972 F.3d 83, 100 (D.C. Cir. 2020) (citing *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 930–31 (D.C. Cir. 2008)). Indeed,

either an agency's written materials or its pattern of conduct can demonstrate and "illuminate[]" that the agency has "adopt[ed]" the de facto policy challenged in litigation. *Venetian*, 530 F.3d at 931.

This is because the final agency action inquiry is a "pragmatic" one. *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249 (3d Cir. 2011). And it must account for the fact that the "Supreme Court has read the [APA] as embodying a basic presumption of judicial review." *M.B. v. Quarantillo*, 301 F.3d 109, 112 (3d Cir. 2002). "Thus, a number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 n.7 (S.D.N.Y. 2020) (collecting cases); *see also Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (collecting cases). These APA standards of judicial review are dictated by "[b]oth law and logic," because a contrary rule "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003).

Applying these basic APA principles here, the most plausible inference based on TSA's written materials and its pattern of conduct is that TSA has adopted a policy of treating "large" amounts of cash as suspicious and detaining travelers and their property solely on that basis.

*First*, TSA Operations Directive 400-54-6 and TSA Management Directive 100.4 (discussed and incorporated by reference, FAC ¶ 368) evince the agency's stated policy of acting as a quasi general law enforcement agency, going so far as to suggest that even though "[t]raveling with large amounts of currency is not illegal," the "quantity" of cash a person is traveling with is the primary factor for "indicating that currency may be related to criminal activity" (which the Directives do not limit to criminal activity that threatens transportation security). FAC ¶¶ 341, 352.

*Second*, TSA Management Directive 100.4—in conjunction with its discussion of the supposed suspicion created by traveling with large amounts of cash—instructs TSA agents to "request that [an] individual [traveling with a large amount of cash] remain accessible" to TSA while TSA notifies a law enforcement agency. The agency couches this in somewhat permissive rather than mandatory terms, but the implication to its agents is clear: do not let individuals traveling with a large amount of cash leave the screening area. And agents abide, as detailed in the FAC.

22

*Third*, TSA's Screening of Passengers by Observation Technique (SPOT) Referral Report Form instructs TSA Screeners that travelers who have a "[l]arge sum of monies with no apparent reason to possess" it should receive an "Automatic LEO Notification." And it is during that notification period that TSA Screeners regularly detain travelers and their property in violation of the law and the Constitution. As the DHS OIG found, these cash-related seizures do not advance TSA's transportation security mandate (i.e., its only mandate). *See* FAC ¶¶ 355–357.

*Fourth*, as found by the DOJ OIG, at least some TSA Screeners have incentives to detain travelers with large amounts of cash, based on Screeners' "lucrative relationships" for cash payments for turning travelers over to DEA—raising obvious "implications relating to compliance with the Fourth Amendment's protections against unreasonable searches and seizures." FAC ¶ 452.

*And finally*, from 2011 to the present, TSA agents across the country are, in fact, detaining travelers and their property based solely on their traveling with a "large" amount of cash—including Named Plaintiffs and a host of others with eerily similar experiences. *See* FAC ¶¶ 152–164, 244–260, 284–300, 371–385. This is not a coincidence. It is evidence of "prior, formal authorization" or "at least ratif[ication]" by TSA—especially because the agency "has done nothing to disassociate itself from its agents' behavior[.]" *Washington v. DHS*, 2020 WL 1819837, at *5 (W.D. Wash. Apr. 10, 2020).[2]

Under the plausible allegations of the FAC, the most logical inference is that TSA has adopted the practices at issue in this case as de facto policy, and its motion to dismiss on "final agency action" grounds must be denied. *See Venetian*, 530 F.3d at 929–30 (denying summary judgment to agency "[a]lthough the details of [its unwritten] policy are still unclear"). Given the pragmatic nature of this inquiry, for this Court to hold otherwise would be to "exhibit a naiveté [regarding the agency] from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (internal quotation omitted).

---

[2] For all these reasons, the cases that TSA relies on, MtD 21–22, are obviously inapposite. Plaintiffs' allegations are not speculative assertions based on one-off incidents, nor are they based on an amorphous definition of a purported policy. Rather, Plaintiffs have identified and defined specific unlawful and unconstitutional practices tied to TSA's own written policies and alleged many examples where those practices have been consistently implemented over a broad range of time and locations.

2. **Plaintiffs have stated valid Fourth Amendment claims against DEA.**

a. The APA provides redress against DEA for its unconstitutional de facto policies of seizing travelers merely for having "large" amounts of cash and of treating travelers' "large" amounts of cash as presumptively subject to seizure for civil forfeiture.

DEA's "no final agency action" argument, MtD 23, 27–28, fails for the same reasons as TSA's: DEA has adopted the unconstitutional personal seizure and cash seizure policies detailed in Count III, as demonstrated by the agency's consistent practice—including that of an Operation Jetway interdiction instructor—of seizing travelers known or believed to be traveling with a "large" amount of cash, that same instructor's actions, the testimony of other DEA agents as to their training regarding the presumption of seizure for civil forfeiture of "large" amounts of cash, and the findings of the DOJ OIG that DEA conducts its airport encounters in a manner that travelers may interpret as non-consensual seizures and searches "similar to their obligations at a TSA checkpoint."

Like TSA, DEA callously dismisses the consistent (in manner and over time) constitutional violations and deprivations of liberty and property carried out by its agents against innocent people as an irrelevant "handful of individual travelers." MtD 28. Far from that, the experiences of Named Plaintiffs Rebecca and Stacy and the fourteen other identified travelers (and others who depended on those travelers' money) at airports across the country demonstrate that DEA has "adopted" two unconstitutional policies, *Venetian*, 530 F.3d at 931: first, seizing travelers at airports based solely on the knowledge or belief that they are traveling with a "large" amount of cash, which is not reasonable suspicion of criminality; and second, treating "large" amounts of cash as presumptively subject to seizure for civil forfeiture regardless of whether the DEA agent has established probable cause of any particular criminal activity. *See* FAC ¶¶ 415–430, 431–436.

It beggars belief for DEA to deny that it has a policy of seeking out air travelers based solely on the knowledge or belief that they are traveling with a large amount of cash, and relying on the post-9/11 airport setting to initiate non-consensual seizures of those travelers. *See* FAC ¶¶ 414–418. Based on the similar experiences of Named Plaintiffs and so many others across the country, Plaintiffs have alleged more than enough for the Court to plausibly infer at this stage of the case that DEA's pervasive practices are not a mere coincidence. DEA runs a national airport interdiction program called

Operation Jetway, which operates at every major commercial airport in the United States, provides standardized training, and seizes tens of millions of dollars a year from airport travelers. FAC ¶¶ 401–409. DEA-trained agents conduct the vast majority of their airport seizures "absent any preexisting intelligence of a specific drug crime." And DEA's seizures have typically not "advanced or been related to ongoing investigations." FAC ¶¶ 411–412 (quoting DOJ OIG, *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* at iii, 20–22 (Mar. 2017)).

Anthony DiGiovanni—the DEA agent who seized Named Plaintiff Stacy and her husband based on TSA's alert that they were traveling with a "large" amount of cash and then seized their cash for civil forfeiture without probable cause—is an Operation Jetway instructor, FAC ¶¶ 266, 413, which plausibly suggests that the common experiences identified throughout the FAC are inculcated through DEA's training. While that training is not publicly available, the most plausible inference based on the allegations of the FAC is that DEA is training its interdiction agents to (1) treat cash alone as reasonable suspicion of criminality justifying the seizure of travelers and (2) treat "large" amounts of cash as presumptively subject to seizure for civil forfeiture—sometimes without even conducting any investigation, as found by the DOJ OIG. FAC ¶¶ 438–440.

In short, the unconstitutional personal seizure and cash seizure practices detailed in the FAC are the result of DEA policy, and the agency cannot dodge accountability for them. These are not the disjointed or disparate actions of untrained law enforcement officers. They are the products of DEA's standardized, nationwide Operation Jetway trainings and practices. The consistency and similarity of DEA's practices at airports across the country, over a period of years, by agents receiving the same standardized training, plausibly demonstrate "prior, formal authorization" or "at least ratif[ication]" by the agency of its agents' practices—especially because DEA "has done nothing to disassociate itself from its agents' behavior." *Washington v. DHS*, 2020 WL 1819837, at *5.

DEA makes much of the fact that Plaintiffs have not been able to precisely identify whether DEA treats any *specific amount* of cash as presumptively subject to seizure for civil forfeiture, or whether the trainings and policies are simply based on the existence of a "large" amount of cash. MtD 27–28. At this stage of the case, the practices described in the FAC—including DEA agents' own testimony,

travelers' consistent experiences across the country, and the findings of the DOJ OIG—are sufficient to plausibly allege that DEA has adopted the policies at issue and deny its motion to dismiss. *See Venetian*, 530 F.3d at 929–30 (denying summary judgment to agency based on its adoption of a de facto policy "[a]lthough the details of [its unwritten] policy are still unclear"). And in any event, a de facto policy that treats a "large" amount of cash as satisfying reasonable suspicion or as presumptively subject to seizure for civil forfeiture is just as unconstitutional as a formal written policy that treats a particular amount of cash as satisfying reasonable suspicion or as presumptively subject to seizure for civil forfeiture. Either way, the agency is treating a lawful and innocuous activity as a basis for seizing people and property—a clear violation of the Fourth Amendment.

> b. DEA's personal seizure and cash seizure policies clearly violate the Fourth Amendment, and the experiences of Named Plaintiffs and others are illustrative of how those policies operate at airports across the country.

DEA (unlike TSA) also erroneously argues that its personal seizure and cash seizure policies are constitutional. MtD 23–24 (regarding personal seizure policy), 25 (regarding cash seizure policy). DEA's argument regarding its personal seizure policy is wrong because it ignores the effect of approaching individuals in the high-security setting of an airport screening area or airline gate and asking questions that indicate knowledge of those individuals' particular circumstances (i.e., traveling with cash), thereby conveying that compliance with agents' requests is required. And DEA's argument regarding its cash seizure policy is wrong because it rests entirely on the agency's inexplicable description of seizure for civil forfeiture as a temporary deprivation that requires only reasonable suspicion, as opposed to an indefinite deprivation that requires probable cause. In any event, the constitutional infirmity with DEA's cash seizure policy is that it presumes "large" amounts of cash are subject to seizure for civil forfeiture regardless of reasonable suspicion *or* probable cause.

*First*, DEA argues that its personal seizure policy does not violate the Fourth Amendment because "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, . . . ask to examine the individual's identification, . . . and request consent to search his or her luggage, . . . as long as the police do not convey a message that compliance with

their requests is required." MtD 24 (quoting *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991)). But this reasoning is inapposite where, as here, the police agency has a policy of targeting individuals based on a particular characteristic (traveling with cash) in the non-public, high-security setting of a TSA screening checkpoint or airport gate and *conveying to those individuals that they are being targeted for questioning based on traveling with cash*—in other words, approaching travelers in a place and in a manner that suggests they are not free to decline to cooperate and are obligated to answer questions.

The personal seizure policy at issue here is not about "approaching an individual on the street or in another public place[.]" MtD 24 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). It is about approaching individuals known or believed to be traveling with cash in the non-public, high-security settings of TSA screening checkpoints and airline gates of post-9/11 commercial airports in the United States. *See* FAC ¶¶ 416–425. In this context—in which air travelers are constantly asked for identifying information, warned about failure to comply with officials' orders, and constantly reminded of the high-security nature of their location—when air travelers are approached by DEA interdiction agents, they reasonably believe that they are legally obligated to cooperate with those officers, including answering their questions and submitting to searches upon risk of being prevented from flying or being further detained. Indeed, it was in this context that the DOJ OIG found DEA conducts its airport encounters in a manner that travelers may interpret "to mean they are required to consent to the encounter, similar to their obligations at a TSA checkpoint." FAC ¶ 453.[3]

In short, the Supreme Court's holding that merely asking travelers to consent to questions is not automatically a seizure is of no consequence given the circumstances of this case. Those circumstances

---

[3] Plaintiffs' position is not in tension or conflict with the Supreme Court's holding in *Bostick* that it is not a "per se" violation of the Fourth Amendment for drug interdiction agents to ask consensual questions of random travelers on a bus or in an "airport lobby." 501 U.S. 439–40. The policy at issue here is not about asking consensual questions of random travelers. It is about asking targeted questions to particular travelers of the sort that—particularly when combined with the modern-day high security setting of an airport—*indicate individualized knowledge of those travelers' circumstances*, namely the fact that they are traveling with "large" amounts of cash that piqued law enforcement's interest enough to seek them out in the high-security setting of an airport. Enjoining such a policy would not eradicate consensual encounters at airports, nor hinder DEA from conducting *Terry* stops of individuals who do *actually* arouse reasonable suspicion of particularized criminal activity.

are illustrated by the experiences of Named Plaintiffs Rebecca and Stacy, as well as more than a dozen other travelers across the country. Their encounters with DEA were not consensual interviews; they were non-consensual seizures. *See* FAC ¶¶ 177–196 (non-consensual seizure of Rebecca); 264–272 (non-consensual seizure of Stacy); *see also* FAC ¶ 446 ("On March 12, 2018, four plainclothes DEA agents at the Detroit Metropolitan Wayne County Airport (DTW) positioned themselves directly between domestic air traveler Qui Ta and his boarding gate in order to ask him questions about the cash they knew he was traveling with, presumably because they were alerted by TSA Screeners [after] his transportation security screening.").

For example, DEA agent Dawkin approached Rebecca at an airline gate, immediately indicated that he knew about the cash she was traveling with, and demanded that she move to a different area for questioning about that cash. He did so along with another law enforcement officer who had already interrogated Rebecca about the cash. FAC ¶¶ 177–184. In Stacy's case, DEA agent DiGiovanni took over her interrogation while she and her husband were already detained against their will in a sheriff's deputy's office—based solely on the fact that TSA detained her upon detecting a "large" amount of cash during her transportation security screening. FAC ¶¶ 263–266.

These seizures were unconstitutional because Dawkin and DiGiovanni conducted them without a particularized basis to suspect that these travelers were committing a particular crime (or any crime). Rather, they seized Rebecca and Stacy merely for traveling with a "large" amount of cash—which is not reasonable suspicion. *Law*, 384 F. App'x at 122; *Sokolow*, 490 U.S. at 9. And because that policy of relying on an impermissible justification (traveling with cash) for seizing individual travelers is the agency action that Plaintiffs seek to declare unconstitutional and enjoin, Plaintiffs' Fourth Amendment claim is sufficiently pleaded and properly before the Court. *See Floyd*, 959 F. Supp. 2d at 588 (holding NYPD stop-and-frisk policy violates Fourth Amendment, in part due to impermissible "unwritten policy of targeting racially defined groups for stops" without reasonable suspicion).

*Second*, DEA argues that its cash seizure policy is constitutional because seizing cash for civil forfeiture requires only reasonable suspicion. This argument is misguided for two reasons. First, seizing cash for civil forfeiture is an indefinite deprivation—not a temporary one—and therefore

requires probable cause. Second, DEA's argument misses the point, which is that the agency treats "large" amounts of cash as presumptively subject to seizure for civil forfeiture *without regard to any Fourth Amendment standard.*

DEA's effort to re-cast its actions against Named Plaintiffs Rebecca and Stacy as temporary deprivations of their cash requiring only reasonable suspicion (as opposed to the proper standard of probable cause required when seizing cash for civil forfeiture) is a ruse. In both instances, DEA took the Named Plaintiffs' cash for civil forfeiture right off the bat, knowing that the deprivation was not going to be short in duration. FAC ¶¶ 192–197 (DEA agent Defendant Dawkin took Terry's and Rebecca's cash and immediately provided her a civil forfeiture notice, sending her on her way to board a flight to Boston—resulting in a seven-month deprivation of her father's life savings.); FAC ¶¶ 267–270 (DEA agent DiGiovanni told Stacy to expect a receipt for her uncounted seized cash "in a week or so"—making clear that this was no temporary deprivation. That receipt never came, and DEA still has her money.); *see also* FAC ¶ 442 ("Almost immediately, they asked if he had any cash, and when he said yes, they seized for civil forfeiture his entire $16,000 in lawfully earned savings."). These were not temporary deprivations requiring reasonable suspicion; they were indefinite deprivations knowingly made for the purpose of civil forfeiture and required probable cause. *See United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d 215, 221, 225–26 (3d Cir. 2001) (seizure for forfeiture requires probable cause); *cf. United States v. Frost*, 999 F.2d 737, 740 (3d Cir. 1993) (temporary seizure upon reasonable suspicion is acceptable only if the property is not detained for a "long period of time"); *United States v. Place*, 462 U.S. 696, 709–10 (1983) (detention of property for 90 minutes upon reasonable suspicion violated the Fourth Amendment).

More fundamentally, the problem with DEA's cash seizure policy is not that it treats reasonable suspicion as the standard to seize cash for civil forfeiture (though such a policy would also be unconstitutional for the reasons just discussed); the problem is that DEA treats "large" amounts of cash as presumptively subject to seizure for civil forfeiture without regard to probable cause *or* reasonable suspicion. *See* FAC ¶¶ 430–436. This treatment is illustrated by the experiences of not only the Named Plaintiffs, but also many other individuals across the country detailed in the FAC, all of

whom Plaintiffs plausibly allege had their cash seized for civil forfeiture by DEA without any evidence of criminal activity and based solely on DEA's knowledge that they were traveling with "large" amounts of cash—which DEA treats as automatically or presumptively subject to seizure for civil forfeiture without any evidence of criminality. *See* FAC ¶¶ 440–450 (illustrating DEA's unconstitutional policy that "You have to have a legitimate reason to travel with a large amount of currency" to avoid DEA seizing it for civil forfeiture).

In sum, Plaintiffs' allegations plausibly demonstrate that DEA has adopted personal seizure and cash seizure policies that violate the Fourth Amendment, and the agency's motion to dismiss Count III of the FAC for failure to state a claim must be denied.

## II. Count IV Is Properly Pleaded, and Plaintiffs Preserve It for Appeal.

The government argues this Court lacks subject matter jurisdiction over Count IV regarding the return of interest on the money seized from Terry and Rebecca, claiming that sovereign immunity bars the claims. MtD 28–29. But Terry and Rebecca have not brought claims for monetary damages, so their claims are not barred by sovereign immunity. Instead they simply seek the return of the full *res* that was seized, including the interest that accrued while it was held by DEA. Plaintiffs recognize that these arguments are foreclosed by *United States v. Craig*, 694 F.3d 509, 512 (3d Cir. 2012), and seek to preserve this argument for possible review *en banc* or by the U.S. Supreme Court.

## CONCLUSION

For the reasons stated above, this Court should deny the government's Motion to Dismiss.

Dated: October 30, 2020                      Respectfully submitted,

                                             /s/ Dan Alban
                                             Dan Alban*
                                             VA Bar No. 72688

                                             Jaba Tsitsuashvili*
                                             DC Bar No. 1601246

                                             INSTITUTE FOR JUSTICE
                                             901 North Glebe Rd., Suite 900

30

Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org

*Attorneys for Plaintiffs*

*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2020, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Dan Alban