## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBECCA BROWN, *et al.*, | ) | |
| | ) | Civil Action No. 2:20-cv-64 |
| Plaintiffs, | ) | |
| v. | ) | District Judge Marilyn J. Horan |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | ECF Nos. 47, 55 |
| | ) | |

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTIONS TO DISMISS

For the reasons set forth below, it is respectfully recommended that the Government Defendants' Motion to Dismiss, ECF No. 55, be denied as to Counts I through III and granted as to Count IV; and that Defendant Dawkin's Motion to Dismiss, ECF No. 47, be granted.

## I.  Factual and Procedural History

Plaintiffs, Rebecca Brown, Auguste Terrence Rolin, Stacy Jones-Nasr and Matthew Berger ("Plaintiffs"), allege that their persons and effects, including their cash, were successively seized by Defendants Transportation Security Agency ("TSA") and Drug Enforcement Agency ("DEA"), without probable cause or reasonable suspicion of criminal conduct on their part, based on alleged policies or practices (the "Seizure Policies") on the part of TSA to detain domestic air travelers found through security screenings to be in possession of large sums of cash, and on the part of DEA to continue or resume such detention in order to seize such cash for civil forfeiture.  Plaintiffs bring the present action on behalf of themselves and a putative class of similarly-situated travelers against TSA and its Administrator David P. Pekoske, DEA and its Acting Administrator Timothy J. Shea, DEA Agent Steve Dawkin in his individual capacity, and the United States. They assert the following claims: a class claim under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA") for *ultra vires* conduct against TSA, Pekoske and the United States (Count I); a class claim for unconstitutional conduct under the APA and the Fourth Amendment against TSA, Pekoske and the United States (Count II); a class claim for

1

unconstitutional conduct under the APA and the Fourth Amendment against DEA, Shea and the United States (Count III); individual claims by Brown and Rolin for return of interest on seized cash against DEA, Shea and the United States (Count IV); and individual damages claims by Brown and Rolin under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) against Dawkin (Count V).  Presently before the Court are two Motions to Dismiss, filed by TSA, Pekoske, DEA, Shea and United States (the "Government Defendants"), and by Dawkin, ECF Nos. 55 and 47, respectively.  The Government Defendants' Motion argues that Plaintiffs lack standing; that the Court lacks jurisdiction over claims under the APA; that the First Amended Complaint, ECF No. 43 ("FAC") fails to state a plausible claim; and that Plaintiffs' claim for interest is barred by sovereign immunity.  Dawkin's Motion argues that extension of *Bivens* to airport seizures is unwarranted, and that Plaintiffs' Count V claims are barred by qualified immunity.

## II.  <u>Standard of Review</u>

### A.  <u>Motion to Dismiss</u>

The United States Court of Appeals for the Third Circuit summarized the standard to be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." As explicated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claimant must state a "plausible" claim for relief, and "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213 (quotation marks and citations omitted); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 117-18 (3d Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).  In addition, "[w]hen reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff. . . .  [W]here there are well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citations and internal quotation marks omitted).

### B.   Standing

The Third Circuit has also summarized the legal principles governing standing to sue under Article III:

> In order to have Article III standing to sue, a plaintiff bears the burden of establishing "(1) [an] injury-in-fact … that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) [a likelihood] … that the injury will be redressed by a favorable decision."  When, as in this case, prospective relief is sought, the plaintiff must show that he is "likely to suffer future injury" from the defendant's conduct.  In the class action context, that requirement must be satisfied by at least one named plaintiff.  The threat of injury must be "sufficiently real and immediate," and, as a result of the immediacy requirement, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects."

*McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (brackets and ellipses in original; citations and parentheticals omitted).  In addition, "when standing is challenged on the basis of the pleadings, we 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'"  *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988), quoting *Warth v. Seldin*, 422 U. S. 490, 501 (1975) (ellipsis in *Pennell*).

## III.  Analysis

### A.   Plaintiffs have standing

Plaintiffs assert that they desire to travel by air with large sums of cash; that if they were to do so they would be likely to suffer seizure of their persons, effects and cash as a result of the Seizure Policies; and that they are therefore effectively obliged to refrain from such lawful conduct, to their detriment.  The Government Defendants do not dispute that injuries attendant on seizure of one's person, effects or cash would be concrete and particularized, or that the

3

prospect of such injuries would be redressible by injunctive relief.[1]  Instead, the Government
Defendants argue that no injury to Plaintiffs is imminent or likely because Plaintiffs do not allege
plans to travel with large sums of cash; and that Plaintiffs cannot "manufacture" standing by
"choosing" to refrain from traveling with a large amount of cash.  In support of their arguments
as to both prospective and present injury, the Government Defendants rely primarily upon
*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), in which the Supreme Court held that
lawyers and journalists could not establish injury in fact from a foreign surveillance program
based on speculation or fear that their foreign contacts might be targeted.  *Clapper* does not
undermine Plaintiffs' assertion of standing in this case for two principal reasons.

     First, although the *Clapper* Court invoked a "certainly impending" standard, its holding
was predicated on the speculative nature of the "attenuated chain of inferences" necessary to find
injury from the challenged statute.  The Court expressly acknowledged that plaintiffs are not
required to demonstrate that identified harms are literally "certain" to come about, and that it has
sometimes found standing "based on a 'substantial risk' that the harm will occur."  568 U.S. at
414 n.5, quoting *Monsanto v. Geertsen Seed Farms*, 561 U.S. 139, 153 (2010).[2]  The Court had
no occasion to determine the extent to which "the 'substantial risk' standard . . . is distinct from
the 'clearly impending' requirement," because it found that the *Clapper* plaintiffs' injury claims
fell short of either standard.  In particular, the Court found the plaintiffs' assertion that their
foreign contacts were likely to be targeted for surveillance to be mere speculation because they
had "no actual knowledge of the Government's . . . targeting practices."  568 U.S. at 411.  In the
present case, in contrast, Plaintiffs have plausibly alleged policies or practices on the part of the
Government Defendants to target travelers with large sums of cash.  And rather than relying
upon speculation or assumption, Plaintiffs have supported their claims with official agency

---

[1] *Cf. Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185-86
(2000) ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future
injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that
conduct and prevents its recurrence provides a form of redress.").

[2] Additional cases cited in Footnote 5 of *Clapper* formulate the standard for "substantial risk" in
terms of whether a threat is "realistic."  *See Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982)
(finding standing based on "substantial," "quite realistic" threat); *Babbitt v. Farm Workers*, 442
U. S. 289, 298 (1979) (requiring "realistic danger" of direct injury); *Pennell*, 485 U.S. at 8
(same, quoting *Babbitt*).

4

promulgations, investigative findings, and numerous instances of actual seizures.  See Section 3, *infra*.  *Cf. O'Shea v. Littleton*, 414 U. S. 488, 496 (1974) ("past wrongs are evidence bearing on whether there is real and immediate threat of repeated injury").  If we accept the premise (as we must at the pleading stage) that TSA and DEA have adopted policies or practices of seizing large sums of cash discovered in TSA screenings, then it is a reasonable inference that if Plaintiffs were to resume domestic air travel with large sums of cash, there would be an imminent, substantial risk that their persons, effects and cash would be subjected to seizure by the TSA and the DEA.

Second, the Court also acknowledged in *Clapper* that the "substantial risk" supporting standing "may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."  568 U.S. at 414 n.5.  This language plainly indicates that a plaintiff's avoidance of a threatened harm – at a cost – does not negate standing.[3]  On the contrary, as the Supreme Court has stated, "the need to take . . . affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury."  *Meese v. Keene*, 481 U. S. 465, 475 (1987). More particularly, where, as here, a plaintiff has "eliminated the imminent threat of harm by simply not doing what he claimed the right to do," his conduct does not "cause[] the dispute no longer to be a case or controversy within the meaning of Article III," because "the threat-eliminating behavior was effectively coerced."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 127 S.Ct. 764, 772 (2007).[4]

A recent Supreme Court case illustrates the application of this principle in circumstances analogous to the present case.  In *New York State Rifle & Pistol Assn. v. City of New York*, 500 U.S. ___, 140 S.Ct. 1525 (2020), the petitioners wished to take their handguns to ranges and competitions outside of New York City, but refrained from doing so due to an allegedly

---

[3] As two of the cases cited in Footnote 5 of *Clapper* observe, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief."  *Blum*, 457 U.S. at 1000; *Babbitt*, 442 U.S. at 298 (quoting *Pennsylvania v. West Virginia*, 262 U. S. 553, 593 (1923)).

[4] *MedImmune* concerned the limits of jurisdiction under the Declaratory Judgment Act.  As the Court noted, "[t]he justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing (whether plaintiff is threatened with 'imminent' injury in fact 'fairly . . . traceable to the challenged action of the defendant')."  127 S.Ct. at 772 n.8, quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 (1992) (internal quotation marks and brackets omitted; ellipsis in original).

unconstitutional ordinance.  140 S. Ct at 1530-31 (Alito, J., dissenting).  Despite the absence of any allegation that the petitioners had imminent future plans to travel with their guns in defiance of the ordinance, Justice Alito – the author of the majority opinion in *Clapper* – observed that it was "not disputed that petitioners have standing to contest the City's restrictions on trips to out-of-city ranges and competitions, and as a result of those restrictions, petitioners have suffered and will continue to suffer injury that is concrete, traceable to actions taken by the City, and remediable by a court."  *Id*. at 1540.[5]

The Government Defendants contend that cases predicating standing on the cost of avoiding substantial risk "are inapposite, as they involve[] statutes or regulations that proscribe[] certain conduct."  ECF No. 65 at 3.  However, the Government Defendants do not identify any reason or authority to support their implicit contention that costs incurred to avoid non-statutory, non-regulatory risks are less injurious than those incurred to comply with a statute or regulation.  In any event, in *MedImmune*, the Supreme Court held that the Article III "case or controversy" requirement is met in "situations in which the plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of *a private party* rather than the government."  127 S.Ct. at 773 (italics in original).  Since a private party cannot enact statutes or regulations or otherwise proscribe conduct, *MedImmune* stands in opposition to the Government Defendants' asserted rule.

Finally, the Government Defendants argue that Plaintiffs' choices to refrain from traveling with large sums of cash cannot be attributable to the TSA's and DEA's Seizure Policies, because the Plaintiffs were undeterred by those policies before they became aware of them.  ECF 56 at 14-15; ECF No. 65 at 2-3.  This is clearly a *non-sequitur*.  It is hardly surprising that one would take steps to guard against a risk after, rather than before, becoming aware of it.[6]  *Cf. New York State Rifle*, 140 S.Ct. at 1531 (Alito, J., dissenting) (slip op. at 8)

---

[5] To similar effect, *see, e.g.*, *Laidlaw*, 528 U.S. at 184 (finding injury in fact based on plaintiffs' "conditional statements" that they would like to use a river for recreation but refrained due to concerns about defendants' pollutant discharges).

[6] The universal understanding of this connection between experience-based awareness of risk and subsequent precautions is captured in the aphorism, "once burned, twice shy."

(noting that petitioners "regularly traveled outside the City to ranges and championships before learning of the restriction imposed by" the challenged ordinance).

> **B.      This Court has jurisdiction to adjudicate Plaintiffs' claims with respect to TSA's alleged Seizure Policy.**

The Government Defendants argue that "to the extent Plaintiffs challenge an existing TSA policy or procedure regarding airport security," jurisdiction over such a challenge lies exclusively in the Courts of Appeals pursuant to 49 U.S.C. § 46110.  However, Plaintiffs allege that the TSA Seizure Policy they seek to challenge applies only "*after* TSA Screeners have concluded the transportation security screening."  FAC ¶ 90, FAC at 15.

To assess the Government Defendants' jurisdictional argument, we turn first to the statutory language.  *Cf. Merritt v. Shuttle, Inc.*, 245 F.3d 182 (2d Cir. 2001) ("Merritt II") ("In determining whether Section 46110 deprives the district court of jurisdiction . . . , we must begin with the text of the statute.").  Section 46110 provides in relevant part:

> (a) . . . . .  [A] person disclosing a substantial interest in *an order* issued by . . . the Administrator of the Transportation Security Administration *with respect to security duties and powers designated* to be carried out by the Administrator of the Transportation Security Administration . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.  The petition must be filed not later than *60 days after the order is issued*.  . . . .
>
> (b) . . . . .  The . . . Administrator of the Transportation Security Administration . . . shall file with the court *a record of any proceeding in which the order was issued* . . . .
>
> (c) . . . . .  [T]he court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order . . . . .
>
> (d) . . . .  In reviewing an order under this section, the court may consider an objection . . . only if the *objection was made in the proceeding* conducted by the . . . Administrator of the Transportation Security Administration . . . or if there was a reasonable ground for not making the objection in the proceeding.
> . . . . .

49 U.S.C. § 46110 (emphasis added).  Two problems with the Government Defendants' argument arise from consideration of the statutory text, as indicated by the phrases emphasized

in italics. First, the statute contemplates an actual *order* issued by the TSA Administrator, rather than an informal policy or practice.  The requisite formality is reinforced by the statute's contemplation of a date of *issuance*, administrative *proceedings* and a *record*.  The Government Defendants do not contend that any of these formal attributes of an administrative order is present here. Second, as applied to the TSA the statute is limited to orders *with respect to security duties and designated powers* of the TSA.  As alleged by Plaintiffs, the TSA Seizure Policy is *ultra vires* precisely because it is unrelated to the TSA's security duties or other designated powers.

A principal case upon which the Government Defendants rely is *Blitz v. Pistole*, 700 F.3d 733 (4th Cir. 2012), which affirmed dismissal under § 46110 of a "challenge to TSA's standard operating procedures for checkpoint screening ('[the] SOP')."  ECF No. 65 at 5.  It is instructive to compare *Blitz* with the present case with respect to the statutory criteria discussed above: First, in *Blitz*, the TSA Administrator submitted a Declaration providing the SOP's dates of revision and implementation, and affirming that the SOP was approved by him and constituted "TSA's final agency decision" governing the conduct at issue.  700 F.3d at 736.  Moreover, the TSA represented in *Blitz* that it would "submit the relevant administrative record" if the plaintiffs were to file a petition in an appropriate Court of Appeals.  *Id.* at 739.  In view of its formal attributes, the Court had little difficulty concluding that the SOP "constitutes an order of the TSA Administrator under § 46110."  *Id.* at 740. Second, the challenged TSA policy embodied in the SOP at issue in *Blitz* consisted of invasive security screening procedures adopted by the TSA in response to an attempted bombing.  There can be no question that an order implementing such procedures is "with respect to [the TSA's] security duties."

Implicitly recognizing that Plaintiffs are not challenging any TSA security policy, the Government Defendants also assert that to the extent Plaintiffs challenge an unwritten policy or practice "in conjunction with" (*i.e.*, separate from) airport security protocols, "any such policy or practice would be 'inescapably intertwined' with the policies and procedures for airport security screening adopted by the Administrator of TSA."  ECF No. 56 at 16.  The Government Defendants make no attempt to explain why this would be so.

The Government Defendants rely upon *Merritt v. Shuttle, Inc.*, 187 F.3d 263 (2d Cir. 1999) ("Merritt I"), in which the Court held that § 46110 precluded District Court jurisdiction

over a pilot's *Bivens* claim against FAA investigators who blamed him for taking off in bad weather, because that claim was inescapably intertwined with an FAA order suspending his license for the same incident.  On a subsequent appeal in the same case, the Second Circuit explained that "[i]n Merritt I, we held that the District Court lacked subject matter jurisdiction to hear Merritt's *Bivens* claim precisely because that claim challenged the ALJ's order suspending Merritt's pilot's certificate."  Merritt, 245 F.3d at 189.  The Court elaborated on the test of whether a claim is inescapably intertwined with review of an administrative order: "[T]he mere overlap of evidence and testimony adduced in the two proceedings, or the mere overlap of findings made by an ALJ and by a district Court judge are insufficient to preclude the district Court from hearing a given claim.  Such overlap is relevant only if the claim attacks the matters decided by the administrative order."  *Id.*  In the present case, the Government Defendants have not identified any security-related (or otherwise *intra vires*) policy, procedure or order that is even arguably "attacked" by Plaintiffs' challenge to the TSA's Seizure Policy.  Because Plaintiffs are not directly or indirectly challenging an administrative order under § 46110, this Court is not divested of subject-matter jurisdiction over their claims.

> **C.**     **Counts I – III of the FAC state claims upon which relief may be granted.**

Counts I through III are predicated on alleged policies or practices on the part of TSA to detain domestic air travelers in possession of large sums of cash, despite the absence of a transportation security risk or probable cause or reasonable suspicion of criminal conduct (the "TSA Seizure Policy"); and on the part of DEA to extend or resume such detention in order to seize such cash for civil forfeiture, again without probable cause or reasonable suspicion of criminal conduct (the "TSA Seizure Policy").  Plaintiffs claim that the TSA Seizure Policy exceeds TSA's lawful authority (Count I) and violates the Fourth Amendment (Count II); and that the DEA Seizure Policy also violates the Fourth Amendment (Count III).

The Government Defendants do not dispute that the Seizure Policies, if established, would be *ultra vires* and unconstitutional.  However, they assert that the FAC does not plausibly plead the existence of such policies or practices under the standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  The Government Defendants characterize Plaintiffs' allegations as "merely a conclusion – effectively, a recitation of the elements of Plaintiffs' claim"; "at best, an 'amorphous description'" of  "actions by

individual TSA screeners in particular cases" involving a "handful of individual travelers." ECF No. 56 at 20-21, 23, 28. However, just as mere conclusory averments would not suffice to state a claim, by the same token merely labeling allegations conclusory does not make them so. Here, Plaintiffs allege much more than mere conclusions tracking the elements of their claims.

First, Plaintiffs relate dozens of incidents of travelers being detained by the TSA after completion of security screening, and/or then being detained by the DEA, for the purpose of seizing the travelers' currency. FAC at ¶¶ 148-196, 244-272, 284-305, 364, 372-385, 441-451. That is more than a "handful".

Second, Plaintiffs identify TSA Operations and Management Directives, Operating Procedures and other TSA documents that direct TSA Screeners who encounter travelers with cash in excess of $10,000 to investigate ("[c]onduct the procedures for checking travel documents"), to notify law enforcement, and to ask the travelers to "remain accessible". FAC at ¶¶ 350-53, 355, 368; ECF No. 62 at 22.

Third, Plaintiffs allege that in April, 2009 TSA stated on its website that passengers' required cooperation with the TSA screening process includes "answering questions about . . . why they are carrying a large sum of cash"; that it was "standard practice for TSA Screeners to 'ask a passenger who is carrying a large sum of cash to account for the money'"; and that such investigations for the purpose of "detecting 'signs of criminal activity'" were among the "principal duties of TSA Screeners". FAC at ¶¶ 365, 366.

Read in the light most favorable to Plaintiffs, the FAC plausibly alleges that the TSA previously adopted a policy of having TSA Screeners interrogate passengers carrying large sums of cash, for law enforcement rather than transportation security purposes; that TSA continues to maintain written policies and standard practices governing TSA Screeners' encounters with travelers carrying large sums of cash; and that the Screeners' consistent practice has been to detain travelers and their effects while awaiting law enforcement. A fair inference (again, in the light most favorable to Plaintiffs) is that the Screeners' persistent course of conduct on a matter closely regulated by the TSA is revelatory of the agency's policy.

The Government Defendants appear to argue that to plead a claim based on custom or policy, Plaintiffs must "specify what exactly [the] custom or policy [is]." ECF No. 56 at 21

(quoting *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009)).  However, the complaint in *McTernan* gave "no notice as to the Defendants' improper conduct," but simply alleged a "policy of ignoring First Amendment" rights.  654 F.3d at 658.  Plaintiffs' FAC, in contrast, explicitly alleges the salient elements of the TSA's alleged policy or practice, and its extensive factual allegations provide ample notice of "what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2006); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).   *Compare McTernan*, 564 F.3d at 658.

Fourth, Plaintiffs allege that the DEA runs a national interdiction program called "Operation Jetway" which seizes tens of millions of dollars per year from travelers at every major commercial airport, and which provides standardized training and data collection and analysis.  FAC at ¶¶ 401-09. Fifth, the Plaintiffs allege that a 2017 Department of Justice Inspector General's Report found that most DEA seizures reviewed were unrelated to investigations, posing a risk that DEA "is more interested in seizing and forfeiting cash than advancing an investigation or prosecution."  FAC at ¶ 411. And sixth, Plaintiffs allege that DEA interdiction agents have testified that they were trained by the DEA to regard travelers' cash in excess of $5,000 as presumptively subject to seizure.  FAC at ¶ 438. Again, considering the factual allegations in the light most favorable to Plaintiffs, it is reasonably inferable that the DEA adopted policies and practices governing seizure of cash at airports, and that the DEA agents' persistent practice of detaining travelers and seizing their cash based solely on its amount is consistent with and revelatory of the agency's policy.[7]

The Government Defendants argue that "the policy at issue" did not direct agents to seize cash in excess of $5,000, but "simply provided guidance regarding a threshold amount below which seizure of cash for forfeiture would *not* be appropriate, absent a compelling law enforcement interest."  ECF No. 56 at 27.  This argument amounts to a telling admission. Because the term "threshold" entails that amounts above and below are treated differently, it is reasonably inferable that under the DEA's policy as characterized by the Government Defendants, seizure of amounts above $5,000 would or might be appropriate, even "absent a

---

[7] This inference is bolstered by the fact that DEA Agent DiGiovanni, who seized over $40,000 from Plaintiff Jones-Nasr allegedly without probable cause or reasonable suspicion, served as a DEA instructor for Operation Jetway.  *See* FAC at ¶¶ 266-72, 413.

compelling law enforcement interest." Such a policy would appear to violate the Fourth Amendment.

**D.      Count IV of the FAC is barred by sovereign immunity.**

In Count IV, Plaintiffs Rolin and Brown seek "return of interest" on their $82,373 that was seized by the DEA and held for 7 months. Plaintiffs "recognize" that their claims are "foreclosed" by *United States v. Craig*, 694 F.3d 509, 512 (3d Cir. 2012) (holding that "the United States is immune from an interest award"), but they "seek to preserve this argument for possible review" on appeal. ECF No. 62 at 30. Accordingly, Count IV should be dismissed.

**E.      Plaintiffs' *Bivens* claims against Dawkin.**

Dawkin argues that allowance of a damages claim for seizure of cash at an airport would constitute an unwarranted extension of *Bivens* to a new context, and that his alleged conduct toward Brown and her cash did not violate clearly established constitutional law. Resolution of the first argument may require careful balancing of prudential considerations to refine the contours of constitutional common law, while the second only requires the Court to engage in the familiar judicial task of saying what the law is (or was, at the time of Brown's encounter with Dawkin).[8] Accordingly, it is appropriate to address Dawkin's arguments in reverse order, and reach the *Bivens* extension issue only if Count V states a claim that can overcome Dawkin's assertion of qualified immunity.

**1.      Plaintiffs' claims against Dawkin are barred in part by qualified immunity.**

The doctrine of qualified immunity shields public officials such as Dawkin from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," in light of "the legal rules that were 'clearly established' at the time." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Dawkin contends that it is not clearly established that his conduct toward Brown amounted to a seizure of her person, or that such a seizure was unreasonable under the Fourth Amendment. In the absence of physical force, a seizure of a person occurs for Fourth Amendment purposes when the

---

[8] *Cf. Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the Judicial Department to say what the law is.").

subject submits to an officer's "show of authority" that would convey to a reasonable subject that her liberty was constrained.  *Calif. v. Hodari D.*, 499 U.S. 621, 628 (1991).  Plaintiffs contend that Dawkin seized Brown by approaching her in the company of another officer (who had already interrogated her about her cash), asking her targeted questions about her cash, and asking her to accompany him to another area, to show him her cash, and to call her father to corroborate her account.  ECF No. 53 at 21-22.

   Considering allegations and reasonable inferences in the light most favorable to Brown, a reasonable person in her position would not feel free to disregard Dawkin's demands. However, in light of extensive caselaw indicating that no seizure occurs when officers approach people at airports or other transportation facilities and ask them to submit to questions or permit search of their effects, *see* ECF No. 48 at 21-22, it is not clear that Dawkin should have understood that his conduct amounted to a seizure.  As the Supreme Court stated in *Anderson*, in order to overcome the defense of qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  483 U.S. at 640.  *See also Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ("existing precedent must have placed the . . . constitutional question beyond debate").  Because the conduct alleged by Plaintiffs does not meet this exacting standard, Dawkin is entitled to dismissal of Count V with respect to Brown's claim arising out of alleged seizure of her person.

   Dawkin also contends that his seizure of cash from Brown did not violate clearly established law because it was based on "reasonable suspicion."  ECF No. 48 at 23-24.  This contention does not fare as well.  As of the date of the seizure, it was clearly established that (i) seizures for civil forfeiture require a warrant or probable cause;[9] (ii) possession of a large amount of cash does not give rise to probable cause;[10] and (iii) temporary seizure based on reasonable suspicion must be investigative and of short duration.[11]  Dawkin does not assert that he had

---

[9] *See U.S. v. Ten Thousand Seven Hundred Dollars in U.S. Currency*, 258 F.3d 215 (3d Cir. 2001).

[10] *See U.S. v. Law*, 384 F. App'x 121, 122-23 (3d Cir. 2010); *Ten Thousand Seven Hundred Dollars*.

[11] *See U.S. v. Place*, 462 U.S. 696, 702 (1983) (authorizing "warrantless seizures of personal luggage . . . on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation . . . that would quickly confirm or dispel the authorities' suspicion"); *Frost*, 999

probable cause to seize the cash, or that the seizure was for the purpose of investigation or was expected to be brief.  Consequently he is not entitled to dismissal of the cash seizure claims based on qualified immunity.

Finally, Dawkin argues that he is entitled to qualified immunity because Plaintiffs have alleged that his seizure of the cash was "pursuant to some purported DEA policy or practice," which he could not have known was unlawful.  ECF No. 48 at 24.  However, the mere alleged existence of an agency policy does not automatically immunize patently unlawful conduct that may be consistent with that policy.  Moreover, unless Plaintiffs (or Dawkin) can establish the policy's existence and applicability, there will be no basis to conclude that Dawkin reasonably relied on the policy in seizing Brown's and Rolin's cash.[12]  The DEA Seizure Policy could be relevant to Dawkin's qualified immunity defense, but at present it does not entitle him to a dismissal.

### 2.    The availability of alternative remedies makes the context of Plaintiffs' claims against Dawkin novel, and precludes extension of a *Bivens* damages remedy.

Reduced to its essentials, Count V of the FAC alleges that Dawkin detained Brown without reasonable suspicion, and seized $82,373 in cash belonging to Rolin and Brown without probable cause, in violation of the Fourth Amendment.  Those Plaintiffs seek damages pursuant to *Bivens*.  As the Third Circuit recently summarized,

> *Bivens* involved a Fourth Amendment claim against federal narcotics agents who conducted a warrantless search of a man's home, and allegedly arrested the man without probable cause and threatened to arrest his entire family.  In its seminal decision, the Supreme Court held that a damages remedy could be directly implied from the Fourth Amendment to redress the harm that resulted from the federal agents' unconstitutional search and seizure.

---

F.2d at 740 (temporary seizure permitted under *Place* "so long as the property is not detained for a long period of time"); *Place*, 462 U.S. at 709 ("The [90-minute] length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause.").

[12] To the extent that Count V could be barred by establishment of the DEA Seizure Policy, an element of Count III, it is appropriate to consider Count V as an alternative claim to Count III. Cf. Fed. R. Civ. P. 8(d) (permitting a party to state alternative, hypothetical and inconsistent claims).

*Mack v. Yost*, 968 F.3d 311, 318 (3d Cir. 2020) (citations omitted).  Although *Bivens* has become "a fixed principle in the law," its judicial expansion is "disfavored," and accordingly *Bivens* is not to be extended to a "new context" if "special factors" counsel hesitation.  *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017).

In *Abbasi*, the Court explained the "proper test for determining whether a case presents a new *Bivens* context":

> If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new.  . . . .  A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

137 S.Ct. at 1859-60.  None of these considerations makes Plaintiffs' claims against Dawkin meaningfully different from *Bivens*, with the possible exception of the final catch-all consideration of potential special factors not previously considered.  The present case involves the same rank, constitutional right, specificity, judicial guidance,[13] legal mandate, and inter-branch intrusion as *Bivens*.  In sum, Count V of the FAC presents a "classic" *Bivens* case – an asserted Fourth Amendment violation in a routine law enforcement context.  *See Meshal v. Higgenbotham*, 804 F.3d 417, 429 (D.C. Cir. 2015) (Kavanaugh, J., concurring) ("The classic *Bivens* case entails a suit alleging an unreasonable search or seizure by a federal officer in violation of the Fourth Amendment.").  As the *Abbasi* Court took pains to emphasize, its opinion "is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose."  137 S.Ct. at 1860.  *See also id.* (describing *Bivens* as "settled law . . . in this common and recurrent sphere of law enforcement").

Dawkin nevertheless contends that Plaintiffs' claims against him occur in a new *Bivens* context –  the "airport setting," with its "unique national security concerns."  ECF No. 48 at 7-8.

---

[13] Actually, the present case affords a greater extent of judicial guidance, due to the accretion of caselaw.  *Cf. Abbasi*, 137 S.Ct. at 1860 ("*Bivens* . . .  provides instruction and guidance to federal law enforcement officers going forward.").

In support of this contention, Dawkin relies upon *Vanderklok v. United States*, 868 F.3d 189, 199-200 (3d Cir. 2017), in which the Third Circuit declined to extend *Bivens* to claims against TSA screeners in the "airport *security*" context (emphasis added). The *Vanderklok* Court explained that TSA screeners are "tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic" and that they are "not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers." *Id.* at 207, 208. The Court expressed concern that "[t]he threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers." *Id.* at 207. These considerations are simply not applicable to Plaintiffs' claims against Dawkin, a trained law enforcement officer who was not engaged in airport security screening. Dawkin's choice to initiate a law enforcement encounter within the confines of an airport does not imbue the encounter with any airport- or national-security attribute. A mere change in location would not ordinarily constitute a meaningful difference in a law enforcement search-and-seizure context.[14]

Dawkin also contends that the context of Plaintiffs' claims against him is altered by the presence of a statutory scheme governing asset forfeitures – the Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983. ECF No. 48 at 4-5, 8. Plaintiffs argue in response that because the seizures complained of did not take place in the course of any asset forfeiture proceedings, CAFRA is immaterial to the legal mandate under which Dawkin operated. ECF No. 53 at 12. Plaintiffs' argument misses the point, however. If CAFRA gives rise to a new context, it is not by changing the legal mandate governing law enforcement conduct, but by providing a remedial scheme that may qualify as a novel "special factor" under *Abbasi*. Moreover, Plaintiffs' attempt to separate the law enforcement encounter from its intended forfeiture context appears too facile. The DEA's alleged purpose to seize travelers' money for forfeiture is central to the events which form the basis of Count V. Plaintiffs have alleged that Dawkin's seizure of Brown's and Rolin's cash was "in accordance with DEA's policy or practice of presumptively seizing cash totaling $5,000 or more from travelers at U.S. airports for civil forfeiture regardless of whether there is

---

[14] Of course the location could make a meaningful difference if it implicates special factors not otherwise present. *See Hernádez v. Mesa*, 582 U.S. ____, 140 S.Ct. 735 (2020) (cross-border shooting by Border Patrol agent implicated border security and international relations). No such factors are implicated by the "airport setting" here.

probable cause for the seizure." FAC at ¶ 185.[15]  Plaintiffs further allege that the cash was seized "for civil forfeiture"; that the DEA issued CAFRA notices of its intent to pursue civil forfeiture; and that Brown and Rolin filed CAFRA claims with respect to the money.  FAC at ¶¶ 195, 196, 200, 201.  Moreover, the principal injuries claimed by Brown and Rolin stem from the seizure of their cash.  See FAC at ¶¶ 215-24.  Any injuries suffered by Brown from Dawkin's briefly detaining her, without physical force, to investigate her story and extract her cash appear to be incidental to the central theme of attempted asset forfeiture.

Under these circumstances, the alleged asset forfeiture purpose of Dawkin's encounter with Brown constitutes a salient context that was not present in *Bivens*.  Moreover, this asset-forfeiture context implicates an important special factor not considered in *Bivens* or its progeny: As the Supreme Court has stated, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S.Ct. at 1858.  *See also, e.g.*, *id.* at 1863 ("when Alternative methods of relief are available, a *Bivens* remedy usually is not").  The Third Circuit has described the availability of an alternative remedial structure as a "particularly weighty" special factor counselling hesitation. *Mack*, 968 F.3d at 320. In the present case, the CAFRA remedial structure was available to Brown and Rolin, and that they availed themselves of that structure to achieve substantial, albeit incomplete, relief.  *Cf. id.* ("the alternative remedy need not provide an individual with complete relief in order to foreclose a damages remedy under *Bivens*") (citing *Schweiker v. Chilicky*, 487 U.S. 412, 424-25 (1988)).

An additional argument mentioned in passing by Dawkin reinforces the Court's hesitancy:  Dawkin points out that *Bivens* and its Supreme Court progeny did not involve "challenges to conduct undertaken via purported policy or practice," and suggests that this difference goes to the "legal mandate under which the officer was operating" (which is one of the "meaningful" differences listed in *Abbasi*).  ECF No. 48 at 8.  Although the alleged DEA Seizure Policy does not appear to constitute a "statutory or other legal mandate" as contemplated by

---

[15] Similarly, Plaintiffs have alleged that Dawkin's seizure of Brown's person was "in accordance with DEA's policy or practice of seizing travelers at airports without reasonable suspicion, based solely on the presence or amount of cash DEA agents know they are traveling with."  FAC at ¶ 184.

*Abbasi*,[16] the principal ground on which the Court differentiated the context of *Abbasi* from *Bivens* was that the *Abbasi* claims "challenge the confinement conditions imposed on illegal aliens *pursuant to a high-level executive policy* created in the wake of a major terrorist attack on American soil." *Abbasi*, 137 S.Ct. at 1860. This suggests that a controlling policy that does not constitute a legal mandate may nevertheless give rise to "potential special factors that previous *Bivens* cases did not consider."[17] One such special factor implicated by the detention policy claims in *Abbasi* is also applicable here: A challenge to "large-scale policy decisions" might be addressed through injunctive relief rather than damages. 137 S.Ct. at 1862. Indeed, Brown and Rolin have sought such injunctive relief against the Seizure Policies in this very action (and the Court has found that their claims of ongoing and prospective injury are redressible by such relief). In view of the remedial structure under CAFRA and the injunctive claim at bar, "this is not a case like *Bivens* . . . in which 'it is damages or nothing.'" *Abbasi*, 137 S.Ct. at 1862 (describing this difference as "of central importance") (citation omitted). Thus, in the final analysis, the intended forfeiture setting and the alleged controlling policy are sufficiently meaningful differences to bring a novel aspect to an otherwise classic *Bivens* context; and the associated prospect of administrative and/or injunctive relief constitutes a sufficiently weighty special factor to bar an implied damages remedy. The Court should therefore grant Dawkin's motion to dismiss Count V.

## IV. Conclusion and Recommendation

     For the reasons set forth above:

---

[16] The phrase "other legal mandate" should be read to mean a mandate similar to that imposed by a statute. *See, e.g.*, *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."). An unwritten policy or practice probably does not qualify.

[17] On the other hand, it seems clear that the presence of a controlling policy does not automatically amount to a meaningful difference that will preclude an implied right of action. *See FDIC v. Meyer*, 501 U.S. 471, 473-74, 485 (1994) (Where plaintiff was terminated pursuant to an agency's "general policy," allegedly in violation of the Fifth Amendment right of due process, "the logic of *Bivens* supports . . . a *Bivens* claim for damages against . . . the [agency] employee who terminated him.").

18

It is respectfully recommended that ECF No. 55, the Government Defendants' Motion to Dismiss, be granted as to Count IV of the First Amended Complaint, ECF No. 43, and otherwise denied.

It is further recommended that ECF No. 47, Steven Dawkin's Motion to Dismiss the Individual-Capacity Claim Against Him in the First Amended Complaint, be granted.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto.  Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated:  January 7, 2021.

Lisa Pupo Lenihan
United States Magistrate Judge

19