IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REBECCA BROWN, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>TRANSPORTATION SECURITY ADMINISTRATION, *et al.*,<br><br>    *Defendants*. | Civil Action No. 2:20-cv-64-MJH-KT |

**JOINT DISCOVERY STATUS REPORT**

The parties hereby jointly file the following status report, pursuant to the Court's April 1, 2024 Order, to address "the parties' proposal for moving forward, additional court intervention if needed and proposed deadlines," as extended. (Dkt. 123, 126.)

The parties agree that they need additional time to complete certain discovery tasks and that they will be better able to set a schedule once those tasks are completed. Therefore, the parties jointly propose to file another joint status report in 90 days, on or before August 6, 2024.

**BACKGROUND**

1.     This case is brought as a putative nationwide class action under the Administrative Procedure Act (APA) and Fourth Amendment seeking to enjoin alleged personal seizure and cash seizure policies of the Transportation Security Administration (TSA) and Drug Enforcement Administration (DEA) as *ultra vires* and unconstitutional.[1] The four plaintiffs in this case are individuals whose cash was allegedly seized by DEA agents or other unidentified law enforcement

---

[1] The court has not set a deadline for moving for class certification. The parties agree that it is not necessary to decide class certification until after the close of discovery. *See, e.g.*, Initial Scheduling Order at 3, Dkt. 86 ("The Court understands Defendants intend to file a summary judgment motion on the merits prior to class certification. This motion is not to be filed until the completion of all merits discovery[.]").

1

personnel after the cash was detected by TSA screeners during routine airport security screenings when three of the plaintiffs were traveling through U.S. airports.

2.      Counts I and II of Plaintiffs' First Amended Complaint allege that TSA has a "policy or practice of having TSA Screeners seize travelers' cash, carry-on luggage, personal effects, and/or their person—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded." First Amended Complaint, Dkt. 43 ("Compl.") (July 17, 2020) ¶ 475; *see also id.* ¶ 492.  Plaintiffs assert that this alleged "policy or practice" is "*ultra vires*," *id.* ¶ 477 (Count I), and violates the Fourth Amendment, *id.* ¶ 493 (Count II). Count III alleges that the DEA has "a policy or practice of conducting suspicionless non-consensual seizures of travelers at U.S. airports" and "a "policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture based solely on the presence of a large amount of cash." *Id.* ¶¶ 505, 508. All three counts seek declaratory and injunctive relief.[2]

3.      The Government Defendants moved to dismiss all official capacity claims in September 2020.  *See* Dkt. 55.  In January 2021, Magistrate Judge Lisa Pupo Lenihan recommended that the Government Defendants' motion to dismiss Counts I-III be denied, *see* Dkt. 66, and in March 2021, the Court adopted the Magistrate Judge's recommendations as to Counts I-III.  *See* Dkt. 78.

4.      On April 20, 2021, the parties filed their joint Rule 26(f) report. *See* Dkt. 83. In the report, Plaintiffs identified six categories of documents and information they deem relevant to both class and merits discovery, while Government Defendants contended that discovery should be significantly more limited. Dkt. 83 ¶ 9.

---

[2] Two additional counts are no longer at issue.  Count IV, seeking interest on the seized funds that were ultimately returned to two plaintiffs, was dismissed by the Court in March 2021 for lack of subject matter jurisdiction.  *See* Opinion at 8, Dkt. 78.  And Count V, which brought an individual capacity claim against a DEA agent, was dismissed on the ground that there was no legal basis to recognize a *Bivens* claim here.  *See id.* at 6, 8.

2

5.  The Magistrate Judge held an initial scheduling conference in April 2021 and issued an initial scheduling order the same day. *See* Dkt. 86. The Magistrate Judge ordered that "[b]y September 30, 2021 the parties shall complete class and merits discovery on the topics identified in (1), (2), (6) and the policy portions of (5) as described in Plaintiffs' position in paragraph 9 of the parties' 26(f) Report at ECF No. 83." Dkt. 86 ¶ 4. The parties have referred to this as "Phase 1" discovery regarding DEA and TSA policies.

6.  The Magistrate Judge granted three extensions of the initial discovery period, through July 2022. *See* Dkt. 93, 98, 101. At a discovery conference in July 2022, the Magistrate Judge urged the parties to retain an e-discovery special master to initially evaluate the parties' discovery disputes, and determined that the relevant time frame for e-discovery would be from 2014 to the date of filing of the Complaint. *See* Dkt. 108. At a discovery conference in August 2022, the Magistrate Judge directed the parties to begin Phase 2 discovery of the topics that had been excluded from the initial discovery period, namely the incidents involving the named Plaintiffs as well as nationwide incidents that Plaintiffs believe may support their claims about alleged policies or practices. *See* Dkt. 111.

7.  An e-discovery special master, Cecilia R. Dickson, was appointed in September 2022. *See* Dkt. 115, 117. Pursuant to court order, the parties filed joint status reports in September 2022, November 2022, and January 2023. *See* Dkt. 112, 118, 120. Thereafter, the Magistrate Judge took no further action in the case.

## STATUS OF DISCOVERY

8.  The parties have made significant headway in discovery. Plaintiffs have served four sets of document requests, and Government Defendants have produced almost 11,000 pages of documents, including a substantial volume of documents produced pursuant to protective order because they contain information subject to the law enforcement privilege and/or Sensitive Security Information (SSI) designated pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. Part 1520. Government

Defendants have served one round of document requests and a set of requests for admissions, and Plaintiffs have produced about 1,500 pages of documents. Plaintiffs have conducted several Rule 30(b)(6) depositions of DEA and TSA, along with two individual witness depositions. There are, however, still outstanding issues for both Phase 1 and Phase 2 discovery.

9. For Phase 1, with regard to DEA and TSA policies and procedures, Government Defendants agreed to conduct keyword searches in electronic files of a sample of headquarters and field officials for any documents relevant to the claims in this case. These searches identified about 48,000 documents for DEA and about 46,000 for TSA. In first level review, DEA and TSA have identified a subset of documents that appear responsive. These documents require second level review for responsiveness and privilege before they can be produced to Plaintiffs. In addition, the parties are negotiating regarding about 13,000 of the TSA documents that have not yet been reviewed because of TSA's concerns that the keywords are overbroad.

10. For Phase 2, with regard to individual incidents, the Government Defendants have produced the available documents regarding the named Plaintiffs' incidents and spreadsheets providing basic information about incidents at airports between 2014 and 2020. DEA's spreadsheet identified about 3,500 instances in which DEA airport groups made bulk currency seizures at airports between January 15, 2014 and January 15, 2020. TSA's spreadsheet identified about 3,735 checkpoint incidents involving "bulk currency," excluding incidents involving travelers with international itineraries, that did not occur during checkpoint screening, or that were otherwise non-responsive. As discussed in more detail below, Plaintiffs seek detailed information regarding a statistical sample of these incidents that they believe are relevant to establishing whether Government Defendants' alleged policies and practices exist. The parties are negotiating regarding the terms of any such statistical sample and whether the burden outweighs its potential probative value.

11. Once document discovery is substantially complete, the parties expect to conduct depositions regarding individual incidents. Government Defendants expect to depose the named Plaintiffs. Plaintiffs expect to depose DEA Task Force Officer Steve Dawkin and other TSA or DEA officials involved in the incidents involving the named Plaintiffs, as well as additional supervisory officials from both agencies involved in supervising agency interactions with Air Travelers with Cash and/or airport cash seizures, and training officials from both agencies who provide training related to agency interactions with Air Travelers with Cash and/or airport cash seizures.[3] Plaintiffs also expect to retain an expert to conduct statistical analyses regarding the sampled incidents, and Government Defendants will determine whether to retain their own expert once they have received Plaintiffs' expert disclosure.

## THE PARTIES' SEPARATE POSITIONS

**Plaintiffs' View Regarding Next Steps**

This case is a class action lawsuit aimed at the unconstitutional policies and practices of TSA and DEA. Dkt. 66 at 9. For TSA, Plaintiffs allege that TSA has a policy of "detaining domestic air travelers in possession of large sums of cash, despite the absence of a transportation security risk or probable cause or reasonable suspicion of criminal conduct (the 'TSA Seizure Policy')." *Id.* And for DEA, Plaintiffs allege that DEA has a policy of seizing cash from air travelers "for civil forfeiture, again without probable cause or reasonable suspicion of criminal conduct (the '[DEA] Seizure

---

[3] "Air Travelers with Cash" is defined by Plaintiffs to mean any traveler at an airport who is known or believed to be traveling with "bulk cash," "bulk currency," "large" amounts of cash or currency, or otherwise unusual amounts of cash or currency—including with any specific minimum threshold level of cash or currency such as $5,000 or $10,000—whether on their person, in their carry-on-luggage, or in their checked luggage. "Bulk cash" or "bulk currency" means the amount(s) of cash or currency the agency considers to be "bulk cash" or "bulk currency." "Large" or "unusual" amounts of cash or currency means whatever amount(s) of cash or currency the agency considers large enough to trigger any specific policies, practices, or protocols, including any differential treatment from other travelers.

Policy').ˮ *Id.* Put simply, TSA has an unlawful policy or practice of detaining travelers just because they have large amounts of cash; DEA has an unlawful policy or practice of seizing cash from travelers just because they have large amounts of cash.

Neither of these policies or practices are necessarily written down. But that is neither a surprise nor case dispositive. To be sure, discovery in this case would be significantly truncated if TSA and DEA took the time to write down their unconstitutional Seizure Policies in their respective handbooks. But an explicit written policy is not required under the Fourth Amendment or the APA. Indeed, this Court denied this exact argument from Defendants in their motion to dismiss. *Compare* Dkt. 56 at 22, *with* Dkt. 66 at 7–9. And importantly, as this Court noted, "[t]he Government Defendants do not dispute that the Seizure Policies, **if established**, would be *ultra vires* and unconstitutional." Dkt. 66 at 9 (emphasis added). Instead, Defendants just deny the existence of the policies. But that is exactly what discovery is for—to prove or disprove the existence of these policies that were plausibly alleged.

Plaintiffs previously explained why Defendants' argument (about the lack of written policies) was wrong when TSA and DEA objected to producing the still-outstanding documents from Phase 1. The requested Phase 1 communications (mostly emails) are highly relevant to this case because they can establish government policy that qualifies as "final agency action." As countless courts have found, even informal communications—including an email *or even an oral statement*—can qualify as a "final agency action" reviewable under the APA. *See, e.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (collecting cases), *accord Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 248–49 (3d Cir. 2011); *see also Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (finding that an official, reviewable policy existed when agency employees relied on an unwritten policy of disclosing confidential information); *Akebia Therapeutics, Inc. v. Becerra*, 548 F. Supp. 3d 274 (D. Mass. 2021) (finding that an "e-mail[]" was "final agency action" because the email "changed [the agency's]

stance on a particular regulation"); *Doe v. Hagee*, 473 F. Supp. 2d 989, 999 (N.D. Cal. 2007) (finding that emails, conduct, and statements from Marines could establish a policy that qualified as a "final agency action"). Put simply, if Defendants sent emails or communications that impacted policy, those documents lie at the heart of Plaintiffs' claims and are absolutely discoverable.

What's more, for the Phase 1 discovery requests, this Court already agreed. Over the course of three status conferences in July, August, and September 2022 (*see* Dkts. 108, 111, 114), Magistrate Lenihan held that "the discovery was relevant." And critically, to even get to that point, Plaintiffs made significant concessions to lessen the burden on the federal government, which is hardly a mom-and-pop business that lacks resources or document retention policies that enable it to respond to e-discovery. Plaintiffs served the relevant Phase 1 discovery requests in January 2022. After months of back and forth (with the Court having to confirm that the requested documents were relevant), Plaintiffs proposed search terms in August 2022. Defendants responded to those search terms in November 2022. Defendants proposed significantly narrowing the search terms based on the raw number of "hits." Here is just one example of DEA's response to Plaintiffs' search terms:

**Appendix 1:**

**Response to Plaintiffs' Proposed DEA Search Terms (Sept. 2, 2022)**

| # | Search Terms | Hits for HQ Custodians | Hits for GS Custodians | 1st 100 HQ Docs Audit Responsive | Notes | Conclusion |
|---|---|---|---|---|---|---|
| 1 | "bulk cash" <br><br> Alternative: ("bulk cash" OR "bulk currency") w/20 (seiz* OR "search warrant") | 0 | 2,642 <br><br> 827 (/20 alternative terms) | N/A | Overbroad. Needs proximity limits to additional relevant terms. | DEA open to using its alternative term |
| 2 | "bulk currency" | 0 | 6,297 | N/A | Overbroad. There is an "EPIC Bulk Currency SEARS Mailbox," which provides notification reports, including lots of international incidents. | DEA declines to search for this term, but incorporated it into #1 |
| 3 | 10,000 OR 10000 | 4,259 | 4,684 | N/A | Irrelevant. $10k has no particular significance for DEA. | DEA declines to search for this term |
| 4 | 5,000 OR 5000 | 4,767 | 5,116 | N/A | Overbroad. DEA's seizure thresholds are clear and this term would not target anything meaningful. | DEA declines to search for this term |
| 5 | TSA OR "Transportation Security Administration" <br><br> Alternative: TSA or "Transportation Security Administration" /20 (cash or currency or money) | 1,756 <br><br> 77 (/20 alternative terms) | 7,120 <br><br> 2,105 (/20 alternative terms) | 78% | Overbroad because DEA has to interact with TSA for reasons other than passenger incidents. Only apparently responsive documents from audit were Today's DEA Press Clips and emails discussing *Brown* lawsuit. | DEA open to using its alternative term |

7

After a meet and confer on January 9, 2023, Plaintiffs agreed that the Special Master was not needed. Plaintiffs agreed to the narrowed search terms and custodians—and agreed to exclude emails that "could be pretty burdensome for the TSA Defendants."

> From: Dan Alban <dalban@ij.org>
> Sent: Friday, January 13, 2023 11:36 AM
> To: Thorp, Galen (CIV) <Galen.Thorp@usdoj.gov>; Tulis, Elizabeth (CIV) <Elizabeth.Tulis@usdoj.gov>
> Cc: Jaba Tsitsuashvili <jtsitsuashvili@ij.org>; Anna Goodman <agoodman@ij.org>; Brian Morris <bmorris@ij.org>; Kendall Morton <kmorton@ij.org>
> Subject: Re: Brown v. TSA (W.D. Pa.)
>
> Galen,
>
> Thanks for the heads up. We'd prefer to have some emails from former employees in the mix, but it sounds like that could be pretty burdensome for the TSA Defendants. I'm not sure the juice would be worth the squeeze, so no objections from us to your updated proposal.
>
> Thanks,
> Dan

In the January 27, 2023 status report, then, Defendants explained that, after utilizing the agreed-upon custodians, search terms, and sampling procedures, they would "be better able to assess how long it will take to complete production of the responsive, non-privileged documents." Dkt. 120 at 1. But still today, more than a year later, Defendants have not produced these agreed-upon documents in response to Plaintiffs *January 2022* discovery requests. Defendants should produce the narrowed and agree-upon document set for Phase 1 without modification.

For Phase 2, Plaintiffs served their Fourth Set of Document Requests on October 14, 2022. In those requests, Plaintiffs asked DEA for all documents and communications related to "specific encounters with Air Travelers with Cash or cash seizures at airports," such as case files, seizure reports, and police reports. For TSA, Plaintiffs asked, among other things, for all documents and communications related "specific encounters between TSA Personnel and Air Travelers with Cash," such as incident reports, case files, and notifications to law enforcement officers.

In response, Defendants raised the same objections they make below. Plaintiffs, however, agreed to a sampling methodology that significantly reduced any burden on Defendants. For DEA, Plaintiffs agreed that Defendants could simply produce a spreadsheet of identification numbers

8

(related to responsive incidents) and then Plaintiffs accessed the U.S. Department of Justice's Consolidate Asset Tracking System (CATS) to retrieve available information for each encounter. DEA did not produce any documents about any individual encounters. Similarly for TSA, Plaintiffs agreed to receive only a table of encounters with Air Travelers with Cash—but like DEA, no individual documents. In other words, Defendants did **not** have to produce all documents and communications related to every encounter with any air traveler carrying a large amount of cash—nowhere close. But now, after receiving the much-narrowed responses from Defendants, Plaintiffs still want to see a small (yet statistically significant) sample of what those individualized documents and communications actually look like. Plaintiffs are working on that proposal now.

These documents, however, are both relevant and critical. Plaintiffs alleged that Defendants have a policy or practice of unlawfully detaining and seizing air travelers with cash. Defendants have confirmed that practice—by producing spreadsheets identifying detentions and seizures of air travelers with cash. Plaintiffs are not asking Defendants to produce all the underlying documents related to those encounters, but they do want a statistically significant sample of documents that would allow Plaintiffs' expert to opine on whether these incidents establish the very pattern or practice that, "***if established***, would be *ultra vires* and unconstitutional." Dkt. 66 at 9 (emphasis added).

**Defendants' View Regarding Next Steps**

Government Defendants are concerned about the potential undue burden of conducting extensive additional discovery in this case. Government Defendants have consistently pointed out that this case is governed by the requirements of the Administrative Procedure Act (APA), including the limitations that suits must challenge final agency actions and should be resolved on the basis of the administrative record. *See* Mem. in Supp. of Mot. to Dismiss at 17-28, Dkt. 57; Reply in Supp. of Mot. to Dismiss at 7-14, Dkt. 65; Rule 26(f) Report at 3, Dkt. 83. Plaintiffs do not challenge any

9

written DEA or TSA policy. Rather, "[t]his action is unusual in that Plaintiffs' claims challenge putative policies that Defendants maintain do not exist." Dkt. 83 at 3. Accordingly, because "there can be no administrative record for a non-existent policy," Government Defendants proposed the following discovery steps in 2021:

> Defendants are prepared to present declarations establishing the non-existence of the alleged policies in support of their anticipated motion for summary judgment, which should be sufficient to adjudicate this issue. To the extent Plaintiffs are entitled to any discovery prior to summary judgment briefing, such discovery must go to the questions at issue: whether the alleged unlawful policies exist. To that end, discovery could reasonably include a limited number of depositions under Fed. R. Civ. P. 30(b)(6), during which Plaintiffs could question agency representatives about the putative policies alleged in the complaint, and written discovery on TSA and DEA policies related to the subjects that are the focus of Plaintiffs complaint, i.e., cash and personal seizures at airports.

Dkt. 83 at 3. However, the Magistrate Judge decided to permit much broader discovery, *see* Dkt. 86 ¶ 4; Dkt. 111 at 2, and paid scant attention to the APA—indeed, the recommendation to deny Government Defendants' motion to dismiss contained no discussion of the APA and gave credence to Plaintiffs' effort to infer agency policies from collections of anecdotes. *See* Dkt. 66 at 9-12.

In order to comply with discovery as directed by the Court, Government Defendants first collected thousands of pages of agency policies, training materials, and related documents, then provided individual and Rule 30(b)(6) deposition testimony of senior officials or subject matter experts. Next, Plaintiffs requested keyword searches of the electronic documents of hundreds of headquarters and field officials. Government Defendants negotiated down to 142 custodians as follows:

| Agency | Headquarters/Program Offices | Field Officials |
|---|---|---|
| DEA | 16 section chiefs | 59 airport interdiction group supervisors who had retained email from the relevant period |
| TSA | 10 individuals or subject matter mailboxes | 57 federal security directors (FSDs) and assistant federal security directors for screening (AFSD-S), selected by random sample from among 324 people who served in these roles during the relevant period |

After further negotiating keywords, Government Defendants identified about 94,000 documents with keyword hits (including other documents in the same family).  The ostensible purpose is to determine whether these officials imposed or approved any relevant agency practices that are inconsistent with the agencies' written policies.  While Plaintiffs argue that one or more of these emails could be "final agency action" reviewable under the APA, Government Defendants note that the opinion of one local or regional manager would not necessarily represent an agency-wide policy.

With significant commitments of time and manpower, DEA and TSA have largely reviewed these documents, identifying documents that appeared responsive on first level review.  Once second level review for responsiveness and privilege have been completed, the documents can be produced to Plaintiffs.  The parties are still discussing one search of TSA custodians that returned over 13,000 documents for any of the stand-alone terms "DEA", "Drug Enforcement Administration," "bulk cash," "bulk currency", "$10,000," or "$10k."  Government Defendants hope that this search can be further refined to focus on the documents most likely to be responsive.

The next subject of discovery is even farther afield and has the potential to be far more burdensome.  Plaintiffs hope to analyze a statistically representative sample of the individual incidents between 2014 and 2020 where (1) TSA logged an interaction with a domestic air traveler with cash at an airport checkpoint or (2) DEA seized cash at an airport, in order to infer something about the agencies' relevant policies and practices, likely with the help of a statistician.  Defendants have two primary concerns with this proposal.  First, no statistical analysis of individual incidents will confirm whether DEA has a policy of making seizures without probable cause or whether TSA has a policy of detaining people after an administrative search concludes.  Given the inherently fact-driven analysis applicable to this context under the Fourth Amendment, determining what happened in each individual encounter would essentially entail a mini trial to develop the material circumstances of the interaction in question.  Moreover, even if such an analysis identified an individual seizure made

11

without probable cause (or the even more challenging assessment of whether an air traveler was kept at a checkpoint too long and whether there was reasonable suspicion to justify any such delay), that would demonstrate only an individual error, not an agency policy. There is no plausible way to generalize statistical data where individual factual development and analysis for each incident would be required to determine whether the incident could be characterized as falling within a particular category for purposes of statistical analysis.

Second, this fishing expedition is likely to be very burdensome. Defendants' databases are generally not designed to facilitate mass extraction of data, so it could be very labor intensive to collect documents from the databases. Moreover, Defendants believe that much of the data, even if extracted, would require burdensome redactions, including law enforcement sensitive information unrelated and unnecessary to this case, Sensitive Security Information, confidential source information, and personally identifiable information of thousands of travelers and others. Because of this burden, Plaintiffs anticipate proposing some sampling method to collect additional information for an unspecified number of the 3,000+ incidents Defendants have identified for each agency. However, Defendants remain concerned that the burden of collecting, redacting, and producing documents even for a limited sample would far exceed any probative value. Moreover, determining the facts of individual incidents might require deposition testimony from current or former agency employees who may have very limited recollections of events up to 10 years ago.

Because Plaintiffs have not yet specified their proposed sampling method, this issue is not yet ripe for judicial resolution. Perhaps Plaintiffs will propose something that is not too burdensome, or the specificity may crystalize the potential problems in a way that would be helpful for the Court. Accordingly, Government Defendants agree with Plaintiffs that the best course is to submit an additional status report in 90 days to update the Court regarding how discovery and discovery negotiations have progressed.

Plaintiffs have not described with any specificity the nature of their proposed expert testimony, or explained how such testimony would aid the factfinder in this case. Accordingly, once fact discovery concludes, Government Defendants believe that there should be a prompt opportunity to move for summary judgment because Plaintiffs' discovery efforts have not confirmed their speculative theories about unwritten practices that conflict with the agencies' written policies.

\* \* \* \*

In sum, the parties propose to file another Joint Status Report on August 6, 2024. The parties expect that the next status report will provide a refined estimate of the time necessary to complete the undisputed aspects of Phase 1 and Phase 2 discovery, and alert the Court to any issues requiring judicial intervention. At that point, the parties hope to be in a position to set a schedule for completion of discovery.

Dated: May 8, 2024

Respectfully submitted,

/s/ Dan Alban (by permission)
Dan Alban*
VA Bar No. 72688

Jaba Tsitsuashvili*
DC Bar No. 1601246

Brian Morris*
OH Bar No. 0093530

INSTITUTE FOR JUSTICE
901 North Glebe Road., Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)
dalban@ij.org
jtsitsuashvili@ij.org
bmorris@ij.org

*Attorneys for Plaintiffs*

\* Admitted *Pro Hac Vice*

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director
Civil Division, Federal Programs Branch

/s/ Galen Thorp
GALEN N. THORP (VA Bar #75517)
Senior Trial Counsel
ALEXANDER RESAR (NY Bar #5636337)
ELIZABETH TULIS (NY Bar #4905956)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 514-4781 / Fax: (202) 616-8460
galen.thorp@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2024, a true and correct copy of the foregoing document was served via electronic mail upon all counsel of record.

*/s/ Galen N. Thorp*