**Exhibit A**

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 25-3179

HALIL DEMIR,

*Plaintiff-Appellant*,

*v.*

MARKWAYNE MULLIN, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:22-cv-07209 — **John F. Kness**, *Judge.*

ARGUED MAY 20, 2026 — DECIDED AUGUST 4, 2026

Before BRENNAN, *Chief Judge*, and SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges*.

PER CURIAM. Halil Demir, a naturalized United States citizen, runs the Zakat Foundation of America, an international aid organization. As Zakat's Executive Director, he travels regularly for work, philanthropic events, and speaking engagements with government agencies and world leaders. The federal government has even granted Demir security clearances to participate in certain events.

Since 2016, the Transportation Security Administration has subjected Demir to extended screening in airports, beyond the typical passenger experience. Demir suspected he was wrongfully included on the FBI's Terrorist Watchlist and a sublist called the Selectee List. He took the only action available—to utilize the Department of Homeland Security's Traveler Redress Inquiry Program. Demir submitted five DHS TRIP inquiries between 2016 and 2022. DHS closed his cases and sent him a brief, boilerplate letter that did not confirm or deny whether he is on a watchlist.

Frustrated and in the dark, Demir challenged his inclusion on the Terrorist Watchlist and the subset Selectee List as violating his substantive and procedural due process rights, and as arbitrary in violation of the Administrative Procedure Act. He further alleged that the DHS TRIP program itself is procedurally deficient because it does not provide anyone who believes they are on the Selectee List a meaningful opportunity to challenge incorrect information about themselves in the government database. The black-box nature of DHS's redress program, Demir says, violates due process and produces arbitrary watchlist decisions. The district court dismissed Demir's complaint for a lack of subject matter jurisdiction, invoking 49 U.S.C. § 46110, which channels challenges to "order[s] issued by the … [TSA]" to a court of appeals at the outset.

We reverse in part. Section 46110 does not apply to Demir's challenges to his inclusion in the Terrorist Watchlist and Selectee List because it only grants a court of appeals original jurisdiction over TSA, which does not control either list. We remand that claim to allow the district court to consider its merits. But we affirm dismissal of Demir's challenge to

DHS TRIP because the program is an "order" within the meaning of § 46110. This means Demir must file that claim in a court of appeals in the first instance.

**I**

When reviewing a dismissal under Rule 12(b)(1), we take Demir's allegations as true and may "look beyond the jurisdictional allegations of the complaint" to determine whether we have subject matter jurisdiction. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (cleaned up). Here, the public record contains a document maintained on the FBI's website that explains the FBI's Terrorist Watchlist and the DHS TRIP program as of April 2024.

In response to the attacks of September 11, 2001 and pursuant to a presidential directive, the Attorney General created the Threat Screening Center, a multi-agency body administered by the FBI, to "consolidate the Government's approach to terrorism screening." Homeland Security Presidential Directive-6—Directive on Integration and Use of Screening Information to Protect Against Terrorism, 39 Weekly Comp. Pres. Doc. 1234 (Sep. 16, 2003). The Threat Screening Center merges terrorist watchlists maintained by federal agencies into one database—the Terrorism Screening Dataset or, as it is often called, the Terrorist Watchlist.

The Terrorist Watchlist contains biographic and biometric information of known and suspected terrorists. It also has two subcategories that trigger different travel restrictions. The Selectee List identifies people who may be subject to additional screening before being permitted to board flights on U.S. carriers or flights into, out of, over, or within U.S. airspace. See, *e.g.*, 49 C.F.R. § 1560.105(b)(2). The No Fly List contains people

who may not board such flights at all. Agencies use the Terrorist Watchlist to determine how to engage with people they encounter. By way of common example, TSA agents reference the Terrorist Watchlist to determine whether to subject travelers to additional screening or prohibit them from boarding a flight. See 49 U.S.C. § 114(h).

Inclusion on the Terrorist Watchlist occurs through a nomination and multi-step review process. First, a federal agency nominates someone to the Terrorist Watchlist if they meet certain criteria. The nomination is then reviewed by the FBI or National Counterterrorism Center, depending on whether the nominee has a nexus to domestic or international terrorism. Finally, the Threat Screening Center reviews the nominee and decides whether to include them in the database and, if appropriate, on either the Selectee or No Fly List.

The National Counterterrorism Center, FBI, nominating agency, and Threat Screening Center periodically review the Terrorist Watchlist for accuracy. The Threat Screening Center removes records that no longer meet the criteria for inclusion in the Terrorism Screening Dataset.

As another quality control measure, Congress directed the TSA Administrator to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); see also *id.* §§ 44903(j)(2)(G)(i), 44926(a), (b)(1).

In response, the TSA Administrator created the DHS Traveler Redress Inquiry Program, commonly shorthanded as

DHS TRIP. See 49 C.F.R. §§ 1560.201–.207. If someone believes they have been "improperly or unfairly delayed or prohibited from boarding" a flight, they may file an inquiry through DHS TRIP. *Id.* § 1560.205(a). TSA then coordinates with the Threat Screening Center to "review all the documentation and information requested from the individual" and "correct any erroneous information." *Id.* § 1560.205(d).

Administered by the FBI, the Threat Screening Center ultimately determines whether an individual should remain on the Terrorist Watchlist and Selectee List. As of 2015, the TSA Administrator makes final determinations about the No Fly List. See *Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019); *Abdellatif v. U.S. Dep't of Homeland Sec.*, 109 F.4th 562, 568 (D.C. Cir. 2024) ("While [the Threat Screening Center] has … transferr[ed] final decisionmaking authority over [the No Fly List] to TSA, it has not done so for the Selectee List."). As to No Fly List inquiries, the Threat Screening Center only makes a recommendation to TSA and then implements its decision.

Finally, DHS TRIP regulations require TSA to "provide the individual with a timely written response." 49 C.F.R. § 1560.205(d). They do not dictate the contents of the response. But the record before us indicates that federal policy is to neither confirm nor deny a person's watchlist status due to security concerns (with some exceptions for U.S. persons on the No Fly List).

**II**

Halil Demir believes he is on the Terrorist Watchlist and Selectee List based on the screening measures he has endured, the DHS TRIP letter he received, and a third-party hack of copies of the Selectee List from a U.S.-based airline that

revealed his name on the list. After unsuccessful attempts to resolve his travel issues through DHS TRIP, Demir invoked the Administrative Procedure Act, 5 U.S.C. § 702, and brought suit in federal court against the heads of DHS, DOJ, FBI, Threat Screening Center, and TSA in their official capacities, and unnamed Screening Center employees in their official and individual capacities.

Demir's complaint is two-pronged. He contends that his ongoing and unexplained inclusion on the Terrorist Watchlist and Selectee List violates the APA and the Fifth Amendment's Due Process Clause. Demir also challenges the DHS TRIP program itself as procedurally deficient. Because TSA, in response to DHS TRIP inquiries, does not tell a traveler whether or why they are on a watchlist or subjected to extended screening, the program allegedly provides no meaningful opportunity to be heard and produces arbitrary results in violation of the Fifth Amendment and APA. In the same way, Demir alleges that DHS TRIP infringes on his substantive due process rights to travel and pursue his chosen profession as Executive Director of Zakat Foundation.

The district court dismissed the complaint for lack of subject matter jurisdiction, concluding that Demir brought his claims in the wrong court. More specifically, the court pointed to 49 U.S.C. § 46110, which channels challenges to TSA orders to federal courts of appeals in the first instance, and determined that Demir should have sought relief in our court first. In relevant part, § 46110(a) states:

> [A] person disclosing a substantial interest in an order issued by … the [TSA Administrator] with respect to security duties and powers designated to be carried out by the [TSA

> Administrator] … in whole or in part under [Part A or B of this subsection or § 114(l) or (r)] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

The district court framed Demir's watchlist challenge as contesting a TSA decision to keep him on a watchlist. It then dismissed it because that decision, embodied in the DHS TRIP final determination letter, is an "order" of the TSA Administrator within the meaning of § 46110.

The district court further interpreted "order" in § 46110 to include regulations like DHS TRIP. Accordingly, it determined that Demir's challenge to the DHS TRIP program too should be channeled to a court of appeals through § 46110.

## III

### A

We begin with Demir's challenge to his inclusion on terrorist watchlists. The district court relied on case law germane to challenges to inclusion on the No Fly List. That was mistaken. By its terms, Demir's complaint only addresses the Selectee List and broader Terrorist Watchlist.

But Demir did challenge both his initial and continued inclusion on the Terrorist Watchlist and Selectee List subset. He underscored this point in the district court, emphasizing in his amended complaint and in response to the government's motion to dismiss that he has never engaged in terrorism and requesting removal from the watchlists. See *Pegram v.*

*Herdrich*, 530 U.S. 211, 230 & n.10 (2000) ("[W]e may use [a plaintiff's] brief to clarify allegations in her complaint whose meaning is unclear."). These clarifications lead us to conclude that § 46110 does not apply.

First, recall that TSA has no authority to place someone on the Terrorist Watchlist or its sublists (the No Fly List and Selectee List) in the first instance. The Threat Screening Center, which is not part of TSA and instead is administered by the FBI, makes that decision. A challenge to initial placement on a watchlist is therefore a challenge to a Threat Screening Center action, not to an order of the TSA Administrator within the meaning of § 46110. The jurisdictional provision does not apply and the district court may hear this claim. See *Khalid v. Blanche*, 172 F.4th 876, 887 (D.C. Cir. 2026) ("Challenges to [Threat Screening Center] action fall outside the class of claims that Section 46110 covers."); *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 774–75 (9th Cir. 2022) (similar).

Nor does § 46110 apply to Demir's challenge to his continued inclusion on the Terrorist Watchlist and Selectee List. At this point, Demir has a TSA order in hand—the final determination letter. But that letter simply informs him that the review process undertaken in response to his DHS TRIP inquiry has concluded. The *remedy* he seeks—removal from the lists—can only come from the Threat Screening Center because it alone controls the Terrorist Watchlist and Selectee List. Yet a court of appeals cannot provide that relief on direct review, as § 46110 only confers jurisdiction on a court of appeals to "affirm, amend, modify, or set aside" orders of the TSA and other listed agencies, excluding the Threat Screening Center and its administrator, the FBI. See 49 U.S.C. § 46110(a), (c). Demir's challenge to continued inclusion on the Selectee List

and broader Terrorist Watchlist must go to a district court in the first instance.

Every circuit to have considered these questions has reached this conclusion in the same or analogous circumstances. See, *e.g.*, *Kashem*, 941 F.3d at 390–91 (Ninth Circuit) (explaining this logic as applied to a challenge to inclusion on the No Fly List at a time when the Threat Screening Center, not TSA, controlled the No Fly List); *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 793 (D.C. Cir. 2015) (dismissing petition for review of a challenge to inclusion on the No Fly List when the Threat Screening Center controlled it "because we have no jurisdiction under 49 U.S.C. § 46110 to issue an order binding the [Threat Screening Center]"); *Khalid*, 172 F.4th at 879 (D.C. Circuit) ("[Section 46110] does not apply to Terrorist Watchlist claims, however, because the Threat Screening Center … alone oversees the broader list.").

B

Separate and apart from his inclusion on the Terrorist Watchlist and Selectee List, Demir challenges the DHS TRIP program itself as procedurally deficient because it provides no information about whether or why he is on either list that would enable him to effectively challenge his status. The district court determined that the DHS TRIP program is an "order" of the TSA Administrator and § 46110 accordingly requires Demir to file his challenge to DHS TRIP in a court of appeals.

We agree. While our court has not interpreted the scope of the term "order" in § 46110, we have interpreted "order" in § 46110's nearly identical predecessor statute, 49 U.S.C. § 1486, to include "any agency action capable of review on the

basis of the administrative record," including actions like DHS TRIP best labeled as "regulations." *Sima Prods. Corp. v. McLucas*, 612 F.2d 309, 313 (7th Cir. 1980); see also, *e.g.*, *Blitz v. Napolitano*, 700 F.3d 733, 739–40 (4th Cir. 2012) (relying on precedent interpreting § 1486 to interpret § 46110).

As a matter of statutory interpretation, especially under today's approach to interpreting jurisdictional provisions, it may seem odd to interpret "order" in a direct review provision to include a regulation. After all, the APA, which guides review of agency action, distinguishes orders on the one hand and rules and regulations on the other. See 5 U.S.C. § 551(4), (6) (defining "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency" and "order" as "a final disposition … of an agency in a matter other than rule making but including licensing").

But interpreting "order" broadly, often to include a "regulation," has been the prevailing view of every circuit to have addressed § 1486 or § 46110 and hornbook administrative law since at least the D.C. Circuit's 1977 decision in *Investment Company Institute v. Board of Governors of Federal Reserve System*, 551 F.2d 1270, 1278 (D.C. Cir. 1977). See, *e.g.*, *Magassa v. Mayorkas*, 52 F.4th 1156, 1165, 1170 (9th Cir. 2022); *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 54–57 (D.C. Cir. 2016); *Mokdad v. Lynch*, 804 F.3d 807, 812 (6th Cir. 2015); *Blitz*, 700 F.3d at 740; *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010); *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1313–14 (8th Cir. 1981); Charles Alan Wright & Arthur R. Miller, 33 *Federal Practice and Procedure* § 8303 (2026 ed.); Charles H. Koch & Richard Murphy, 3 *Administrative Law & Practice*

§ 8:20 (2026 ed.); see also *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985) ("Absent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals.").

*Investment Co.* reasoned that, so long as the agency record is sufficient for review, going to a district court first "results in unnecessary delay and expense." 551 F.2d at 1276. It also drew some support from *United States v. Storer Broadcasting Company*, 351 U.S. 192 (1956), which allowed a party challenging an agency order amending a regulation to proceed in a court of appeals under a direct review provision addressing "final orders." See *id.* at 1276; *Storer*, 351 U.S. at 195 n.2, 199–200. Although *Storer* mainly discussed whether the petitioner qualified as "aggrieved" under the direct review provision for standing purposes, *Investment Co.* viewed it as at least degrading D.C. Circuit precedent holding that direct review statutes providing for review of "orders" do not include regulations. See generally *Storer*, 351 U.S. at 199–200; see also *Inv. Co.*, 551 F.2d at 1276.

Further, *Investment Co.* has been in the Federal Reporter for nearly 50 years, with neither the Supreme Court calling it into question nor Congress amending § 46110 or its predecessor § 1486 to channel orders to district courts in the first instance. Indeed, Congress recodified § 1486 in § 46110 in 1994 without any significant change or otherwise signaling any desire to alter its meaning. See Act of July 5, 1994, Pub. L. 103-272, § 46110, 108 Stat. 745, 1230; S. Rep. No. 103-265, at 1–2 (1994) ("The purpose of H.R. 1758 is to restate in comprehensive form, without substantive change, certain general and

permanent laws related to transportation and to enact those laws as subtitles II, III, and V–X of title 49, United States Code, and to make other technical improvements in the Code.").

In the final analysis, then, and especially mindful of the weight and consensus of the precedent, we see no compelling reason to abandon *Sima Products* at this time. See *Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 858 (7th Cir. 2001) (recognizing that "a court will not reexamine a recent decision … unless given a compelling reason to do so" such as a change in legislation or applicable regulations, or a judicial decision on a related or analogous issue); *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015) ("[*S*]*tare decisis* carries enhanced force when a decision … interprets a statute" because "Congress can correct any mistake it sees.").

Demir disagrees and urges us, at the very least, to carve an exception out of § 46110 for challenges to TSA's procedures and practices, such as the DHS TRIP program, following *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). *McNary* addressed the scope of a jurisdictional provision in another statute, the Immigration Reform and Control Act of 1986, which barred judicial review of "a determination respecting an application" under a certain amnesty program. *Id.* at 483–84, 491 (quoting 8 U.S.C. § 1160(e)(1)). Honing in on the text of the provision, the Court interpreted "determination" to refer to a "single act rather than … a practice or procedure employed in making decisions," and therefore to exclude broader constitutional challenges to "practices and policies used by the agency in processing applications." *Id.* at 492. *McNary* further observed that Congress "could easily have used broader statutory language" if it intended the provision

to encompass those sorts of programmatic challenges. *Id.* at 494.

In Demir's view, we should similarly interpret "order" in § 46110 to exclude his due process challenge to the DHS TRIP program. But that reading runs headlong into *Sima Products*' broad interpretation of "order." And *McNary* offers little support, as it interpreted a different jurisdictional provision that did not even reference "orders." See *Mullin v. Doe*, 146 S. Ct. 2121, 2134 (2026) ("[*McNary*] turned on the specific wording of the provision at issue."). *McNary* further interpreted the provision to permit district court review of the plaintiffs' claim in part to avoid "a total denial of judicial review of generic constitutional and statutory claims" that would otherwise result. 498 U.S. at 497. That is not an animating concern here. Demir can still challenge the DHS TRIP program, but in a court of appeals. Cf. *Blitz*, 700 F.3d at 742 (distinguishing *McNary* along similar lines and rejecting the position that channeling a challenge to a TSA standard operating procedure through § 46110 violates due process).

Finally, we recognize the procedural oddity our decision creates: Demir's challenge to his inclusion on federal watchlists will proceed in the district court while his challenge to the DHS TRIP program will have to begin in a court of appeals. But "[i]t is not unprecedented for a jurisdictional scheme to require 'plaintiffs to file two actions in different courts to obtain complete relief in connection with one set of facts.'" *Khalid*, 172 F.4th at 887 (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 323 (2011) (Sotomayor, J., concurring in the judgment)) (holding that challenges to inclusion on the No Fly List and Terrorist Watchlist must proceed separately in a court of appeals and district court,

respectively); see also *Mokdad*, 804 F.3d at 814–15 (concluding that a challenge to a Threat Screening Center order placing plaintiff on the No Fly List is not inescapably intertwined with "TSA's orders governing the redress process" and remanding the challenge to the district court).

What remains to be seen is whether Demir's challenge to the DHS TRIP program is capable of review on the present administrative record—a point hard to know the answer to because no record has been filed with the district court. Whether the record will prove adequate or need further development in our court is a matter we will resolve if and when the case comes to us.

* * *

For these reasons, we REVERSE IN PART the judgment of the district court and REMAND for the district court to consider Demir's substantive challenges to his inclusion on the Terrorist Watchlist and Selectee List. We AFFIRM the district court's dismissal of Demir's procedural challenges to the DHS TRIP program.

SCUDDER, *Circuit Judge*, with whom *Chief Judge* BRENNAN and *Circuit Judge* JACKSON-AKIWUMI join, concurring. Today's decision resolves a question of federal subject matter jurisdiction by adhering to precedent without revisiting whether that precedent aligns with the statutory text it purports to interpret. We are far from alone in construing the term "order" within 49 U.S.C. § 46110 to include "regulations," as every circuit to have considered the issue has reached this conclusion, following the D.C. Circuit's lead from nearly 50 years ago in *Investment Company Institute v. Board of Governors of Federal Reserve System*, 551 F.2d 1270, 1276–78 (1977). So, if consistency is the measuring stick, today's decision gets an A+. But if squaring the interpretation of "order" with the term's plain meaning, canons of construction, and Congress's definition of the same word in the Administrative Procedure Act is the proper course, we hope that the law in this area undergoes a course correction, whether in the Supreme Court or across the circuits.

**I**

The Administrative Procedure Act supplies Halil Demir with a cause of action and courts with standards for reviewing agency action. See 5 U.S.C. §§ 702, 706; see also *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 675 (2025). But "[w]hile the APA says *how* to review agency actions, it says next-to-nothing about *where* that review should take place (*e.g.*, in particular district courts or courts of appeals)," *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 719 (D.C. Cir. 2016), other than that it should occur in a court of competent jurisdiction unless a statute provides another form of review, see § 703.

The default rule is that a challenge to agency action begins in federal district court pursuant to § 702 of the APA and 28 U.S.C. § 1331. See *Loan Syndications & Trading Ass'n*, 818 F.3d at 719; *Califano v. Sanders*, 430 U.S. 99, 105 (1977). That pathway applies unless a "special review statute" says otherwise. See 5 U.S.C. § 703. Most special review statutes channel review of agency action to courts of appeals in the first instance. See 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 8314 (2026 ed.). We call these "direct review" schemes. *Id.*

Direct review schemes vary in formulation. Some channel review of agency action broadly by applying to a "rule, regulation, or order." 15 U.S.C. § 766(c) (Federal Energy Administration). Others singularly address agency "rules" or "orders." 15 U.S.C. § 78y(a)(1), (b)(1) (Securities and Exchange Commission). And still others speak to certain kinds of agency action. See, *e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 117–18 (2018) (interpreting direct review provision channeling review of the EPA Administrator's "action[s]" in "promulgating" certain "standard[s]," "limitation[s]," and "issuing or denying" certain "permit[s]" under 33 U.S.C. § 1369(b)). Congress's varied formulations have spawned decades of debate about the proper scope of direct review statutes. See Joseph W. Mead & Nicholas A. Fromherz, *Choosing a Court to Review the Executive*, 67 Admin. L. Rev. 1, 10–22 (2015) (reviewing this history).

Two principles should guide our interpretation of a direct review statute. *First*, Congress controls a federal court's subject matter jurisdiction. See *Nat'l Ass'n of Mfrs.*, 583 U.S. at 132 ("[J]urisdiction is 'governed by the intent of Congress and not by any views we may have about sound policy.'" (quoting *Fla.*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 746 (1985))). So we should interpret the scope of a direct review scheme by applying traditional methods of statutory interpretation to discern and give effect to Congress's intent. See generally, *e.g.*, *id.*; *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188 (2021). *Second*, Supreme Court precedent tells us that, if the scope of agency action covered by a direct review provision is ambiguous, we should assume review in a court of appeals. See *Fla. Power*, 470 U.S. at 745; 33 Wright & Miller, *Federal Practice & Procedure* § 8314. But the *Florida Power* presumption does not displace an otherwise clear statement of jurisdiction. See 470 U.S. at 737, 745; *Nat'l Ass'n of Mfrs.*, 583 U.S. at 131–32.

**II**

Our 1980 decision in *Sima Products Corporation v. McLucas* does not align with these guideposts. The case presented a question of statutory interpretation, yet we devoted little attention to discerning the meaning of "order" in § 46110's predecessor, § 1486, and instead resolved the case primarily on functional reasoning. See 612 F.2d 309, 312–14 (7th Cir. 1980). Without asking whether or how an "order" differed from a "regulation" or "rule," we determined that an "order" included "any agency action capable of review on the basis of the administrative record." *Id.* at 313. Put another way, if district court factfinding seemed unnecessary, we saw the agency action as an "order" and therefore required initial review in the circuit court. See *id.* at 313.

We took our direction from the D.C. Circuit's decision in *Investment Co.*, which itself interpreted a different direct review scheme that similarly addressed agency "orders." See 551 F.2d at 1272. *Investment Co.* adopted a policy-based rationale to conclude that an "order" includes "any agency

action capable of review on the basis of the administrative record." *Id.* at 1278. In so reasoning, it rejected the view that the APA's definition of "order" should inform, if not control, the understanding of the same term in direct review statutes. See *id.*

Anyone reading *Sima Products* today would see that our approach through and through was pragmatic, focused on the "nature of the claim raised on appeal," 612 F.2d at 314, regardless of whether the challenged agency action fit within the ordinary and accepted meaning of the term "order." Other circuits have followed *Investment Co.*'s functional reasoning in droves. See, *e.g.*, *Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012); *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010); *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1313–14 (8th Cir. 1981). Indeed, to my knowledge, no circuit has addressed the question presented here—the meaning of the term "order" within a direct review jurisdictional provision—by applying principles of statutory interpretation in the first instance.

Despite the floodtide of support for *Investment Co.*, the dissonance between its atextual approach and the Supreme Court's current way of interpreting judicial review provisions cries out for reexamination. See, *e.g.*, *Mullin v. Doe*, 146 S. Ct. 2121, 2133–34 (2026) (employing statutory interpretation to construe the scope of "determination" in a jurisdiction-stripping provision in the INA); *Patel v. Garland*, 596 U.S. 328, 338–39 (2022) (same to interpret "judgment" in a jurisdiction-stripping provision in the INA); *Salinas*, 592 U.S. at 194–99 (same to interpret "any final decision" in judicial review provision in the Railroad Unemployment Insurance Act); *Nat'l Ass'n of Mfrs.*, 583 U.S. at 121–29 (same to interpret the scope of certain EPA actions included in a direct review provision).

A few other judges have recognized this same disconnect. See, *e.g.*, *Magassa v. Mayorkas*, 52 F.4th 1156, 1169–72 (9th Cir. 2022) (Nelson, J., concurring) (emphasizing the same point); *N.Y. Republican State Comm. v. S.E.C.*, 70 F. Supp. 3d 362, 371–75 (D.D.C. 2014) (Howell, J., observing the interpretive difficulties in *Investment Co.* but following circuit precedent), *aff'd*, 799 F.3d 1126 (D.C. Cir. 2015). Their point and the one animating this separate writing is straightforward: we should discern Congress's intent by interpreting and applying the words it used to define a jurisdictional provision and only channel initial review to a court of appeals if the direct review provision clearly directs that path or is otherwise ambiguous. See *Nat'l Ass'n of Mfrs.*, 583 U.S. at 131–32.

For what it is worth, I am also skeptical that the functional approach we charted in *Sima Products* always yields efficiencies. Channeling judicial review of agency action to a court of appeals places an unfamiliar burden on a court of review to "make difficult factual determinations about when the administrative record supports direct review." *Magassa*, 52 F.4th at 1171 (Nelson, J., concurring). And in the context of Demir's due process challenge to the DHS TRIP program, it is not clear what the administrative record contains beyond the cursory letters Demir received from DHS and perhaps the DHS TRIP notice-and-comment record. We cannot tell from the parties' briefing in our court or their submissions to the district court.

This information deficit may prove material. In undertaking a Fifth Amendment procedural due process analysis, courts commonly apply *Mathews* balancing. See, *e.g.*, *Kashem v. Barr*, 941 F.3d 358, 377–78 (9th Cir. 2019) (utilizing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). That in turn requires information about the DHS TRIP process, policies, and the

government's interest in maintaining elements of confidentiality. It is far from clear that the administrative record applicable to Demir's DHS TRIP inquiry can answer this question. That means additional fact development may need to occur in our court—a rare event. Perhaps the government can submit declarations and supporting documents elaborating on the DHS TRIP policy, the government's interest in maintaining the confidentiality of particular information, and what transpired in the processing of Demir's inquiries. See, *e.g.*, *Abdellatif v. U.S. Dep't of Homeland Sec.*, 109 F.4th 562, 569–70 (D.C. Cir. 2024) (describing declarations submitted by TSA in the court of appeals and used to aid its review of the petitioner's claim). Regardless, a district court is better positioned to develop evidence as needed, including by holding a hearing and asking the parties to supplement the record in particular ways. See *Burdue v. F.A.A.*, 774 F.3d 1076, 1085 (6th Cir. 2014) ("Constitutional claims dependent upon factual development should first be entertained by district courts.").

In the end, it seems more sensible, predictable for litigants, and faithful to the role of Congress, to anchor jurisdiction in the type of action Congress says is reviewable rather than the nature of the administrative record or a policy judgment.

**III**

Following that method here leads to the conclusion that § 46110 does not authorize direct review of rules or regulations in a circuit court. The relevant text states that § 46110 provides for review of "an order issued by" the TSA Administrator "in whole or in part under this part, part B, or subsection (l) or (r) of section 114." 49 U.S.C. § 46110(a).

"Statutory interpretation proceeds on the assumption that those who draft and enact a provision generally intend its terms to mean what they mean in ordinary usage" unless the statute clearly signals another meaning. *Mullin*, 146 S. Ct. at 2135. Congress did not define "order" for the purposes of § 46110. But common definitions in place at the time § 46110 entered the U.S. Code indicate that the term can have broad meaning. For instance, an "order" is "[a] mandate; precept; command or direction authoritatively given; rule or regulation." Black's Law Dictionary (6th ed. 1990). On that broad meaning, it is possible to consider the DHS TRIP program an "order"—an awkward interpretation, for sure, but a possible one.

But any ambiguity subsides the moment we look to how Congress used the term "order" within "the overall statutory scheme, not just in a single subsection." *Mullin*, 146 S. Ct. at 2136 (cleaned up). On that view, it is clear that Congress did not use the term "order" as a catchall phrase to cover any and all agency action, including administrative regulations.

Section 46110 resides in Title 49, which consistently distinguishes between "orders" on the one hand and "regulations" on the other. See, *e.g.*, § 40113 (providing the Secretary of Transportation may "conduct[] investigations, prescribe[] regulations, standards, and procedures, and issu[e] orders"); § 40114(a) (requiring records of "orders, decisions and regulations"); § 46105(a) (specifying when "a regulation prescribed or order issued" will take effect).

By way of another illustration, § 46105(b) provides that "an order" "shall include the findings of fact … and shall be served on the parties to the proceeding and the persons affected by the order." It does not mention regulations. And

those actions—factfinding and service to the parties—are more germane to an adjudication aimed at resolving disputed facts between adverse parties than a general regulation noticed in the Federal Register. See 1 Admin. L. & Prac. § 4:46 (2026 ed.) (explaining that publication of a final rule in the Federal Register satisfies the APA's notice and publication requirement).

The list and examples could go on but the takeaway is clear: orders in Title 49 are not regulations. That distinction applies to § 46110 absent evidence to the contrary. See *Smith v. Berryhill*, 587 U.S. 471, 479 (2019) (observing "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning" (cleaned up)).

An even broader point warrants emphasis. Recognize that § 46110 concerns challenges to agency action under the APA, just like the one Demir brought here. The APA separates and distinguishes between agency rulemaking, which produces rules and regulations, and administrative adjudication, which produces orders. See 5 U.S.C. § 551(5), (7) (APA provisions defining "rule making" as the "agency process for formulating, amending, or repealing a rule" and "adjudication" as the "agency process for the formulation of an order"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J., concurring) (observing that the distinction between "rules" and "orders" is the "dichotomy upon which the most significant portions of the APA are based").

Indeed, the APA, by its terms, defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or

practice requirements of an agency." *Id.* § 551(4). Congress then defines an order as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency *in a matter other than rule making* but including licensing." *Id.* § 551(6) (emphasis added).

The APA ought to be a touchstone for the meaning of "order" in administrative law. Accordingly, it should heavily inform our interpretation of a direct review provision like § 46110 that likewise differentiates between "orders" and "regulations" in an APA action like Demir's. It is even more sensible to harmonize "order" in § 46110 with the APA definition since both statutes address the same overarching content: the APA provides for review of agency action subject to special review statutes and § 46110 qualifies judicial review of certain agencies' actions. See *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315–16 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law." (cleaned up)); see also *Berryhill*, 587 U.S. at 474, 481 (using the APA definition of "final" to inform the meaning of a judicial review provision covering "any final decision … made after a [Social Security Administration] hearing").

Notice, too, that the APA's distinction between "orders" and "regulations" mirrors Title 49's treatment of them. In various places, Title 49 designates certain agency actions as "orders" reviewable under § 46110. See, *e.g.*, § 40110 (adjudication of bid protests); § 41108 (dismissals of certain applications); § 41307 (decisions on transfer certificates); § 44710(d)(3) (orders revoking airman certificates). While those examples are not exclusive, it is telling that they fit the APA definition of "order."

These distinctions apply here to show that the DHS TRIP program is not an "order" within the meaning of § 46110. It does not provide a final disposition on any particular DHS TRIP inquiry. Rather, as a redress program, it is best seen as a "statement of general … applicability and future effect designed to implement … law." 5 U.S.C. § 551(4). The program effectuates Congress's directive to DHS to create a redress process for people experiencing air travel delays to appeal to TSA and correct erroneous information that may have landed them on a terrorist watchlist. See 49 U.S.C. § 44903 (j)(2)(C)(iii)(I), (G)(i). DHS TRIP also underwent the notice-and-comment process and codification in the Code of Federal Regulations. See 49 C.F.R. § 1560.201–.207; 73 Fed. Reg. 64061, 64065–66 (Oct. 28, 2008). The program therefore fits comfortably into the rulemaking category and Demir's challenge to it should proceed in a district court.

* * *

For now, we follow *Sima Products*. But we would welcome the Supreme Court considering a course correction that would allow traditional principles of statutory interpretation to guide our understanding of direct review provisions, and, for that matter, all jurisdictional limitations that Congress prescribes for federal courts.